UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

JUN 06 2011

U.S.D.C. S.D. N.Y.
CASHIERS

|  |  |
|---|---|
| DONNA KASSMAN, individually and on behalf of a class of similarly-situated female employees, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KPMG LLP, | ) ) |
| Defendant. | ) ) ) ) |

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**Civ. No. 11-CV-3743 (RJH)**

Plaintiff Donna Kassman ("Plaintiff," "Named Plaintiff" or "Class Representative"), by her attorneys Sanford Wittels & Heisler, LLP, brings this action in her individual capacity and on behalf of a class of female exempt Client Service and Support Professionals, including but not limited to female Associates, Senior Associates, Managers, Senior Managers and Managing Directors (collectively "Professionals"), against KPMG LLP ("KPMG" or the "Company") to redress gender discrimination in employment. Plaintiff Kassman alleges upon knowledge as to herself and her own acts, and otherwise upon information and belief, as follows:

## I.  INTRODUCTION AND OVERVIEW OF CLASS-WIDE GENDER DISCRIMINATION AT KPMG

### A.  KPMG's Glass Ceiling: Discriminatory Denial of Promotions

1.      As one of the "Big Four" accounting firms, KPMG is part of an elite cadre of accountancy and professional services firms that help set industry standards. But rather than use its vast resources and status to stamp out gender discrimination, KPMG actively perpetuates it.

2.      Women are conspicuously absent from KPMG's leadership.  Among the 20 members of KPMG's global executive team, only one, or 5%, is female.[1]  Similarly, of the 24 members of the global board, only one, or 4%, is female.[2]

3.      Although KPMG's workforce is approximately 50% female, partnership is largely reserved for men.[3]  Less than one in five KPMG Partners is female.[4]  Managing Directors are also predominately male.  Even in lower-level management positions such as Manager and Senior Manager, women only do marginally better, representing approximately one in three managers. Nonetheless, across KPMG's management ranks, the number of female managers never approaches parity with their overall representation at the Company.

4.      KPMG's gender hierarchy is all the more jarring considering women have entered the accounting industry in record numbers for decades.  For the past twenty-five years, women have comprised more than half of all accounting graduates.[5]  In 2009, women made up 55% of newly hired accounting graduates and 61.8% of all accountants and auditors.[6]  But despite constituting half of the workforce at accounting firms for decades, women are only 23% of all partners industry-wide and 18% at KPMG.[7]

5.      At the Big Four – the crème de la crème of accounting firms – women fare even worse than the industry average.  Studies show that women are not "moving through the pipeline" as quickly at these larger, more elite firms compared to their smaller counterparts.[8]

---

[1] KPMG International, KPMG International Annual Review 2010: Cutting Through Complexity (2011), at 55.
[2] *Id.* at 56.
[3] Catalyst, Women in Accounting (2010), at 1, available at
http://www.catalyst.org/file/178/qt_women_in_accounting.pdf.
[4] *Id.*
[5] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research. A Decade of Changes in The Accounting Profession: Workforce Trends and Human Capital Practices (2006), at 5, available at
http://www.awscpa.org/pdfs_and_docs/ResearchPaperDecadeofChange.pdf.
[6] Catalyst, Women in Accounting, at 1.
[7] *Id.*
[8] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 5.

6. KPMG is one of the worst offenders. The Company promotes fewer women to Partner (18%) than the industry average (23%).[9] KPMG also promotes fewer women to Senior Manager (35%) positions than the industry average (44%).[10] KPMG's promotion rate falls below its competitors, even though KPMG has a similar number of female non-management employees (48%) as the industry (49%) to groom and mentor for leadership.

7. Rather than reward high-performing female employees with partnership, KPMG tracks a disproportionate number of these women into non-partnership roles as career managers at drastically lower compensation levels. Industry-wide, 60% of female Senior Managers and 36% of female Managers have followed lower paid non-partnership career tracks, compared to only 26% of male Senior Managers and 9% of male Managers.[11]

8. These figures make it clear that while male and female accountants may begin their careers on roughly equal footing, their paths sharply diverge as they ascend up the hierarchy, particularly at KPMG. Women in the accounting industry face a number of systemic barriers to promotion, including lack of visible role models and their exclusion from after-work activities and other informal networking opportunities, reflecting the gender bias of "old boys" networks within these firms.[12]

8. As one accounting professional noted, as women come within reach of making Partner, "[i]t becomes subtle who's mentored, who's invited out to the important dinners with the important clients [and] who's groomed to participate in AICPA and state society committees. All of these are indicative of who is going to be promoted to Partner a year or two or three or four

---

[9] Catalyst, Women in Accounting, at 1.
[10] Public Accounting Report, Public Accounting Report's 2008 Survey of Women in Public Accounting — Percentage of Women by Staff Category (Dec. 15, 2008).
[11] Catalyst, Women in Accounting, at 3.
[12] Catalyst, Women of Color in Accounting (2008), at 31, available at http://www.catalyst.org/file/138/woc_accounting_final_book.pdf.

into the future."[13]

9.      At KPMG, the discrimination is not always so subtle. High-performing female managers are viewed as interlopers by their male Partners, as threats by their male peers, and as individuals unworthy of respect by their male subordinates. As soon as these women come within reach of partnership, they are suddenly – without warning or provocation – chastised and removed from the promotion track before they can infiltrate KPMG's "good old boys" network. By contrast, male employees who "have an issue working with women" effortlessly ascend through the ranks at KPMG.

10.      Plaintiff Ms. Kassman was a casualty of this discriminatory system. After languishing in a Senior Manager position for a decade, during which she demonstrated stellar performance, Ms. Kassman was finally "put up" for a promotion to Managing Director. At this pivotal juncture, a troika of men – Scott Schapiro ("Principal Schapiro"), Principal in Charge of the National Employment Tax Practice and the person to whom Ms. Kassman reported; John Montgomery ("Manager Montgomery"), another Senior Manager in Ms. Kassman's practice; and Jon Stone ("Associate Stone"), an Associate who worked under Ms. Kassman and Manager Montgomery – conspired to derail her career advancement. Principal Schapiro abruptly removed Ms. Kassman from the promotion track based on unfounded, stereotypical complaints by the other two men about Ms. Kassman's "tone" and "direct" approach – a complaint never before lodged against her during her 17-year tenure at KPMG. Unilaterally adopting the position of the male troika, the Company instead put up Manager Montgomery for the position that had been slated for Ms. Kassman.

---

[13] Liz Gold, "Women in Accounting: How far to the top?," ACCOUNTING TODAY, available at http://www.accountingtoday.com/ato_issues/2007_18/25549-1.html (last visited May 19, 2011).

11.     KPMG's subjective promotion procedures and practices reflect the biases of the Company's mostly male management and, naturally, have a disparate impact on the Company's female employees.   The Company's promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women within and across levels Company-wide. Although KPMG has had knowledge of these stark gender disparities for decades, it has acted deliberately indifferent towards them.

12.     Like Ms. Kassman, countless women have progressed along KPMG's standard career track with rave reviews, only to find their career ambitions shattered by KPMG's glass ceiling.

