RECEIVED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DONNA KASSMAN, LINDA O'DONNELL, SPARKLE PATTERSON, JEANETTE POTTER AND ASHWINI VASUDEVA, individually and on behalf of a class of similarly-situated female employees, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KPMG LLP, | ) ) ) |
| Defendant. | ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Civ. No. 11-CV-3743 (RJH)

Plaintiffs Donna Kassman, Linda O'Donnell, Sparkle Patterson, Jeanette Potter and Ashwini Vasudeva ("Plaintiffs," "Named Plaintiffs" or "Class Representatives"), by their attorneys Sanford Wittels & Heisler, LLP, bring this action against KPMG LLP ("KPMG" or the "Company") in their individual capacities and on behalf of a class of female exempt Client Service and Support Professionals, including but not limited to female Associates, Senior Associates, Managers, Senior Managers and Managing Directors (collectively "Professionals"), to redress gender discrimination in employment.  Plaintiffs allege upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

I.     **INTRODUCTION AND OVERVIEW OF CLASS-WIDE GENDER DISCRIMINATION AT KPMG**

A.     **KPMG's Glass Ceiling: Discriminatory Denial of Promotions**

1.     As one of the "Big Four" accounting firms, KPMG is part of an elite cadre of accountancy and professional services firms that help set industry standards. But rather than use its vast resources and status to stamp out gender discrimination, KPMG actively perpetuates it.

2.     Women are conspicuously absent from KPMG's leadership. Among the 20 members of KPMG's global executive team, only one, or 5%, is female.[1] Similarly, of the 24 members of the global board, only one, or 4%, is female.[2]

3.     Although KPMG's workforce is approximately 50% female, partnership is largely reserved for men.[3] Less than one in five KPMG Partners is female.[4] Managing Directors are also predominately male. Even in lower-level management positions such as Manager and Senior Manager, women only do marginally better, representing approximately one in three managers. Nonetheless, across KPMG's management ranks, the number of female managers never approaches parity with their overall representation at the Company.

4.     KPMG's gender hierarchy is all the more jarring considering women have entered the accounting industry in record numbers for decades. For the past twenty-five years, women have comprised more than half of all accounting graduates.[5] In 2009, women made up 55% of newly hired accounting graduates and 61.8% of all accountants and auditors.[6] But despite constituting half of the workforce at accounting firms for decades, women are only 23% of all

---

[1] KPMG International, KPMG International Annual Review 2010: Cutting Through Complexity (2011), at 55.
[2] *Id.* at 56.
[3] Catalyst, Women in Accounting (2010), at 1, available at http://www.catalyst.org/file/178/qt_women_in_accounting.pdf.
[4] *Id.*
[5] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research. A Decade of Changes in The Accounting Profession: Workforce Trends and Human Capital Practices (2006), at 5, available at http://www.awscpa.org/pdfs_and_docs/ResearchPaperDecadeofChange.pdf.
[6] Catalyst, Women in Accounting, at 1.

partners industry-wide and 18% at KPMG.[7]

5.    At the Big Four – the crème de la crème of accounting firms – women fare even worse than the industry average.  Studies show that women are not "moving through the pipeline" as quickly at these larger, more elite firms compared to their smaller counterparts.[8]

6.    KPMG is one of the worst offenders.   The Company promotes fewer women to Partner (18%) than the industry average (23%).[9]   KPMG also promotes fewer women to Senior Manager (35%) positions than the industry average (44%).[10]  KPMG's promotion rate falls below its competitors, even though KPMG has a similar number of female non-management employees (48%) as the industry (49%) to groom and mentor for leadership.

7.    Rather than reward high-performing female employees with partnership, KPMG tracks a disproportionate number of these women into non-partnership roles as career managers at drastically lower compensation levels.   Industry-wide, 60% of female Senior Managers and 36% of female Managers have followed lower paid non-partnership career tracks, compared to only 26% of male Senior Managers and 9% of male Managers.[11]

8.    These figures make it clear that while male and female accountants may begin their careers on roughly equal footing, their paths sharply diverge as they ascend up the hierarchy, particularly at KPMG.  Women in the accounting industry face a number of systemic barriers to promotion, including lack of visible role models and their exclusion from after-work activities and other informal networking opportunities, reflecting the gender bias of "old boys" networks

---

[7] Id.
[8] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 5.
[9] Catalyst, Women in Accounting, at 1.
[10] Public Accounting Report, Public Accounting Report's 2008 Survey of Women in Public Accounting – Percentage of Women by Staff Category (Dec. 15, 2008).
[11] Catalyst, Women in Accounting, at 3.

within these firms.[12]

9.      As one accounting professional noted, as women come within reach of making

Partner, "[i]t becomes subtle who's mentored, who's invited out to the important dinners with the

important clients [and] who's groomed to participate in AICPA and state society committees.  All

of these are indicative of who is going to be promoted to Partner a year or two or three or four

into the future."[13]

10.      At KPMG, the discrimination is not always so subtle.  High-performing female

managers are viewed as interlopers by their male Partners, as threats by their male peers, and as

individuals unworthy of respect by their male subordinates.  As soon as these women come within

reach of partnership, they are suddenly – without warning or provocation – chastised and removed

from the promotion track before they can infiltrate KPMG's "good old boys" network.  By

contrast, male employees who "have an issue working with women" effortlessly ascend through

the ranks at KPMG.

11.      Plaintiff Donna Kassman was a casualty of this discriminatory system.  After

languishing in a Senior Manager position for a decade, during which she demonstrated stellar

performance, Ms. Kassman was finally "put up" for a promotion to Managing Director.  At this

pivotal juncture, a troika of men – Scott Schapiro ("Principal Schapiro"), Principal in Charge of

the National Employment Tax Practice and the person to whom Ms. Kassman reported; John

Montgomery ("Senior Manager Montgomery"), another Senior Manager in Ms. Kassman's

practice; and Jon Stone ("Associate Stone"), an Associate who worked under Ms. Kassman and

Senior Manager Montgomery – conspired to derail her career advancement.  Principal Schapiro

---

[12] Catalyst, Women of Color in Accounting (2008), at 31, available at
http://www.catalyst.org/file/138/woc_accounting_final_book.pdf.
[13] Liz Gold, "Women in Accounting: How far to the top?," ACCOUNTING TODAY, available at
http://www.accountingtoday.com/ato_issues/2007_18/25549-1.html (last visited May 19, 2011).

abruptly removed Ms. Kassman from the promotion track based on unfounded, stereotypical complaints by the other two men about Ms. Kassman's "tone" and "direct" approach – a complaint never before lodged against her during her 17-year tenure at KPMG.    Unilaterally adopting the position of the male troika, the Company instead put up Senior Manager Montgomery for the position that had been slated for Ms. Kassman.

12.    Like Ms. Kassman, Plaintiff Jeanette Potter earned exceptional reviews at KPMG, only to spend a decade stuck in a Senior Manager position.   Principal Bruce McLaughlin ("Principal McLaughlin") had only one criticism of Ms. Potter: she did not "schmooze" enough. In fact, Ms. Potter avoided the Company's happy hours – one of the main venues for "schmoozing" – because they were known to be hostile to women; among other things, male Partners did "body shots" off of female employees.  Because KPMG's promotion decisions rely substantially on personal relationships built at Company social events that are unwelcoming to women, high-achieving female employees like Ms. Potter are frequently passed over for promotion in favor of their less qualified, but more well-connected, male counterparts

13.    Until 2010, KPMG utilized a 9-box rating system, ranging from EP-1 (exceptional) to NI-9 (needs improvement), for all of its professional staff, across the Company's spectrum of job titles, practice areas, and offices.   Each employee was evaluated "The KPMG Way"– a set of criteria which purported to measure behaviors and values but failed to provide a consistent or reliable measure of performance.

14.    After the initial round of evaluations, the Partners in each group had discretion to change the ratings to ensure that the employees they had taken under their wing – most of whom were male – were ranked higher relative to their peers, and thus stood a greater chance of being promoted.

15.     Upon information and belief, female employees were disproportionately downgraded and undervalued within KPMG's discriminatory performance review system.  The Company's new 5-point evaluation system, introduced last year, suffers from the same defects.

16.     Upon information and belief, KPMG Partners also took advantage of the performance evaluation system's lack of transparency, quality standards and controls, and opportunities for redress by including unfounded criticism against many female employees.

17.     KPMG employees are promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly develop and promote excellent employees.

18.     KPMG was able to derail the advancement of high-performing female Professionals who were viewed as a threat, who were wrongly cast as less committed to their careers, or who the Company wanted to push out for other discriminatory reasons.

19.     KPMG's promotion procedures and practices reflect the biases of the Company's mostly male management and, naturally, have a disparate impact on the Company's female employees.  The Company's promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women within and across levels Company-wide. Although KPMG has had knowledge of these stark gender disparities for decades, it has been deliberately indifferent towards them.

20.     Countless women have progressed along KPMG's standard career track with rave reviews, only to find their career ambitions shattered by KPMG's glass ceiling.

