UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DONNA KASSMAN et al., *individually and on behalf of* :
*a class of similarly situated female employees*, :
           :
             Plaintiffs, :
           :
         -v- :
           :
KPMG LLP, :
           :
             Defendant. :
------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:_____**
**DATE FILED: 2/7/2013**

11 Civ. 3743 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      Plaintiffs, five women, have brought this action on behalf of themselves and a putative class of current and former female professional employees of Defendant KPMG LLP, the U.S. member firm of global accounting firm KPMG International, alleging various forms of employment discrimination. Defendant has moved to dismiss, strike, or transfer most of Plaintiffs' claims, including all of their class claims. For the reasons discussed below, Defendant's motions are GRANTED in part and DENIED in part.

**BACKGROUND**

      The Third Amended Complaint ("TAC") in this case is 120 pages long and contains over 550 paragraphs. For present purposes, it suffices to describe the five named plaintiffs — Donna Kassman, Linda O'Donnell, Sparkle Patterson, Jeanette Potter, and Ashwini Vasudeva — and to briefly summarize their claims.[1]

---

[1]       On a motion to dismiss, a court may consider facts stated in the complaint, any documents attached to the complaint, and any documents incorporated by reference into the complaint. *See, e.g.*, *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). Accordingly, the following facts are taken from the Complaint and are assumed to be true for

## A.  The Named Plaintiffs

Kassman began working at KPMG in 1993 and was steadily promoted until 1999, when she was made Senior Manager.  (TAC ¶¶ 70-72).  In 2003, while out on maternity leave, her pay was significantly cut without sufficient explanation and in spite of strong performance reviews.  (TAC ¶¶ 74-78, 80-81).  When Kassman returned from maternity leave in 2004, she began working on a flexible time schedule.  (TAC ¶¶ 84, 106-7, 110).  For the next six years, Kassman was repeatedly denied promotion to Managing Director despite her interest in such a promotion, a promise to promote her, and the promotion of less senior and equally or less qualified male colleagues.  (TAC ¶¶ 88-91, 96).  During this same period, she experienced baseless and gendered complaints from her colleagues that led to her removal from the promotion track.  (TAC ¶¶ 92-97).  For example, a fellow Senior Manager and one of his subordinates filed complaints about Kassman, claiming that she was "unapproachable" and "too direct," and later criticized her "tone."  (TAC ¶¶ 92, 119).  In April 2009, after these complaints began, Kassman filed discrimination complaints with KPMG's Office of Ethics and Compliance and Office of the General Counsel.  (TAC ¶ 134).  Shortly thereafter, Kassman began experiencing harassment and enhanced discrimination that led her to transfer, in October 2009, from the New York to the Stamford office.  (TAC ¶¶ 118-31).  Despite repeated complaints to KPMG human resources officials, nothing was done to remedy the discrimination and, in October 2010, Kassman felt compelled to resign.  (TAC ¶¶ 132-50).

O'Donnell worked at KPMG from January 2003 until her termination in April 2009.  (TAC ¶ 152).  O'Donnell began her career in KPMG's Johannesburg, South Africa office, where

---

purposes of this motion. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

she was promoted to Manager.  (TAC ¶ 153).  In September 2006, O'Donnell began a rotation in KPMG's Atlanta office, and transitioned to a permanent position there in February 2007. (TAC ¶¶ 154-55).  As part of the rotation, KPMG demoted her to Senior Associate, ostensibly because all employees who transferred were demoted.  (TAC ¶¶ 154, 160).  Despite her demotion, O'Donnell continued performing Manager-level tasks.  (TAC ¶¶ 164-70).  In March 2008, O'Donnell informed her supervisors that she was pregnant, which resulted in a halt to her career progression.  (TAC ¶ 173).  She began receiving negative performance reviews for the first time and was denied a promotion to Manager, despite having held that title in South Africa, while others with less experience were promoted.  (TAC ¶¶ 174-78).  Moreover, after learning that O'Donnell was pregnant, her supervisor made several negative comments to her about pregnant women's abilities and a woman's role in an office and a family.  (TAC ¶¶ 185-86).  For example, he told her that he thought pregnant women were incapable of doing their jobs; that he did not see how, as a working mother, one could "tend to a child and work at KPMG at the same time"; and that O'Donnell did not need to work when her husband was the "breadwinner" in the family.  (TAC ¶ 185-86).  On the day O'Donnell returned from maternity leave, KPMG fired her, allegedly because of the economy.  (TAC ¶ 193).

Patterson worked as an Associate at KPMG from June 2007 until November 2010.  (TAC ¶¶ 196, 218).  Through 2009, Patterson received strong performance reviews and several performance awards.  (TAC ¶¶ 199-204).  Moreover, Patterson regularly performed tasks done by Senior Associates, but was never compensated or promoted, despite working as an Associate for longer than the standard two-year promotion timeframe.  (TAC ¶¶ 207-08, 218-21).  While Patterson was out on maternity leave, her supervisors asked her to reduce her role at KPMG. (TAC ¶ 224).  When she returned from maternity leave, Patterson was intentionally intimidated

3

and harassed by her supervisors and given negative performance reviews.  (TAC ¶ 225).  In addition, her largest client was taken away from her and, despite repeated requests, she was not provided with alternative work, resulting in a failure to meet her billable work goals.  (TAC ¶¶ 232, 244).  Patterson complained about the alleged discrimination and retaliation through various channels, but her complaints were ignored.  (TAC ¶¶ 250-59).  In November 2010, she felt compelled to resign because of the treatment, KPMG's failure to address her complaints, and a belief that there was no future for her at the company.  (TAC ¶¶ 261-66).

Potter was employed at KPMG for eleven years, from July 1995 to July 2006.  (TAC ¶ 268).  Potter was hired as a Manager and received strong performance reviews during her entire tenure at KPMG.  (TAC ¶¶ 269, 271-72).  Despite those reviews, Potter had her pay frozen when similarly situated male colleagues did not.  (TAC ¶¶ 280-87).  Potter was also induced to decline attractive employment offers from other accounting firms with the promise of a promotion, but was ultimately passed over for that promotion in favor of less qualified male colleagues, allegedly because she did not engage in hostile and degrading social activities.  (TAC ¶¶ 292-304).  For example, in May 2002 Potter was removed from the track for a promotion she had been promised because she did not "schmooze" enough at Friday happy hours.  (TAC ¶ 298).   Potter declined to attend these happy hours for religious reasons and because male partners regularly engaged in overtly sexual conduct toward female employees at the events, including doing "body shots" (licking salt or sugar off of another person's body while consuming alcohol) off of female employees.  (TAC ¶¶ 298-99).  In July 2006, Potter felt compelled to resign from KPMG based on the lack of possible advancement, hostile and harassing comments from her supervisors, and the company's failure to address any of the discriminatory and harassing treatment she received.  (TAC ¶¶ 306-12).

4

Vasudeva began her career at KPMG as an Intern, but was ultimately promoted to Senior Associate based on her strong performance, which was reflected in the positive reviews and numerous performance awards she received.  (TAC ¶¶ 313-17).  Vasudeva's career at KPMG stalled, however, when she informed her supervisors that she was pregnant and planned to take maternity leave.  (TAC ¶ 328).  Thereafter, she was passed over for promotions in favor of less qualified male employees, removed from her biggest client, reassigned to a client located far from her office, not invited to "client-building" events when male employees were, denied adequate support staff to meet her supervisors' expectations, began receiving negative performance reviews for irrelevant skills, and steered toward a flexible time schedule despite the fact that she was working full-time hours.  (TAC ¶¶ 327-54).  She was also subjected to sexual harassment and other degrading treatment by senior managers.  (TAC ¶ 361).  For example, in July 2009, one of Vasudeva's former supervisors suggested that, for women, the flavor of certain Indian food was similar to semen "in their mouth[s]."  (TAC ¶ 361).  In June 2009, Vasudeva complained about her treatment to senior management, human resources personnel, and ethics and compliance personnel.  (TAC ¶¶ 355, 367).  Nevertheless, KPMG failed to respond.  (TAC ¶ 367).  In September 2009, Vasudeva felt compelled to resign.  (TAC ¶ 368).