**B.     *"You Don't Need the Money Because You Have a Nice Engagement Ring"*: Pay Discrimination at KPMG**

13.     Upon information and belief, KPMG's female Professionals are not only under-promoted, but underpaid as well.

14.     Recent reports on the accounting industry have found that female Associates, Senior Associates, Managers and Senior Managers are systematically paid less than their male colleagues, with white male Senior Managers out-earning their female counterparts by $53,000 on average.[14] This pay disparity is even greater at the Partner level.[15]

15.     Far from disproving this industry-wide trend, KPMG actively perpetuates it. Because KPMG employs a compensation system that lacks transparency, utilizes highly subjective criteria and commonly allows stereotypes to dictate pay decisions, its compensation practices have had a disparate impact on the Company's female employees.  Upon information and belief, KPMG took advantage of this system by paying female employees less than similarly

---

[14] Catalyst, Women of Color in Accounting, at 50 (discussing survey results from top 20 revenue-generating U.S. accounting firms).
[15] *Id.*

situated male employees.

16.     In one particularly egregious act of discrimination, KPMG slashed Ms. Kassman's base salary by $20,000 while she was on maternity leave because she was paid "too much." KPMG cited no business justification for slashing her salary – and indeed, could not, as Ms. Kassman was a top-notch performer. When Ms. Kassman complained about the salary cut and wanted to discuss ways for her to earn back the $20,000 that was taken from her, her male supervising Partner asserted that she did not need the money because she "ha[d] a nice engagement ring."

17.     Moreover, KPMG's compensation policies and practices regarding flexible workers have a disparate impact on the Company's female employees. Employees who avail themselves of KPMG's flexible work arrangements – the overwhelming majority of whom are working mothers and other women – are forced to accept reduced pay while still working full-time schedules and being held to virtually full-time standards.

### C.     The Scarlet "F": Pregnancy/Caregiver Discrimination at KPMG

18.     In addition to the systematic discrimination faced by female Professionals at KPMG, female employees with children also face discrimination based on their status as caregivers and/or pregnant women.

19.     KPMG promotes a corporate culture whereby female employees are made to feel they cannot have successful careers after they have children. Ms. Kassman hoped to be the one to prove them wrong. As a female manager with an impressive seventeen-year career at KPMG and two children under the age of seven, Ms. Kassman set out to demonstrate that one could be both a good mother and a successful manager at the Company. Indeed, KPMG and Ms. Kassman's supervisors publicly touted her as a role model for other working mothers.

20.    However, Ms. Kassman quickly discovered that KPMG's purported support for female employees and working mothers was just a sham. After she gave birth to her first child in 2003, Ms. Kassman's career advancement at KPMG -- which had previously progressed at a steady clip -- came to a screeching halt. KPMG abruptly cut her salary while she was on maternity leave and -- as if this did not send a clear enough message -- placed her on a Performance Improvement Plan ("PIP") upon her return to work.

21.    Although KPMG touts its flexible work schedule plan as proving it supports working mothers, the reality is that working mothers are often forced to take a so-called "reduced" schedule for less pay — but are still expected to shoulder the same responsibilities as their full-time counterparts. Like Ms. Kassman, many of KPMG's female employees feel pressured to move to a flexible plan after having children due to the Company's stereotype that working mothers with young children are less effective employees and less committed to their careers. These mothers do not accept reduced pay by choice, but to avoid heightened scrutiny and termination.

22.    KPMG has what amounts to a "don't ask, don't tell" policy regarding flexible schedules for working mothers with young children. Employees who avail themselves of the Company's flex time option – the overwhelming majority of whom are working mothers – rarely discuss it freely and are ultimately penalized for it. One of KPMG's male Partners even commented that women who are on flexible plans "work exactly their $x$ hours and not a minute over" and "you know they're not going to get anywhere [at KPMG]."

23.    Indeed, when Plaintiff – the first flex worker in her practice – moved to a reduced schedule upon her return from maternity leave, she was made to feel like she had a scarlet "F" on her chest for "flex time benefit taker." As it turns out, flex time as a result of motherhood is not

viewed as a badge of honor, but a source of shame (as if the woman cannot handle both motherhood and full-time employment) and a handicap at KPMG. "Having it all" remains a pipe dream.

24.     KPMG discriminates against its female employees by assuming they are less committed to their careers – a gender stereotype that the Company's male employees do not have to overcome.   Tellingly, of the few working mothers who have managed to break through KPMG's glass ceiling, most, upon information and belief, have stay-at-home spouses like Patricia Brown ("Principal Brown"), Principal in Charge of the East for the International Executive Services ("IES") practice – a luxury that the overwhelming majority of KPMG's female employees do not have.  Indeed, one study of the accounting industry revealed that 46% of male professionals employed by large national/international firms have stay-at-home spouses, compared to only 11% of female professionals.[16]   And, even if men work a flexible work schedule, they can do so free of gender stereotypes and are therefore less likely than their female counterparts to experience a negative career impact as a result.[17]

25.     Given this discriminatory culture, it is no wonder that female employees – especially working mothers – are a rarity in KPMG's upper ranks.   Upon information and belief, there were only a handful of female managers with small children in the Northeast State and Local Tax ("SALT") Practice during Ms. Kassman's tenure with the Company.

**D.**    *"He Might Have an Issue Working with Women"*: **KPMG's Hostile Work Environment and Retaliation**

27.     As a recent report noted, "With women… joining the accounting industry at an increasing rate, firms are faced with the job of creating more inclusive environments in a

---

[16] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 39.
[17] *Id.* at 34.

traditionally white, male-dominated, 'up-or-out' culture."[18]  KPMG has clearly failed to rise to this challenge.

28.    At KPMG, female employees routinely experience harassment and unequal treatment.  In particular, once they become poised to assume positions of greater authority, female employees frequently encounter gender hostility, including subjective, unfounded criticisms and other attempts to derail their career advancement.

29.    Ms. Kassman's experience in many ways typifies that of KPMG's female Professionals.  In late 2008, after more than fifteen years of hard work and impressive achievements at the Company, Ms. Kassman was finally told she was next in line for a promotion to Managing Director.  But rather than support Ms. Kassman, her male colleagues reacted with overt hostility.  One of Ms. Kassman's male subordinates, Associate Stone, suddenly complained that he "didn't like [her] tone."  He and Manager Montgomery, one of Ms. Kassman's peers, complained that Ms. Kassman was "unapproachable" and "too direct," a thinly veiled gender-based criticism -- particularly given these two men's "direct" personalities, which are embraced by senior leadership at KPMG.

30.    Even though Ms. Kassman's supervisor, Principal Schapiro, acknowledged that Associate Stone "might have an issue working with women," neither Associate Stone nor Manager Montgomery was disciplined for his discriminatory conduct.   Instead, the Company took these two male employees' unfounded and gender-biased complaints at face value, and repeatedly interrogated Ms. Kassman about her behavior, ultimately recommending that she consult a "coach" to resolve these trumped up issues.

---

[18] Catalyst, Women of Color in Accounting, at 1.

31.     Rather than address Ms. Kassman's complaints of discrimination, KPMG retaliated against her by removing her from the promotion track, instead "putting up" her harasser (Manager Montgomery) for the Managing Director position once slotted for her.