B.     ***"You Don't Need the Money Because You Have a Nice Engagement Ring"*: Pay Discrimination at KPMG**

21.     Upon information and belief, KPMG's female Professionals are not only under-promoted, but underpaid as well.

6

22.    Recent reports on the accounting industry have found that female Associates, Senior Associates, Managers and Senior Managers are systematically paid less than their male colleagues, with white male Senior Managers out-earning their female counterparts by $53,000 on average.[14]  This pay disparity is even greater at the Partner level.[15]

23.    Far from disproving this industry-wide trend, KPMG actively perpetuates it. Because KPMG employs a compensation system that lacks transparency, lacks adequate quality standards and controls, and lacks opportunities for redress or challenge, its compensation practices have had a disparate impact on the Company's female employees.  Upon information and belief, KPMG took advantage of this system by paying female employees less than similarly situated male employees.

24.    This discrimination stems, in part, from an antiquated adherence to the idea that if there is a husband who acts as a "breadwinner" in the home, then there is no need for a woman to work at all or to be compensated at the same level as a male employee.

25.    For example, in an egregious act of discrimination, KPMG slashed Ms. Kassman's base salary by $20,000 while she was on maternity leave because she was paid "too much."  KPMG cited no business justification for slashing her salary – and indeed, could not, as Ms. Kassman was a top-notch performer.  When Ms. Kassman complained about the salary cut and wanted to discuss ways for her to earn back the $20,000 that was taken from her, her male supervising Partner asserted that she did not need the money because she "ha[d] a nice engagement ring."

26.    Similarly, when KPMG fired Plaintiff Linda O'Donnell on her first day back from maternity leave, Partner Truc To ("Partner To") reassured her that she "should be fine without a

---

[14] Catalyst, Women of Color in Accounting, at 50 (discussing survey results from top 20 revenue-generating U.S. accounting firms).
[15] *Id.*

job" because her husband "ma[de] a lot of money."

27.     Like Ms. Kassman and many other female Professionals, Ms. Potter was told she was "paid too much," even though her less experienced male counterparts earned more than her. Ms. Potter received no pay increases during her last four years of employment at KPMG, despite her consistently strong performance.

28.     Moreover, KPMG's compensation policies and practices regarding flexible workers have a disparate impact on the Company's female employees.  Employees who avail themselves of KPMG's flexible work arrangements – the overwhelming majority of whom are working mothers and other women – are forced to accept reduced pay while still working full-time schedules and being held to virtually full-time standards.

29.     At KPMG, salary increases and bonuses are based largely on a performance evaluation system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly compensate strong-performing employees.   Upon information and belief, KPMG's discriminatory performance evaluation system has resulted in the under-payment of female Professionals at all levels throughout the Company.

30.     In addition, the compensation system as a whole lacks the adequate quality standards and controls to consistently or reliably result in compensation decisions that correlate with an employee's overall quality.   The lack of transparency and sufficient opportunities or systems for redress coupled with insufficient standardization in implementation result in women being systematically undercompensated.

C.     The "Scarlet F": Pregnancy/Caregiver Discrimination at KPMG

31.     In addition to the systematic discrimination faced by female Professionals at KPMG, female employees with children also face discrimination based on their status as

8

caregivers and/or pregnant women.

32.     KPMG promotes a corporate culture whereby female employees are made to feel they cannot have successful careers after they have children.  Indeed, at least one Partner explicitly suggested that women should go on part-time schedules or move away from his practice group when they become mothers.  Another Partner has stated that he believes pregnant women are incapable of doing their jobs and that he did not see how a working mother could "tend to a child and work at KPMG at the same time."

33.     Ms. Kassman hoped to be the one to prove them wrong.  As a female manager with an impressive seventeen-year career at KPMG and two children under the age of seven, Ms. Kassman set out to demonstrate that one could be both a good mother and a successful manager at the Company.  Indeed, KPMG and Ms. Kassman's supervisors publicly touted her as a role model for other working mothers.

34.     However, Ms. Kassman quickly discovered that KPMG's purported support for female employees and working mothers was just a sham.  After she gave birth to her first child in 2003, Ms. Kassman's career advancement at KPMG – which had previously progressed at a steady clip – came to a screeching halt.   KPMG abruptly cut her salary while she was on maternity leave and – as if this did not send a clear enough message – placed her on a Performance Improvement Plan ("PIP") upon her return to work.

35.     Ms. Kassman's experience as a working mother at KPMG is far from unique. Plaintiff Ashwini Vasudeva, a Senior Associate in the Company's Mountain View, California office, faced swift and ongoing retaliation following her decision to go on maternity leave.  After she became a mother, Ms. Vasudeva, who had always earned stellar reviews, was abruptly removed from her largest, most lucrative engagement; was assigned to projects without any staff

to support her; and was passed over for promotion in favor of a less experienced male employee.

36.     Plaintiff Sparkle Patterson, an award-winning Associate in KPMG's Atlanta office, also fell victim to the Company's pregnancy/caregiver discrimination.  Although the standard promotion track at KPMG provides for the promotion of Associates to Senior Associates after two years, Ms. Patterson never received a promotion during her three-and-a-half year tenure with the Company, despite her exceptional performance.  When Ms. Patterson returned from maternity leave, her work load was decreased and her repeated requests for work were systematically denied, leaving her with virtually no billable work, even though she was available and willing to work long hours.

37.     Ms. O'Donnell, a Senior Associate in the Atlanta office, suffered a similar fate. Shortly after notifying her supervising Partner that she was pregnant and planned to take maternity leave, Ms. O'Donnell was denied a promotion to a Manager position for which she was abundantly qualified.   Just weeks before she announced her pregnancy, Ms. O'Donnell's Performance Manager and various others had reassured her that she was on track for promotion. Adding insult to injury, KPMG terminated Ms. O'Donnell on her very first day back from maternity leave.

38.     Although KPMG touts its flexible work schedule plan as proving it supports working mothers, the reality is that working mothers are often forced to take a so-called "reduced" schedule for less pay — but are still expected to shoulder the same responsibilities as their full-time counterparts.   These mothers accept reduced pay only to avoid unfair and discriminatory heightened scrutiny and wrongful termination.

39.     KPMG has what amounts to a "don't ask, don't tell" policy regarding flexible schedules for working mothers with young children.  Employees who avail themselves of the

Company's flex time option – the overwhelming majority of whom are working mothers – rarely discuss it freely and are ultimately penalized for it.   One of KPMG's male Partners even commented that women who are on flexible plans "work exactly their $x$ hours and not a minute over" and "you know they're not going to get anywhere [at KPMG]."

40.     Indeed, when Plaintiff Kassman – the first flex worker in her practice – moved to a reduced schedule upon her return from maternity leave, she was made to feel like she had a scarlet "F" on her chest for "flex time benefit taker."   As it turns out, flex time as a result of motherhood is not viewed as a badge of honor, but a source of shame and a handicap at KPMG. "Having it all" remains a pipe dream.

41.     KPMG discriminates against its female employees by assuming they are less committed to their careers – a gender stereotype that the Company's male employees do not have to overcome.   Tellingly, of the few working mothers who have managed to break through KPMG's glass ceiling, most, upon information and belief, have stay-at-home spouses like Patricia Brown ("Principal Brown"), Principal in Charge of the East for the International Executive Services ("IES") practice – a luxury that the overwhelming majority of KPMG's female employees do not have.   Indeed, one study of the accounting industry revealed that 46% of male professionals employed by large national/international firms have stay-at-home spouses, compared to only 11% of female professionals.[16]   And, even if men work a flexible work schedule, they can do so free of gender stereotypes and are therefore less likely than their female counterparts to experience a negative career impact as a result.[17]

42.     Given this discriminatory culture, it is no wonder that female employees – especially working mothers – are a rarity in KPMG's upper ranks.

---

[16] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 39.
[17] *Id.* at 34.

**D.** **_"He Might Have an Issue Working with Women"_: KPMG's Hostile Work Environment and Retaliation**

43.     As a recent report noted, "With women… joining the accounting industry at an increasing rate, firms are faced with the job of creating more inclusive environments in a traditionally white, male-dominated, 'up-or-out' culture."[18]  KPMG has clearly failed to rise to this challenge.

44.     At KPMG, female employees routinely experience harassment and unequal treatment.  In particular, once they become poised to assume positions of greater authority, female employees frequently encounter gender hostility, including hypocritical and unfounded criticisms and other attempts to derail their career advancement.

45.     Ms. Kassman's experience in many ways typifies that of KPMG's female Professionals.   In late 2008, after more than fifteen years of hard work and impressive achievements at the Company, Ms. Kassman was finally told she was next in line for a promotion to Managing Director.   But rather than support Ms. Kassman, her male colleagues reacted with overt hostility.  One of Ms. Kassman's male subordinates, Associate Stone, suddenly complained that he "didn't like [her] tone."  He and Senior Manager Montgomery, one of Ms. Kassman's peers, complained that Ms. Kassman was "unapproachable" and "too direct," a thinly veiled gender-based criticism – particularly given these two men's "direct" personalities, which are embraced by senior leadership at KPMG.

46.     Even though Ms. Kassman's supervisor, Principal Schapiro, acknowledged that Associate Stone "might have an issue working with women," neither Associate Stone nor Senior Manager Montgomery was disciplined for his discriminatory conduct.   Instead, the Company took these two male employees' unfounded and gender-biased complaints at face value, and

---

[18] Catalyst, Women of Color in Accounting, at 1.

12

repeatedly interrogated Ms. Kassman about her behavior, ultimately recommending that she consult a "coach" to resolve these trumped up issues.