## B.  Summary of Claims

The TAC includes nineteen counts of employment discrimination under various statutes and on behalf of different combinations of named and putative class plaintiffs.  Specifically, it includes counts alleging: (1) individual and class claims for pay discrimination, promotion discrimination, and pregnancy and caregiving discrimination in violation of Title VII, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL") on behalf of Kassman, Patterson, and all members of the putative class (Counts I-

5

III, V-VI, VII-X); (2) claims for the denial of equal pay for equal work under the federal and

New York State Equal Pay Acts ("EPA" and "NYSEPA," respectively) on behalf of Kassman,

O'Donnell, Patterson, Vasudeva and similarly situated claimants with respect to the EPA, and on

behalf of all individual plaintiffs and putative class plaintiffs with respect to the NYSEPA

(Counts IV, XI); (3) individual claims for retaliation under Title VII on behalf of Kassman and

Patterson; under the NYSHRL and NYCHRL on behalf of Kassman; under the EPA on behalf of

Kassman, O'Donnell, Patterson, and Vasudeva; under the NYSEPA on behalf of Kassman and

Potter; and under the Family and Medical Leave Act ("FMLA") on behalf of O'Donnell,

Patterson, and Vasudeva (Counts XII-XVI, XVIII); (4) individual claims for violations of the

FMLA on behalf of O'Donnell, Patterson, and Vasudeva (Count XVII); and (5) an individual

claim for race discrimination in violation of Title 42, United States Code, Section 1981 on behalf

of Patterson (Count XIX).

     The class claims (Counts I-XI) are brought on behalf of a putative class composed of

"female exempt Client Service and Support Professionals, including but not limited to female

Associates, Senior Associates, Managers, Senior Managers and Managing Directors."  (TAC

at 1).  Plaintiffs allege that this class suffers from "a pattern and practice of gender

discrimination, and employment policies and practices."  (TAC ¶ 371).  Such policies and

practices include

> (a) assigning female Professionals to lower titles and classifications than their
> male counterparts; (b) paying female Professionals less than their male
> counterparts; (c) denying female Professionals promotion and advancement
> opportunities in favor of male employees; (d) treating pregnant employees and
> mothers differently from non-pregnant employees, male employees, and non-
> caregivers; and (e) failing to prevent, respond to, adequately investigate, and/or
> appropriately resolve instances of gender discrimination and pregnancy/caregiver
> discrimination in the workplace.

(TAC ¶ 371).  Plaintiffs allege that problems resulting from these practices were "systemic and Company-wide, because . . . all stem from flawed policies, practices and procedures which emanate from the Company's New York headquarters."  (TAC ¶ 374).  They identify as problematic Defendant's "assignment, development, promotion, advancement, compensation and performance evaluation policies, practices and procedures."  (TAC ¶ 372).  Plaintiffs allege that these policies "all suffer from a lack of transparency, adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge."  (TAC ¶ 372).  "As a result," they contend, "employees are assigned, evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees."  (TAC ¶ 372).

With respect to their claims under the EPA, Plaintiffs allege a putative Collective Action class composed of all future, current, and former female Professionals during the liability period, including female Professionals who "(a) were not compensated equally to males who had substantially similar job classifications, functions, families, titles and/or duties, (b) were not compensated equally to males who performed substantially similar work, and (c) who were denied promotion and advancement opportunities that would result in great compensation in favor of lesser qualified male employees."  (TAC ¶ 418).  Putative class members are required to "opt-in" to the Collective Action class pursuant to Title 29, United States Code, Section 216(b). (TAC ¶ 420).

## LEGAL STANDARDS

### A.  Rule 12(b)(6)

Defendant moves to dismiss many of Plaintiffs' claims pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  To survive a Rule 12(b)(6) motion, a plaintiff must generally

plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a

sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels

and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.  Further, if the plaintiff has not "nudged [his or her] claims across the

line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

Twombly and *Iqbal* notwithstanding, the Supreme Court has held that, to survive a

motion to dismiss, "a complaint in an employment discrimination lawsuit [need] not contain

specific facts establishing a prima facie case of discrimination under the framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Id.* at 569 (quoting *Swierkiewicz v.*

*Sorema N. A.*, 534 U.S. 506, 508 (2002)) (internal quotation marks omitted).[2]  Nevertheless, the

---

[2]    Whether *Swierkiewicz* remains good law in light of *Twombly* and *Iqbal* is "somewhat of
an open question" in this Circuit.  *Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir.
2012) (summary order).  Although the Supreme Court expressly reaffirmed the decision in
*Twombly*, *see* 550 U.S. at 569-70, the Second Circuit has questioned its continuing vitality in
several unpublished opinions.  *See Hedges*, 456 F. App'x at 23; *Jackson v. Cnty. of Rockland*,
450 F. App'x. 15, 19 (2d Cir. 2011) (summary order); *Schwab v. Smalls*, 435 F. App'x 37, 39-40
(2d Cir. 2011) (summary order).  The Court of Appeals has not resolved the question, however,
suggesting only "that, at a minimum, employment discrimination claims must meet the standard

elements of a *prima facie* case "provide an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." *Sommersett v. City of N.Y.*, No. 09 Civ. 5916 (LTS) (KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011). Accordingly, "courts consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the grounds on which it rests." *Murphy v. Suffolk Cnty. Cmty. Coll.*, No. 10-CV-0251 (LDW) (AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011).

## B. Rule 23(d)(1)(D)

Defendant also moves to strike some of Plaintiffs' class claims pursuant to Rule 23(d)(1)(D), which provides that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons." Fed. R. Civ. P. 23(d)(1)(D); *see also* Fed. R. Civ. P. 23(c)(1)(A) (providing that "[a]t an early practicable time . . . , the court must determine by order whether to certify the action as a class action"). Pursuant to that Rule, a party may move to strike class claims even before discovery. *See, e.g.*, *Davito v. AmTrust Bank*, 743 F. Supp. 2d 114, 115-16 (E.D.N.Y. 2010) (collecting cases); *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06 Civ. 6198 (LAK) (JCF), 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008). In this Circuit, however, "[m]otions to strike are generally looked upon with disfavor." *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (quoting *Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011)) (internal quotation mark omitted); *accord Calibuso v. Bank of Am. Corp.*, — F. Supp. 2d —, No. 10 Civ. 1413 (JFB) (ETB), 2012 WL 4458404, at *8 (E.D.N.Y. Sept. 27, 2012) (quoting

---

of pleading set forth in *Twombly* and *Iqbal*, even if pleading a prima facie case is not required." *Hedges*, 456 F. App'x at 23.

*Chenensky*, 2011 WL 1795305, at *1).  A motion to strike class claims "is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  *Chen-Oster*, 877 F. Supp. 2d at 117 (quoting *Chenensky*, 2011 WL 1795305, at *1); *see also, e.g.*, *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) ("[D]istrict courts in this Circuit have frequently found that a determination of whether the Rule 23 requirements are met is more properly deferred to the class certification stage, where a more complete factual record can aid the court in making this determination.").  Nevertheless, such a motion may be entertained "if the inquiry would not mirror the class certification inquiry and if resolution of the motion is clear."  *Davito*, 743 F. Supp. 2d at 116 (quoting *In re Initial Pub. Offering Sec. Litig.*, 21 MC 92 (SAS), 2008 WL 2050781, *2 (S.D.N.Y. May 13, 2008)) (internal quotation mark omitted); *accord Chen-Oster*, 877 F. Supp. 2d at 117.

## DISCUSSION

Defendant challenges Plaintiffs' class claims pursuant to both Rule 12(b)(6) and Rule 23(d)(1)(D).  (Def.'s Mem. 12-36).  In addition, it moves to dismiss various individual claims brought by Plaintiffs pursuant to Rule 12(b)(6).  (*Id.* at 36-49).  The Court will begin with the class claims and then turn to Plaintiffs' individual claims.