32.     As a result of KPMG's hostile work environment, Ms. Kassman – a strong, competent manager with a long and distinguished career at KPMG – was reduced to someone who could barely eat or sleep, and took the back elevators at work to avoid running into her tormentors.  She was ultimately forced to resign from her position because the work environment at KPMG had become unbearable.

33.     Upon information and belief, other female Professionals have experienced harassment and retaliation similar to what Ms. Kassman experienced at KPMG.  In particular, other female managers have suddenly found themselves targeted and elbowed out by the Company's "old boys" network once they come perilously close to infiltrating the upper ranks of management.

E.     *"This is Three Men Ganging Up on a Woman; We've Had it Before"*: KPMG's Deliberate Indifference to Complaints of Discrimination

34.     KPMG has long been on notice regarding its Company-wide gender discrimination, but has taken no steps to remedy it.

35.     Ms. Kassman repeatedly complained about the discrimination and harassment she was experiencing, going through all of the requisite channels, including her performance manager, Principal Schapiro; his boss, Principal Brown; the Office of Ethics and Compliance; the Office of General Counsel; and Human Resources.  Every step of the way, the Company reacted with its characteristic indifference and simply passed the buck.

36.     Even while acknowledging that the facts presented by Ms. Kassman were undisputed, KPMG sat on its hands and allowed the discrimination and harassment to continue unabated.   Throughout the complaint process, the Company seemed more concerned about offending Ms. Kassman's harassers than the harassment itself.   In fact, all of the "solutions" proposed by KPMG treated Ms. Kassman as the source of the problem.

37.     KPMG's mishandling of Ms. Kassman's repeated complaints highlights various system-wide flaws in the Company's complaint mechanisms, including inadequate reporting mechanisms; the lack of a defined channel to report complaints of discrimination and harassment; the lack of defined investigation procedures; inadequate training of HR and other professionals tasked with addressing complaints of discrimination and harassment; and the leadership's willingness to allow discrimination and an "old boys" culture to flourish at the Company.

38.     The blatant disregard and indifference displayed by KPMG towards Ms. Kassman's complaints is all the more shocking given the Company's awareness that these problems are systemic.   As Vicki Sweeney ("Principal Sweeney"), Principal in Charge of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman. *We've had it before.*"

* * *

39.     Plaintiff brings this lawsuit on her own behalf and on behalf of a class of similarly situated female employees Company-wide, including but not limited to Associates, Senior Associates, Managers, Senior Managers and Managing Directors, to remedy the gender discrimination she has witnessed and experienced during her seventeen years of exemplary service to KPMG. The lawsuit is designed to achieve systemic injunctive relief and to change

11

KPMG's discriminatory employment policies, practices and/or procedures based on gender, including discrimination in assignment, promotion and advancement; pay discrimination; and pregnancy/caregiver discrimination; as well as a hostile work environment; retaliation; and routine mishandling of complaints of discrimination and harassment.

## II.    JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"), and the Equal Pay Act, 29 U.S.C. §§ 206, *et seq,* and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-5(f) because Defendant KPMG is headquartered and conducts substantial business in this District, and because Plaintiff was an employee of KPMG's New York, New York office when the unlawful employment practices were committed.

42.    Plaintiff has standing to bring this suit as she has duly filed her administrative charge before the EEOC and received her Notice of Right to Sue on March 9, 2011.

## III.    THE PARTIES

43.    Plaintiff **DONNA KASSMAN** is a resident of New York.   Plaintiff was employed at KPMG as an Associate, a Senior Associate, a Manager, and then a Senior Manager from April 1993 until her constructive discharge from the Company in October 2010.

44.    Defendant **KPMG LLP** ("KPMG" or the "Company") is an audit, tax, and advisory services firm headquartered in New York, New York.  It is the U.S. member firm of

KPMG International, which is headquartered in the Netherlands.  In 2010, KPMG reported global revenues of $20.63 billion.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

45.    In April of 1993, Ms. Kassman began working at KPMG as an Associate.

46.    In the years that followed, she steadily progressed along the Company's standard career track.[19]  In 1995, Ms. Kassman became a Senior Associate, and two years later, in 1997, she advanced to the position of Manager.  In 1999, Ms. Kassman went on to become a Senior Manager – the position in which she would be stuck for eleven years, before ultimately being pushed out of the Company.

47.    Throughout her seventeen-year tenure, Ms. Kassman demonstrated stellar performance at KPMG.

48.    In Ms. Kassman's Fiscal Year 2006 Year End Performance Review ("Review"), Principal Schapiro, to whom she directly reported, wrote that she "contributed greatly to the overall success of the practice" and that "staff look to her for guidance."

49.    The following year, in Ms. Kassman's 2007 Review, he wrote that Plaintiff "had a very strong year."

50.    Principal Schapiro wrote in Ms. Kassman's 2008 Review that she "had a very successful FY 2008, and ha[d] shown excellent leadership abilities."

---

[19] For promotions from entry-level Associates to Senior Managers, KPMG uses a standard career progression track, which advances employees on a schedule of approximately every two years in the following order: Associate, Senior Associate, Manager, and Senior Manager.

51.     He wrote in Ms. Kassman's 2009 Review that she "did all the right things from a business perspective to be successful," that she "ha[d] been a leader in the office, and ha[d] been forward thinking."

52.     In Ms. Kassman's 2010 Review, Principal Schapiro wrote that she again had "a very strong year."

## B.     Disparate Pay

53.     Upon information and belief, KPMG paid Ms. Kassman less than similarly situated male employees, despite her exemplary performance.

54.     Ten years after joining KPMG, Ms. Kassman went on maternity leave in May 2003, just before the birth of her first child in June 2003.

55.     While Ms. Kassman was on maternity leave, KPMG abruptly cut her base salary by $20,000 because she was paid "too much."  Upon information and belief, KPMG viewed Ms. Kassman as an easy target because of her gender and her status as a working mother.

56.     KPMG cited no business justification for slashing her salary.  When Ms. Kassman asked her manager at the time, Gary Rosen ("Partner Rosen"), Partner in Charge of the Northeast SALT Practice, to reconsider the cut in her salary, he said that she should consider some of her past salary "a loan," implying that she had not earned it for exemplary performance.  He also indicated that Ms. Kassman did not need the money because she had a nice engagement ring.

57.     In addition, KPMG discriminates against flex time workers – the overwhelming majority of whom are women – by reducing their salaries without a commensurate reduction in responsibilities.

58.     Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

### C.    Denial of Promotions

59.    Despite Ms. Kassman's stellar qualifications and performance, KPMG denied her promotions in favor of lesser qualified male employees.

60.    Throughout Ms. Kassman's last decade as a Senior Manager at KPMG, she consistently expressed interest in a promotion to Managing Director and ultimately to Partner. After several strong performance years and numerous requests for advancement, Principal Schapiro finally told Ms. Kassman she was next in line for a promotion in the employment tax practice.  In December 2008, Principal Schapiro confirmed that Ms. Kassman would be put up for a promotion to Tax Managing Director effective for the Fiscal Year 2009/2010 beginning October 1, 2009.  The promotion decision was to be made during the summer of 2009. However, Ms. Kassman was not promoted that year, despite her strong performance.