47.     Rather than address Ms. Kassman's complaints of discrimination, KPMG retaliated against her by removing her from the promotion track, instead "putting up" her harasser (Senior Manager Montgomery) for the Managing Director position once slotted for her.

48.     As a result of KPMG's hostile work environment, Ms. Kassman – a strong, competent manager with a long and distinguished career at KPMG – was reduced to someone who could barely eat or sleep, and took the back elevators at work to avoid running into her tormentors.  She was ultimately forced to resign from her position because the work environment at KPMG had become unbearable.

49.     Upon information and belief, other female Professionals have experienced harassment and retaliation similar to what Ms. Kassman experienced at KPMG.  In particular, other female managers have suddenly found themselves targeted and elbowed out by the Company's "old boys" network once they come perilously close to infiltrating the upper ranks of management.  At least one Partner has explicitly acknowledged that it is "much harder being a woman" at KPMG.

E.     ***"This Is Three Men Ganging Up on a Woman; We've Had It Before"***: **KPMG's Deliberate Indifference to Complaints of Discrimination**

50.     KPMG has long been on notice regarding its Company-wide gender discrimination, but has taken no steps to remedy it.

51.     Ms. Kassman repeatedly complained about the discrimination and harassment she was experiencing, going through all of the requisite channels, including her performance manager, Principal Schapiro; his boss, Principal Brown; the Office of Ethics and Compliance; the

Office of General Counsel; and Human Resources.  Every step of the way, the Company reacted with indifference and simply passed the buck.

52.    Even while acknowledging that the facts presented by Ms. Kassman were undisputed, KPMG sat on its hands and allowed the discrimination and harassment to continue unabated.   Throughout the complaint process, the Company seemed more concerned about offending Ms. Kassman's harassers than the harassment itself.    In fact, all of the "solutions" proposed by KPMG treated Ms. Kassman as the source of the problem.

53.    Other female employees have also complained about KPMG's discrimination, only to have their complaints fall on deaf ears.   For example, Ms. Patterson repeatedly complained over the course of a year about the discrimination she was facing to HR and Ethics and Compliance.   However, KPMG failed to do anything to resolve the situation, forcing Ms. Patterson to leave the Company.

54.    In yet another situation, HR not only failed to investigate the complaints of discrimination but failed to intervene when male managers then retaliated against the woman complainant, ultimately forcing her from the Company.

55.    KPMG's mishandling of these repeated complaints highlights various system-wide flaws in the Company's complaint mechanisms, including inadequate reporting mechanisms; the lack of a defined channel to report complaints of discrimination and harassment; the lack of defined investigation procedures; inadequate training of HR and other professionals tasked with addressing complaints of discrimination and harassment; and the leadership's willingness to allow discrimination and an "old boys" culture to flourish at the Company.

56.    The blatant disregard and indifference displayed by KPMG towards complaints of discrimination is all the more shocking given the Company's awareness that these problems are

systemic.   As Vicki Sweeney ("Principal Sweeney"), Principal in Charge of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman. *We've had it before."*

* * *

57.     Plaintiffs bring this lawsuit on their own behalf and on behalf of a class of similarly situated female employees Company-wide, including but not limited to Associates, Senior Associates, Managers, Senior Managers and Managing Directors, to remedy the gender discrimination they have witnessed and experienced during their years of exemplary service to KPMG.   The lawsuit is designed to achieve systemic injunctive relief and to change KPMG's discriminatory employment policies, practices and/or procedures based on gender, including: (1) paying female Professionals less than their male counterparts; (2) denying female Professionals promotion and advancement opportunities in favor of male employees; (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; and (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace.

## II.     JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e)-5(f), *et seq.,* as amended ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206, *et seq.,* the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.,* the Civil Rights Act of 1866, 42 U.S.C § 1981, *et seq.,* as amended, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

59.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-5(f) because Defendant KPMG is headquartered and conducts substantial business in this District, and because Plaintiffs Kassman and Potter were employees of KPMG's New York, New York office when the unlawful employment practices were committed.

60.     Plaintiffs have standing to bring this suit as Plaintiff Kassman has duly filed her administrative charge before the EEOC and received her Notice of Right to Sue on March 9, 2011.   Ms. Kassman's administrative charge gave notice of the class-wide nature of the allegations, including those alleged by the other Named Plaintiffs.

### III.   THE PARTIES

61.     Plaintiff **DONNA KASSMAN** is a resident of New York.   Plaintiff was employed at KPMG as an Associate, a Senior Associate, a Manager, and then a Senior Manager from April 1993 until her constructive discharge from the Company in October 2010.

62.     Plaintiff **LINDA O'DONNELL** is a resident of Georgia. Plaintiff was employed at KPMG in its Johannesburg, South Africa office as an Associate, a Senior Associate, and a Manager from January 2003 through August 2006, then in its Atlanta, Georgia office as a Senior Associate from September 2006 until her wrongful termination in April 2009.

63.     Plaintiff **SPARKLE PATTERSON** is a resident of Florida. Plaintiff was employed at KPMG in its Atlanta, Georgia office as an Associate from June 2007 until her constructive discharge from the Company in November 2010.

64.     Plaintiff **JEANETTE POTTER** is a resident of New York. Plaintiff was employed at KPMG in its New York, New York office as a Manager, then a Senior Manager from July 1995 until her constructive discharge in July 2006.

65.     Plaintiff **ASHWINI VASUDEVA** is a resident of California. Plaintiff was employed at KPMG in its Mountain View, California office as an Associate, then a Senior Associate, from January 2005 until her constructive discharge from the Company in September 2009.

66.     Defendant **KPMG LLP** ("KPMG" or the "Company") is an audit, tax, and advisory services firm headquartered in New York, New York.  It is the U.S. member firm of KPMG International, which is headquartered in the Netherlands.  In 2010, KPMG reported global revenues of $20.63 billion.

## IV.     FACTUAL ALLEGATIONS

### A.     PLAINTIFF DONNA KASSMAN

67.     Ms. Kassman suffered discrimination in pay, denial of promotional opportunities, discrimination as a result of pregnancy, and a hostile work environment.  She was ultimately constructively discharged.

68.     In April of 1993, Ms. Kassman began working at KPMG as an Associate.

69.     For promotions from entry-level Associates to Senior Managers, KPMG uses a standard career progression track, which advances employees on a schedule of approximately every two years in the following order: Associate, Senior Associate, Manager, and Senior Manager.

70.     In the years after Ms. Kassman began working at KPMG, she steadily progressed along the Company's standard career track.  In 1995, Ms. Kassman became a Senior Associate, and two years later, in 1997, she advanced to the position of Manager.  In 1999, Ms. Kassman

went on to become a Senior Manager – the position in which she would be stuck for eleven years, before ultimately being pushed out of the Company.

71.    Throughout her seventeen-year tenure, Ms. Kassman demonstrated stellar performance at KPMG.

72.    In Ms. Kassman's Fiscal Year 2006 Year End Performance Review ("Review"), Principal Schapiro, to whom she directly reported, wrote that she "contributed greatly to the overall success of the practice" and that "staff look to her for guidance."

73.    The following year, in Ms. Kassman's 2007 Review, he wrote that Plaintiff "had a very strong year."

74.    Principal Schapiro wrote in Ms. Kassman's 2008 Review that she "had a very successful FY 2008, and ha[d] shown excellent leadership abilities."

75.    He wrote in Ms. Kassman's 2009 Review that she "did all the right things from a business perspective to be successful," that she "ha[d] been a leader in the office, and ha[d] been forward thinking."

76.    In Ms. Kassman's 2010 Review, Principal Schapiro wrote that she again had "a very strong year."

### Disparate Pay

77.    Upon information and belief, KPMG paid Ms. Kassman less than similarly situated male employees, despite her exemplary performance.

78.    Ten years after joining KPMG, Ms. Kassman went on maternity leave in May 2003, just before the birth of her first child in June 2003.

79.    While Ms. Kassman was on maternity leave, KPMG abruptly cut her base salary by $20,000 because she was paid "too much."  Similar cuts were not made to male counterparts'

salaries, and as a result, Ms. Kassman was and continued to be paid $20,000 less than her male counterparts during her tenure at KPMG. Upon information and belief, KPMG viewed Ms. Kassman as an easy target because of her gender and her status as a working mother.

80.     KPMG cited no business justification for slashing her salary. When Ms. Kassman asked her manager at the time, Gary Rosen ("Partner Rosen"), Partner in Charge of the Northeast State and Local Tax ("SALT") Practice, to reconsider the cut in her salary, he said that she should consider some of her past salary "a loan," implying that she had not earned it for exemplary performance. He also indicated that Ms. Kassman did not need the money because she had a nice engagement ring.

81.     In addition, KPMG discriminates against flex time workers – the overwhelming majority of whom are women – by reducing their salaries without a commensurate reduction in responsibilities.

82.     Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

**Denial of Promotions**

83.     Despite Ms. Kassman's stellar qualifications and performance, KPMG denied her promotions in favor of lesser qualified male employees.