**A.  The Class Claims**

Defendant raises several arguments with respect to Plaintiffs' class claims.  First and foremost, relying primarily on the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S. Ct. 2541 (2011), KPMG seeks to dismiss or strike all of Plaintiffs' class claims on the grounds that (1) Plaintiffs' allegations are insufficient to state a claim; (2) Plaintiffs

fail to allege common questions of law or fact sufficient to maintain a class action; (3) Plaintiffs, as former employees of KPMG, lack standing to certify a class under Rule 23(b)(2); (4) certification under Rule 23(b)(2) would be improper because Plaintiffs seek monetary relief and there is no class-wide injunctive relief that could be granted; (5) certification under Rule 23(b)(3) would be improper because Plaintiffs cannot establish that questions of law or fact common to the class predominate over individual questions and because a class action is not superior to other methods of litigating the case; and (6) hybrid certification under Rules 23(b)(2) and 23(b)(3) would be improper.  (Def.'s Mem. 12-31).  Second, KPMG contends that Plaintiffs cannot maintain a nationwide class under the NYSHRL, the NYCHRL, or the NYSEPA insofar as the proposed class would include people who neither lived nor worked in New York State or City.  (*Id.* at 31-32).  And third, it argues that Plaintiffs' disparate impact claims must be dismissed because the TAC fails to identify any specific, facially neutral policy or practice that caused a disparate impact.  (*Id.* at 33-36).  The Court will address these arguments in turn.

### 1.  The Motion to Dismiss or Strike in Light of *Dukes*

As an initial matter, Defendant moves to dismiss or strike Plaintiffs' class claims in light of *Dukes*.  In that case, the Supreme Court reversed a decision of the Ninth Circuit to certify a nationwide class of female Wal-Mart employees who alleged that "the discretion exercised by their local supervisors over pay and promotion matters" was discriminatory.  131 S. Ct. at 2547. The Supreme Court held that the class could not satisfy the "commonality" requirement set forth in Rule 23(a)(2), which "requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Id.* at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)) (internal quotation marks omitted).  The Court explained that the plaintiffs could have satisfied that requirement in either of two ways:

> First, if the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)."  Second, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes."

*Id.* at 2553 (quoting *Falcon*, 457 U.S. at 159 n.15).  In *Dukes*, the plaintiffs could do neither:  Wal-Mart had no companywide testifying procedure or evaluation method and the only "policy" at issue was one of unfettered local discretion, which "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices."  *Id.* at 2254 (emphasis in original).

        Significantly, however, the Court did not close the door altogether on the possibility of certifying a class based on a policy of giving discretion to lower-level supervisors.  *See Calibuso*, 2012 WL 4458404, at *15.  The Court acknowledged that "'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory — since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'"  *Dukes*, 131 S. Ct. at 2254 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988)).  To warrant certification in such a case, however, a plaintiff must identify "a 'specific employment practice' . . . that ties all [of the class members'] claims together."  *Id.* at 2255-56 (quoting *Watson*, 487 U.S. at 994 (plurality opinion)).  "The operative question is whether the plaintiffs can identify a 'common mode of exercising discretion that pervades the entire company.'"  *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2012 WL 205875, at *5 (S.D.N.Y. Jan. 19, 2012) (Francis, M.J.) (Report & Recommendation)

(quoting *Dukes*, 131 S. Ct. at 2254-55), *adopted in relevant part by Chen-Oster*, 877 F. Supp. 2d 113.

Relying on *Dukes*, KPMG makes a forceful argument that Plaintiffs will be unable to satisfy Rule 23(a)(2)'s commonality requirement in this case, but its argument is premature. Unlike *Dukes*, which involved an appeal from the certification of a class, the present case is at the motion to dismiss or strike stage.  Thus, the relevant question is not, as it was in *Dukes*, whether Plaintiffs have "*prove*[*d*] that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.," for purposes of Rule 23.  131 S. Ct. at 2551 (initial emphasis added).  Instead, the relevant question is whether, based on the allegations in the TAC, "it is plausible that plaintiffs will come forth with sufficient evidence at the class certification stage to demonstrate commonality."  *Calibuso*, 2012 WL 4458404, at *15.  The answer to that question is yes.  Although the TAC includes generalized and conclusory allegations of "flaws" and "discretion" that would not suffice by themselves, Plaintiffs allege that several specific headquarters-level policies resulted in discrimination.  These policies include, but are not limited to, evaluation of employees using a common standard known as "The KPMG Way" (TAC ¶13); KPMG's flexible work schedule policy (TAC ¶¶ 29, 39-43); and KPMG's alleged policy of automatically demoting women, but not men, who transfer to the United States from an international office (TAC ¶ 160-61).  These allegations suffice to survive at this stage of the proceedings.  *See Calibuso*, 2012 WL 4458404, at *13-16 (denying a post-*Dukes* motion to dismiss in an analogous employment discrimination class action on the ground that plaintiffs had sufficiently alleged specific headquarters-level policies to satisfy their burden at the pleadings stage); *Chen-Oster*, 877 F. Supp. 2d at 118-19 (same); *see also, e.g.*, *Barghout v. Bayer Healthcare Pharms.*, No. 11-CV-1576 (DMC) (JAD), 2012 WL 1113973 (D.N.J. Mar. 30, 2012)

13

(finding that a motion to dismiss should be denied where plaintiffs had plausibly alleged a disparate impact claim based on company-wide promotion and pay policies).

Putting aside whether Plaintiffs have standing to bring a Rule 23(b)(2) class action — an issue that is addressed in more detail below — Defendants' other arguments in support of its motion to strike are even more easily rejected.  That is because, at least in this Circuit, a motion to strike class claims is considered premature if the issues raised are "the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b)."  *Rahman*, 2008 WL 161230, at *3; *accord Winfield*, 842 F. Supp. 2d at 573; *Chen-Oster*, 877 F. Supp. 2d at 117; *Calibuso*, 2012 WL 4458404, at *8.  KPMG's assertions to the contrary notwithstanding (Def.'s Reply Mem. 4-6), that is the case here.  KPMG's objections go to whether Plaintiffs can satisfy the requirements of Rule 23(a)(2), (b)(2), and (b)(3).  (Def.'s Mem. 14-31 (arguing that class certification discovery cannot save the class claims)).  These are "exactly the sort[s] of issues[s] that would be litigated and decided in the context of a motion for class certification."  *Chen-Oster*, 877 F. Supp. 2d at 117; *accord Winfield*, 842 F. Supp. 2d at 573-74; *Calibuso*, 2012 WL 4458404, at *13-16; *Barghout*, 2012 WL 1113973, at *11-12.  Accordingly, they are "procedurally premature," *Chen-Oster*, 877 F. Supp. 2d at 117, and denied "without prejudice to the defendant's ability to oppose class certification on these same grounds," *Winfield*, 842 F. Supp. 2d at 574.

## 2. Plaintiffs' Standing to Seek Class Certification Under Rule 23(b)(2)

The one component of Defendant's motion to strike that calls for more detailed analysis is its argument that Plaintiffs, as former employees of KPMG, lack standing to seek injunctive or declaratory relief and, therefore, cannot, as a matter of law, obtain class certification under Rule

23(b)(2).[3]  (Def.'s Mem. 19-22).  The Supreme Court has held that a court may defer

consideration of Article III standing until after class certification where certification issues are

"'logically antecedent' to Article III concerns."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831

(1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)); *see also Mahon v.

Ticor Title Ins. Co.*, 683 F.3d 59, 64-65 (2d Cir. 2012) (limiting *Ortiz*'s "logically antecedent"

holding to cases where the certification issue is dispositive).  But this exception to the usual rule

that a court must confirm that it has jurisdiction over a plaintiff at the outset of a case, *see, e.g.*,

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,

433 F.3d 181, 197-98 (2d Cir. 2005), does not apply where, as here, the standing of the *named*

plaintiffs is in question, *see, e.g.*, *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406

(S.D.N.Y. 2011) (citing cases).  Moreover, in *Chen-Oster* — a factually analogous case — Judge

Sand addressed the question of standing at the motion-to-dismiss stage and, consistent with

Defendant's argument here, held that, following *Dukes*, a former employee lacks standing to

seek injunctive or declaratory relief.  *See* 877 F. Supp. 2d at 120-22.

    To satisfy the "'irreducible constitutional minimum' of standing," a plaintiff must

demonstrate (1) a personal injury-in-fact (2) that the challenged conduct of the defendant caused

and (3) that a favorable decision will likely redress.  *Alliance for Open Soc'y Int'l, Inc. v. U.S.

Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992)), *cert. granted*, 2013 WL 135533 (U.S. Jan. 11, 2013).  Where, as

here, a plaintiff seeks injunctive relief, he or she must also establish a "real and immediate threat

---

[3]      Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied
and if . . . the party opposing the class has acted or refused to act on grounds that apply generally
to the class, so that final injunctive relief or corresponding declaratory relief is appropriate
respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

of repeated injury" demonstrated by more than "[p]ast exposure to illegal conduct." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)) (internal quotation marks omitted); *see also, e.g.*, *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) ("[A]bstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (quoting *O'Shea*, 414 U.S. at 494) (internal quotation marks and brackets omitted)).  Put another way, a plaintiff seeking prospective relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."  *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

These principles demonstrate that a plaintiff generally lacks standing to seek injunctive or declaratory relief against his or her former employer, as there is no prospect that he or she will be injured in the future.  *See, e.g.*, *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *see also Oakley v. Verizon Commc'ns Inc.*, 09 Civ. 9175 (CM), 2012 WL 335657, at *15 (S.D.N.Y. Feb. 1, 2012) ("Former employees lack standing to obtain injunctive relief because they are no longer affected by the challenged policies, and an injunction would do nothing to remedy their past injuries.").  Where, as here, a plaintiff seeks reinstatement with a former employer, however, several courts have held that the former employee does have standing to seek prospective relief.  *See, e.g.*, *Freitag v. Ayers*, 468 F.3d 528, 547-48 (9th Cir. 2006); *Chen-Oster*, 2012 WL 205875, at *5-6, *overruled in relevant part by* 877 F. Supp. 2d at 121-22; *Gilster v. Primebank*, No. C 10-4084-MWB, 2012 WL 3518507, at *32 (N.D. Iowa Aug. 14, 2012); *Levin v. Madigan*, 697 F. Supp. 2d 958, 975 (N.D. Ill. 2010); *see also True v. Neb.*, 612 F.3d 676, 679 (8th Cir. 2010) (holding that a former employee had standing to seek

injunctive relief against enforcement of a random vehicle search policy by his employer where

he sought reinstatement).  As Judge Sand explained in *Chen-Oster*:

> The reason . . . is that a specific request for "reinstatement absent a corresponding
> injunction would expose plaintiffs to the immediate threat of further
> discrimination."  In other words, should plaintiffs prevail, and should a court
> grant them reinstatement, they have a very real interest in a court issued
> injunction preventing their employer from engaging in the same or substantially
> identical discriminatory behavior.

877 F. Supp. 2d at 122 (quoting *Chen-Oster*, 2012 WL 205875, at *6); *accord Levin*, 697 F.

Supp. 2d at 975.  In addition, denying such plaintiffs standing to pursue injunctive relief might

have perverse effects: It could encourage plaintiffs "to remain employed, sometimes under very

difficult conditions, to ensure standing" or encourage employers to terminate employees in order

to forestall their ability to seek prospective relief.  *Chen-Oster*, 877 F. Supp. 2d at 122.  "Neither

outcome is desirable."  *Id.*

     Judge Sand recognized the force of these arguments in *Chen-Oster*, *see id.* at 121-22, but

nevertheless concluded that he was bound by the Supreme Court's ruling in *Dukes* to hold that a

plaintiff may never seek injunctive relief against his or her former employer.  His conclusion was

based on the third part of *Dukes*, in which the Supreme Court opined that the plaintiffs' claims

for backpay were also improperly certified under Rule 23(b)(2) because that provision "applies

only when a single injunction or declaratory judgment would provide relief to each member of

the class. . . .  [I]t does not authorize class certification when each class member would be

entitled to an individualized award of monetary damages."  131 S. Ct. at 2557.  As part of its

analysis, the Court rejected the plaintiffs' argument that a Rule 23(b)(2) class may be certified as

long as claims for monetary damages did not "predominate" over requests for injunctive and

declaratory relief.  *See id.* at 2559.  Among other things, the Court reasoned, such a

"predominance test" would

> require the District Court to reevaluate the roster of class members continually.
> *The Ninth Circuit recognized the necessity for this when it concluded that those*
> *plaintiffs no longer employed by Wal-Mart lack standing to seek injunctive or*
> *declaratory relief against its employment practices.*  The Court of Appeals'
> response to that difficulty, however, was not to eliminate all former employees
> from the certified class, but to eliminate only those who had left the company's
> employ by the date the complaint was filed.  That solution has no logical
> connection to the problem, since those who have left their Wal-Mart jobs since
> the complaint was filed have no more need for prospective relief than those who
> left beforehand.  As a consequence, even though the validity of a (b)(2) class
> depends on whether "final injunctive relief or corresponding declaratory relief is
> appropriate respecting the class as a whole," *about half the members of the class*
> *approved by the Ninth Circuit have no claim for injunctive or declaratory relief at*
> *all*. . . .  What follows from this . . . is not that some arbitrary limitation on class
> membership should be imposed but that the backpay claims should not be
> certified under Rule 23(b)(2) at all.

*Id.* at 2559-60 (quoting Fed. R. Civ. P. 23(b)(2)) (original emphasis omitted and emphases

added) (citation omitted).

Despite "misgivings" and "reservations," Judge Sand relied on this language to conclude

that *Dukes* had adopted a "blanket rule that always denies standing to ex-employees."  *Chen-*

*Oster*, 877 F. Supp. 2d at 121-22.  He based this conclusion on three considerations:

> First, like the Plaintiffs here, the plaintiffs in *Dukes* sought reinstatement.  In this
> respect, then, the facts of this case cannot be meaningfully differentiated from the
> facts in *Dukes*.  Second, the issue of ex-employee standing was fully briefed and,
> we presume, fully considered by the Supreme Court.  Third, the Supreme Court's
> analysis of this issue, and its blanket denial of standing to ex-employees, is not
> dictum: it was necessary to the resolution of this case insofar as it undergirded the
> invalidation of the Ninth Circuit's "predominance test" and foreclosed
> certification under 23(b)(2).

*Id.* at 121-22 (citations omitted).  For these reasons, Judge Sand concluded that he was

"obligated to follow the rule, notwithstanding misgivings about its wisdom."  *Id.* at 121

This Court respectfully disagrees with Judge Sand.  In fact, there are several reasons that the language from *Dukes* quoted above should not be read to hold categorically that a former employee seeking reinstatement can never seek injunctive or declaratory relief against his or her former employer — a holding that would apply not only in the class action context, but also to individual Title VII claims.  First, it is not clear from the passage whether the Supreme Court itself reached the conclusion that former employees lacked standing or merely accepted as its premise the Ninth Circuit's judgment on that issue.  *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions — *even on jurisdictional issues* — are not binding in future cases that directly raise the questions." (emphasis added) (citations omitted)).[4]  Second, to the extent the Court did reach that conclusion itself, it did not have occasion to consider the specific question presented here — namely, whether a former employee *seeking reinstatement* has standing to seeking injunctive relief.  That issue was not part of the questions on which the Court granted *certiorari*.  *See Wal-Mart Stores, Inc v. Dukes*, 131 S. Ct. 795 (2010); Petition for a Writ of Certiorari, *Dukes*, 131 S. Ct. 2541 (No. 10-277), 2010 WL 3355820, at *1.  And while the parties did address the standing of former employees in their briefs, they did so only in passing and did not address the specific question of

---

[4]     Notably, the Ninth Circuit itself appears to accept that a former employee can have standing to pursue injunctive or declaratory relief if he or she seeks reinstatement.  Indeed, the very case cited by the Ninth Circuit in *Dukes* for the blanket proposition that former Wal-Mart employees "do not have standing to pursue injunctive or declaratory relief," *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 623 (9th Cir. 2010) (en banc) (citing *Walsh*, 471 F.3d at 1037), acknowledged Circuit precedent indicating non-employees "may have standing to sue for injunctive relief against an employer . . . [where] those non-employees [are] in the process of seeking reinstatement to their former positions, or seeking work from that employer," *Walsh*, 471 F.3d at 1037 (citing *Freitag*, 468 F.3d 528, and *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981), *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996)).

whether former employees seeking reinstatement have standing.  *See* Brief for Petitioner 51-52,

*Dukes*, 131 S. Ct. 2541 (No. 10–277), 2011 WL 201045; Brief for Respondents 61-64, *Dukes*,

131 S. Ct. 2541 (No. 10–277), 2011 WL 686407; Reply Brief for Petitioner 22, *Dukes*, 131 S. Ct.

2541 (No. 10–277), 2011 WL 970341.