61.    In early 2009, Ms. Kassman successfully completed the formal Leadership Evaluation & Assistance Program ("LEAP") for the KPMG SALT Practice in preparation for her promotion to Managing Director.  According to Ms. Kassman's 2009 Review, she "successfully presented and navigated the SALT LEAP program and received favorable reviews."  She presented to the National Partner in Charge of the SALT Practice, Tim Gillis, who told her that she had his vote.

62.    In mid-2009, Principal Schapiro again confirmed that Plaintiff was next in line for a promotion in her practice.  On at least one occasion in or around summer 2009, Ben Garfunkel ("Partner Garfunkel"), the National Partner in Charge of IES, echoed Principal Schapiro's comments by stating that he knew Ms. Kassman was "in queue" to make Managing Director. Ms. Kassman's status was specifically a point of discussion with Partner Garfunkel since she was leaving the SALT Practice (where she was presented for promotion) and entering the IES

practice, of which he was the leader. Ms. Kassman wanted confirmation that she would not lose her "next in line" status by switching practices.

63.     In Ms. Kassman's 2009 Review, Principal Schapiro wrote that "an effort was made to promote Donna to TMD effective fy '10...," but explained that it did not happen because of the economy. Principal Schapiro also told Ms. Kassman that no one would receive a promotion to Managing Director at that time due to the economy, but that she would remain first in line.

64.     Shortly after Ms. Kassman was "put-up" for promotion and proceeded through the formal channels set up by the SALT Practice (*i.e.*, the LEAP program) in 2009, Manager Montgomery and his direct subordinate, Associate Stone, lodged unfounded complaints about her. Although Plaintiff had never received a similar complaint in her seventeen years with KPMG, Associate Stone and Manager Montgomery claimed she was considered "unapproachable" and "too direct," a thinly-veiled gender-based criticism, particularly given the abundance of "direct" male personalities in the senior leadership of KPMG.

65.     As a result of Associate Stone's and Manager Montgomery's unfounded, stereotypical and subjective complaints, KPMG removed Ms. Kassman from the promotion track sometime in late 2009 or early 2010, when a candidate is typically put up for promotion.

66.     In December 2009, Ms. Kassman again discussed with Principal Schapiro whether she would be put up for the Managing Director position for the 2010/2011 fiscal year beginning October 1, 2010. Although Principal Schapiro had previously assured Ms. Kassman that she was next in line for the promotion, he claimed that he "[didn't] know anything about making Tax Managing Director in the IES practice," and instead referred Ms. Kassman to Principal Brown.

67.    At Principal Schapiro's suggestion, Ms. Kassman met with Principal Brown in January 2010 to discuss her career.  When Ms. Kassman brought up the Managing Director position, Principal Brown said that Ms. Kassman's name had never come up, that she was not on the list of candidates for that year, and that it was too late for her name to be submitted. Principal Brown later acknowledged that she had lied about the list of candidates being closed.

68.    In April 2010, Ms. Kassman learned from a colleague that Manager Montgomery was up for promotion to Managing Director for the 2010/2011 Fiscal Year -- the same position that had previously been slated for Ms. Kassman.  Principal Schapiro had apparently -- without informing Ms. Kassman -- removed her from the promotion track and replaced her with Manager Montgomery, even though he had a shorter tenure with the Company, fewer years as Senior Manager and less professional experience overall than Ms. Kassman.

69.    Ms. Kassman was a victim of Associate Stone's and Manager Montgomery's discriminatory campaign to derail a female employee's advancement to Managing Director – an effort that KPMG's partnership not only failed to stop, but actively carried out.

70.    Upon information and belief, KPMG has perpetrated and/or condoned similar discriminatory campaigns to derail the careers of other successful female Professionals who were poised to assume positions of greater authority and influence within the Company.  Moreover, KPMG's subjective promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.

### D.    Pregnancy/Caregiver Discrimination

71.    From 2003 until her constructive discharge in 2010, KPMG discriminated against Ms. Kassman based on her gender due to her caregiving responsibilities as a working mother.

Because of Ms. Kassman's status as a working mother, KPMG continuously subjected her to disparate treatment, and also made adverse decisions concerning her employment.

72.    From 1993 until 1999, before Ms. Kassman had her children, she was promoted on KPMG's progressive career track from Associate to Senior Manager.    However, after she had her first child in 2003, her advancement abruptly stopped.    She was not promoted after she became a Senior Manager and remained in this position for over ten years.

73.    Even though Ms. Kassman hit the glass ceiling shortly after having children, KPMG and Principal Schapiro touted Plaintiff as a role model for working mothers.  In practice, however, KPMG and Principal Schapiro in particular did not support Ms. Kassman's efforts to be a successful working mother.

74.    In addition to slashing Ms. Kassman's salary while she was on maternity leave, KPMG took a number of adverse employment actions against her.  For example, in March of 2004, shortly after Ms. Kassman's maternity leave ended, Principal Schapiro gave Plaintiff her first negative review at the Company for not meeting her goals.  Instead of taking her leave into account in measuring Ms. Kassman's goal attainment for the year, Principal Schapiro penalized her for it.

75.    As a further penalty for taking maternity leave, Principal Schapiro put Plaintiff on a 60-day PIP, increasing her goals, upon her return from maternity leave.  Shortly before being slapped with a PIP, Ms. Kassman told Principal Schapiro that she planned to move to a flexible work schedule.  Principal Schapiro placed Ms. Kassman's PIP in between papers on her desk (including the flexible plan paperwork that she was preparing to submit), seemingly in an attempt to avoid drawing attention to the PIP.

76.    Before placing Ms. Kassman on a PIP, Principal Schapiro had never indicated to

Ms. Kassman that her performance was unsatisfactory or that she was in jeopardy of being placed on a PIP. Shocked and dismayed by this unexpected development, Ms. Kassman spoke to Sharon Katz-Pearlman, another Partner at the Company, who confirmed that there was nothing in Ms. Kassman's performance record that would support the imposition of a PIP before she had her baby.

77.    Two years later, Principal Schapiro again penalized Plaintiff for taking maternity leave when she had her second child. He again held her to higher standards than her peers after returning from leave. He also wrote in her 2006 Review that her work was "somewhat abbreviated due to Donna's maternity leave."

78.    From 2004 until Plaintiff's constructive discharge in 2010, she worked a reduced schedule under KPMG's flexible schedule policy. Ms. Kassman felt pressured to move to a flexible plan because of KPMG's working conditions and gender stereotypes about working mothers with young children. Although the Company reduced Ms. Kassman's pay in proportion to her reduced schedule, it held her to the same or higher performance standards than full-time employees. If she did not meet full-time standards on her reduced schedule, Plaintiff was penalized and considered less committed to her career. Her flexible schedule essentially acted as a "penalty" on her employment opportunities at KPMG.

79.    While Ms. Kassman was working on a reduced schedule, KPMG essentially expected her to do the job of a full-time senior manager in fewer hours for less pay. For example, her job requirements related to marketing, teaching, speaking, coaching, administrative, and client development were the same job requirements of full-time Senior Managers. When KPMG evaluated Plaintiff's work performance, the Company measured her against the requirements of a full-time employee. Indeed, both of Plaintiff's direct supervisors – Principal

Schapiro and Partner Rosen – acknowledged this by writing in her LEAP Nomination Form, "Although she works a reduced hourly schedule, she has the same responsibilities as every other Senior Manager in the Practice."