84.     Throughout Ms. Kassman's last decade as a Senior Manager at KPMG, she consistently expressed interest in a promotion to Managing Director and ultimately to Partner. After several strong performance years and numerous requests for advancement, Principal Schapiro finally told Ms. Kassman she was next in line for a promotion in the employment tax practice. In December 2008, Principal Schapiro confirmed that Ms. Kassman would be put up for a promotion to Tax Managing Director effective for the Fiscal Year 2009/2010 beginning October

1, 2009.  The promotion decision was to be made during the summer of 2009.  However, Ms. Kassman was not promoted that year, despite her strong performance.

85.     In early 2009, Ms. Kassman successfully completed the formal Leadership Evaluation & Assistance Program ("LEAP") for the KPMG SALT Practice in preparation for her promotion to Managing Director.  According to Ms. Kassman's 2009 Review, she "successfully presented and navigated the SALT LEAP program and received favorable reviews."  She presented to the National Partner in Charge of the SALT Practice, Tim Gillis, who told her that she had his vote.

86.     In mid-2009, Principal Schapiro again confirmed that Plaintiff was next in line for a promotion in her practice.  On at least one occasion in or around summer 2009, Ben Garfunkel ("Partner Garfunkel"), the National Partner in Charge of IES, echoed Principal Schapiro's comments by stating that he knew Ms. Kassman was "in queue" to make Managing Director.  Ms. Kassman's status was specifically a point of discussion with Partner Garfunkel since she was leaving the SALT Practice (where she was presented for promotion) and entering the IES practice, of which he was the leader.  Ms. Kassman wanted confirmation that she would not lose her "next in line" status by switching practices.

87.     In Ms. Kassman's 2009 Review, Principal Schapiro wrote that "an effort was made to promote Donna to TMD effective fy '10…," but explained that it did not happen because of the economy.  Principal Schapiro also told Ms. Kassman that no one would receive a promotion to Managing Director at that time due to the economy, but that she would remain first in line.

88.     Shortly after Ms. Kassman was "put-up" for promotion and proceeded through the formal channels set up by the SALT Practice (i.e., the LEAP program) in 2009, Senior Manager

Montgomery and his direct subordinate, Associate Stone, lodged unfounded complaints about her. Although Plaintiff had never received a similar complaint in her seventeen years with KPMG, Associate Stone and Senior Manager Montgomery claimed she was considered "unapproachable" and "too direct," a thinly-veiled gender-based criticism, particularly given the abundance of "direct" male personalities in the senior leadership of KPMG.

89.     As a result of Associate Stone's and Senior Manager Montgomery's unfounded and stereotypical complaints, KPMG removed Ms. Kassman from the promotion track sometime in late 2009 or early 2010, when a candidate is typically put up for promotion.

90.     In December 2009, Ms. Kassman again discussed with Principal Schapiro whether she would be put up for the Managing Director position for the 2010/2011 fiscal year beginning October 1, 2010.  Although Principal Schapiro had previously assured Ms. Kassman that she was next in line for the promotion, he claimed that he "[didn't] know anything about making Tax Managing Director in the IES practice," and instead referred Ms. Kassman to Principal Brown.

91.     At Principal Schapiro's suggestion, Ms. Kassman met with Principal Brown in January 2010 to discuss her career.  When Ms. Kassman brought up the Managing Director position, Principal Brown said that Ms. Kassman's name had never come up, that she was not on the list of candidates for that year, and that it was too late for her name to be submitted.  Principal Brown later acknowledged that she had lied about the list of candidates being closed.

92.     In April 2010, Ms. Kassman learned from a colleague that Senior Manager Montgomery was up for promotion to Managing Director for the 2010/2011 Fiscal Year – the same position that had previously been slated for Ms. Kassman.  Principal Schapiro had apparently – without informing Ms. Kassman – removed her from the promotion track and

replaced her with Senior Manager Montgomery, even though he had a shorter tenure with the Company, fewer years as Senior Manager, and less professional experience overall than Ms. Kassman.

93.   Ms. Kassman was a victim of Associate Stone's and Senior Manager Montgomery's discriminatory campaign to derail a female employee's advancement to Managing Director -- an effort that KPMG's partnership not only failed to stop, but actively carried out.

94.   Upon information and belief, KPMG has perpetrated and/or condoned similar discriminatory campaigns to derail the careers of other successful female Professionals who were poised to assume positions of greater authority and influence within the Company.

95.   Upon information and belief, KPMG took advantage of the performance evaluation system's lack of transparency, quality standards and controls, and opportunities for redress by including unfounded criticism against many female employees.

96.   Moreover, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.

### Pregnancy/Caregiver Discrimination

97.   From 2003 until her constructive discharge in 2010, KPMG discriminated against Ms. Kassman based on her gender due to her caregiving responsibilities as a working mother. Because of Ms. Kassman's status as a working mother, KPMG continuously subjected her to disparate treatment, and also made adverse decisions concerning her employment.

98.   From 1993 until 1999, before Ms. Kassman had her children, she was promoted on KPMG's progressive career track from Associate to Senior Manager.   However, after she had

her first child in 2003, her advancement abruptly stopped. She was not promoted after she became a Senior Manager and remained in this position for over ten years.

99.     Upon information and belief, there were only a handful of female managers with small children in the Northeast SALT Practice during Ms. Kassman's tenure with the Company. Ms. Kassman was the first in her practice to work a flexible schedule.

100.    Even though Ms. Kassman hit the glass ceiling shortly after having children, KPMG and Principal Schapiro touted Plaintiff as a role model for working mothers. In practice, however, KPMG and Principal Schapiro in particular did not support Ms. Kassman's efforts to be a successful working mother.

101.    In addition to slashing Ms. Kassman's salary while she was on maternity leave, KPMG took a number of adverse employment actions against her. For example, in March of 2004, shortly after Ms. Kassman's maternity leave ended, Principal Schapiro gave Plaintiff her first negative review at the Company for not meeting her goals. Instead of taking her leave into account in measuring Ms. Kassman's goal attainment for the year, Principal Schapiro penalized her for it.

102.    As a further penalty for taking maternity leave, Principal Schapiro put Plaintiff on a 60-day PIP, increasing her goals, upon her return from maternity leave. Shortly before being slapped with a PIP, Ms. Kassman told Principal Schapiro that she planned to move to a flexible work schedule. Principal Schapiro placed Ms. Kassman's PIP in between papers on her desk (including the flexible plan paperwork that she was preparing to submit), seemingly in an attempt to avoid drawing attention to the PIP.

103.    Before placing Ms. Kassman on a PIP, Principal Schapiro had never indicated to Ms. Kassman that her performance was unsatisfactory or that she was in jeopardy of being placed

on a PIP. Shocked and dismayed by this unexpected development, Ms. Kassman spoke to Sharon Katz-Pearlman, another Partner at the Company, who confirmed that there was nothing in Ms. Kassman's performance record that would support the imposition of a PIP before she had her baby.

104.    Two years later, Principal Schapiro again penalized Plaintiff for taking maternity leave when she had her second child. He again held her to higher standards than her peers after returning from leave. He also wrote in her 2006 Review that her work was "somewhat abbreviated due to Donna's maternity leave."

105.    From 2004 until Plaintiff's constructive discharge in 2010, she worked a reduced schedule under KPMG's flexible schedule policy. Although the Company reduced Ms. Kassman's pay in proportion to her reduced schedule, it held her to the same or higher performance standards than full-time employees. If she did not meet full-time standards on her reduced schedule, Plaintiff was penalized and considered less committed to her career. Her flexible schedule essentially acted as a "penalty" on her employment opportunities at KPMG.

106.    While Ms. Kassman was working on a reduced schedule, KPMG essentially expected her to do the job of a full-time senior manager in fewer hours for less pay. For example, her job requirements related to marketing, teaching, speaking, coaching, administrative, and client development were the same job requirements of full-time Senior Managers. When KPMG evaluated Plaintiff's work performance, the Company measured her against the requirements of a full-time employee. Indeed, both of Plaintiff's direct supervisors – Principal Schapiro and Partner Rosen – acknowledged this by writing in her LEAP Nomination Form, "Although she works a reduced hourly schedule, she has the same responsibilities as every other Senior Manager in the Practice."

107.    Upon information and belief, other female Professionals who took maternity leave and had caregiving responsibilities faced similar systemic barriers to equal employment opportunities at KPMG. In particular, Ms. Kassman's department, the SALT practice, had a poor track record of retaining working mothers. KPMG fired several working mothers within the SALT practice, including one who was pregnant, and forced others out of the Company under circumstances similar to Plaintiff.

108.    KPMG's overwhelmingly female flexible workers are denied not only the pay they deserve, but also various other Company benefits. For example, in early 2010, the Company's Stamford office adopted a policy requiring employees to be in the office a minimum of three days per week in order to qualify for office space. This policy had a disparate impact on female employees such as Ms. Kassman, who had three "in-office" days (per her flex time agreement), one of which was typically spent out of the office generating business.

109.    In addition, because most of KPMG's relationship-building activities occur after hours, employees with primary caregiving responsibilities – the majority of whom are women – are at a disadvantage in their career development. For example, when Ms. Kassman expressed concern to Partner Rosen about her $20,000 salary cut, he suggested that she socialize at KPMG's weekly happy hours as a way to ingratiate herself with the Company's leadership and advance her career. Ms. Kassman explained that, because she had young children, she could not attend happy hours, but was more than willing to meet with people over lunch, breakfast or coffee.