　　　Third, and more substantively, the *Dukes* Court's larger analysis does not depend on such

a broad reading of the language concerning the standing of former employees.  It is true that the

operative complaint in *Dukes* sought "[a]n order restoring class members to their rightful

positions at Wal-Mart," Plaintiffs' Third Amended Complaint 25, *Dukes v. Wal-Mart Stores,*

*Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) (No. C 01–02252), 2002 WL 33645690, but it is

implausible that such an order would have applied to all 750,000 or so former employees in the

class, *see* 131 S. Ct. at 2560, many (perhaps most) of whom likely had no intention of seeking

reinstatement, let alone reasonable prospect of getting it.  In other words, the Court did not need

to reach the question of whether a former employee seeking reinstatement would have standing

to seek injunctive relief for its point — that some members of the class in *Dukes* lacked such

standing — to be valid.  Finally, with all due respect to Judge Sand's assessment, there is a

strong argument that the passage quoted above is indeed dictum, both because the Court did not

need to go beyond its holding with respect to Rule 23(a)(2), discussed above, to conclude that the

Ninth Circuit had erred in certifying a class and because, strictly speaking, the Court's point

about class members' standing was not necessary to its conclusion that claims for monetary relief

may not generally be certified under Rule 23(b)(2).

　　　In short, the Supreme Court's arguably broad language notwithstanding, it is a mistake to

read *Dukes* as having adopted a "blanket rule that always denies standing to ex-employees,"

*Chen-Oster*, 877 F. Supp. 2d at 122, which would have implications far beyond the class action

context.  Accordingly, the Court follows those courts that have held that a plaintiff seeking

reinstatement has standing to pursue injunctive or declaratory relief.  Applying that rule here,

Kassman and Patterson — the two Plaintiffs who bring class claims — have standing to pursue

claims for prospective relief, as both seek reinstatement at KPMG.  (*See* TAC ¶ 388; *id.* at 119).

Thus, to the extent that Defendant moves to dismiss or strike the named Plaintiffs' claims for

injunctive and declaratory relief on the ground that they lack standing, that motion is denied on

the merits.  To the extent that Defendant relies on *Dukes* to attack the standing of potential class

members (who may not seek or be eligible for reinstatement) or to challenge the adequacy of

Kassman and Patterson as class representatives (Def.'s Mem. 21-22), its motion is denied as

premature, because such arguments go to the propriety of certifying a class under Rule 23(b)(2).

As many courts in this Circuit have held — even after *Dukes* — arguments of that sort can and

should be deferred until class certification.  *See, e.g.*, *In re DDAVP Indirect Purchaser Antitrust*

*Litig.*, — F. Supp. 2d —, No. 05 Civ. 2237 (CS), 2012 WL 4932158, at *8-9 (S.D.N.Y. Oct. 17,

2012) (describing "a growing consensus among district courts that class certification is logically

antecedent, where its outcome will affect the Article III standing determination, and the weight

of authority holds that in general class certification should come first" and citing cases (internal

quotation marks and citation omitted)); *Winfield*, 842 F. Supp. 2d at 574 (same); *In re Digital*

*Music Antitrust Litig.*, 812 F. Supp. at 406-07 (same).

### 3.  The Motion to Strike Class Claims Under New York City and State Law

In addition to the federal law class claims, the TAC includes nationwide class claims

pursuant to the NYSHRL (Counts V-VII), the NYCHRL (Counts XIII-X), and the NYSEPA

(Count XI).  Defendant moves to strike the nationwide putative classes under each of these

statutes because the TAC fails to allege that the putative class members lived or worked in New

York City or State.  (Def.'s Mem. 31).  Plaintiffs concede that they may bring class claims

pursuant to the NYSHRL and NYCHRL only on behalf of people who live or work in New York

State and New York City, respectively, and therefore represent that they will seek to certify

classes for those claims consistent with those geographic limitations.  (Pls.' Mem. 29-30).

Plaintiffs dispute Defendant's arguments with respect to their NYSEPA claims, however, and

maintain that a nationwide class may be appropriate because "KPMG's pay decisions are made,

implemented and enforced in New York by actors in the state of New York."  (*Id.* at 30).

   Plaintiffs' contention — for which they cite no legal authority — does not survive

scrutiny.  Under New York law, it is a "settled rule of statutory interpretation, that unless

expressly stated otherwise, 'no legislation is presumed to be intended to operate outside the

territorial jurisdiction of the state . . . enacting it.'"  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 730

N.Y.S.2d 46, 47 (App. Div. 1st Dep't 2001) (quoting 73 Am. Jur. 2d Statutes § 359, at 492),

*aff'd,* 98 N.Y.2d 314 (2002); *see also* N.Y. Stat. Law § 149 ("The laws of one state can have no

force and effect in the territorial limits of another jurisdiction, in the absence of the consent of

the latter.").  The NYSEPA is "silent as to its application abroad."  *Hart v. Dresdner Kleinwort

Wasserstein Sec., LLC.*, No. 06 Civ. 0134 (DAB), 2006 WL 2356157, at *7 (S.D.N.Y. Aug. 9,

2006).  Given the presumption against extraterritoriality, it follows that the statute does not apply

to people who live and work outside of New York State.  *See id.*; *see also Hammell v. Banque

Paribas*, No. 90 Civ. 4799 (JSM), 1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993) (stating,

with respect to a provision of the New York Labor Law in the same Article as the NYSEPA, that

"[t]he purpose of this area of the labor law is clearly to protect workers laboring in New York");

*cf. Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 289-92 (2010) (rejecting an argument that

decisionmaking at corporate headquarters in New York State or City was sufficient to establish application of the NYSHRL and NYCHRL to workers outside the relevant jurisdiction).[5]

Accordingly, Defendant's motion to strike the NYSHRL, NYCHRL, and NYSEPA class claims is granted to the extent those claims are brought on behalf of people who do or did not live or work in New York State (for purposes of the NYSHRL and NYSEPA) or New York City (for purposes of the NYCHRL).  The motion is denied with respect to named Plaintiffs and putative class members who did live or work within the relevant geographic boundaries.

### 4.   The Motion to Dismiss the Disparate Impact Claims

Next, Defendant moves to dismiss the Title VII disparate impact claims brought on behalf of the putative class in Counts I through III for failure "to identify any specific facially neutral policy or practice that caused any disparate impact."  (Def.'s Mem. 33).  Defendant cites a number of cases for the general proposition that plaintiffs must identify a specific facially neutral employment policy in order to survive a motion to dismiss.  (*Id.* at 33-34 (quoting and citing *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005), *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 111-12 (2d Cir. 2001), *Tucker v. Gonzales*, No. 03 Civ. 3106 (LTS) (FM), 2005 WL 2385844 (S.D.N.Y. Sept. 27, 2005), and *Kulkarni v. City Univ. of N.Y.*, No. 01 Civ. 10628 (DLC), 2002 WL 1315596, at *1-2 (S.D.N.Y. June 14, 2002))).  As discussed above, however, Plaintiffs in this case do allege that specific, facially neutral companywide policies had a disparate impact on female class members, including, for example, the evaluation of employees

---

[5]      It is perhaps worth noting that in a factually analogous case in this District, counsel for Plaintiffs here recently filed an amended complaint limiting claims under the NYSHRL, the NYCHRL, *and* the NYSEPA to people living or working in New York State and City.  *See* Second Amended Complaint, *Moore v. Publicis Groupe, SA*, No. 11 Civ. 1279 (AC) (Docket No. 257).

using a common standard known as "The KPMG Way."  (TAC ¶ 13).  Whether or not Plaintiffs

can ultimately prevail, those allegations are sufficient to survive a motion to dismiss.