80.     Upon information and belief, other female Professionals who took maternity leave and had caregiving responsibilities faced similar systemic barriers to equal employment opportunities at KPMG.  In particular, Ms. Kassman's department, the SALT practice, had a poor track record of retaining working mothers.  KPMG fired several working mothers within the SALT practice, including one who was pregnant, and forced others out of the Company under circumstances similar to Plaintiff.

81.     KPMG's overwhelmingly female flexible workers are denied not only the pay they deserve, but also various other Company benefits.  For example, in early 2010, the Company's Stamford office adopted a policy requiring employees to be in the office a minimum of three days per week in order to qualify for office space.  This policy had a disparate impact on female employees such as Ms. Kassman, who had three "in-office" days (per her flex time agreement), one of which was typically spent out of the office generating business.

82.     In addition, because most of KPMG's relationship-building activities occur after hours, employees with primary caregiving responsibilities – the majority of whom are women – are at a disadvantage in their career development.  For example, when Ms. Kassman expressed concern to Partner Rosen about her $20,000 salary cut, he suggested that she socialize at KPMG's weekly happy hours as a way to ingratiate herself with the Company's leadership and advance her career.  Ms. Kassman explained that, because she had young children, she could not attend happy hours, but was more than willing to meet with people over lunch, breakfast or coffee.

83.     The few women who have advanced to the partnership ranks at KPMG have done so by sacrificing their personal lives and abandoning any semblance of work-life balance.  For example, KPMG frequently touted a Partner in the Atlanta office, Tammy Hunter, as a role model for other working mothers because she called the Company to discuss work matters on her way to the delivery room to give birth to her child.  The Company apparently viewed this as a level of dedication to which other working mothers should aspire.

84.     Aside from these rare exceptions, working mothers have been unable to make significant inroads at KPMG – and are unlikely to do so given the Company's discriminatory culture.   In May 2010, Plaintiff was at dinner during an American Payroll Association conference with several colleagues, including the Partner in charge of the West IES practice, Ray Pascuzzi ("Partner Pascuzzi").   At this dinner, Partner Pascuzzi proclaimed that "part time women work exactly their $x$ hours and not a minute over," that "you know you can't make them work any more, and that "you know they're not going to get anywhere."

### E.     Hostile Work Environment

85.     From late 2009 until her constructive discharge in October 2010, Plaintiff suffered harassment and unequal treatment at KPMG.  Beginning in October 2009, Associate Stone began complaining that he "didn't like [Plaintiff's] tone."   Manager Montgomery agreed with these complaints.  Together, these two men complained that Ms. Kassman was "unapproachable" and "too direct," a gender-based criticism, particularly given Associate Stone's and Manager Montgomery's "direct" personalities, which are embraced by senior leadership at KPMG. Nonetheless, KPMG did not correct Associate Stone's or Manager Montgomery's discriminatory behavior.

86.    In addition to complaining about Ms. Kassman's "tone," Associate Stone also complained about her flexible work schedule.  Consistent with the work-life balance priorities marketed at KPMG, the Company had approved Plaintiff's schedule after the birth of her first child.    However, Associate Stone disapproved of Plaintiff's flexible work schedule and complained – again, without basis – that it forced him to "work harder" from Monday until Thursday.

87.    KPMG did nothing to correct Associate Stone's discriminatory actions, even though Principal Schapiro told Plaintiff in March 2010 that Associate Stone "might have an issue working with women."    Moreover, when Ms. Kassman complained about Associate Stone's conduct, Principal Schapiro replied that he did not know if Associate Stone was "unprofessional, stupid or vicious."

88.    Instead of disciplining Associate Stone, KPMG constantly reprimanded Plaintiff as a result of Associate Stone's and Manager Montgomery's gender-based criticisms.    For example, KPMG forced Ms. Kassman to participate in an excessive number of stressful meetings and intense interrogations from late 2009 until mid-2010.  During the meetings, Ms. Kassman was questioned about her "tone" and other stereotypical complaints like her "direct" approach. This harassment and unequal treatment was extremely disruptive to Plaintiff both personally and professionally.

89.    After months of meetings, the Company encouraged Plaintiff to consult with a "coach" to resolve issues concerning Associate Stone's and Manager Montgomery's discriminatory complaints and harassment.  By issuing such a reprimand to Ms. Kassman, KPMG chose to believe these two men's unfounded complaints over her longstanding "very strong" performance and collaborative work style.  At the time, Associate Stone – who was

widely regarded as an "asshole" – had only been at the Company for approximately sixteen months, whereas Plaintiff had been there for sixteen years.

90.    Instead of disciplining Mr. Stone for his discriminatory conduct, KPMG recently promoted Mr. Stone to a Senior Associate position.

91.    Instead of resolving Plaintiff's complaints of discrimination, KPMG removed her from the promotion track as a result of the gender-biased criticisms leveled against her.

92.    When the work environment in KPMG's New York office became unbearable, Ms. Kassman asked to be transferred to the Stamford office.  She successfully worked out of the Stamford office in late 2009 and early 2010, until it adopted a policy requiring employees to be in the office a minimum of three days per week in order to qualify for office space.   Per Ms. Kassman's flex time agreement, she spent three days "in-office" and two working from home. However, at least one of Ms. Kassman's "in-office" days was typically spent out of the office with clients.  Accordingly, the Company forced her to vacate her Stamford office in April 2010. In lieu of an office, Ms. Kassman was provided with four drawers.

93.    Ken Seal, the Partner in charge of the Stamford office, refused to allow Ms. Kassman to retain her office space, even though the alternative was for Ms. Kassman to return to a hostile work environment in New York.

### F.    Mishandling of Complaints and Retaliation

94.    After Plaintiff complained about the harassment and unequal treatment by Associate Stone, Manager Montgomery, and Principal Schapiro, KPMG retaliated against her.

95.    Plaintiff complained to both the Office of Ethics and Compliance and the Office of General Counsel in April 2009 about the ongoing discriminatory treatment towards her.

96.   Principal Sweeney, the Principal in Charge of the Office of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman.   We've had it before."

97.   However, instead of addressing the discrimination, the Office of Ethics and Compliance suggested that Plaintiff try to relocate to another position within KPMG or leave the Company with a "package."   On one occasion, Principal Sweeney suggested that Ms. Kassman go out on leave for emotional distress, noting that many female employees had done so in the past under similar circumstances.

98.   The Office of General Counsel was equally ineffective in addressing Plaintiff's complaints of discrimination.   After investigating the matter (through David Burns of Firmwide Security) – and finding the facts undisputed – it simply referred Ms. Kassman to Human Resources because it was unable to come up with an acceptable solution.

99.   Shortly thereafter, Ms. Kassman spoke with Keri Fleming, Human Resources Associate Director, East Region Tax, about the ongoing discrimination and harassment she was experiencing.   Together, they decided that Human Resources would be Plaintiff's mouthpiece to Principal Schapiro because Plaintiff would physically shake every time he called her.

100.   To minimize contact with her harassers, Ms. Kassman decided that she would try to transfer to another position within KPMG, even if it meant taking a pay cut, assuming an administrative position or having to transfer offices.   Human Resources assured Ms. Kassman that it would help with this transition, but failed to follow through on its promise.