110.    The few women who have advanced to the partnership ranks at KPMG have done so by sacrificing their personal lives and abandoning any semblance of work-life balance. For example, KPMG frequently touted a Partner in the Atlanta office, Tammy Hunter, as a role model for other working mothers because she called the Company to discuss work matters on her way to

the delivery room to give birth to her child. The Company apparently viewed this as a level of dedication to which other working mothers should aspire.

111.    Aside from these rare exceptions, working mothers have been unable to make significant inroads at KPMG – and are unlikely to do so given the Company's discriminatory culture. In May 2010, Ms. Kassman was at dinner during an American Payroll Association conference with several colleagues, including the Partner in charge of the West IES practice, Ray Pascuzzi ("Partner Pascuzzi"). At this dinner, Partner Pascuzzi proclaimed that "part time women work exactly their $x$ hours and not a minute over," that "you know you can't make them work any more, and that "you know they're not going to get anywhere."

### Hostile Work Environment

112.    From late 2009 until her constructive discharge in October 2010, Ms. Kassman suffered harassment and unequal treatment at KPMG. Beginning in October 2009, Associate Stone began complaining that he "didn't like [Ms. Kassman's] tone."   Senior Manager Montgomery agreed with these complaints. Together, these two men complained that Ms. Kassman was "unapproachable" and "too direct," a gender-based criticism, particularly given Associate Stone's and Senior Manager Montgomery's "direct" personalities, which are embraced by senior leadership at KPMG. Nonetheless, KPMG did not correct Associate Stone's or Senior Manager Montgomery's discriminatory behavior.

113.    In addition to complaining about Ms. Kassman's "tone," Associate Stone also complained about her flexible work schedule. Consistent with the work-life balance priorities marketed at KPMG, the Company had approved Ms. Kassman's schedule after the birth of her first child. However, Associate Stone disapproved of Ms. Kassman's flexible work schedule and

complained – again, without basis – that it forced him to "work harder" from Monday until Thursday.

114.    KPMG did nothing to correct Associate Stone's discriminatory actions, even though Principal Schapiro told Ms. Kassman in March 2010 that Associate Stone "might have an issue working with women." Moreover, when Ms. Kassman complained about Associate Stone's conduct, Principal Schapiro replied that he did not know if Associate Stone was "unprofessional, stupid or vicious."

115.    Instead of disciplining Associate Stone, KPMG constantly reprimanded Ms. Kassman as a result of Associate Stone's and Senior Manager Montgomery's gender-based criticisms. For example, KPMG forced Ms. Kassman to participate in an excessive number of stressful meetings and intense interrogations from late 2009 until mid-2010. During the meetings, Ms. Kassman was questioned about her "tone" and other stereotypical complaints like her "direct" approach. This harassment and unequal treatment was extremely disruptive to Ms. Kassman both personally and professionally.

116.    After months of meetings, the Company encouraged Ms. Kassman to consult with a "coach" to resolve issues concerning Associate Stone's and Senior Manager Montgomery's discriminatory complaints and harassment. By issuing such a reprimand to Ms. Kassman, KPMG chose to believe these two men's unfounded complaints over her longstanding "very strong" performance and collaborative work style. At the time, Associate Stone – who was widely regarded as an "asshole" – had only been at the Company for approximately sixteen months, whereas Ms. Kassman had been there for sixteen years.

117.    Instead of disciplining Mr. Stone for his discriminatory conduct, KPMG promoted Mr. Stone to a Senior Associate position and recently promoted him to Manager.

118.   Instead of resolving Ms. Kassman's complaints of discrimination, KPMG removed her from the promotion track as a result of the gender-biased criticisms leveled against her.

119.   When the work environment in KPMG's New York office became unbearable, Ms. Kassman asked to be transferred to the Stamford office.  She successfully worked out of the Stamford office in late 2009 and early 2010, until it adopted a policy requiring employees to be in the office a minimum of three days per week in order to qualify for office space.   Per Ms. Kassman's flex time agreement, she spent three days "in-office" and two working from home. However, at least one of Ms. Kassman's "in-office" days was typically spent out of the office with clients.  Accordingly, the Company forced her to vacate her Stamford office in April 2010. In lieu of an office, Ms. Kassman was provided with four drawers.

120.   Ken Seal, the Partner in charge of the Stamford office, refused to allow Ms. Kassman to retain her office space, even though the alternative was for Ms. Kassman to return to a hostile work environment in New York.

### Mishandling of Complaints and Retaliation

121.   After Ms. Kassman complained about the harassment and unequal treatment by Associate Stone, Senior Manager Montgomery, and Principal Schapiro, KPMG retaliated against her.

122.   Ms. Kassman complained to both the Office of Ethics and Compliance and the Office of General Counsel in April 2009 about the ongoing discriminatory treatment towards her.

123.   Principal Sweeney, the Principal in Charge of the Office of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman.  We've had it before."

124.   However, instead of addressing the discrimination, the Office of Ethics and Compliance suggested that Ms. Kassman try to relocate to another position within KPMG or leave the Company with a "package."  On one occasion, Principal Sweeney suggested that Ms. Kassman go out on leave for emotional distress, noting that many female employees had done so in the past under similar circumstances.

125.   The Office of General Counsel was equally ineffective in addressing Ms. Kassman's complaints of discrimination.  After investigating the matter (through David Burns of Firmwide Security) – and finding the facts undisputed – it simply referred Ms. Kassman to Human Resources because it was unable to come up with an acceptable solution.

126.   Shortly thereafter, Ms. Kassman spoke with Keri Fleming, Human Resources Associate Director, East Region Tax, about the ongoing discrimination and harassment she was experiencing.   Together, they decided that Human Resources would be Ms. Kassman's mouthpiece to Principal Schapiro because Ms. Kassman would physically shake every time he called her.

127.   To minimize contact with her harassers, Ms. Kassman decided that she would try to transfer to another position within KPMG, even if it meant taking a pay cut, assuming an administrative position or having to transfer offices.  Human Resources assured Ms. Kassman that it would help with this transition, but failed to follow through on its promise.

128.   Moreover, even though Ms. Kassman told Human Resources that she did not want to discuss the matter any further with Principals Schapiro and Brown, she continued to receive calls from them.  From the tenor of those conversations, it was clear to Ms. Kassman that Principals Schapiro and Brown thought she simply needed time to cool off and would eventually resume working with Senior Manager Montgomery and Associate Stone.

129.    After Principal Schapiro was informed of Ms. Kassman's complaints, she faced a number of adverse employment actions. KPMG reprimanded her with a "coach," forced her to sit through numerous meetings and interrogations in response to Senior Manager Montgomery's and Associate Stone's gender-based criticisms of her, and ultimately removed her from the promotion track.

130.    By contrast, KPMG did not discipline Associate Stone, Senior Manager Montgomery, or Principal Schapiro in any way. In fact, the Company promoted Associate Stone and, adding insult to injury, "put up" Senior Manager Montgomery for the Managing Director position once slotted for Ms. Kassman.

### Constructive Discharge

131.    As a result of KPMG's campaign of discrimination and harassment, Ms. Kassman's work environment became unbearable. She could barely eat or sleep, and feared walking into the office. To avoid running into her tormentors, Ms. Kassman made a habit of taking the back elevators at work.

132.    Because Ms. Kassman's previous experience had taught her that KPMG would not properly address its employees' unlawful conduct, she felt that she had no recourse against the pervasive harassment and discrimination.

133.    On October 1, 2010, Ms. Kassman resigned from KPMG, stating in her letter of resignation, "By ignoring my requests to put an end to the discriminatory treatment, KPMG has forced me to either continue to endure an intolerable work environment or end my employment. I therefore have no choice but to leave the Firm."

**B.    PLAINTIFF LINDA O'DONNELL**

134.    Ms. O'Donnell suffered discrimination in assignment, discrimination in pay, denial of promotional opportunities, discrimination as a result of pregnancy, and wrongful termination.

135.    KPMG employed Ms. O'Donnell, the mother of a young child, from January 2003 until her wrongful termination in April 2009.

136.    Ms. O'Donnell began her career at KPMG in January 2003 as an Associate in the Johannesburg, South Africa office.    She was promoted to Senior Associate in 2005 and to Manager in March 2006.

137.    In September 2006, Ms. O'Donnell began a temporary rotation in the Company's Atlanta office.    Although she had been a Manager in the Johannesburg office, Ms. O'Donnell was demoted to a Senior Associate position when she transferred to the Atlanta office.    In February 2007, Ms. O'Donnell was offered a permanent Senior Associate position in Atlanta's Transactional Services group with green card sponsorship through her then husband, a higher-ranking KPMG employee who was transferring during the same time.

138.    Ms. O'Donnell proved herself to be an excellent performer and distinguished herself with her strong work ethic, often working through the night.

139.    In 2007, she earned a high "Strong Performer" rating with overwhelmingly positive comments from her clients.

140.    In March 2008, KPMG gave Ms. O'Donnell another outstanding review.

**Discriminatory Assignment**

141.    Although Ms. O'Donnell was highly qualified for the Manager position, and had in fact successfully held that position for several months, KPMG demoted Ms. O'Donnell to a

Senior Associate position when she began her rotation in the Company's Atlanta office in September 2006.  The Company told Ms. O'Donnell that it was "standard practice" to drop a promotion level when transferring from an international level.  Ms. O'Donnell remained a Senior Associate when she was offered a permanent position in the Atlanta office in February 2007.