## B.  The Individual Claims

The Court turns, then, to Defendants' various challenges to the individual claims.  In

particular, KPMG moves to dismiss (1) several of Plaintiffs' individual claims under the EPA

and the NYSEPA; (2) all of Plaintiffs' retaliation claims under the EPA and NYSEPA; (3) all of

Patterson's individual Title VII claims; (4) Kassman's claims for discriminatory performance

evaluations; and (5) Kassman's constructive discharge claim.  In addition, Defendant moves to

sever and dismiss the claims of all Plaintiffs other than Kassman on the ground of misjoinder.

The Court will address each of these arguments in turn.

### 1.  Plaintiffs' Claims Under the EPA and NYSEPA

First, Defendant moves to dismiss some Plaintiffs' individual claims under the EPA and

NYSEPA for failure to state a claim, arguing that two plaintiffs failed to name male comparators

as required and that two plaintiffs are stating disguised failure-to-promote claims.  To prove

discrimination under the EPA and NYSEPA, a plaintiff must show that "(i) the employer pays

different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs

requiring equal skill, effort, and responsibility; and (iii) the jobs are performed under similar

working conditions."  *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001)

(quoting *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999)), *abrogated on other grounds by*

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Rose v. Goldman, Sachs, & Co., Inc.*, 163

F. Supp. 2d 238, 243 (S.D.N.Y. 2001) ("Claims for violations of the Equal Pay Act and the New

York State Equal Pay Act may be evaluated under the same standard.").  Significantly, a plaintiff

"need not demonstrate that her job is identical to a higher paid position, but only must show that

the two positions are 'substantially equal' in skill, effort, and responsibility." *Lavin-McEleney*,

239 F.3d at 480 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995)).

Applying these standards, Defendant argues first that Kassman's and Potter's equal pay

claims are fatally flawed because neither Plaintiff alleges the existence of a specific male

comparator who was paid more than her.  (Def.'s Mem. 37-39).  Whether or not a female

plaintiff must identify a specific male comparator — an issue on which the Second Circuit has

reserved judgment, *see Lavin-McEleney*, 239 F.3d at 480 — the allegations in the TAC suffice to

survive at this stage.  Kassman alleges that while on maternity leave her base salary was cut by

$20,000, that "[s]imilar cuts were not made to male counterparts' salaries, and as a result,

Kassman was and continued to be paid $20,000 less than her male counterparts during her tenure

at KPMG."  (TAC ¶ 81).  Further, she specifically alleges that Senior Manager John

Montgomery, who "joined KPMG after Kassman, worked under the same Partner, . . . worked on

engagements for similar clients[, and] . . . performed the same tasks as Kassman . . . with no

greater skill or effort than Kassman," was paid more than she was.  (TAC ¶ 82).  For her part,

Potter alleges that she and other women at KPMG had their pay frozen in October 2002 and that

similarly situated men did not.  (TAC ¶¶ 280-82).  She also alleges that a specific male

comparator, Senior Manager David Buchner, "whose qualifications experience, and

responsibilities were no greater than Ms. Potter's . . . continued to receive pay raises after 2002."

(TAC ¶ 283).  These allegations plainly name specific comparators and thus are sufficient to

state a claim, even under the higher standard urged by Defendants.

Defendant also seeks dismissal of Patterson's and O'Donnell's equal pay claims on the

ground that they are merely disguised failure-to-promote claims.  (Def.'s Mem. 39).  Although

the EPA does not afford a remedy for denial of promotions, or "titles," the fact that comparators

of the opposite sex had different job titles does not bar an EPA claim.  *See, e.g.*, *Moccio v. Cornell Univ.*, — F. Supp. 2d —, No. 09 Civ. 3601 (PAE), 2012 WL 3648450, at *25 (S.D.N.Y. Aug. 27, 2012) (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, No. 10 Civ. 7462 (NRB), 2012 WL 1758128, at *3 (S.D.N.Y. May 17, 2012)) ("In determining whether two positions are substantially equal in skill, superficial comparisons based on job title or code are insufficient." (internal quotation marks omitted)).  Indeed, the EPA and implementing regulations are clear that the statute is concerned with the provision of equal pay for equal work, and that the "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance."  29 C.F.R. § 1620.13(e); *see also, e.g.*, *Tomka,* 66 F.3d at 1310 (stating that "the standard under the Equal Pay Act is job content and not job title or description.").  Accordingly, whether or not Patterson and O'Donnell had different titles than their male comparators, they have stated a claim under the EPA if they allege that they performed substantially the same job for less pay than those comparators.

They have so alleged.  In a section of the TAC titled "Disparate Pay," Patterson alleges that although she was an "Associate," she regularly performed tasks conducted by a "Senior Associate," but that she was compensated only at an Associate's level.  (TAC ¶¶ 207-08). Further, Patterson identifies specific male comparators who were supervised by the same manager and performed the same job as she did, but who were labeled — and paid — as Senior Associates.  (TAC ¶ 208).  In her "Disparate Pay" section, O'Donnell alleges that although she was employed as a Senior Associate, she regularly performed Manager-level tasks including setting up engagements, meeting with clients, working directly with partners and directors, performing conflict-of-interest checks and compiling budgets.  (TAC ¶¶ 165-67).  O'Donnell also alleges that in order to perform these tasks, she was given special access to computer

programs that was typically restricted to Managers, and at times even trained new Managers, a task normally done only by experienced Managers.  (TAC ¶ 166-67).  Finally, she too identifies a specific male comparator, Krupal Mehta, who she alleges was paid as a Manager despite the fact that he "performed precisely the same tasks" as O'Donnell, in a manner "not meaningfully or substantially better" than she, and that he had "a comparable educational background and experience" to hers.  (TAC ¶ 169).  These allegations plainly state a claim.

### 2.  Plaintiffs' Pay-Retaliation Claims

Next, Defendant moves to dismiss all of the Plaintiffs' EPA and NYSEPA pay-related retaliation claims.  The anti-retaliation provision of the FLSA, of which the EPA is a part, states in relevant part that it shall be unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3); *see also* N.Y. Labor Law § 215 (anti-retaliation statute).  To establish a *prima facie* claim of retaliation under the FLSA and the New York State analogue, a plaintiff must show: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Mullins v. City of N.Y.*, 626 F.3d 47, 53 (2d Cir. 2010); *see also, e.g.*, *Salazar v. Bowne Realty Assocs., L.L.C.*, 796 F. Supp. 2d 378, 384 (E.D.N.Y. 2011) (noting that the standards under the EPA and NYSEPA "significantly overlap" and require the same three elements).  Defendant contends that Plaintiffs' claims fail because they do not allege they made sufficiently specific complaints to satisfy the first prong of this test.  (Def.'s Mem. 41-42).  While Plaintiffs concede that O'Donnell and Potter have not pled retaliation claims under

27

the EPA or NYSEPA, they contend that Kassman, Patterson, and Vasudeva have done so.  (Pls.'
Mem. 36-38 & 36 n.31).

As the Supreme Court recently made clear, to satisfy the first prong of the test for a *prima
facie* claim of retaliation, "a complaint must be sufficiently clear and detailed for a reasonable
employer to understand it, in light of both content and context, as an assertion of rights protected
by the statute and a call for their protection."  *Kasten v. Saint-Gobain Performance Plastics
Corp.*, 131 S. Ct. 1325, 1335 (2011).  Similarly, under the New York Labor Law, Plaintiffs must
show that they "complained about a specific violation of the Labor Law."  *Castagna v. Luceno*,
No. 09 Civ. 9332 (CS), 2011 WL 1584593, at *12 (S.D.N.Y. Apr. 26, 2011) (quoting *Epifani v.
Johnson,* 882 N.Y.S.2d 234, 244 (App. Div. 2d Dep't 2009)) (internal quotation marks omitted).
An employee need not cite a specific statute, *see* N.Y. Labor Law § 215(1)(a), but her
"complaint to the employer [must] be of a colorable violation of the statute," *Castagna*, 2011
WL 1584593, at *12 (quoting *Weiss v. Kaufman*, No. 103473/2010, 2010 WL 4858896 (Sup. Ct.
N.Y. Cty. Nov. 18, 2010)) (internal quotation mark omitted); *see also, e.g.*, *Duarte v. Tri-State
Physical Med. & Rehab., P.C.*, No. 11 Civ. 3765 (NRB), 2012 WL 2847741, at *3 (S.D.N.Y.
July 11, 2012) (denying a motion to dismiss a New York Labor Law retaliation claim where the
plaintiff had begun asking her coworkers whether they were receiving statutorily required
overtimes wages); *Patel v. Baluchi's Indian Rest.*, No. 08 Civ. 9985 (RJS), 2009 WL 2358620, at
*11 (S.D.N.Y. July 30, 2009) (finding that the plaintiffs had alleged a retaliation claim where
they complained to their employer of "'substandard and unsafe working conditions, low wages,
and lack of benefits'" (quoting Second Amended Complaint)).