101.   Moreover, even though Plaintiff told Human Resources that she did not want to discuss the matter any further with Principals Schapiro and Brown, she continued to receive calls from them.   From the tenor of those conversations, it was clear to Ms. Kassman that

Principals Schapiro and Brown thought she simply needed time to cool off and would eventually resume working with Manager Montgomery and Associate Stone.

102.    After Principal Schapiro was informed of Ms. Kassman's complaints, she faced a number of adverse employment actions. KPMG reprimanded her with a "coach," forced her to sit through numerous meetings and interrogations in response to Manager Montgomery's and Associate Stone's gender-based criticisms of her, and ultimately removed her from the promotion track.

103.    By contrast, KPMG did not discipline Associate Stone, Manager Montgomery, or Principal Schapiro in any way. In fact, the Company promoted Associate Stone and, adding insult to injury, "put up" Manager Montgomery for the Managing Director position once slotted for Plaintiff.

### G.    Constructive Discharge

104.    As a result of KPMG's campaign of discrimination and harassment, Plaintiff's work environment became unbearable. She could barely eat or sleep, and feared walking into the office. To avoid running into her tormentors, Plaintiff made a habit of taking the back elevators at work.

105.    Because Ms. Kassman's previous experience had taught her that KPMG would not properly address its employees' unlawful conduct, she felt that she had no recourse against the pervasive harassment and discrimination.

106.    On October 1, 2010, Plaintiff resigned from KPMG, stating in her letter of resignation, "By ignoring my requests to put an end to the discriminatory treatment, KPMG has forced me to either continue to endure an intolerable work environment or end my employment. I therefore have no choice but to leave the Firm."

## V.    CLASS ACTION ALLEGATIONS

107.    Class Representative Donna Kassman and the class of female employees she seeks to represent have been subjected to a pattern and practice of gender discrimination, and employment policies and practices which have had a continuing, unlawful disparate impact on them and their employment opportunities.  Such gender discrimination includes (a) paying female Professionals less than their male counterparts; (b) denying female Professionals promotion and advancement opportunities in favor of male employees; (c) retaliating against female Professionals for complaining about gender discrimination; and (d) subjecting female Professionals to other disparate terms and conditions of employment, including pregnancy/caregiver discrimination and a hostile work environment, with no viable avenue for recourse.

108.    KPMG, in effect, bars female employees from better and higher-paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, KPMG's assignment, development, promotion, advancement, and performance evaluation policies, practices and procedures.

109.    KPMG's assignment, development, promotion, advancement, and performance evaluation policies, practices and procedures incorporate the following gender-based discriminatory practices: (a) relying upon subjective judgments, procedures, and criteria which permit and encourage the incorporation of gender stereotypes and biases by KPMG's predominately male executive, managerial and supervisory staff in making promotion, performance evaluation, and compensation decisions; (b) refusing or failing to provide equal

training opportunities to females; (c) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional biases or stereotypes; and (d) ignoring, disregarding, minimizing, covering up, mishandling, or otherwise failing to properly respond to evidence of discrimination in the workplace, even when directly brought to the attention of senior management, Human Resources, or other supposed reporting channels.

110.    In addition, KPMG cultivates a hostile environment in which the Company regularly retaliates against women who have brought gender discrimination complaints to their attention.

111.    Further, KPMG demonstrates a reckless disregard – a deliberate indifference – to its female employees by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

112.    KPMG's compensation, promotion and flexible schedule policies, practices, and procedures have had a disparate impact on the Class Representative and the members of the class.  Such procedures are not valid, job-related, or justified by business necessity.

113.    Defendant's assignment, development, compensation, promotion, training, performance evaluation, termination and transfer policies, practices and procedures have a disparate impact on the Class Representative and the class she seeks to represent.  Such practices form a part of the Defendant's overall pattern-or-practice of keeping women in the lower classifications which have less desirable terms and conditions of employment.

114.    Because of Defendant's pattern-or-practice of gender discrimination, the Class Representative and class she seeks to represent have been adversely affected and have

experienced harm, including the loss of compensation, promotion and other advancement opportunities, employment benefits and non-economic damages.

115.   KPMG has failed to impose adequate discipline on managers and employees who violate equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such laws regarding the employment policies, practices, and procedures described above.

116.   The Class Representative and the class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representative and the class are now suffering, and will continue to suffer, irreparable injury from KPMG's ongoing, unlawful policies, practices, and procedures as set forth herein unless those policies, practices, and procedures are enjoined by this Court.

A.   **General Facts Relevant to Class Claims and Class Definition**

117.   Class Representative Kassman seeks to maintain claims on her own behalf and on behalf of a class of current and former female exempt Client Service and Support Professionals at KPMG.

118.   The class consists of all female exempt Client Service and Support Professionals, including but not limited to Associates, Senior Associates, Managers, Senior Managers and Managing Directors (collectively "Professionals"), who are, or have been, employed by KPMG nationwide during the applicable liability period until the date of judgment.  Upon information and belief, there are thousands of such employees in the proposed class.

119.   The Class Representative seeks to represent all of the female employees described above.  The systemic and disparate impact gender discrimination described in this Complaint has been, and is, continuing in nature.

### B.    Efficiency of Class Prosecution of Common Claims

120.    Certification of a class of female Professionals is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representative and the proposed class.    The individual claims of the Class Representative require resolution of the common question of whether KPMG has engaged in a systemic pattern and/or practice of gender discrimination against female Professionals.    Class Representative Kassman seeks remedies to eliminate the adverse effects of such discrimination in her own life, career and working conditions, and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future. Plaintiff has standing to seek such relief because of the adverse effect that such discrimination has had on her individually and on female employees generally.    In order to gain such relief for herself, as well as for the class members, Plaintiff will first establish the existence of systemic gender discrimination as the premise for the relief she seeks.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.    Certification of the proposed class of females is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the proposed class, and Defendant KPMG.

### C.    Numerosity and Impracticability of Joinder

121.    The class which the Class Representative seeks to represent is too numerous to make joinder practicable.    Upon information and belief, the proposed class consists of thousands of current and former female Professionals during the liability period.    KPMG's pattern and/or practice of gender discrimination also makes joinder impracticable by discouraging females from

applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of KPMG's class-wide liability.

### D.    Common Questions of Law and Fact

122.    The prosecution of the claims of the Class Representative will require the adjudication of numerous questions of law and fact common to both her individual claims and those of the putative class she seeks to represent. The common questions of law include, *inter alia:* whether KPMG has engaged in unlawful, systemic gender discrimination in its compensation, assignment, selection, promotion, advancement, transfer, training and discipline policies, practices, and procedures, and in the general terms and conditions of work and employment; whether KPMG is liable for a continuing systemic violation of Title VII, and/or other statutes; and a determination of the proper standards for proving a pattern or practice of discrimination by KPMG against its female Professionals. The common questions of fact include, *inter alia:* whether KPMG has, through its policies, practices, and procedures: (a) compensated female Professionals less than similarly-situated males through the use of salary, bonuses, and/or other perks; (b) precluded or delayed the selection, assignment and promotion of female Professionals into higher level jobs traditionally held by male employees; (c) minimized, ignored, or covered up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management, the human resources department, or other reporting channels; (d) retaliated against those who have complained of gender-based discrimination; and (e) otherwise subjected female Professionals to disparate treatment with

respect to terms and conditions of employment, including pregnancy/caregiver discrimination and a hostile work environment.