142.    Upon information and belief, the Company did not automatically drop male employees a level when they transferred from international offices.  For example, Bruce O'Donnell, Ms. O'Donnell's then husband, retained his Senior Manager title when he transferred from KPMG's Johannesburg office to the Atlanta office at the very same time.

143.    Upon information and belief, KPMG regularly discriminates against female employees by assigning them to lower-level positions than they are qualified for or than they would have received had they been men.

### Disparate Pay

144.    Upon information and belief, KPMG paid Ms. O'Donnell less than similarly situated male employees during her tenure in the Atlanta office.

145.    Ms. O'Donnell regularly performed Manager-level tasks, though as a Senior Associate, she was paid less than male employees doing the same work.  Among other things, Ms. O'Donnell set up engagements, met with clients and frequently worked with Partners and Directors regarding substantive matters, all tasks typically performed by Managers.

146.    Further, KPMG gave Ms. O'Donnell special access to computer programs that enabled her to perform Manager-level tasks like setting up engagements.  Access to these programs is typically granted to Managers and not to Senior Associates. Additionally, Ms. O'Donnell performed other tasks normally completed by Managers, including setting up engagement letters, performing conflict of interest checks and compiling budgets.

147.    Ms. O'Donnell also trained new Managers to structure reports, communicate with clients, collect data, send documents and manage invoices.   Typically, experienced Managers train new Managers in these areas.

148.    As a Senior Associate, Ms. O'Donnell earned substantially less in salary than a Manager and did not receive a bonus for promotion to Manager.

149.    Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

### Denial of Promotions

150.    In addition to being demoted from Manager to Senior Associate upon her transfer to the Atlanta office, Ms. O'Donnell was denied a promotion to Manager after she informed her supervising Partner, Rob Coble ("Partner Coble"), that she was pregnant.

151.    In March 2008, KPMG gave Ms. O'Donnell outstanding performance reviews. According to her Performance Manager, Director Ron Evans ("Director Evans"), Partner To, and Directors Hudy Mulia and Jon Parker, she was on track for promotion to Manager.  Because of her experience and skill set, KPMG even tasked Ms. O'Donnell with training new Managers who were coming into the department from other firms.

152.    In March 2008, Ms. O'Donnell informed Partner Coble that she was pregnant and would take maternity leave beginning in November 2008.  Almost immediately after this announcement, Ms. O'Donnell's career progression came to an abrupt halt.

153.    Later in April 2008, Director Evans gave Ms. O'Donnell the first negative review of her career, which included unfounded criticism about her performance.  In June 2008, Ms. O'Donnell was denied the promotion to Manager, even though she had been performing Manager-level duties and had been reassured that she was on track for promotion.  Instead,

KPMG promoted Derek Pitts, a male Senior Associate, and Elizabeth Roberts, a female Senior Associate without children, to Manager positions.

154.   Ms. O'Donnell asked Partner Coble and Director Evans about her denied promotion. Despite her excellent reviews, Director Evans told Ms. O'Donnell that she was "not performing at manager level." However, neither Manager Pitts nor Manager Roberts had Ms. O'Donnell's extensive experience performing managerial duties prior to their promotion, nor were they involved in training new Managers or handling other management tasks as Senior Associates.

155.   Manager Roberts left KPMG in 2010 to have children of her own.   Upon information and belief, Manager Roberts left because having children is incompatible with a successful career at KPMG because of unlawful discrimination.

156.   Upon information and belief, KPMG took advantage of the performance evaluation system's lack of transparency, quality standards and controls, and opportunities for redress by including unfounded criticism against many female employees.

157.   Upon information and belief, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher level positions than women across the Company.

**Pregnancy/Caregiver Discrimination and Retaliation**

158.   Because of Ms. O'Donnell's pregnancy and decision to take maternity leave, KPMG subjected her to hostile comments, denied her a promotion, and ultimately terminated her employment the day she returned from maternity leave.

159.   In March 2008, Ms. O'Donnell separately informed Partners Coble and To that she was pregnant and that she planned to take maternity leave beginning in November 2008.

34

160.    Partner To did not attempt to hide his hostility towards working mothers. After Ms. O'Donnell informed him of her pregnancy, Partner To said he thought pregnant women were incapable of doing their jobs, and that he did not see how, as a working mother, one could "tend to a child and work at KPMG at the same time."

161.    Partner To also told Ms. O'Donnell it was "much harder being a woman [than a man]" at KPMG in a manner that suggested this was acceptable.

162.    This was not the only hostile or negative comment that Partner To made about women at KPMG. Upon information and belief, Partner To had caused several women to contact HR regarding his hostile comments toward women. In one instance, Manager Spiceda Davis had received EP ratings until she complained to HR about Partner To. After her complaints, she received unfairly negative reviews and was forced to leave KPMG.

163.    Partner To also told Ms. O'Donnell that, because her husband was the "breadwinner" in her family, there would not be a need for her to work.

164.    In June 2008, KPMG denied Ms. O'Donnell a promotion, despite her track record of outstanding work, in favor of her two peers without children.

165.    In November 2008, Ms. O'Donnell went on maternity leave, only to be terminated immediately upon her return to work in April 2009.

166.    Upon information and belief, KPMG has subjected and continues to subject female employees with caregiving responsibilities and/or young children like Ms. O'Donnell to disparate terms and conditions of employment.

**Wrongful Termination**

167.    In April 2009, the very day Ms. O'Donnell returned from maternity leave, Partners Coble and To told her she had been "laid off" due to "the economy." Partner To told Ms.

O'Donnell that her husband "ma[de] a lot of money so [she] should be fine without a job." Further, Manager To told Ms. O'Donnell that she "shouldn't be upset because [she would] get more time to spend with [her] baby."

C.   **PLAINTIFF SPARKLE PATTERSON**

168.   Ms. Patterson suffered discrimination in pay, denial of promotional opportunities, and discrimination as a result of pregnancy and race.   She was ultimately constructively discharged.

169.   KPMG employed Ms. Patterson, an African-American mother of two children, from June 2007 until her constructive discharge from the Company in November 2010.

170.   In June of 2007, Ms. Patterson began working at KPMG as an Associate in Atlanta, first in Federal Tax, then in the IES practice.

171.   Ms. Patterson proved herself to be an excellent performer.

172.   In her 2008 year-end review, Federal Tax Partner Bernard Cates gave Ms. Patterson a "Strong" rating and wrote that she was "trending towards an EP ['Exceptional'] performance level."

173.   In Ms. Patterson's October 2008 engagement review, IES Manager Greg Woofter ("Manager Woofter") wrote that Ms. Patterson worked "diligently" and that he was "pleased with [her] progress."

174.   In her April 2009 review, Manager Woofter wrote that Ms. Patterson "excelled" and "exceeded [his] expectations," and that he wanted to "continue [Ms. Patterson's] career progression within the IES practice."

175.   In her 2009 year-end review, Senior Manager Yozura Yoshida ("Manager Yoshida") gave Ms. Patterson a "Strong" rating and wrote that she was "pr[o]fessional,

commit[t]ed, motivated and eager to learn" and that he "expect[ed] her to continue this positive trend."

176.   In April 2008 and October 2008, Ms. Patterson received a "Standing Ovation" award with a $500 American Express Card, one of the highest honors within KPMG's "Encore" award system that recognizes employees who go "above and beyond" in their work.

177.   In January 2009, Ms. Patterson received a $200 "Bravo" award, another form of recognition within KPMG's "Encore" award system.  Manager Yoshida originally nominated her for the "Standing Ovation" award, but as part of KPMG's effort to manage costs, that award was temporarily unavailable.  In the award description, Manager Yoshida wrote that Ms. Patterson had "[gone] the extra mile to get things done."

### Disparate Pay

178.   Upon information and belief, KPMG paid Ms. Patterson less than similarly situated male and non-African-American employees, despite her excellent performance.

179.   Although Ms. Patterson was a stellar performer, her total compensation was not commensurate with that awarded to pertinent male and non-African-American employees.  Ms. Patterson regularly performed the duties of a Senior Associate, though she was not compensated accordingly.  For example, Ms. Patterson managed her client engagements by allocating work to Associates and Tax Technicians, and reviewing work prepared by Associates and Tax Technicians.  She also served as the initial point of contact for certain clients.

180.   In addition, KPMG refused to pay Ms. Patterson for the entire month of June 2010 following her maternity leave.

181.   In February 2010, Ms. Patterson requested a paid sabbatical following her maternity leave from June 1, 2010 to August 15, 2010 to complete two additional courses for her

CPA license, which was important for career growth. KPMG routinely approved paid sabbaticals for other employees to travel overseas, go hiking, run triathlons, or pursue other personal interests. While KPMG promptly approved other employees' paid sabbaticals, Partner Gary Lusk ("Partner Lusk"), who reported up the IES chain to Principal Brown and Partner Garfunkel, ignored Ms. Patterson's sabbatical request.

182.    According to KPMG policy, sabbatical requests must either be approved or formally denied with a written explanation. On March 1, 2010, Ms. Patterson consulted HR Tax Manager Tammy Woodard ("HR Manager Woodard"), who confirmed that Ms. Patterson could proceed with the sabbatical application process if Partner Lusk did not formally deny the request.