Applying these standards here, Plaintiffs' claims fail as a matter of law.  To be sure,
Kassman alleges that she made a number of complaints, about her salary cut (TAC ¶ 26),

discrimination generally (TAC ¶¶ 52, 137-38), and harassment and disparate treatment generally (TAC ¶¶ 133-35); Vasudeva alleges that she contacted supervisors to question why she had been denied a bonus (TAC ¶ 325) and that she made general complaints about discrimination and the denial of a sabbatical (TAC ¶¶ 354-55); and Patterson alleges that she complained to supervisors about a KPMG Partner's refusal to address her sabbatical request and negative comments about her pregnancy (TAC ¶¶ 251-54), that she sent "an electronic message outlining and detailing her discrimination claims" to a Human Resources Director (TAC ¶ 253), and that she complained about negative comments in her performance review (TAC ¶ 256). Even taking these allegations as true, however, none of these complaints rises to the level of specificity required to state a retaliation claim under the FLSA or the New York Labor Law, as there is no indication that any Plaintiffs were actually complaining of EPA or NYSEPA violations such that these complaints constituted "an assertion of rights protected by the statute" and a "call for their protection." *Kasten*, 131 S. Ct. at 1335. Indeed, given the multiple forms of discrimination alleged by each Plaintiff, it is possible, and perhaps even likely, that the alleged complaints concerned (or were understood by KPMG to concern) racial, caregiver, or promotion discrimination, which are not actionable under the EPA or NYSEPA and therefore could not support a retaliation claim under those statutes. Accordingly, Plaintiffs' pay-related retaliation claims fail as a matter of law and Counts XVIII and XVI must be dismissed.[6]

---

[6]     Plaintiffs' retaliation claims under the FLSA also fail because they do not allege that they complained to a governmental entity. In *Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir. 1993), the Second Circuit held that the FLSA's anti-retaliation provision only proscribes retaliation that occurs after an employee has complained of a potential violation to a government authority. Although the Supreme Court recently abrogated *Lambert* in part, *see Kasten*, 131 S. Ct. at 1336, it expressly refrained from deciding whether intra-company complaints may constitute protected activity under the statute. Accordingly, *Lambert*'s holding on that issue remains controlling precedent in this Circuit. *See, e.g.*, *Duarte*, 2012 WL 2847741, at *3; *Ryder*

### 3. Patterson's Title VII Claims

Defendant moves to dismiss Patterson's individual Title VII claims (Counts I through III and XII) on two grounds: (1) that the Court lacks jurisdiction because Patterson failed to file suit within ninety days of receiving a right-to-sue letter from the EEOC; and (2) that venue in this District is improper. (Def.'s Mem. 42-43). The first argument — that this Court lacks jurisdiction[7] — is easily rejected, as the Supreme Court has held, in a case with virtually identical facts to those here (albeit not cited by either party), that "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.' Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) (citation omitted) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)); *see also In re WorldCom Sec. Litig.*, 496 F.3d 245, 252-56 (2d Cir. 2007) (holding that the *American Pipe* rule extends to plaintiffs who file individual suits prior to a decision on class certification). Applying that rule here, Patterson's claim is plainly timely, as the First Amended Complaint in this case, which asserted Title VII claims on behalf of a class that would include Patterson, was filed on June 6, 2011, six days *before* Patterson received her right-to-sue letter from the EEOC.

---

*v. Platon*, No. 11 Civ. 4292 (JFB) (ARL), 2012 WL 2317772, at *7-8 (E.D.N.Y. June 19, 2012); *Hyunmi Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238, 242-44 (S.D.N.Y. 2011).

[7]     It should be noted that, although Defendant argues that this Court lacks jurisdiction in light of Patterson's delay in bringing suit, the law is clear that the ninety-day rule is not jurisdictional. *See, e.g.*, *Francis v. City of N.Y.*, 235 F.3d 763, 767-68 (2d Cir. 2000).

KPMG's second argument — that venue is improper — also fails.  To the extent relevant here, Title VII provides that suit "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed."  42 U.S.C. § 2000e-5(f)(3).[8] Applying that provision, courts have held that where a plaintiff alleges that a corporate policy developed in the company's headquarters has a disparate impact throughout the company, the relevant employment practice "is 'committed' where . . . [it] is initiated," namely, in the district where the company's headquarters is located.  *Turnley v. Banc of Am. Inv. Servs., Inc.*, 576 F. Supp. 2d 204, 213 (D. Mass. 2008); *accord Hoffman v. United Telecomms., Inc*, 575 F. Supp. 1463, 1483-85 (D. Kan. 1983); *cf. Ring v. Roto-Rooter Servs. Co.*, No. 10-CV-179, 2010 WL 3825390, at *5-7 (S.D. Ohio Sept. 28, 2010) (declining to apply *Turnley* and *Hoffman* where the plaintiff had alleged only a disparate treatment claim, not a disparate impact claim).  Here, as discussed above, Patterson brings a disparate impact claim challenging various company-wide policies and practices.  (*See, e.g.*, TAC ¶¶ 371-81).  Further, the TAC plausibly alleges that these policies and practices "emanate from the Company's New York headquarters" (TAC ¶ 374), and Defendant has not submitted any evidence contradicting that allegation.  *Cf. Cook v. UBS Fin. Servs., Inc.*, No. 05 Civ. 8842 (SHS), 2006 WL 760284, at *3-5 (S.D.N.Y. Mar. 21, 2006) (distinguishing *Hoffman* and holding that venue could not be based on the location of the defendant's headquarters because the complaint alleged that all the unlawful employment practices had occurred elsewhere and the defendant had submitted a declaration stating that none of the relevant employment decisions required headquarters approval).  It follows that venue is proper.

---

[8]      Title VII includes other bases for venue, *see* 42 U.S.C. § 2000e-5(f)(3), but they are not relevant in this case.

**4.   Kassman's Discriminatory Performance Evaluation Claim**

Next, Defendant moves to dismiss Kassman's claims for discriminatory performance evaluations under Title VII, the NYSHRL, and the NYCHRL as time-barred.  (Def.'s Mem 44).  Under Title VII, a plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory act.  *See* 42 U.S.C. § 2000e-5(e)(1).  Under the NYSHRL and NYCHRL, claims must be brought within three years.  *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d).  In this case, as Kassman filed her EEOC charge on August 19, 2010, and the complaint in this case on June 2, 2011, the parties agree that she cannot bring Title VII claims for events that occurred prior to October 29, 2010, or claims under the NYSHRL and NYCHRL for events that occurred prior to June 2, 2008.  (Def.'s Mem. 44; Pls.' Mem. 42).  Thus, to the extent that Kassman alleges that she received discriminatory performance evaluations prior to those dates, they are — as Kassman implicitly concedes by not arguing to the contrary — time barred under the relevant statutes.  However, to the extent that she alleges such discrimination after those dates (*see, e.g.*, TAC ¶¶ 92-94, 118-23), her claims are timely and may proceed.

**5.   Kassman's Constructive Discharge Claim**

Defendant's final substantive challenge to the complaint is to Kassman's claim of constructive discharge.  As the Second Circuit has explained, constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.  Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011).  Given this high standard, an employee's mere dissatisfaction with job assignments or the denial of a raise do not, in themselves, give rise to a constructive discharge

claim.  *See, e.g.*, *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993); *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).  At the same time, "the effect of a number of adverse conditions in the workplace is cumulative . . . [b]ecause a reasonable person encounters life's circumstances cumulatively and not individually."  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996); *see also, e.g.*, *Terry v. Ashcroft*, 336 F.3d 128, 152-53 & 153 n. 24 (2d Cir. 2003) (applying this cumulative effect standard); *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 410-11 (E.D.N.Y. 2011) (same).