123.    The employment policies, practices, and procedures to which the Class Representative and the class members are subjected are set at KPMG's corporate level and apply universally to all class members.  These employment policies, practices and procedures are not unique or limited to any department; rather, they apply to all departments and, thus, affect the Class Representative and class members in the same ways no matter the facility, department, or position in which they work.

124.    Throughout the liability period, a disproportionately large percentage of the managers and officers at KPMG have been male.

125.    Discrimination in selection, assignment, promotion and advancement occurs as a pattern and practice throughout KPMG.  Selection, assignment, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male managers and subordinates rather than by merit or equality of opportunity.  As a result, male employees have advanced and continue to advance more rapidly to better and higher-paying jobs than do female employees.  KPMG's policies, practices, and procedures have had an adverse impact on female Professionals seeking selection for, or advancement to, better and higher-paying positions.  In general, the higher the level of the job classification, the lower the percentage of female employees holding it.

E.      **Typicality of Claims and Relief Sought**

126.    The claims of Class Representative Kassman are typical of the claims of the class. The relief sought by the Class Representative for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the class.

127.    Like the members of the class, Class Representative Kassman is a Professional who worked at KPMG during the liability period.

128.    Discrimination in selection, promotion, advancement, and training affects the compensation of the Class Representative and all the employee class members in the same or similar ways.

129.    KPMG has failed to create adequate incentives for its management to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and has failed to discipline adequately its managers and other employees when they violate the Company policy or discrimination laws.    These failures have affected the Class Representative and the class members in the same or similar ways.

130.    The relief necessary to remedy the claims of the Class Representative is exactly the same as that necessary to remedy the claims of the class members in this case.    Class Representative Kassman seeks the following relief for her individual claims and for those of the members of the proposed class: (a) a declaratory judgment that KPMG has engaged in systemic gender discrimination against female Professionals by (1) paying female Professionals less than their male counterparts, and (2) denying female Professionals promotions into better and higher-paying positions, (3) discriminating against pregnant women and women with child-rearing responsibilities, and (4) otherwise failing to investigate or respond to evidence of discrimination or harassment in the workplace; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of KPMG's assignment, promotion, transfer, training, performance evaluation, compensation, and discipline policies, practices, and procedures – so that female Professionals will be able to compete fairly in

the future for promotions, transfers, and assignments to better and higher-paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) back pay, front pay, and other equitable remedies necessary to make the female Professionals whole from the Defendant's past discrimination; (f) punitive and nominal damages to prevent and deter KPMG from engaging in similar discriminatory practices in the future; (g) compensatory damages; (h) pre- and post-judgment interest; and (i) attorneys' fees, costs and expenses.

### F.    Adequacy of Representation

131.    The Class Representative's interests are co-extensive with those of the members of the proposed class which she seeks to represent in this case. Class Representative Kassman seeks to remedy KPMG's discriminatory employment policies, practices, and procedures so that female Professionals will no longer be prevented from advancing into higher-paying and/or more desirable higher-level positions. Plaintiff is willing and able to represent the proposed class fairly and vigorously as she pursues her individual claims in this action.

132.    Class Representative Kassman has retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of Plaintiff's counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.    Requirements Of Rule 23(b)(2)

133.    KPMG has acted on grounds generally applicable to the Class Representative and the class by adopting and following systemic policies, practices, and procedures which are discriminatory. Gender discrimination is KPMG's standard operating procedure rather than a

sporadic occurrence. KPMG has refused to act on grounds generally applicable to the class by, *inter alia*: (a) failing to pay female Professionals on par with similarly-situated male employees; (b) refusing to adopt and apply selection, assignment, promotion, training, performance evaluation, compensation, and discipline policies, practices, and procedures which do not have a disparate impact on, or otherwise systemically discriminate against, female Professionals; and (c) refusing to provide equal terms and conditions of employment for female Professionals. KPMG's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

134.    Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of KPMG's individual and class-wide liability and the essential predicate for the Class Representative's and the class members' entitlement to monetary and non-monetary remedies at Stage II of such trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female Professionals at KPMG. Such relief is the factual and legal predicate for the Class Representative's and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by such systematic discrimination.

### H.    Requirements of Rule 23(b)(3)

135.    The common issues of fact and law affecting the claims of Class Representative Kassman and proposed class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims. These issues include whether KPMG has engaged in gender discrimination against female

Professionals by denying them equal pay, promotion, and advancement opportunities and whether KPMG has tolerated a culture of gender discrimination directed against such employees.

136.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representative and members of the proposed class.

137.   The cost of proving KPMG's pattern and practice of discrimination makes it impracticable for the Class Representative and members of the proposed class to prosecute their claims individually.

## VI.   COLLECTIVE ACTION ALLEGATIONS (EQUAL PAY ACT)

138.   Plaintiff Kassman incorporates by reference the allegations from the previous paragraphs of this Complaint alleging class-based discrimination against similarly-situated female employees.

139.   Plaintiff brings collective violations of the Equal Pay Act ("EPA") as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) on behalf of all members of the gender class – e.g. current, former, and future female Managers, during the liability period.  The EPA action includes female Professionals who (a) were not compensated equally to males who had substantially similar job classifications, functions, families, titles and/or duties, (b) were not compensated equally to males who performed substantially similar work, and (c) who were denied promotion and advancement opportunities that would result in greater compensation in favor of lesser qualified male employees.

140.   Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following: (a) whether Defendant unlawfully failed and continues to fail to compensate female Professionals at a level commensurate with similarly

situated male employees; (b) whether Defendant unlawfully failed and continues to fail to promote and advance female Professionals in a fashion commensurate with similarly qualified males; (c) whether Defendant's policy and practice of failing to compensate female Professionals on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and (d)  whether Defendant's failure to compensate female Professionals on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

141.    Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs because the claims of Plaintiff are similar to the claims of the EPA Collective Action Plaintiffs.

142.    Plaintiff Kassman and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, families, titles and/or duties; and (c) are subject to Defendant's common policy and practice of gender discrimination in (i) failing to compensate female Professionals on par with men who perform substantially equal work and/or hold equivalent levels and positions, and (ii) failing to provide female Professionals equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to males who perform substantially equal work.

## CLASS AND COLLECTIVE ACTION COUNTS

<u>COUNT I</u>
(INDIVIDUAL AND CLASS CLAIMS)

VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII") -
GENDER DISCRIMINATION
42 U.S.C. § 2000e, *et seq.*

143.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

144.    This Count is brought on behalf of Plaintiff and all members of the class.

145.    Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender.  Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

146.    Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of Title VII.

147.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff and all members of the class, entitling Plaintiff and all members of the class to punitive damages.

148.    By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiff and the members of the class, Plaintiff and the

members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

149.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

150.    Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiff and the members of the class with respect to the terms and conditions of their employment.

151.    By reason of Defendant's discrimination, Plaintiff and the members of the class are entitled to all remedies available for violations of Title VII, including an award of punitive damages.