183.    From March through May 2010, Ms. Patterson went on maternity leave before the birth of her second child. In March 2010, Partner Lusk finally confirmed that he had received Ms. Patterson's sabbatical request and would review it by mid-April. In April 2010, Ms. Patterson followed up about the status of her sabbatical request. Partner Lusk ignored her request. In May 2010, Ms. Patterson again followed up with Partner Lusk, and once again Partner Lusk refused to approve or deny her request.

184.    In June 2010, Ms. Patterson did not return to work following her paid maternity leave because her sabbatical request was still pending. Ms. Patterson consulted her informal mentor Partner Milford McGuirt ("Partner McGuirt"), co-chair of KPMG's national African-American Network and one of few African-American partners at the company, who confirmed that Ms. Patterson had followed the proper procedure for requesting a sabbatical. Partner Lusk had still neither approved nor denied Ms. Patterson's request.

185.    In July 2010, after months of ignoring Ms. Patterson's sabbatical request, Partner Lusk verbally denied Ms. Patterson's request and instead approved a sabbatical beginning in July 2010. Partner Lusk refused to pay Ms. Patterson for the entire month of June.

186.    Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

187.    Upon information and belief, Ms. Patterson was paid less as compared to non-African-American KPMG employees who performed the same duties and/or held the same status as she did within the company. This disparity arose in large part because of the disparate career advancement opportunities she was provided in comparison to non-African-American colleagues, described below.

### Denial of Promotions

188.    Despite Ms. Patterson's award-winning performance, KPMG denied her a promotion in favor of lesser qualified male and non-African-American employees. Though the standard promotion track at KPMG promotes Associates to Senior Associates after two years, Ms. Patterson was never promoted beyond Associate in her three-year tenure with the Company.

189.    Approximately seven of Ms. Patterson's Associate-level peers in Federal Tax were promoted within two years; all seven were Caucasian and none had children. Ms. Patterson and two other black females were not promoted. Associate Gayann Greene, also a mother of two small children, resigned and Associate Avalyn Goodwin was laid off.

190.    In the fall of 2009, Ms. Patterson was on track for promotion to Senior Associate. Ms. Patterson regularly solicited feedback from her Engagement Managers to ensure she stayed on track for promotion. Ms. Patterson's interim reviews in 2009 were excellent.

191.   In November 2009, Ms. Patterson informed Partner Lusk and Manager Yoshida that she was pregnant and would take maternity leave beginning March 2010.   Partner Lusk expressed strong disapproval of Ms. Patterson's leave and told her that missing the first week in March was like "missing the whole year."

192.   While Ms. Patterson was on maternity leave in April 2010, Partner Lusk asked Ms. Patterson to take on a lesser role in IES.   Partner Lusk suggested that Ms. Patterson return to work "part time" or would move to the Japanese practice, even though it was not a good fit for her interests, experience or background.   Ms. Patterson told Partner Lusk that neither working part time nor transferring to an entirely new practice was in line with her career goals.

193.   Upon information and belief, similarly situated male employees were not asked to work "part time" or to change practices.

194.   When Ms. Patterson returned from leave and sabbatical in August 2010, Partner Lusk and Manager Yoshida intentionally intimidated Ms. Patterson.   In a change from the standard year-end performance review practice where only the Performance Manager would review the evaluation with Ms. Patterson, both men joined together to raise pretextual concerns with her performance.

195.   Specifically, Partner Lusk and Manager Yoshida criticized Ms. Patterson in her year-end review about concerns that had never been raised before her maternity leave.   In Ms. Patterson's interim performance review for the same fiscal year, Manager Yoshida wrote that Ms. Patterson was "eager to perform well" and that she "manage[d] her time well."   In her fiscal year-end review after she returned from maternity leave, Manager Yoshida wrote that Ms. Patterson was unavailable and caused her manager to spend more time during the Christmas holidays, though Ms. Patterson had not taken any vacation days during this time and frequently worked

overtime.  Ms. Patterson was still given a "Strong" performance rating and had never heard this criticism before her maternity leave.

196.   In the same fiscal year-end review for 2010, Partner Lusk and Manager Yoshida accused Ms. Patterson of "not mak[ing] herself available to help others" when Ms. Patterson had taken a Saturday, Sunday and Monday out of the office one week to complete the final portion of her CPA exam.  Prior to announcing her pregnancy, both Partner Lusk and Manager Yoshida had approved this time out of the office.  Partner Lusk had known Ms. Patterson needed to complete the exam since he accepted her transfer in July 2008 and knew that her passing scores on previous sections would expire if she did not timely complete the final section.

197.   Ms. Patterson's August 2010 review also ignored her notable achievements, such as completing her CPA, achieving all of her performance goals set at the beginning of the fiscal year, being on the Board of Directors for a non-profit organization and participating in KPMG Affinity Networks.

198.   As a result of the unfounded negative comments in the review, Ms. Patterson was denied a promotion to Senior Associate despite her three-year track record of award-winning performance.

199.   In October 2010, Ms. Patterson was removed from her largest client, despite previously winning a "Bravo" award in April 2009 for her work relating to the same client. Partner Lusk and Manager Yoshida told Ms. Patterson she was being removed so she could "get more exposure" to other clients.  However, Ms. Patterson was not given work on other clients despite her persistent requests.  KPMG generally does not remove employees from their largest clients without clear transfers to new clients.

200.    Partner Lusk and Manager Woofter, both white males, assigned Associate Sarah Bohman ("Associate Bohman"), a Caucasian recent college graduate with no children, to take Ms. Patterson's place on the client team.

201.    This was not the first time Ms. Patterson had been excluded from career-advancement opportunities at KPMG; since the beginning of her employment at KPMG, Ms. Patterson found that white managers would develop friendly, casual relationships with white Associates, but made no such efforts with her.

202.    Upon information and belief, KPMG took advantage of the performance evaluation system's lack of transparency, quality standards and controls, and opportunities for redress by including unfounded criticism against many female employees.

203.    Upon information and belief, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher level positions than women across the Company.

### Pregnancy/Caregiver Discrimination and Retaliation

204.    During Ms. Patterson's tenure with KPMG, she was the only employee in the Atlanta office IES practice with small children other than Manager Yoshida and Partner Lusk, both of whom had stay-at-home wives or close family members living at home.

205.    KPMG discriminated against Ms. Patterson based on her pregnancy.  From July 2007 to November 2009, Ms. Patterson received awards and strong reviews.  However, when she became pregnant, she was subjected to hostile comments and her opportunities for advancement disappeared.

206.    When Ms. Patterson informed Manager Yoshida of her pregnancy in November 2009, Manager Yoshida angrily asked, "Did you plan this?"

207.    From February 2010 to July 2010, Partner Lusk actively ignored Ms. Patterson's sabbatical request while KPMG granted sabbatical requests to similarly situated male employees.

208.    In August 2010, Partner Lusk and Manager Yoshida wrote negative comments in Ms. Patterson's review that had never been raised as issues prior to Ms. Patterson announcing her pregnancy.

209.    After Ms. Patterson returned from maternity leave, her requests for work were systematically denied by the KPMG managers she approached.  This prevented Ms. Patterson from reaching the 89% target for billable work set by KPMG policy.  At best, Ms. Patterson was only able to bill twelve hours in a forty-hour work period, which made her, at best, 30% chargeable.  Prior to her pregnancy, Ms. Patterson did not have difficulty obtaining billable work.

210.    Although Ms. Patterson was available and willing to work long hours, KPMG managers refused to give her work because of the prevailing stereotype at KPMG that working mothers with young children are less effective employees and less committed to their careers.

211.    Because it had become clear that she was not going to advance in IES following her pregnancy, Ms. Patterson requested a transfer to another group in August 2010.  However, KPMG glossed over the difficulties Ms. Patterson was experiencing and refused to consider her request for a transfer.

212.    In October 2010, Ms. Patterson was removed from her largest client and replaced by Associate Sarah Bohman, a Caucasian recent college graduate with no children.

213.    Upon information and belief, KPMG has subjected and continues to subject female employees with caregiving responsibilities and/or young children like Ms. Patterson to disparate terms and conditions of employment.

**Mishandling of Complaints**

214.    From December 2009 until her constructive discharge on November 29, 2010, Ms. Patterson complained through various reporting channels, including HR and Ethics and Compliance, about the discrimination and retaliation she was experiencing.  However, KPMG failed to address Ms. Patterson's complaints.

215.    In December 2009, Ms. Patterson contacted HR to raise concerns regarding Manager Yoshida's negative and discriminatory response to her pregnancy.  Upon information and belief, HR did nothing to investigate or address Ms. Patterson's complaints.

216.    In March 2010, Ms. Patterson contacted HR regarding Partner Lusk's failure to address her sabbatical request, but no action was taken until July 2010, after the sabbatical was supposed to begin.

217.    In July 2010, Ms. Patterson contacted HR Regional Director Chris Beall ("HR Director Beall") about the discriminatory treatment she had received since announcing her pregnancy, including Manager Yoshida and Partner Lusk's insensitive comments, and Partner Lusk's refusal to address her sabbatical request.  Following a meeting with HR Director Beall, Ms. Patterson sent him an electronic message outlining and detailing her discrimination claims. Without Ms. Patterson's consent, HR Director Beall sent her message to Partner Lusk and requested a meeting.