Whether Kassman's allegations are sufficient to state a claim in light of these standards is a close question, but the Court concludes that they are.  Among other things, Kassman alleges that she experienced a more acute form of harassment and hostility beginning in or about October 2009, several months after she began complaining about harassment and discrimination. (TAC ¶¶ 119, 134).  Beginning that month, another Senior Manager and an Associate in Kassman's group began complaining to senior leadership that Kassman was "unapproachable," and "too direct."  (TAC ¶ 119).  Although Kassman's superiors acknowledged that the complaining Associate "might have an issue working with women," and he had only been working at KPMG for sixteen months, they nonetheless credited his complaints and discounted Kassman's own complaints about him.  (TAC ¶¶ 119-23).  Kassman was "constantly reprimanded," encouraged to meet with a behavioral "coach," and forced "to participate in an excessive number of stressful meetings and intense interrogations," often on a weekly basis. (TAC ¶¶ 122-23).  Additionally, Kassman was removed from the promotion track, despite having been promised a promotion.  (TAC ¶¶ 88-93).  Adding insult to injury, although Kassman was told that she would be put up for the promotion the following year (TAC ¶ 94), the Senior Manager who had complained about her was promoted to fill the opening instead.  (TAC ¶ 96).

33

Despite Kassman's complaints, the harassing Associate's career also blossomed: He was promoted first to Senior Associate and then to Manager.  (TAC ¶ 124).

In late 2009, Kassman transferred to the Stamford office to escape the harassment.  (TAC ¶ 126).  A few months later, however, the Stamford office adopted a policy that required workers to be physically in the office for three days per week to qualify for office space.  (TAC ¶ 127).  Due to her flex-time arrangement, Kassman worked only three days per week "in office," one of which was usually spent out of the physical office with clients, so she was forced to vacate her office — despite the fact that there were empty offices available.  (TAC ¶¶ 126-29).   That, in turn, made Kassman's job performance much more difficult, required her to transport and rearrange her workspace each day she was in the office, and signified a significant loss of status to coworkers.  (TAC ¶ 128).  When Kassman complained to the Office of Ethics and Compliance about her treatment, was told that it was "three men ganging up on a woman. We've had it before."  (TAC ¶¶ 134-35).  Instead of addressing the harassment, however, the Office of Ethics and Compliance suggested that Kassman relocate to another position within KPMG or leave the company with a "package."  (TAC ¶ 136).  The person in charge also suggested that Kassman take a leave of absence for emotional distress, noting that "many" female employees had done so in the past under similar circumstances.  (TAC ¶ 136).

In short, Kassman faced a combination of circumstances, including the denial of a promotion; the promotions of two harassers despite her complaints about them; the encouragement to attend coaching; her forced participation in interrogations; eviction from her office even though extra offices were available; the failure to address her repeated complaints notwithstanding an acknowledgment that the company had repeated gender harassment issues; and the suggestion that she leave the company, either permanently with a "package" or on a

34

leave of absence for emotional distress as other harassed women had done.  Taken together, these allegations render plausible Kassman's claim that she was "forced to end her career at KPMG . . . because the Company had deliberately made her working conditions so intolerable that she was compelled to resign involuntarily."  (TAC ¶ 143).  Put another way, she plausibly alleges that Defendant intentionally created an intolerable working environment sufficiently severe to make her feel that she was "not wanted as an employee," *Terry*, 336 F.3d at 152, thus compelling her to resign. That is sufficient to survive a motion to dismiss.  *See, e.g.*, *Timothy v. Our Lady of Mercy Med. Ctr.*, 03 Civ. 3556 (RCC), 2004 WL 503760, at *7 (S.D.N.Y. Mar. 12, 2004) (finding that the plaintiff had stated a claim for constructive discharge where she had alleged that "she [has] been passed over for positions for which she was qualified . . . been placed in inferior positions below her skill level[,] . . . stripped of her substantive responsibilities, removed from her office, shunted to several inadequate work locations, and that Defendants generally engaged in actions that made it more difficult for her to work"); *Halbrook v. Reichhold Chems., Inc.*, 735 F. Supp. 121, 128 (S.D.N.Y. 1990) (finding that the plaintiff had stated a claim of constructive discharge where she had alleged a "change in responsibilities, reduction in workload, humiliation and embarrassment, and the absence of any further chance of advancement").

## 6.  Joinder of the Named Plaintiffs' Claims

Finally, Defendant moves to sever and dismiss the claims of O'Donnell, Patterson, Potter, and Vasudeva on the ground of misjoinder.  (Def.'s Mem. 46-49).  Under Rule 20(a) of the Federal Rules of Civil Procedure, plaintiffs may join claims in a single lawsuit if

> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a).  By its terms, Rule 20(a) requires that both criteria "be met for joinder to be proper."  *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009).  The two requirements, however, are "not rigid tests.  They are flexible concepts used by the courts to implement the purpose of Rule 20 and therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy."  7 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 1653 (3d ed.) (footnotes omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.").  In particular, "'[c]ourts within this Circuit repeatedly have interpreted the phrase "same transaction" to encompass "all logically related claims" and have counseled that such determinations are to be made on a case-by-case basis.'"  *Deskovic*, 673 F. Supp. 2d at 166 (quoting *Barnhart v. Town of Parma*, 252 F.R.D. 156, 160 (W.D.N.Y. 2008)).

Applying these standards here, the Court concludes that the allegations in the TAC — which must be accepted as true for these purposes, *see id.* at 159 — are sufficient to justify joinder at this stage in the proceedings.  As discussed above, Plaintiffs allege that several specific, company-wide employment policies have resulted in employment discrimination.  In light of these allegations, the requirements of Rule 20(a) have been met and "considerations of judicial economy and fairness dictate" — at least for now — that the case move forward as one lawsuit.  *Barnhart*, 252 F.R.D. at 160 (quoting *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)); *see also, e.g.*, *Tardd v. Brookhaven Nat'l Lab.*, No. 04 Civ. 3262 (ADS), 2007 WL 1423642, at *10 (E.D.N.Y. May 8, 2007) (noting other courts' acceptance of joinder in

employment discrimination cases where "plaintiffs were subjected to the same type of conduct giving rise to the discrimination, even though that conduct occurred at different times or was perpetrated by different people"); *Fong v. Rego Park Nursing Home*, No. 95 Civ. 4445 (SJ), 1996 WL 468660, at *2-3 (E.D.N.Y. Aug. 7, 1996) (permitting joinder of employment discrimination claims by three plaintiffs when events occurred several years apart and under different supervisors). If, after discovery, there is a basis to revisit the question of joinder, the Court will do so. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may *at any time*, on just terms, add or drop a party." (emphasis added)); *see also, e.g.*, *Barnhart*, 252 F.R.D. at 161 (denying a motion to sever trials at the pleading stage without prejudice to revisiting the issue after discovery). For now, however, Defendant's motion to sever and dismiss the claims of O'Donnell, Patterson, Potter, and Vasudeva must be denied.

## CONCLUSION

For the reasons discussed above, Defendant's motions to strike or dismiss are GRANTED in part and DENIED in part. In particular, Defendant's motions to strike or dismiss the class claims in their entirety in light of *Dukes* are DENIED. Defendant's motion to strike the class claims under New York State and New York City law is GRANTED with respect to putative class members not living or working in the relevant jurisdictions, but DENIED with respect to putative class members living or working within those jurisdictions. Defendant's motion to dismiss the disparate impact class claims is DENIED. Defendant's motion to dismiss the individual Plaintiffs' equal pay claims under the EPA and NYSEPA is DENIED, although Defendant's motion to dismiss the individual Plaintiffs' retaliation claims under those statutes is GRANTED. Defendant's motion to dismiss Patterson's Title VII claims on grounds of timeliness or improper venue is DENIED. Defendant's motion to dismiss Kassman's

37

discriminatory performance evaluation claims is GRANTED as to claims prior to the statute of

limitations and DENIED as to claims accruing after the statute of limitations.  Defendant's

motion to dismiss Kassman's constructive discharge claim is DENIED.  Finally, Defendant's

motion to sever and dismiss the individual claims other than Kassman's is DENIED.


      SO ORDERED.

Dated: February 7, 2013
      New York, New York

_____
      JESSE M. FURMAN
      United States District Judge