152.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II
### (INDIVIDUAL AND COLLECTIVE ACTION CLAIMS)

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 – 29 U.S.C. §§ 206, *et seq.* DENIAL OF EQUAL PAY FOR EQUAL WORK

153.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein, including the allegations that any waivers signed by collective plaintiffs are ineffective.

154.    Defendant, an employer of Plaintiff and the EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act, has discriminated against Plaintiff and EPA Collective Action Plaintiffs in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq.,

as amended by the Equal Pay Act of 1963 ("EPA"), by subjecting them to unequal pay on the basis of sex.

155.    Defendant has discriminated against Plaintiff and EPA Collective Action Plaintiffs by treating them differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.  Defendant so discriminated by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the Equal Pay Act.

156.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act.  Moreover, Defendant knew of or showed reckless disregard for the fact that its conduct was in violation of the Equal Pay Act.

157.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing and intentional discrimination, Plaintiff and EPA Collective Action Plaintiffs have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

158.    Plaintiff and EPA Collective Action Plaintiffs are therefore entitled to all remedies available for violations of the EPA, including liquidated damages for all willful violations.

159.    Attorneys' fees should be awarded under 29 U.S.C. §§ 216, et seq.

## COUNT III
## (INDIVIDUAL AND CLASS CLAIMS)

### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a) --
### GENDER DISCRIMINATION

160.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

161.    This Count is brought on behalf of Plaintiff and all members of the class.

162.    Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting them to different treatment on the basis of their gender.

163.    Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York Executive law.

164.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

165.    By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York Executive Law.

## COUNT IV
### (INDIVIDUAL AND CLASS CLAIMS)

## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a) – GENDER DISCRIMINATION

166.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

167.    This Count is brought on behalf of Plaintiff and all members of the class.

168.    Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment on the basis of their gender.

169.    Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees and by subjecting them to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York City Administrative Code.

170.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

171.    By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## COUNT V
## (INDIVIDUAL AND CLASS CLAIMS)

### VIOLATION OF THE NEW YORK EQUAL PAY LAW–
### N.Y. LABOR LAW § 194
### DENIAL OF EQUAL PAY FOR EQUAL WORK

172.   Plaintiff Kassman re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

173.   This Count is brought on behalf of Plaintiff and all members of the class.

174.   Defendant, an employer of Plaintiff and all members of the class within the meaning of the New York Equal Pay Law, has discriminated against Plaintiff and all members of the class in violation of the New York Labor Law § 194, by subjecting them to unequal pay on the basis of sex.

175.   Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.   Defendant so discriminated by subjecting them to discriminatory pay, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the New York Equal Pay Law.

176.   Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying women less than men.

177. Plaintiff and all members of the class are therefore entitled to all remedies available for violations of N.Y. Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations.

## INDIVIDUAL COUNTS

### COUNT VI
### (INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)

### VIOLATION OF TITLE VII – RETALIATION
### 42 U.S.C. § 2000e-3

178. Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

179. In the final year of her employment with Defendant, Plaintiff repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

180. In retaliation for Plaintiff's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations. Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

181. Upon information and belief, other women at KPMG who opposed or complained about unlawful gender discrimination were similarly retaliated against.

182. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

183.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

184.   By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII, including an award of punitive damages.

185.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT VII**
**(INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)**

**VIOLATIONS OF THE EQUAL PAY ACT,**
**U.S.C. § 215(a)(3)-RETALIATION**

186.   Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

187.   In the final year of her employment with Defendant, Plaintiff repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

188.   In retaliation for Plaintiff's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations.   Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

189.   By reason of Defendant's conduct as alleged herein, Plaintiff is entitled to all remedies available under the EPA, including liquidated damages for all willful violations.

190.   Attorneys' fees should be awarded under 29 U.S.C. § 216, et seq.

**COUNT VIII**
**(INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296**
**RETALIATION**

191.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

192.    In the final year of her employment with Defendant, Plaintiff repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

193.    In retaliation for Plaintiff's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations. Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

194.    By reason of Defendant's conduct as alleged herein, Plaintiff is entitled to all remedies available under the New York Executive Law.

**COUNT IX**
**(INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)**

**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 7 –**
**RETALIATION**

195.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

45

196.    In the final year of her employment with Defendant, Plaintiff repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

197.    In retaliation for Plaintiff's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations. Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

198.    By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

### COUNT X
### (INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)

### VIOLATION OF THE NEW YORK EQUAL PAY LAW–
### N.Y. LABOR LAW § 215 – RETALIATION

199.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

200.    In retaliation for Plaintiff's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations. Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

201.    By reason of Defendant's conduct as alleged herein, Plaintiff Kassman is entitled to all remedies available under the New York Equal Pay Law.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, on her own behalf and on behalf of the class and collective action members, pray that this Court:

A.    Certify the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff class, and designate Ms. Kassman as the representatives of this class and their counsel of record as class counsel;

B.    Designate this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in as Plaintiffs;

C.    Designate Plaintiff Kassman as representatives of the EPA Collective Action;

D.    Declare and adjudge that Defendant's employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representative and

members of the class under Title VII of the Civil Rights Act of 1964, as amended, the New York Executive Law, the New York City Administrative Code, the New York Labor Law, and the Equal Pay Act;

E.    Issue a permanent injunction against the Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiff, class members, and collective action plaintiffs, and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F.    Issue a permanent injunction against Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, gender discrimination or retaliation by the Defendant as set forth herein;

G.    Order Defendant to initiate and implement programs that will: (i)  provide equal employment opportunities for female Professionals; (ii) remedy the effects of the Defendant's past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

H.    . Order Defendant to initiate and implement systems of assigning, training, transferring, compensating and promoting female Professionals in a non-discriminatory manner;

I.    Order Defendant to establish a task force on equality and fairness to determine the effectiveness of the programs described in G through H above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting

forth information relevant to the determination of the effectiveness of the programs described in G through H above;

     J.     Order Defendant to adjust the wage rates and benefits for Plaintiff, class members and collective action plaintiffs to the level that they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures;

     K.     Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Defendant has remedied the practices complained of herein and is determined to be in full compliance with the law;

     L.     Award nominal, compensatory and punitive damages to Plaintiff, class members and collective action plaintiffs, in excess of 400 million dollars;

     M.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiff, the class members, and the collective action plaintiffs;

     N.     Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiffs, class members and collective action plaintiffs to be determined at trial;

     O.     Order Defendant to make whole Plaintiff, class members and collective action plaintiffs by providing them with appropriate lost earnings and benefits, and other affirmative relief;

     P.     Award any other appropriate equitable relief to Plaintiff, class members and collective action plaintiffs; and

     Q.     Award any additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

Dated: June 6, 2011

Respectfully submitted,

Jeremy Heisler (JH-0145)
Steven L. Wittels (SLW-8110)
Siham Nurhussein (SN-9379)
Deepika Bains (DB-4935)
SANFORD WITTELS & HEISLER, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 723-2947
Facsimile: (646) 723-2948
swittels@swhlegal.com

Janette Wipper (CA Bar No. 275264)
SANFORD WITTELS & HEISLER, LLP
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 391-6900
Facsimile: (415) 391-6901
jwipper@swhlegal.com

*Counsel for Plaintiff Donna Kassman and the Class*