218.    At the end of the month, Ms. Patterson met with HR Director Beall and Partner Lusk to discuss Ms. Patterson's discrimination claims, including the denial of her sabbatical request.  Because Ms. Patterson felt intimidated, she brought her mentor, Senior Manager T. Angie Napier to the meeting.  At the meeting, HR Director Beall and Partner Lusk ignored Ms. Patterson's discrimination claims and instead focused on her CPA exam in August 2009.  HR

44

Director Beall and Partner Lusk told Ms. Patterson that time taken for her CPA exam would not be held against her in her year-end review.

219.     Following the meeting, Partner Lusk denied Ms. Patterson's initial request for sabbatical from June 1 to August 15 and pressured her to take a sabbatical from August through October, which would have damaged her prospects for a fall promotion.  When Ms. Patterson protested, Partner Lusk finally allowed a sabbatical beginning July 1 but still ending August 15, 2010, thus shortening her sabbatical by one full month and denying her compensation for June.

220.     In August 2010, Ms. Patterson complained to Ethics and Compliance about the negative comments in her Performance Review – the first negative comments of her career – and the discriminatory denial of her promotion following her pregnancy.  Partner Lusk and Manager Yoshida told newly appointed HR Tax Manager, Rebecca Berry, during a second performance review meeting that the review was not negative.   HR did not challenge this or otherwise investigate or respond to the situation further.

221.     Later that month, Ms. Patterson requested a transfer out of IES because the managers in her group refused to give her any work, despite repeated requests.  The Ethics officer told her to wait, and that the situation in IES would be resolved.

222.     Ms. Patterson continually followed up with Ethics through November, as her work situation had not improved.  However, KPMG never granted the transfer out of IES or made any effort to address Ms. Patterson's complaints of discrimination and retaliation.

### Constructive Discharge

223.     In November 2010, after enduring ongoing discrimination and retaliation with no resolution in sight, Ms. Patterson had no choice but to resign from KPMG.

**D.**   **PLAINTIFF JEANETTE POTTER**

224.   Ms. Potter suffered discrimination in assignment, discrimination in pay, and denial of promotional opportunities.  She was ultimately constructively discharged.

225.   KPMG employed Ms. Potter from July 1995 until her constructive discharge from the Company in July 2006.

226.   In July 1995, Ms. Potter began working at KPMG as a Manager in the IES Tax practice.

227.   In June 1996, Ms. Potter was promoted to Senior Manager, the position in which she would be stuck for ten years before being pushed out of the company.

228.   Throughout her eleven-year tenure, Ms. Potter demonstrated excellent performance.  From 1996 to 2000, Ms. Potter always received "Meets Expectations" or "Exceeds Expectations" on her performance reviews, then, under a new performance rating system, received "Exceptional Performer" ratings in 2001 and 2002.

229.   Ms. Potter received "Strong Performer" ratings from 2003 to 2006, when she was pushed out of the Company.  Ms. Potter was applauded for her excellent work and praised as "clearly a leader in the group."

### Discriminatory Assignment

230.   Although Ms. Potter was highly qualified for a Senior Manager position at the time she was hired by KPMG, the Company initially assigned her to the position of Manager. Ms. Potter's previous employer did not have a "Senior Manager" distinction, so Ms. Potter held the title of Manager even though she performed duties typically performed by Senior Managers at comparable firms, including KPMG.  It was not until a year after Ms. Potter joined KPMG that she received the title she should have been assigned upon her hire.

231. Upon information and belief, KPMG regularly discriminates against female employees by assigning them to lower-level positions than those for which they are qualified.

### **Disparate Pay**

232. Ms. Potter's excellent performance over the course of her eleven-year career at KPMG was not rewarded with the compensation she deserved. Upon information and belief, the Company paid her less than similarly situated males throughout her tenure.

233. From 1996 to 2001, Ms. Potter received yearly pay increases. However, after October 2002, Ms. Potter's pay was frozen when her performance rating was lowered to "Strong Performer," even though there had been no identifiable change in Ms. Potter's performance beyond a need to "socialize more." Upon information and belief, similarly situated male employees in her office did not have their pay frozen.

234. After October 2002, Ms. Potter received no pay increases before her constructive discharge from the Company in July 2006, despite her consistently strong performance.

235. In May 2006, Ms. Potter asked Principal Ed Gibbons about her frozen pay. Surprised by the inquiry, Principal Gibbons referenced a spreadsheet with pay information and told Ms. Potter she was the fifth highest paid Senior Manager in her practice. When Ms. Potter asked which Senior Managers earned more than her, Principal Gibbons confirmed that the four higher salaries belonged to male employees. No male employees had comparable tenure to Ms. Potter. Ms. Potter asked why the less-experienced men were paid more than she was, but Principal Gibbons refused to engage on the issue and instead told Ms. Potter she was "paid too much."

236.    Upon information and belief, at least two other female Senior Managers received pay cuts, while no male Senior Managers in her office have received pay cuts.  For example, KPMG cut Senior Manager Elaine Blum's salary because she was "paid too much."

237.    Upon information and belief, KPMG also subjects female employees to discriminatory demotions that come with lower salaries.  For example, Senior Manager Lu Tseng ("Senior Manager Tseng") was sent on an eighteen-month assignment to Japan.  When she returned to the United States, she was told there were no Senior Manager positions available even though her previous position had not been filled.  Instead, KPMG offered Senior Manager Tseng a Manager position for a salary cut.

238.    Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

### Denial of Promotions

239.    Despite Ms. Potter's exceptional performance, KPMG denied her promotions in favor of lesser qualified male employees.

240.    By the summer of 2000, it had become clear to Ms. Potter that she was not going to be promoted at the rate she deserved.  Ms. Potter observed that employees who spent a significant amount of time schmoozing and socializing at office happy hours were more likely to advance, while employees who did not were less likely to be promoted.  This corporate culture tended to disproportionately harm female employees like Ms. Potter, who were less likely to be welcomed into the Company's "good old boys" club, and who felt uncomfortable at many social events, which tended to be hostile to women.

241.    In the summer of 2000, Ms. Potter informed Partner McLaughlin that she planned to resign from KPMG due to the lack of promotional opportunities.  She was prepared to

accept an offer at Ernst & Young for a comparable position with a $13,000 salary increase and a $17,000 signing bonus. Ms. Potter expected that Ernst & Young would provide greater opportunities for promotion than KPMG. However, Partners McLaughlin, Pete Dolan, Patricia Brown (who also served as Principal in Charge of the East for IES during the time Ms. Kassman experienced discrimination and retaliation), Bill Hibbit, Dan Orchant, Sam Russo and Jeff Stein told Ms. Potter that they refused to accept her resignation and reassured her that she was just about to be promoted. The group of Partners offered her a $20,000 retention bonus (which she had to repay if she left within one year) and sent her a box of chocolates with a card that read, "Please don't leave." Neither the $20,000 bonus nor the box of chocolates with a note were standard practice under KPMG policy.

242.   Because Ms. Potter believed, based on the Partners' representations, that she was about to be promoted, she declined the attractive offer from Ernst & Young and decided to stay at KPMG.

243.   In Ms. Potter's May 2001 review, Principal McLaughlin wrote that she "had a fabulous year" and was "clearly a leader in the group." Despite Principal McLaughlin's positive comments and "Exceptional Performer" rating, Ms. Potter was not promoted in 2001.

244.   In Ms. Potter's May 2002 performance review, Principal McLaughlin gave Ms. Potter a "Strong Performer" rating, lower than all her previous ratings, despite the review's overwhelmingly positive comments. The only criticism Principal McLaughlin wrote was that Ms. Potter needed to "continue to build relationships" for a promotion to Tax Managing Director.

245.   In May 2002, KPMG denied Ms. Potter the promotion to Managing Director because, according to Principal McLaughlin, she did not "socialize" enough. Principal McLaughlin told Ms. Potter she needed to "schmooze" more. However, Ms. Potter could not

attend events on Fridays – when many of the happy hours were scheduled – because she observed the Sabbath.

246.     In addition, Ms. Potter did not attend many of the Company's other informal social events because she strongly disapproved of male Partners' overtly sexual conduct toward female staff at the events.    Upon information and belief, KPMG Partners accosted and manhandled junior female employees at the Company happy hours.   Male Partners regularly took "body shots" off of female employees, during which Partners would put salt or sugar on a female employee's neck and lick it off.  Principal Brown was present and witnessed these events, and through her inaction tacitly condoned the behavior of her male counterparts and subordinates.

247.     Accordingly, these socializing events were much more amenable to fostering male employees' sense of belonging and ownership than women.   Nonetheless, KPMG's promotion decisions rely substantially on personal relationships built at Company social events that are hostile to, or that tend to exclude, female employees.

248.     Because Ms. Potter did not engage in or otherwise support these hostile social events, she was marginalized, downgraded in her review, and denied a promotion.

249.     Upon information and belief, KPMG took advantage of the performance evaluation system's lack of transparency, quality standards and controls, and opportunities for redress by including unfounded criticism against many female employees.

250.     Upon information and belief, KPMG's flawed promotion practices consistently result in males being promoted more rapidly, developed more purposefully, and assigned more frequently to higher level positions than women across the Company.