# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA KASSMAN, SPARKLE PATTERSON, JEANETTE POTTER, ASHWINI VASUDEVA, TINA BUTLER, CHERYL CHARITY, HEATHER INMAN, NANCY JONES AND CAROL MURRAY,  individually and on behalf of a class of similarly-situated female employees, | **FOURTH AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | **Civ. No. 11-CV-3743 (RJH)** |
| v. | |
| KPMG LLP, | |
| Defendant. | |

Plaintiffs Donna Kassman, Sparkle Patterson, Jeanette Potter, Ashwini Vasudeva, Tina Butler, Cheryl Charity, Heather Inman, Nancy Jones and Carol Murray ("Plaintiffs," "Named Plaintiffs" or "Class Representatives"), by their attorneys Sanford Heisler Kimpel, LLP, bring this action against KPMG LLP ("KPMG" or the "Company") in their individual capacities and on behalf of a class of female exempt Client Service and Support Professionals, including but not limited to female Associates, Senior Associates, Managers, Senior Managers/Directors and Managing Directors (collectively "Professionals"),  to redress gender discrimination in employment.  Plaintiffs allege upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

## I.   INTRODUCTION AND OVERVIEW OF CLASS-WIDE GENDER DISCRIMINATION AT KPMG

### A.   KPMG's Glass Ceiling: Discriminatory Denial of Promotions

1.    As one of the "Big Four" accounting firms, KPMG is part of an elite cadre of accountancy and professional services firms that help set industry standards.  But rather than use its vast resources and status to stamp out gender discrimination, KPMG actively perpetuates it.

2.    Women are conspicuously absent from KPMG's leadership.  Among the 20 members of KPMG's global executive team, only one, or 5%, is female.[1]  Similarly, of the 24 members of the global board, only one, or 4%, is female.[2]

3.    Although KPMG's workforce is approximately 50% female, partnership is largely reserved for men.[3]  Less than one in five KPMG Partners is female.[4]  Managing Directors are also predominately male.  Even in lower-level management positions such as Manager and Senior Manager, women only do marginally better, representing approximately one in three managers.  Nonetheless, across KPMG's management ranks, the number of female managers never approaches parity with their overall representation at the Company.

4.    KPMG's gender hierarchy is all the more jarring considering women have entered the accounting industry in record numbers for decades.  For the past twenty-five years, women have comprised more than half of all accounting graduates.[5]  In 2009, women made up 55% of newly hired accounting graduates and 61.8% of all accountants and auditors.[6]  But despite constituting half of the workforce at accounting firms for decades, women are only 23% of all

---

[1] KPMG International, KPMG International Annual Review 2010: Cutting Through Complexity (2011), at 55.
[2] *Id.* at 56.
[3] Catalyst, Women in Accounting (2010), at 1, available at
http://www.catalyst.org/file/178/qt_women_in_accounting.pdf.
[4] *Id.*
[5] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research. A Decade of Changes in The Accounting Profession: Workforce Trends and Human Capital Practices (2006), at 5, available at
http://www.awscpa.org/pdfs_and_docs/ResearchPaperDecadeofChange.pdf.
[6] Catalyst, Women in Accounting, at 1.

partners industry-wide and 18% at KPMG.[7]

5.      At the Big Four – the crème de la crème of accounting firms – women fare even worse than the industry average.  Studies show that women are not "moving through the pipeline" as quickly at these larger, more elite firms compared to their smaller counterparts.[8]

6.      KPMG is one of the worst offenders.   The Company promotes fewer women to Partner (18%) than the industry average (23%).[9]   KPMG also promotes fewer women to Senior Manager (35%) positions than the industry average (44%).[10]   KPMG's promotion rate falls below its competitors, even though KPMG has a similar number of female non-management employees (48%) as the industry (49%) to groom and mentor for leadership.

7.      Rather than reward high-performing female employees with partnership, KPMG tracks a disproportionate number of these women into non-partnership roles as career managers at drastically lower compensation levels.   Industry-wide, 60% of female Senior Managers and 36% of female Managers have followed lower paid non-partnership career tracks, compared to only 26% of male Senior Managers and 9% of male Managers.[11]

8.      These figures make it clear that while male and female accountants may begin their careers on roughly equal footing, their paths sharply diverge as they ascend up the hierarchy, particularly at KPMG.  Women in the accounting industry face a number of systemic barriers to promotion, including lack of visible role models and their exclusion from after-work activities and other informal networking opportunities, reflecting the gender bias of "old boys"

---

[7] *Id.*

[8] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 5.

[9] Catalyst, Women in Accounting, at 1.

[10] Public Accounting Report, Public Accounting Report's 2008 Survey of Women in Public Accounting – Percentage of Women by Staff Category (Dec. 15, 2008).

[11] Catalyst, Women in Accounting, at 3.

networks within these firms.[12]

9.      As one accounting professional noted, as women come within reach of making Partner, "[i]t becomes subtle who's mentored, who's invited out to the important dinners with the important clients [and] who's groomed to participate in AICPA and state society committees. All of these are indicative of who is going to be promoted to Partner a year or two or three or four into the future."[13]

10.     At KPMG, the discrimination is not always so subtle.  High-performing female managers are viewed as interlopers by their male Partners, as threats by their male peers, and as individuals unworthy of respect by their male subordinates.  As soon as these women come within reach of partnership, they are suddenly – without warning or provocation – chastised and removed from the promotion track before they can infiltrate KPMG's "good old boys" network. By contrast, male employees who "have an issue working with women" effortlessly ascend through the ranks at KPMG.

11.     Plaintiff Donna Kassman was a casualty of this discriminatory system.  After languishing in a Senior Manager position for a decade, during which she demonstrated stellar performance, Ms. Kassman was finally "put up" for a promotion to Managing Director.  At this pivotal juncture, a troika of men – Scott Schapiro ("Principal Schapiro"), Principal in Charge of the National Employment Tax Practice and the person to whom Ms. Kassman reported; John Montgomery ("Senior Manager Montgomery"), another Senior Manager in Ms. Kassman's practice; and Jon Stone ("Associate Stone"), an Associate who worked under Ms. Kassman and Senior Manager Montgomery – conspired to derail her career advancement.  Principal Schapiro

---

[12] Catalyst, Women of Color in Accounting (2008), at 31, available at
http://www.catalyst.org/file/138/woc_accounting_final_book.pdf.
[13] Liz Gold, "Women in Accounting: How far to the top?," ACCOUNTING TODAY, available at
http://www.accountingtoday.com/ato_issues/2007_18/25549-1.html (last visited May 19, 2011).

abruptly removed Ms. Kassman from the promotion track based on unfounded, stereotypical complaints by the other two men about Ms. Kassman's "tone" and "direct" approach – a complaint never before lodged against her during her 17-year tenure at KPMG.   Unilaterally adopting the position of the male troika, the Company instead put up Senior Manager Montgomery for the position that had been slated for Ms. Kassman.

12.    Like Ms. Kassman, Plaintiff Jeanette Potter earned exceptional reviews at KPMG, only to spend a decade stuck in a Senior Manager position.   Principal Bruce McLaughlin ("Principal McLaughlin") had only one criticism of Ms. Potter: she did not "schmooze" enough. In fact, Ms. Potter avoided the Company's happy hours – one of the main venues for "schmoozing" – because they were known to be hostile to women; among other things, male Partners did "body shots" off of female employees.   Because KPMG's promotion decisions rely substantially on personal relationships built at Company social events that are unwelcoming to women, high-achieving female employees like Ms. Potter are frequently passed over for promotion in favor of their less qualified, but more well-connected, male counterparts.

13.    Until 2010, KPMG utilized a 9-box rating system, ranging from EP-1 (exceptional) to NI-9 (needs improvement), for all of its professional staff, across the Company's spectrum of job titles, practice areas, and offices.   Each employee was evaluated "The KPMG Way" – a set of criteria which purported to measure behaviors and values but failed to provide a consistent or reliable measure of performance.

14.    After the initial round of evaluations, the Partners in each group had discretion to change the ratings to ensure that the employees they had taken under their wing – most of whom were male – were ranked higher relative to their peers, and thus stood a greater chance of being promoted.

15.     Upon information and belief, female employees were disproportionately and discriminatorily downgraded and undervalued within KPMG's performance review system, which is uniform throughout the Company.  The Company's new 5-point evaluation system, introduced last year, suffers from the same defects.

16.     Upon information and belief, KPMG's performance evaluation system's insufficient standards, quality controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, had a discriminatory and disparate impact on women and caretaking employees.

17.     KPMG employees are promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly develop and promote excellent employees.  Promotions are not based upon true comparative performance as they lack transparency and sufficient quality controls in their design and implementation.

18.     KPMG's promotion procedures and practices reflect and codify the biases of the Company's mostly male management and, naturally, have a disparate impact on the Company's female employees.  Even when ostensibly based on performance, Partners have discretion to promote those within the "good old boys" club based on factors such as friendship and social connections or to otherwise give undue weight to these or other improper factors.  Participation in male-dominated social activities—such as golf outings and after-work happy hours (where body shots might be consumed off of female employees) are among criteria that may be considered for evaluation, compensation and advancement within KPMG.

19.     KPMG was able to and systematically did derail the advancement of high-performing female Professionals who were viewed as a threat, who were wrongly cast as less committed to their careers, or who the Company wanted to push out for other discriminatory

reasons.

20.     The Company's promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women within and across levels Company-wide. Although KPMG has had knowledge of these stark gender disparities for decades, it has been deliberately indifferent towards them.

21.     Countless women have progressed along KPMG's standard career track with rave reviews, only to find their career ambitions shattered by KPMG's glass ceiling.

**B.**     ***"You Don't Need the Money Because You Have a Nice Engagement Ring"*: Pay Discrimination at KPMG**

22.     Upon information and belief, KPMG's female Professionals are not only under-promoted, but underpaid as well.

23.     Recent reports on the accounting industry have found that female Associates, Senior Associates, Managers and Senior Managers are systematically paid less than their male colleagues, with white male Senior Managers out-earning their female counterparts by $53,000 on average.[14] This pay disparity is even greater at the Partner level.[15]

24.     Far from disproving this industry-wide trend, KPMG actively perpetuates it. Because KPMG employs a compensation system that has insufficient quality standards, controls, and implementation metrics, and lacks transparency and opportunities for redress or challenge, its compensation practices have had a disparate impact on the Company's female employees.

25.     Upon information and belief, KPMG management systematically took advantage of the flaws in the system by paying female employees less than similarly situated male employees.  This pattern and practice of discrimination stems, in part, from an antiquated

---

[14] Catalyst, Women of Color in Accounting, at 50 (discussing survey results from top 20 revenue-generating U.S. accounting firms).
[15] *Id.*

adherence to the idea that if there is a husband who acts as a "breadwinner" in the home, then there is no need for a woman to work at all or to be compensated at the same level as a male employee.

26.     For example, in an egregious act of discrimination, KPMG slashed Ms. Kassman's base salary by $20,000 while she was on maternity leave because she was paid "too much."  KPMG cited no business justification for slashing her salary – and indeed, could not, as Ms. Kassman was a top-notch performer.  When Ms. Kassman complained about the salary cut and wanted to discuss ways for her to earn back the $20,000 that was taken from her, her male supervising Partner asserted that she did not need the money because she "ha[d] a nice engagement ring."

27.     Like Ms. Kassman and many other female Professionals, Ms. Potter was told she was "paid too much," even though her less experienced male counterparts earned more than her. Ms. Potter received no pay increases during her last four years of employment at KPMG, despite her consistently strong performance.

28.     Moreover, KPMG's compensation policies and practices regarding flexible workers have a disparate impact on the Company's female employees.  Employees who avail themselves of KPMG's flexible work arrangements – the overwhelming majority of whom are working mothers and other women – are forced to accept reduced pay while still working full-time schedules and being held to virtually full-time standards.

29.     At KPMG, salary increases and bonuses are based largely on a performance evaluation system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly compensate strong-performing employees.  Upon information and belief, KPMG's discriminatory performance evaluation system has resulted in the under-

payment of female Professionals at all levels throughout the Company.

30.     In addition, the compensation system as a whole lacks the adequate quality standards and controls and implementation metrics to consistently or reliably result in compensation decisions that correlate with an employee's overall quality or contributions to the Company.  The lack of transparency and sufficient opportunities or systems for redress result in women being systematically undercompensated.

C.     **The "Scarlet F": Pregnancy/Caregiver Discrimination at KPMG**

31.     In addition to the systematic discrimination faced by female Professionals at KPMG, female employees with children also face discrimination based on their status as caregivers and/or pregnant women.

32.     KPMG promotes a corporate culture whereby female employees are made to feel they cannot have successful careers after they have children.  Indeed, at least one Partner explicitly suggested that women should go on part-time schedules or move away from his practice group when they become mothers.  Another Partner has stated that he believes pregnant women are incapable of doing their jobs and that he did not see how a working mother could "tend to a child and work at KPMG at the same time."

33.     Ms. Kassman hoped to be the one to prove them wrong.  As a female manager with an impressive seventeen-year career at KPMG and two children under the age of seven, Ms. Kassman set out to demonstrate that one could be both a good mother and a successful manager at the Company.  Indeed, KPMG and Ms. Kassman's supervisors publicly touted her as a role model for other working mothers.

34.     However, Ms. Kassman quickly discovered that KPMG's purported support for female employees and working mothers was just a sham.  After she gave birth to her first child in

2003, Ms. Kassman's career advancement at KPMG – which had previously progressed at a steady clip – came to a screeching halt.  KPMG abruptly cut her salary while she was on maternity leave and – as if this did not send a clear enough message – placed her on a Performance Improvement Plan ("PIP") upon her return to work.

35.    Ms. Kassman's experience as a working mother at KPMG is far from unique. Plaintiff Ashwini Vasudeva, a Senior Associate in the Company's Mountain View, California office, faced swift and ongoing retaliation following her decision to go on maternity leave.  After she became a mother, Ms. Vasudeva, who had always earned stellar reviews, was abruptly removed from her largest, most lucrative engagement; was assigned to projects without any staff to support her; and was passed over for promotion in favor of a less-experienced male employee.

36.    Plaintiff Sparkle Patterson, an award-winning Associate in KPMG's Atlanta office, also fell victim to the Company's pregnancy/caregiver discrimination.  Although the standard promotion track at KPMG provides for the promotion of Associates to Senior Associates after two years, Ms. Patterson never received a promotion during her three-and-a-half year tenure with the Company, despite her exceptional performance.  When Ms. Patterson returned from maternity leave, her work load was decreased and her repeated requests for work were systematically denied, leaving her with virtually no billable work, even though she was available and willing to work long hours.

37.    Although KPMG touts its flexible work schedule plan as proving it supports working mothers, the reality is that working mothers are often forced to take a so-called "reduced" schedule for less pay – but are still expected to shoulder the same responsibilities as their full-time counterparts.  These mothers accept reduced pay only to avoid unfair and discriminatory heightened scrutiny and wrongful termination.

38.     KPMG has what amounts to a "don't ask, don't tell" policy regarding flexible schedules for working mothers with young children.  Employees who avail themselves of the Company's flex time option – the overwhelming majority of whom are working mothers – rarely discuss it freely and are ultimately penalized for it.  One of KPMG's male Partners even commented that women who are on flexible plans "work exactly their $x$ hours and not a minute over" and "you know they're not going to get anywhere [at KPMG]."

39.     Indeed, when Plaintiff Kassman – the first flex worker in her practice – moved to a "reduced" schedule upon her return from maternity leave, she was made to feel like she had a scarlet "F" on her chest for "flex time benefit taker."  As it turns out, flex time as a result of motherhood is not viewed as a badge of honor, but a source of shame and a handicap at KPMG. "Having it all" remains a pipe dream.

40.     KPMG discriminates against its female employees by assuming they are less committed to their careers – a gender stereotype that the Company's male employees do not have to overcome.  Upon information and belief, of the few working mothers who have managed to break through KPMG's glass ceiling, most –  like Patricia Brown ("Principal Brown"), Principal in Charge of the East for the International Executive Services ("IES") practice – have a stay-at-home spouse, a luxury that the overwhelming majority of KPMG's female employees do not have.  Indeed, one study of the accounting industry revealed that 46% of male professionals employed by large national/international firms have stay-at-home spouses, compared to only 11% of female professionals.[16]  And, even if men work a flexible work schedule, they can do so free of gender stereotypes and are therefore less likely than their female counterparts to experience a negative career impact as a result.[17]

---

[16] AICPA, AICPA Work/Life and Women's Initiatives 2004 Research, at 39.
[17] *Id.* at 34.

41.     Given this discriminatory culture, it is no wonder that female employees – especially working mothers – are a rarity in KPMG's upper ranks.  Taking leave or going on flex time for pregnancy and caretaking reasons can weigh as a negative factor within KPMG's evaluation, compensation, development and promotion systems, which have insufficient standards, quality controls, implementation metrics, and transparency, and which lack means of redress to prevent or correct this discrimination.

     **D.**     ***"He Might Have an Issue Working with Women"*: KPMG's Hostile Work Environment and Retaliation**

42.     As a recent report noted, "With women… joining the accounting industry at an increasing rate, firms are faced with the job of creating more inclusive environments in a traditionally white, male-dominated, 'up-or-out' culture."[18]  KPMG has clearly failed to rise to this challenge.

43.     At KPMG, female employees routinely experience harassment and unequal treatment.  In particular, once they become poised to assume positions of greater authority, female employees frequently encounter gender hostility, including hypocritical and unfounded criticisms and other attempts to derail their career advancement.

44.     Ms. Kassman's experience in many ways typifies that of KPMG's female Professionals.  In late 2008, after more than fifteen years of hard work and impressive achievements at the Company, Ms. Kassman was finally told she was next in line for a promotion to Managing Director.  But rather than support Ms. Kassman, her male colleagues reacted with overt hostility.  One of Ms. Kassman's male subordinates, Associate Stone, suddenly complained that he "didn't like [her] tone."  He and Senior Manager Montgomery, one of Ms. Kassman's peers, complained that Ms. Kassman was "unapproachable" and "too direct,"

---

[18] Catalyst, Women of Color in Accounting, at 1.

a thinly veiled gender-based criticism – particularly given these two men's "direct" personalities, which are embraced by senior leadership at KPMG.

45.     Even though Ms. Kassman's supervisor, Principal Schapiro, acknowledged that Associate Stone "might have an issue working with women," neither Associate Stone nor Senior Manager Montgomery was disciplined for his discriminatory conduct.   Instead, the Company took these two male employees' unfounded and gender-biased complaints at face value, and repeatedly interrogated Ms. Kassman about her behavior, ultimately recommending that she consult a "coach" to resolve these trumped up issues.

46.     Rather than address Ms. Kassman's complaints of discrimination, KPMG retaliated against her by removing her from the promotion track, instead "putting up" her harasser (Senior Manager Montgomery) for the Managing Director position once slotted for her.

47.     As a result of KPMG's hostile work environment, Ms. Kassman – a strong, competent manager with a long and distinguished career at KPMG – was reduced to someone who could barely eat or sleep, and took the back elevators at work to avoid running into her tormentors.  She was ultimately forced to resign from her position because the work environment at KPMG had become unbearable.

48.     Upon information and belief, other female Professionals have experienced harassment and retaliation similar to what Ms. Kassman experienced at KPMG.  In particular, other female managers have suddenly found themselves targeted and elbowed out by the Company's "old boys" network once they come perilously close to infiltrating the upper ranks of management.  At least one Partner has explicitly acknowledged that it is "much harder being a woman" at KPMG.

E.      ***"This Is Three Men Ganging Up on a Woman; We've Had It Before"***: **KPMG's Deliberate Indifference to Complaints of Discrimination**

49.     KPMG has long been on notice regarding its Company-wide gender discrimination, but has taken no steps to remedy it.

50.     Ms. Kassman repeatedly complained about the discrimination and harassment she was experiencing, going through all of the requisite channels, including her performance manager, Principal Schapiro; his boss, Principal Brown; the Office of Ethics and Compliance; the Office of General Counsel; and Human Resources.  Every step of the way, the Company reacted with indifference and simply passed the buck.

51.     Even while acknowledging that the facts presented by Ms. Kassman were undisputed, KPMG sat on its hands and allowed the discrimination and harassment to continue unabated.  Throughout the complaint process, the Company seemed more concerned about offending Ms. Kassman's harassers than the harassment itself.   In fact, all of the "solutions" proposed by KPMG treated Ms. Kassman as the source of the problem.

52.     Other female employees have also complained about KPMG's discrimination, only to have their complaints fall on deaf ears.  For example, Ms. Patterson repeatedly complained over the course of a year about the discrimination she was facing to HR and Ethics and Compliance.  However, KPMG failed to do anything to resolve the situation, forcing Ms. Patterson to leave the Company.

53.     In yet another situation, HR not only failed to investigate the complaints of discrimination but failed to intervene when male managers then retaliated against the female complainant, ultimately forcing her from the Company.

54.     KPMG's mishandling of these repeated complaints highlights various system-wide flaws in the Company's complaint mechanisms, including inadequate reporting mechanisms; the lack of a defined channel to report complaints of discrimination and

harassment; insufficiently defined and implemented investigation procedures; inadequate training of HR and other professionals tasked with addressing complaints of discrimination and harassment; and the leadership's willingness to allow discrimination and an "old boys" culture to flourish at the Company.

55.     The blatant disregard and indifference displayed by KPMG towards complaints of discrimination is all the more shocking given the Company's awareness that these problems are systemic.   As Vicki Sweeney ("Principal Sweeney"), Principal in Charge of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman.  *We've had it before.*"

* * *

56.     Plaintiffs bring this lawsuit on their own behalf and on behalf of a class of similarly situated female employees Company-wide, including but not limited to Associates, Senior Associates, Managers, Senior Managers and Managing Directors, to remedy the gender discrimination they have witnessed and experienced during their years of exemplary service to KPMG.  The lawsuit is designed to achieve systemic injunctive relief and to change KPMG's discriminatory employment policies, practices and/or procedures based on gender, including: (1) assigning female Professionals to lower titles than similarly-situated male employees; (2) paying female Professionals less than their male counterparts; (3) denying female Professionals promotion and advancement opportunities in favor of male employees; (4) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; and (5) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace.

57.    Had the changes sought been in place previously, Plaintiffs might still be employed there and might, in fact, be able to pursue careers there moving forward should those changes come about as a result of this action.

## II.    JURISDICTION AND VENUE

58.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206, *et seq.,* the Family and Medical Leave Act,  29 U.S.C. § 2601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

59.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-5(f) because Defendant KPMG is headquartered and conducts substantial business in this District, and because Plaintiffs Kassman and Potter were employees of KPMG's New York, New York office when the unlawful employment practices were committed.

60.    Plaintiffs have standing to bring this suit as Plaintiff Kassman has duly filed her administrative charge before the EEOC and received her Notice of Right to Sue on March 9, 2011.   Ms. Kassman's administrative charge gave notice of the class-wide nature of the allegations, including those alleged by the other Named Plaintiffs.

## III.    THE PARTIES

61.    Plaintiff **DONNA KASSMAN** is a resident of New York.   Plaintiff was employed at KPMG in its New York, New York office as an Associate, a Senior Associate, a Manager, and then a Senior Manager from April 1993 until her constructive discharge from the Company in October 2010.

62.     Plaintiff **SPARKLE PATTERSON** is a resident of Georgia. Plaintiff was employed at KPMG in its Atlanta, Georgia office as an Associate from June 2007 until her constructive discharge from the Company in November 2010.

63.     Plaintiff **JEANETTE POTTER** is a resident of Israel. Plaintiff was employed at KPMG in its New York, New York office as a Manager, then a Senior Manager from July 1995 until her constructive discharge in July 2006.

64.     Plaintiff **ASHWINI VASUDEVA** is a resident of California. Plaintiff was employed at KPMG in its Mountain View, California office as an Associate, then a Senior Associate, from January 2005 until her constructive discharge from the Company in September 2009.

65.     Plaintiff **TINA BUTLER** is a resident of Virginia.  Plaintiff is a current employee of KPMG and has been employed at KPMG since October 2004 in its Atlanta, Georgia and Tysons, Virginia offices as an Associate, Senior Associate, and, since 2013, as a Manager.

66.     Plaintiff **CHERYL CHARITY** is a resident of Virginia.  Plaintiff is a current employee of KPMG and has been employed at KPMG since March 2001 in its Washington, D.C. and Tysons, Virginia offices as a Senior Associate, Manager, and, since 2011, as a Senior Manager/Director.

67.     Plaintiff **HEATHER INMAN** is a resident of Missouri.  Plaintiff was employed at KPMG from August 2005 to October 2014 in its St. Louis, Missouri office as a Manager.

68.     Plaintiff **NANCY JONES** is a resident of Georgia.  Plaintiff was employed at KPMG in its Atlanta, Georgia office as a Senior Associate from November 2010 until her constructive discharge from the Company in June 2014.

69.     Plaintiff **CAROL MURRAY** is a resident of Washington.  Plaintiff is a current employee of KPMG and has been employed at KPMG since October 2008 in its Los Angeles, California and Seattle, Washington offices as an Associate, Senior Associate, and, since 2013, as a Manager.

70.     Defendant **KPMG LLP** ("KPMG" or the "Company") is an audit, tax, and advisory services firm headquartered in New York, New York.  It is the U.S. member firm of KPMG International, which is headquartered in the Netherlands.  In 2011, KPMG reported global revenues of $22.7 billion.

## IV.     FACTUAL ALLEGATIONS

### A.     PLAINTIFF DONNA KASSMAN

71.     Ms. Kassman suffered discrimination in pay, denial of promotional opportunities, discrimination as a result of pregnancy, and a hostile work environment.  She was ultimately constructively discharged.

72.     In April of 1993, Ms. Kassman began working at KPMG as an Associate.  She had previously earned her Bachelor of Arts in Political Science from the University of Michigan in 1989 and completed her law degree in 1992.

73.     For promotions from entry-level Associates to Senior Managers, KPMG uses a standard career progression track, which advances employees on a schedule of approximately every two years in the following order: Associate, Senior Associate, Manager, and Senior Manager.

74.     In the years after Ms. Kassman began working at KPMG, she steadily progressed along the Company's standard career track.  In 1995, Ms. Kassman became a Senior Associate, and two years later, in 1997, she advanced to the position of Manager.  In 1999, Ms. Kassman

went on to become a Senior Manager – the position in which she would be stuck for eleven years, before ultimately being pushed out of the Company.

75. Throughout her seventeen-year tenure, Ms. Kassman demonstrated stellar performance at KPMG.

76. In Ms. Kassman's Fiscal Year 2006 Year End Performance Review ("Review"), Principal Schapiro, to whom she directly reported, wrote that she "contributed greatly to the overall success of the practice" and that "staff look to her for guidance."

77. The following year, in Ms. Kassman's 2007 Review, he wrote that Plaintiff "had a very strong year."

78. Principal Schapiro wrote in Ms. Kassman's 2008 Review that she "had a very successful FY 2008, and ha[d] shown excellent leadership abilities."

79. He wrote in Ms. Kassman's 2009 Review that she "did all the right things from a business perspective to be successful," that she "ha[d] been a leader in the office, and ha[d] been forward thinking."

80. In Ms. Kassman's 2010 Review, Principal Schapiro wrote that she again had "a very strong year."

**Disparate Pay**

81. Upon information and belief, KPMG paid Ms. Kassman less than similarly-situated male employees, despite her exemplary performance; she was paid at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

82. Ten years after joining KPMG, Ms. Kassman went on maternity leave in May 2003, just before the birth of her first child in June 2003.

83.     While Ms. Kassman was on maternity leave, KPMG abruptly cut her base salary by $20,000 because she was paid "too much."  Similar cuts were not made to male counterparts' salaries, and as a result, Ms. Kassman was and continued to be paid $20,000 less than her male counterparts during her tenure at KPMG.

84.     For example, Senior Manager John Montgomery's pay was not cut in May 2003 or later as a Senior Manager, even though he had joined KPMG after Ms. Kassman, worked under the same Partner, and worked on engagements for similar clients. He performed the same tasks as Ms. Kassman, and upon information and belief, did so with no greater skill or effort than Ms. Kassman, achieving a substantially equivalent level of performance.

85.     KPMG cited no business justification for slashing her salary.  When Ms. Kassman asked her manager at the time, Gary Rosen ("Partner Rosen"), Partner in Charge of the Northeast State and Local Tax ("SALT") Practice, to reconsider the cut in her salary, he said that she should consider some of her past salary "a loan," implying that she had not earned it for exemplary performance.  He also indicated that Ms. Kassman did not need the money because she had a nice engagement ring.  Upon information and belief, KPMG disparately paid Ms. Kassman because of her gender and her status as a working mother.

86.     In addition, KPMG discriminates against flex time workers – the overwhelming majority of whom are women – by reducing their salaries without a commensurate reduction in responsibilities.  While Ms. Kassman performed precisely the same tasks after she became a "flex time" employee as male Senior Managers in SALT with her experience level, she received less in salary than male and non-caretaking Senior Managers.  These conditions did not change from when she began the flex time plan after returning from maternity leave in 2004 until she departed from the Company in 2010.

87.     Upon information and belief, Ms. Kassman was not the only woman to suffer the effects of the compensation policies and practices at KPMG, which lacked sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.

88.     Upon information and belief, KPMG management systematically took advantage of the flaws in the system by paying female employees less than similarly situated male employees.   KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

### Denial of Promotions

89.     Despite Ms. Kassman's stellar qualifications and performance, KPMG denied her promotions in favor of lesser-qualified male employees.   The Company's evaluation and promotion systems' insufficient quality standards and controls and implementation metrics, coupled with their lack of transparency and opportunities for redress, had a discriminatory and disparate impact on women and caretaking employees.

90.     Throughout Ms. Kassman's last decade as a Senior Manager at KPMG, she consistently expressed interest in a promotion to Managing Director and ultimately to Partner. After several strong performance years and numerous requests for advancement, Principal Schapiro finally told Ms. Kassman she was next in line for a promotion in the employment tax practice.   In December 2008, Principal Schapiro confirmed that Ms. Kassman would be put up for a promotion to Tax Managing Director effective for the Fiscal Year 2009/2010 beginning October 1, 2009.   The promotion decision was to be made during the summer of 2009. However, Ms. Kassman was not promoted that year, despite her strong performance.

91.     In early 2009, Ms. Kassman successfully completed the formal Leadership Evaluation & Assistance Program ("LEAP") for the KPMG SALT Practice in preparation for her promotion to Managing Director.  According to Ms. Kassman's 2009 Review, she "successfully presented and navigated the SALT LEAP program and received favorable reviews."  She presented to the National Partner in Charge of the SALT Practice, Tim Gillis, who told her that she had his vote.

92.     In mid-2009, Principal Schapiro again confirmed that Ms. Kassman was next in line for a promotion in her practice.  On at least one occasion in or around summer 2009, Ben Garfunkel ("Partner Garfunkel"), the National Partner in Charge of IES, echoed Principal Schapiro's comments by stating that he knew Ms. Kassman was "in queue" to make Managing Director.  Ms. Kassman's status was specifically a point of discussion with Partner Garfunkel since she was leaving the SALT Practice (where she was presented for promotion) and entering the IES practice, of which he was the leader.  Ms. Kassman wanted confirmation that she would not lose her "next in line" status by switching practices.

93.     In Ms. Kassman's 2009 Review, Principal Schapiro wrote that "an effort was made to promote Donna to TMD effective fy '10…," but explained that it did not happen because of the economy.  Principal Schapiro also told Ms. Kassman that no one would receive a promotion to Managing Director at that time due to the economy, but that she would remain first in line.

94.     Shortly after Ms. Kassman was "put-up" for promotion and proceeded through the formal channels set up by the SALT Practice (i.e., the LEAP program) in 2009, Senior Manager Montgomery and his direct subordinate, Associate Stone, lodged unfounded complaints about her.  Although Ms. Kassman had never received a similar complaint in her seventeen years with

KPMG, Associate Stone and Senior Manager Montgomery claimed she was considered "unapproachable" and "too direct," a thinly-veiled gender-based criticism, particularly given the abundance of "direct" male personalities in the senior leadership of KPMG.

95.    As a result of Associate Stone's and Senior Manager Montgomery's unfounded and gendered complaints, KPMG removed Ms. Kassman from the promotion track sometime in late 2009 or early 2010, when a candidate is typically put up for promotion.

96.    In December 2009, Ms. Kassman again discussed with Principal Schapiro whether she would be put up for the Managing Director position for the 2010/2011 fiscal year beginning October 1, 2010.  Although Principal Schapiro had previously assured Ms. Kassman that she was next in line for the promotion, he claimed that he "[didn't] know anything about making Tax Managing Director in the IES practice," and instead referred Ms. Kassman to Principal Brown.

97.    At Principal Schapiro's suggestion, Ms. Kassman met with Principal Brown in January 2010 to discuss her career.  When Ms. Kassman brought up the Managing Director position, Principal Brown said that Ms. Kassman's name had never come up, that she was not on the list of candidates for that year, and that it was too late for her name to be submitted. Principal Brown later acknowledged that she had lied about the list of candidates being closed.

98.    In April 2010, Ms. Kassman learned from a colleague that Senior Manager Montgomery was up for promotion to Managing Director for the 2010/2011 Fiscal Year – the same position that had previously been slated for Ms. Kassman.  Principal Schapiro had apparently – without informing Ms. Kassman – removed her from the promotion track and replaced her with Senior Manager Montgomery, even though he had a shorter tenure with the Company, fewer years as Senior Manager, and less professional experience overall than Ms.

Kassman by several years.  Upon information and belief, no male Senior Managers were removed from the Managing Director track in this abrupt fashion.

99.  Ms. Kassman was a victim of Associate Stone's and Senior Manager Montgomery's discriminatory campaign to derail a female employee's advancement to Managing Director – an effort that KPMG's partnership not only failed to stop, but actively carried out.

100.  Upon information and belief, KPMG has perpetrated and/or condoned similar discriminatory campaigns to derail the careers of other successful female Professionals who were poised to assume positions of greater authority and influence within the Company.

101.  Upon information and belief, KPMG's performance evaluation system's insufficient quality standards and controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, had a discriminatory and disparate impact on women and caretaking employees.

102.  Upon information and belief, KPMG management systematically took advantage of the flaws in the system and often undervalued, mismeasured, or otherwise inaccurately captured performance to the particular detriment of women and mothers.  In addition, unfounded criticism can be included and legitimate criticism given undue weight.  Within this flawed system, leave for pregnancy and caretaking responsibilities can constitute a negative factor in female Professionals' evaluations, compensation decisions and promotion considerations at KPMG.

103.  Moreover, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.

### Pregnancy/Caregiver Discrimination

104.    From 2003 until her constructive discharge in 2010, KPMG discriminated against Ms. Kassman based on her gender due to her caregiving responsibilities as a working mother. Because of Ms. Kassman's status as a working mother, KPMG continuously subjected her to disparate treatment, and also made adverse decisions concerning her employment.

105.    From 1993 until 1999, before Ms. Kassman had her children, she was promoted on KPMG's progressive career track from Associate to Senior Manager.   However, after she had her first child in 2003, her advancement abruptly stopped.   She was not promoted after she became a Senior Manager and remained in this position for over ten years as she watched men and individuals without primary caretaking responsibilities—who shared her level of experience, responsibility and skill—proceed to Managing Director and Partner positions.

106.    Upon information and belief, there were only a handful of female managers with small children in the Northeast SALT Practice during Ms. Kassman's tenure with the Company. Ms. Kassman was the first in her practice to work a flexible schedule.

107.     Even though Ms. Kassman hit the glass ceiling shortly after having children, KPMG and Principal Schapiro touted her as a role model for working mothers.   In practice, however, KPMG and Principal Schapiro in particular did not support Ms. Kassman's efforts to be a successful working mother.

108.    In addition to slashing Ms. Kassman's salary while she was on maternity leave, KPMG took a number of adverse employment actions against her.   For example, in March of 2004, shortly after Ms. Kassman's maternity leave ended, Principal Schapiro gave Ms. Kassman her first negative review at the Company for not meeting her goals.   Instead of taking her leave into account in measuring Ms. Kassman's goal attainment for the year, Principal Schapiro

penalized her for it.

109.    As a further penalty for taking maternity leave, Principal Schapiro put Plaintiff on a 60-day PIP, increasing her goals upon her return from maternity leave.  Shortly before being slapped with a PIP, Ms. Kassman told Principal Schapiro that she planned to move to a flexible work schedule.  Principal Schapiro placed Ms. Kassman's PIP in between papers on her desk (including the flexible plan paperwork that she was preparing to submit), seemingly in an attempt to avoid drawing attention to the PIP.

110.    Before placing Ms. Kassman on a PIP, Principal Schapiro had never indicated to Ms. Kassman that her performance was unsatisfactory or that she was in jeopardy of being placed on a PIP.  Shocked and dismayed by this unexpected development, Ms. Kassman spoke to Sharon Katz-Pearlman, another Partner at the Company, who confirmed that there was nothing in Ms. Kassman's performance record that would support the imposition of a PIP before she had her baby.

111.    Two years later, Principal Schapiro again penalized Ms. Kassman for taking maternity leave when she had her second child.  He again held her to higher standards than her peers after returning from leave.  He also wrote in her 2006 Review that her work was "somewhat abbreviated due to Donna's maternity leave."

112.    From 2004 until her constructive discharge in 2010, Ms. Kassman worked a reduced schedule under KPMG's flexible schedule policy.  Although the Company reduced Ms. Kassman's pay in proportion to her reduced schedule, it held her to the same or higher performance standards than full-time employees.  If she did not meet full-time standards on her reduced schedule, Ms. Kassman was penalized and considered less committed to her career.  Her flexible schedule essentially acted as a "penalty" on her employment opportunities at KPMG.

113.    While Ms. Kassman was working on a reduced schedule, KPMG essentially expected her to do the job of a full-time Senior Manager in fewer hours and for less pay.  For example, her job requirements related to marketing, teaching, speaking, coaching, administrative, and client development were the same job requirements of full-time Senior Managers.  When KPMG evaluated Ms. Kassman's work performance, the Company measured her against the requirements of a full-time employee.  Indeed, both of Plaintiff's direct supervisors – Principal Schapiro and Partner Rosen – acknowledged this by writing in her LEAP Nomination Form, "Although she works a reduced hourly schedule, she has the same responsibilities as every other Senior Manager in the Practice."

114.    Upon information and belief, other female Professionals who took maternity leave and had caregiving responsibilities faced similar systemic barriers to equal employment opportunities at KPMG.  In particular, Ms. Kassman's department, the SALT practice, had a poor track record of retaining working mothers.  KPMG fired several working mothers within the SALT practice, including one who was pregnant, and forced others out of the Company under circumstances similar to Ms. Kassman's.

115.    Upon information and belief, taking leave or hours reductions for pregnancy and caretaking reasons is considered a negative factor in employees' evaluations, compensation decisions and promotion considerations, resulting in an adverse impact on women and mothers at the Company.  The Company's policies and procedures regarding evaluation, compensation and promotion lack the transparency, standards, quality controls, implementation metrics, and means for redress necessary to prevent this disparate impact on female Professionals who are pregnant or mothers.

116.    KPMG's overwhelmingly female flexible workers are denied not only the pay

they deserve, but also various other Company benefits. For example, in early 2010, the Company's Stamford office adopted a policy requiring employees to be in the office a minimum of three days per week in order to qualify for office space. This policy had a disparate impact on female employees such as Ms. Kassman, who had three "in-office" days (per her flex time agreement), one of which was typically spent out of the office generating business.

117.     In addition, because most of KPMG's relationship-building activities occur after hours, employees with primary caregiving responsibilities – the majority of whom are women – are at a disadvantage in their career development. For example, when Ms. Kassman expressed concern to Partner Rosen about her $20,000 salary cut, he suggested that she socialize at KPMG's weekly happy hours as a way to ingratiate herself with the Company's leadership and advance her career. Ms. Kassman explained that, because she had young children, she could not attend happy hours, but was more than willing to meet with people over lunch, breakfast or coffee.

118.     The few women who have advanced to the partnership ranks at KPMG have done so by sacrificing their personal lives and abandoning any semblance of work-life balance. For example, KPMG frequently touted a Partner in the Atlanta office, Tammy Hunter, as a role model for other working mothers because she called the Company to discuss work matters on her way to the delivery room to give birth to her child. The Company apparently viewed this as a level of dedication to which other working mothers should aspire.

119.     Aside from these rare exceptions, working mothers have been unable to make significant inroads at KPMG – and are unlikely to do so given the Company's discriminatory culture, which, in combination with insufficiently designed and articulated systems of evaluation, compensation, development, and promotion, produces an adverse impact on working mothers.

28

In May 2010, Ms. Kassman was at dinner during an American Payroll Association conference with several colleagues, including the Partner in charge of the West IES practice, Ray Pascuzzi ("Partner Pascuzzi").  At this dinner, Partner Pascuzzi proclaimed that "part time women work exactly their *x* hours and not a minute over," that "you know you can't make them work anymore," and that "you know they're not going to get anywhere."

**Hostile Work Environment**

120.    From late 2009 until her constructive discharge in October 2010, Ms. Kassman suffered increasing harassment and unequal treatment at KPMG.

121.    Beginning in October 2009, Associate Stone began complaining that he "didn't like [Ms. Kassman's] tone."  Senior Manager Montgomery agreed with these complaints. Together, these two men complained that Ms. Kassman was "unapproachable" and "too direct," a gender-based criticism, particularly given Associate Stone's and Senior Manager Montgomery's "direct" personalities, which are embraced by senior leadership at KPMG. Principal Schapiro, her Performance Manager, conveyed these unfounded criticisms to Ms. Kassman directly in informal evaluations.  Nonetheless, KPMG did not correct Associate Stone's or Senior Manager Montgomery's discriminatory behavior.

122.    In addition to complaining about Ms. Kassman's "tone," Associate Stone also complained about her flexible work schedule.  Consistent with the work-life balance priorities marketed at KPMG, the Company had approved Ms. Kassman's schedule after the birth of her first child.  However, Associate Stone disapproved of Ms. Kassman's flexible work schedule and complained – again, without basis – that it forced him to "work harder" from Monday until Thursday.

123.    KPMG did nothing to correct Associate Stone's discriminatory actions, even though Principal Schapiro told Ms. Kassman in March 2010 that Associate Stone "might have an issue working with women."   Moreover, when Ms. Kassman complained about Associate Stone's conduct, Principal Schapiro replied that he did not know if Associate Stone was "unprofessional, stupid or vicious."  Despite Principal Schapiro's admission regarding Associate Stone's inappropriate and discriminatory behavior, upon information and belief, KPMG took no steps to respond to Ms. Kassman's concerns.

124.    Instead of disciplining Associate Stone, KPMG constantly reprimanded Ms. Kassman as a result of Associate Stone's and Senior Manager Montgomery's gender-based criticisms.  For example, KPMG forced Ms. Kassman to participate in an excessive number of stressful meetings and intense interrogations, often occurring on a weekly basis, from late 2009 until mid-2010.  During the meetings, Ms. Kassman was questioned about her "tone" and other gendered complaints like her "direct" approach.  This harassment and unequal treatment was extremely disruptive and distressing to Ms. Kassman both personally and professionally.

125.    After months of meetings, the Company encouraged Ms. Kassman to consult with a "coach" to resolve issues concerning Associate Stone's and Senior Manager Montgomery's discriminatory complaints and harassment.  By issuing such a reprimand to Ms. Kassman, KPMG chose to believe these two men's unfounded complaints over her longstanding "very strong" performance and collaborative work style.  At the time, Associate Stone – who was widely regarded as an "asshole" – had only been at the Company for approximately sixteen months, whereas Ms. Kassman had been there for sixteen years.

126.    Instead of disciplining Mr. Stone for his discriminatory conduct, KPMG promoted Mr. Stone to a Senior Associate position and recently promoted him to Manager.

127.    Instead of resolving Ms. Kassman's complaints of discrimination, KPMG removed her from the promotion track as a result of the gender-biased criticisms leveled against her.

128.    When the work environment in KPMG's New York office became unbearable, Ms. Kassman sought to work only from the Company's Stamford office in order to avoid her tormentors.  KPMG temporarily granted this request in October 2009, only to effectively rescind the option six months later.  Per Ms. Kassman's flex time agreement, she spent three days "in-office" and two working from home.  However, at least one of Ms. Kassman's "in-office" days was typically spent out of the office with clients.

129.    In early 2010, the Stamford office adopted a policy requiring employees to be "in the office" a minimum of three days per week in order to qualify for office space.   Accordingly, the Company forced her to vacate her Stamford office in April 2010.  In lieu of an office, KPMG suggested Ms. Kassman could make due with four drawers.

130.    .  The loss of office space in Stamford made it considerably harder for Ms. Kassman to perform her work each day.  For example, she had to transport and rearrange her work materials and supplies, which was time-consuming and increased her escalating stress level.  Moreover, it signified to her colleagues and subordinates that her status within KPMG was diminished, particularly because multiple offices remained unoccupied.

131.    Despite available office space, Ken Seal, the Partner in charge of the Stamford office, refused to allow Ms. Kassman to retain an office.  The only alternative was for Ms. Kassman to return to a hostile work environment in New York.

132.    Thus, KPMG ignored and/or failed to respond to repeated and escalating complaints and concerns regarding discrimination and retaliation and provided her with the

31

Hobson's choice of having no real place at KPMG or returning to the discriminatory environment which KPMG refused to address.

133.    These accumulating incidents of harassment, increased scrutiny, and marginalization negatively altered the terms and conditions of Ms. Kassman's employment at KPMG, and caused her significant stress in both her professional and personal life.

### Mishandling of Complaints and Retaliation

134.    Upon information and belief, what Human Resources and Ethics and Compliance policies and procedures exist at KPMG, they lack meaningful quality controls, standards, implementation metrics, and means of redress.   Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed, or worse, to result in further or increased discrimination and retaliation.

135.    After Ms. Kassman complained about the harassment and unequal treatment by Associate Stone, Senior Manager Montgomery, and Principal Schapiro, KPMG retaliated against her.

136.    Ms. Kassman complained to both the Office of Ethics and Compliance and the Office of General Counsel in April 2009 about the ongoing discriminatory treatment towards her.

137.    Principal Sweeney, the Principal in Charge of the Office of Ethics and Compliance, told Ms. Kassman, "This is three men ganging up on a woman.  We've had it before."

138.    However, instead of addressing the discrimination, the Office of Ethics and Compliance suggested that Ms. Kassman try to relocate to another position within KPMG or leave the Company with a "package."  On one occasion, Principal Sweeney suggested that Ms.

Kassman go out on leave for emotional distress, noting that many female employees had done so in the past under similar circumstances.

139.    The Office of General Counsel was equally ineffective in addressing Ms. Kassman's complaints of discrimination.  After investigating the matter (through David Burns of Firmwide Security) – and finding the facts undisputed – it simply referred Ms. Kassman to Human Resources because it was unable to come up with an acceptable solution.

140.    Shortly thereafter, Ms. Kassman spoke with Keri Fleming, Human Resources Associate Director, East Region Tax, about the ongoing discrimination and harassment she was experiencing.   Together, they decided that Human Resources would be Ms. Kassman's mouthpiece to Principal Schapiro because Ms. Kassman would physically shake every time he called her.

141.     To minimize contact with her harassers, Ms. Kassman decided that she would try to transfer to another position within KPMG, even if it meant taking a pay cut, assuming an administrative position or having to transfer offices.  Human Resources assured Ms. Kassman that it would help with this transition, but failed to follow through on its promise.

142.    Moreover, even though Ms. Kassman told Human Resources that she did not want to discuss the matter any further with Principals Schapiro and Brown, she continued to receive calls from them.  From the tenor of those conversations, it was clear to Ms. Kassman that Principals Schapiro and Brown thought she simply needed time to "cool off" and would eventually resume working with Senior Manager Montgomery and Associate Stone.

143.    After Principal Schapiro was informed of Ms. Kassman's complaints, she faced a number of adverse employment actions.  KPMG reprimanded her with a "coach," forced her to sit through numerous meetings and interrogations in response to Senior Manager Montgomery's

and Associate Stone's gender-based criticisms of her, and ultimately removed her from the promotion track.

144.   By contrast, KPMG did not discipline Associate Stone, Senior Manager Montgomery, or Principal Schapiro in any way.  In fact, the Company promoted Associate Stone and, adding insult to injury, "put up" Senior Manager Montgomery for the Managing Director position once slotted for Ms. Kassman.

### Constructive Discharge

145.   Ms. Kassman was forced to end her career at KPMG on October 1, 2010 because the Company had deliberately made her working conditions so intolerable that she was compelled to resign involuntarily.  Although it had been her goal to continue at KPMG and eventually reach the Partnership level, the escalating harassment and hostility she faced from her peers and supervisors – to which HR turned a blind eye – crushed these hopes.  It became clear to her that not only had her career stalled, but that she was being marginalized and ultimately pushed out of the Company against her will.  Indeed, the only options provided to her by HR and Ethics and Compliance were to continue working with her harassers or to leave the Company.

146.   Associate Stone and Senior Manager Montgomery's unfounded criticisms of Ms. Kassman, which were exacerbated and reinforced by the "coaching" and interrogations KPMG forced her to attend, led her to doubt her self-worth and, more important, highlighted what little value the company to which she had dedicated her professional life placed on her.

147.   As a result of KPMG's campaign of discrimination and harassment, Ms. Kassman's work environment became unbearable.  She could barely eat or sleep, and she would physically shake when she approached the KPMG building or when Principal Schapiro called

her.  To avoid running into her tormentors when she worked from the New York office, Ms. Kassman made a habit of taking the back elevators at work.

148.    Because of her torment and desperation at work, anxiety and depression also spread into her home life.  Her relationship with her husband became strained, and she lacked the energy to care for her children.  She experienced daily headaches, neck pain, back pain, and weight loss.

149.    Working from the Stamford office was Ms. Kassman's only hope for escaping the intolerable conditions of the New York office, but even there she was both marginalized by her colleagues and physically removed from her office space to a mere set of drawers, all while she was expected to maintain the same responsibilities and performance of other Senior Managers.

150.    On at least five occasions, Ms. Kassman contacted Keri Fleming in HR to request a transfer to a different practice.  Although Ms. Kassman was willing to work in any division other than her current one, HR failed to connect her to any opportunities or otherwise address the ongoing and persistent discrimination.

151.    Because Ms. Kassman's previous experience had taught her that KPMG would not properly address its employees' unlawful conduct, she felt that she had no recourse against the pervasive harassment and discrimination.  Her repeated requests for assistance were ignored or resulted in further intimidation, and she was left with the choice of returning to an office where she was made physically ill by the treatment of her co-workers, or working in a diminished and disreputable capacity in Stamford.  Losing the right to office space in Stamfordwhile other offices remained unoccupied was demoralizing and physically embodied how she was being pushed out of the Company.

152.    On October 1, 2010, Ms. Kassman resigned from KPMG, stating in her letter of resignation, "By ignoring my requests to put an end to the discriminatory treatment, KPMG has forced me to either continue to endure an intolerable work environment or end my employment. I therefore have no choice but to leave the Firm."

**B.    PLAINTIFF SPARKLE PATTERSON**

153.    Ms. Patterson suffered discrimination in pay, denial of promotional opportunities, and discrimination as a result of gender, pregnancy, and race.  She was ultimately constructively discharged.

154.    KPMG employed Ms. Patterson, an African-American mother of two children, from June 2007 until her constructive discharge from the Company in November 2010.

155.    In June 2007, Ms. Patterson began working at KPMG as an Associate in Atlanta, first in Federal Tax, then in the IES practice, which she joined in August 2008.

156.    Ms. Patterson proved herself to be an excellent performer.

157.    In her 2008 year-end review, Federal Tax Partner Bernard Cates gave Ms. Patterson a "Strong" rating and wrote that she was "trending towards an EP ['Exceptional'] performance level."

158.    In Ms. Patterson's October 2008 engagement review, IES Manager Greg Woofter ("Manager Woofter") wrote that Ms. Patterson worked "diligently" and that he was "pleased with [her] progress."

159.    In her April 2009 review, Manager Woofter wrote that Ms. Patterson "excelled" and "exceeded [his] expectations," and that he wanted to "continue [Ms. Patterson's] career progression within the IES practice."

160.    In her 2009 year-end review, Senior Manager Yozura Yoshida ("Manager Yoshida") gave Ms. Patterson a "Strong" rating and wrote that she was "pr[o]fessional, commit[t]ed, motivated and eager to learn" and that he "expect[ed] her to continue this positive trend."

161.    In April 2008 and October 2008, Ms. Patterson received a "Standing Ovation" award with a $500 American Express Card, one of the highest honors within KPMG's "Encore" award system that recognizes employees who go "above and beyond" in their work.

162.    In January 2009, Ms. Patterson received a $200 "Bravo" award, another form of recognition within KPMG's "Encore" award system.  Manager Yoshida originally nominated her for the "Standing Ovation" award, but as part of KPMG's effort to manage costs, that award was temporarily unavailable.  In the award description, Manager Yoshida wrote that Ms. Patterson had "[gone] the extra mile to get things done."

### Disparate Pay

163.    Upon information and belief, KPMG paid Ms. Patterson at a lower rate than men, non-caregivers, and non-African Americans for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

164.    Although Ms. Patterson was a stellar performer, her total compensation was not commensurate with that awarded to similarly-situated male and non-African-American employees.

165.    Ms. Patterson regularly performed the duties of a "Senior Associate" starting in early 2009, though she was not compensated accordingly.  For example, Ms. Patterson served as an initial point of contact for clients and met with them directly.  She managed engagements

herself, allocating work to Associates and Tax Technicians and reviewing their work, as well as drafting client bills and invoices for Managers' review.

166.    These tasks were not usually assigned to individuals classified as "Associates" like Ms. Patterson, but instead were given to "Senior Associates" who received higher pay than Associates.  For example, Stephan Rabbitt and Anna Bankston, who were both white and lacked caretaking responsibilities, also worked under Ms. Patterson's same Managers in IES and performed the same tasks as she did.  Upon information and belief, their performance was no stronger than Ms. Patterson's.  However, Mr. Rabbitt and Ms. Bankston were assigned and paid as "Senior Associates."  Upon information and belief, Senior Associates were paid approximately $10,000 more in base salary than Ms. Patterson, and also received a "promotion bonus" along with the title.

167.    In addition, KPMG refused to pay Ms. Patterson for the entire month of June 2010 following her maternity leave.

168.    In February 2010, Ms. Patterson requested a paid sabbatical following her maternity leave from June 1, 2010 to August 15, 2010 to complete two additional courses for her CPA license, which were important for career growth.   KPMG routinely approved paid sabbaticals for other employees to travel overseas, go hiking, run triathlons, or pursue other personal interests.  While KPMG promptly approved other employees' paid sabbaticals, Partner Gary Lusk ("Partner Lusk"), who reported up the IES chain to Principal Brown and Partner Garfunkel in New York, ignored Ms. Patterson's sabbatical request.

169.    According to KPMG policy, sabbatical requests must either be approved or formally denied with a written explanation.  On March 1, 2010, Ms. Patterson consulted HR Tax

Manager Tammy Woodard ("HR Manager Woodard"), who confirmed that Ms. Patterson could proceed with the sabbatical application process if Partner Lusk did not formally deny the request.

170.    From March through May 2010, Ms. Patterson went on maternity leave before the birth of her second child.  In March 2010, Partner Lusk finally confirmed that he had received Ms. Patterson's sabbatical request and would review it by mid-April.  In April 2010, Ms. Patterson followed up about the status of her sabbatical request.  Partner Lusk ignored her request.  In May 2010, Ms. Patterson again followed up with Partner Lusk, and once again Partner Lusk refused to approve or deny her request.

171.    In June 2010, Ms. Patterson did not return to work following her paid maternity leave because her sabbatical request was still pending.  Ms. Patterson consulted her informal mentor Partner Milford McGuirt ("Partner McGuirt"), co-chair of KPMG's national African-American Network and one of few African-American partners at the Company.  Partner McGuirt confirmed that Ms. Patterson had followed the proper procedure for requesting a sabbatical.

172.    In July 2010, after months of ignoring Ms. Patterson's sabbatical request, Partner Lusk verbally denied Ms. Patterson's request and instead approved a sabbatical "beginning" in July 2010.  Partner Lusk refused to pay Ms. Patterson for the entire month of June.  Thus, while Ms. Patterson's male, non-caregiving, and non-African-American employees received sabbatical pay to pursue recreational activities, Ms. Patterson was only compensated for *part* of the time she used for career development.

173.    Because KPMG employs a compensation system that has insufficient quality standards and controls, and implementation metrics, and lacks transparency and opportunities for redress or challenge, its compensation practices have had a disparate impact on the Company's female employees.

174.    Upon information and belief, KPMG management systematically took advantage of the flaws in this system by knowingly and intentionally paying female employees less than similarly situated male employees.

175.    Upon information and belief, Ms. Patterson was also paid less as compared to non-African-American KPMG employees who performed the same duties or had the same job title as she did within the company.  This disparity arose in part because of the disparate career advancement opportunities she was provided in comparison to non-African-American colleagues, described below.

### Denial of Promotions and Discriminatory Assignments

176.    Despite Ms. Patterson's award-winning performance, KPMG denied her a promotion in favor of less-qualified male and non-African-American employees.  Although the standard promotion track at KPMG promotes Associates to Senior Associates after two years, Ms. Patterson was never promoted beyond Associate in her three-and-a-half-year tenure with the Company.

177.    Approximately seven of Ms. Patterson's Associate-level peers in Federal Tax were promoted within two years (i.e. by approximately July 2009); all seven were Caucasian and none had children.  Ms. Patterson and two other black females were not promoted; Associate Gayann Greene (also a mother of two small children) resigned, and Associate Avalyn Goodwin was laid off.

178.    In July 2009, however, Ms. Patterson was passed up for the promotion usually granted after two years at the Company.  Instead, Ms. Bankston and Mr. Rabbitt, who were white and lacked childcare responsibilities, were promoted to Senior Associate.  Their educational and experiential backgrounds were equal to Ms. Patterson's, and they performed the same duties as

Ms. Patterson under Partner Lusk in IES. Moreover, when Ms. Patterson moved out of the Federal Tax practice and into IES, Partner Lusk had assured her that this change would not affect her progression toward promotion to Senior Associate.

179.    After being passed up in July 2009, Ms. Patterson made Partner Lusk aware of her concern about not being promoted along with her class of Associates. He promised her that she would be promoted the following year, in 2010.

180.    Accordingly, Ms. Patterson believed she was still on track for promotion to Senior Associate in the fall of 2009. Ms. Patterson regularly solicited feedback from her Engagement Managers to ensure she stayed on track for promotion, and her interim reviews in 2009 were excellent.

181.    However, in November 2009, Ms. Patterson informed Partner Lusk and Manager Yoshida that she was pregnant and would take maternity leave beginning March 2010. Partner Lusk expressed strong disapproval of Ms. Patterson's leave and told her that missing the week before March 15th was like "missing the whole year."

182.    While Ms. Patterson was on maternity leave in April 2010, Partner Lusk asked Ms. Patterson to take on a lesser role in IES. Partner Lusk suggested that Ms. Patterson return to work "part time" or move to the Japanese practice, even though it was not a good fit for her interests, experience or background. Ms. Patterson told Partner Lusk that neither working part time nor transferring to an entirely new practice was in line with her career goals. Upon information and belief, similarly-situated male employees were not asked to work "part time" or to change practices at this time.

183.    When Ms. Patterson returned from leave and sabbatical in August 2010, Partner Lusk and Manager Yoshida intentionally intimidated Ms. Patterson. In a change from the

standard year-end performance review practice where only the Performance Manager would review the evaluation with Ms. Patterson, both men joined together to raise pretextual concerns with her performance.   Upon information and belief, there were no other Associates in the Atlanta IES practice whose performance was evaluated by both a Partner and a Manager in their 2010 year-end review.

184.    Specifically, Partner Lusk and Manager Yoshida criticized Ms. Patterson in her fiscal year-end review about concerns that had never been raised before her maternity leave.   In Ms. Patterson's interim performance review for the same fiscal year, Manager Yoshida wrote that Ms. Patterson was "eager to perform well" and that she "manage[d] her time well."   In her fiscal year-end review, after she returned from maternity leave, Manager Yoshida wrote that Ms. Patterson was "unavailable" and caused her manager to spend more time during the Christmas holidays, though Ms. Patterson had not taken any vacation days during this time and frequently worked overtime.   Ms. Patterson had never heard this criticism before her maternity leave.

185.    In the same fiscal year-end review for 2010, Partner Lusk and Manager Yoshida accused Ms. Patterson of "not mak[ing] herself available to help others" when Ms. Patterson had taken a Saturday, Sunday and Monday out of the office one week in August 2009 to complete the final portion of her CPA exam.   Prior to announcing her pregnancy, both Partner Lusk and Manager Yoshida had approved this time out of the office.   Partner Lusk had known Ms. Patterson needed to complete the exam since he accepted her transfer in July 2008 and knew that her passing scores on previous sections would expire if she did not timely complete the final section.

186.    Ms. Patterson's August 2010 review also ignored her notable achievements, such as completing her CPA, achieving all of her performance goals set at the beginning of the fiscal

year, being on the Board of Directors for a non-profit organization and participating in KPMG Affinity Networks.

187.    Upon information and belief, KPMG's performance evaluation system's insufficient quality standards and controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, had a discriminatory and disparate impact on women and caretaking employees.

188.    Upon information and belief, KPMG management systematically took advantage of the flaws in the system and often undervalued, mismeasured, or otherwise inaccurately captured  performance to the particular detriment of women and mothers.  In addition, unfounded criticism can be included and legitimate criticism given undue weight.   Within this flawed system, leave for pregnancy and caretaking responsibilities can constitute a negative factor in female Professionals' evaluations, compensation decisions and promotion considerations at KPMG.

189.    As a result of the unfounded negative comments in the review, Ms. Patterson was denied a promotion to Senior Associate in 2010 despite her three-year track record of award-winning performance.

190.    In October 2010, Ms. Patterson was removed from her largest client, despite previously winning a "Bravo" award in April 2009 for her work relating to the same client. Partner Lusk and Manager Yoshida told Ms. Patterson she was being removed so she could "get more exposure" to other clients.  However, Ms. Patterson was not given work on other clients despite her persistent requests.  KPMG generally does not remove employees from their largest clients without clear transfers to new clients.

191.     Partner Lusk and Manager Woofter, both Caucasian males, assigned Associate Sarah Bohman ("Associate Bohman"), a Caucasian recent college graduate with no children, to take Ms. Patterson's place on the client team.

192.     This was not the first time Ms. Patterson had been excluded from career-advancement opportunities at KPMG; since the beginning of her employment at KPMG, Ms. Patterson found that white managers would develop friendly, casual relationships with white Associates, but made no such efforts with her.

193.     Upon information and belief, KPMG's develoment and mentoring systems have insufficient standards, quality controls, and implementation metrics, lack of transparency and opportunities for redress, and have a discriminatory and disparate impact on women and caretaking employees.

194.     Further, upon information and belief, KPMG management systematically takes advantage of the flaws in the system, as Partners are allowed to mentor and develop employees selectively, without any standards or guidelines for providing these advancement opportunities.

195.     Upon information and belief, Ms. Patterson was not the only female employee to suffer the effect of the lack of adequate opportunities for mentorship, development (both personal and client-based) and advancement at KPMG.  Instead of having transparent and systematic policies and procedures in place based on objective performance and qualifications, how and when such opportunities are provided is shrouded in secrecy, most often to the detriment of women, caregivers, and African-Americans.

196.     Upon information and belief, KPMG's flawed promotion practices consistently result in males and non-caregivers being promoted more rapidly and assigned more frequently to higher-level positions than women across the Company.

**Pregnancy/Caregiver Discrimination and Retaliation**

197.    During Ms. Patterson's tenure with KPMG, she was the only employee in the Atlanta IES practice with small children other than Manager Yoshida and Partner Lusk, both of whom had stay-at-home wives or close family members living at home.

198.    KPMG discriminated against Ms. Patterson based on her pregnancy.  From July 2007 to November 2009, Ms. Patterson received awards and strong reviews.  However, when she became pregnant, she was subjected to hostile comments and her opportunities for advancement disappeared.

199.    When Ms. Patterson informed Manager Yoshida of her pregnancy in November 2009, Manager Yoshida angrily asked, "Did you plan this?"

200.    From February 2010 to July 2010, Partner Lusk actively ignored Ms. Patterson's sabbatical request to complete her CPA licensing requirements while KPMG granted sabbatical requests and facilitated the efforts of similarly situated male and non-caretaking employees, such as Manager Woofter, to become CPAs.

201.    In August 2010, Partner Lusk and Manager Yoshida subjected Ms. Patterson to increased scrutiny when both reviewed her performance, and wrote negative comments in her review that had never been raised as issues prior to Ms. Patterson announcing her pregnancy.

202.    After Ms. Patterson returned from maternity leave, her requests for work were systematically denied by the KPMG managers she approached.  Indeed, only one Manager, Cordella Scott ("Manager Scott") – an African-American woman – regularly provided her work. This prevented Ms. Patterson from reaching the 89% target for billable work set by IES Partners in New York.  At best, Ms. Patterson was only able to bill twelve hours in a forty-hour work

period, which made her 30% chargeable.  Prior to her pregnancy, Ms. Patterson did not have difficulty obtaining billable work.

203.    Although Ms. Patterson was available and willing to work long hours, KPMG managers refused to give her work because of the predominant culture at KPMG that assumes working mothers with young children are less effective employees and less committed to their careers.

204.    Because it had become clear that she was not going to advance in IES following her pregnancy, Ms. Patterson requested a transfer to another group in August 2010.  However, KPMG glossed over the difficulties Ms. Patterson was experiencing and refused to consider her request for a transfer, despite Ms. Patterson's repeated inquiries.  Associates without caretaking responsibilities were regularly considered and often approved for transfers.

205.    In October 2010, Ms. Patterson was removed from her largest client and replaced by Associate Bohman, a Caucasian recent college graduate with no children.

206.    Upon information and belief, the Company's policies and procedures regarding evaluation, compensation, development and promotion lack the transparency, standards, quality controls, implementation metrics, and means for redress necessary to prevent this disparate impact on female Professionals who are pregnant or mothers. Within this flawed system, leave for pregnancy and caretaking responsibilities can constitute a negative factor in female Professionals' evaluations, compensation decisions and promotion considerations at KPMG.

207.    Upon information and belief, KPMG management systematically took advantage of the flaws in the system and often undervalued, mismeasured, or otherwise inaccurately captured performance to the particular detriment of women and mothers.   KPMG has subjected

and continues to subject female employees with caregiving responsibilities and/or young children, like Ms. Patterson, to disparate terms and conditions of employment and retaliation.

### Mishandling of Complaints

208.   From December 2009 until her constructive discharge on November 29, 2010, Ms. Patterson complained through various reporting channels, including HR and Ethics and Compliance, about the discrimination and retaliation she was experiencing.  However, KPMG failed to address Ms. Patterson's complaints.

209.   In December 2009, Ms. Patterson contacted HR Manager Tammy Woodard to raise concerns regarding Manager Yoshida's negative and discriminatory response to her pregnancy.  Upon information and belief, HR did nothing to investigate or address Ms. Patterson's complaints, despite her repeated attempts to follow up regarding this matter.

210.   In March 2010, Ms. Patterson contacted HR Manager Woodard regarding Partner Lusk's failure to address her sabbatical request, but no action was taken until July 2010, after her desired sabbatical was supposed to begin.

211.   In July 2010, Ms. Patterson contacted HR Regional Director Chris Beall ("HR Director Beall") about the discriminatory treatment she had received since announcing her pregnancy, including Manager Yoshida and Partner Lusk's comments, and Partner Lusk's refusal to address her sabbatical request.  Following a meeting with HR Director Beall, Ms. Patterson sent him an electronic message outlining and detailing her discrimination claims. Without Ms. Patterson's consent, HR Director Beall sent her message to Partner Lusk and requested a meeting.

212.   At the end of the month, Ms. Patterson met with HR Director Beall and Partner Lusk to discuss Ms. Patterson's discrimination claims, including the denial of her sabbatical

request.  Because Ms. Patterson felt intimidated, she brought her mentor, Senior Manager T. Angie Napier to the meeting.  At the meeting, HR Director Beall and Partner Lusk ignored Ms. Patterson's discrimination claims and instead focused on her CPA exam in August 2009,  telling her that time taken for her CPA exam would not be held against her in her year-end review.

213.    Following the meeting, Partner Lusk denied Ms. Patterson's initial request for sabbatical from June 1 to August 15 and pressured her to take a sabbatical from August through October, which she feared would have damaged her prospects for a fall promotion.  When Ms. Patterson protested, Partner Lusk finally allowed a sabbatical beginning July 1 but still ending August 15, 2010, thus shortening her sabbatical by one full month and denying her compensation for June.

214.    In August 2010, Ms. Patterson complained to Ethics and Compliance about the negative comments in her Performance Review – the first negative comments of her career – and the discriminatory denial of her promotion following her pregnancy.   During a second performance review meeting, Partner Lusk and Manager Yoshida told newly appointed HR Tax Manager, Rebecca Berry, that Ms. Patterson's review was not negative.  HR did not challenge this or otherwise investigate or respond to the situation further.

215.    Later that month, Ms. Patterson requested a transfer out of IES because the managers in her group refused to give her any work, despite repeated requests.  The Ethics officer. Craig DeCampli ("Ethics Officer DeCampli"), told her to "wait," and that the situation in IES would be resolved.

216.    Ms. Patterson continually followed up with HR and Ethics through November, as her work situation had not improved.   Although she had been told the investigation would be resolved in October 2010, she was told when she inquired again that it would be resolved in early

November.  When she followed up with Ethics Officer DeCampli after the appointed date in November had come and gone, he again told her that it had not yet been resolved.  Ms. Patterson followed up one final time, in January 2011, only to learn that the investigation had been closed. She was never apprised of the Company's findings.

217.    KPMG never granted the transfer out of IES or made any effort to address Ms. Patterson's complaints of discrimination and retaliation.

218.    Upon information and belief, KPMG's HR and Ethics and Compliance offices and procedures lack standards, quality controls, transparency, implementation metrics, means of redress, and requirements that concerns of discrimination be addressed and resolved.  Women, mothers, and African-Americans are negatively affected by these insufficiently designed and implemented procedures, as unresponsiveness to complaints about discrimination disproportionately falls upon such employees.

### Constructive Discharge

219.    Ms. Patterson was forced to end her career at KPMG in November of 2010 because the Company had deliberately made her working conditions so intolerable that she was compelled to resign involuntarily.

220.    When she returned from maternity leave, she was removed from her largest engagement, and, contrary to standard practice at KPMG, was not provided a replacement project.  She was reliant on odd jobs and work provided to her by one African-American female Manager, Cordella Scott, to reach even a 30% billable level.  She often went to work each day only to suffer the humiliation of sitting at her desk for eight to ten hours with nothing to do, despite her repeated requests for work and the obvious evidence that there was work to be done being deliberately kept from her.

221.    Although Ms. Patterson had always been a strong performer at KPMG, she was not only denied the work and promotions for which she was qualified but also denied support in the advancement she sought through pursuing her CPA.

222.    Because it had become clear to Ms. Patterson that there was no future for her in IES and conditions in the division had become intolerable, she sought a transfer.  Even this channel for redress was denied her, though, because KPMG refused even to consider her request, making it impossible for her to escape the discrimination and marginalization she was experiencing in IES.  As her options for a future at KPMG were systematically closed, Ms. Patterson became increasingly fearful for her ability to support herself and her children.

223.    These stresses at work carried over to the home, as Ms. Patterson's work situation strained her relationship with her significant other and deteriorated her health.  Ms. Patterson's isolation and hopelessness at work made her unable to eat.  While she had been nursing her newborn, she stopped producing breast milk as a result of the physical and emotional strains she suffered at KPMG.

224.    Ms. Patterson wanted nothing more than to stay at KPMG and further her career. She built a house in Atlanta where she expected to raise her two children.  In November 2010, after enduring months of escalating discrimination and retaliation with no hope or resolution whatsoever in light of KPMG's persistent refusal to help, Ms. Patterson had no choice but to resign from KPMG.

### C.  PLAINTIFF JEANETTE POTTER

225.    Ms. Potter suffered discrimination in assignment, discrimination in pay, and denial of promotional opportunities.  She was ultimately constructively discharged.

226.    KPMG employed Ms. Potter from July 1995 until her constructive discharge from the Company in July 2006.

227.    In July 1995, Ms. Potter began working at KPMG as a Manager in the IES Tax practice.  She had previously graduated from the Universite Nanterre in France and, while at KPMG, received a Master's degree in Tax from Pace University.  In addition, she has earned two other advanced degrees.  She had five years of Manager-level experience when she came to KPMG.

228.    In June 1996, Ms. Potter was promoted to Senior Manager, the position in which she would be stuck for ten years before being pushed out of the company.

229.    Throughout her eleven-year tenure, Ms. Potter demonstrated excellent performance.  From 1996 to 2000, Ms. Potter always received "Meets Expectations" or "Exceeds Expectations" on her performance reviews, then, under a new performance rating system, received "Exceptional Performer" ratings in 2001 and 2002.

230.    Ms. Potter received "Strong Performer" ratings from 2003 to 2006, when she was pushed out of the Company.  Ms. Potter was applauded for her excellent work and praised as "clearly a leader in the group."

### Discriminatory Assignment

231.    Although Ms. Potter was highly qualified for a Senior Manager position at the time she was hired by KPMG, the Company initially assigned her to the position of Manager.

232.     Ms. Potter's previous employer did not have a "Senior Manager" distinction, so Ms. Potter held the title of Manager even though she performed duties typically performed by Senior Managers at comparable firms, including KPMG.  These tasks included, primarily, full responsibility in performing clients' returns and managing staff assigned to work on the returns. At KPMG, the title of "Senior Manager" typically went to individuals with two or more years of Manager experience, and Ms. Potter had a full five years of experience at this level.  It was not until a year after Ms. Potter joined KPMG, however, that she received the title she should have been assigned upon her hire.

233.     Upon information and belief, KPMG regularly discriminates against female employees by assigning them to lower-level positions than those for which they are qualified or than they would have received had they been men.  Women are disparately impacted by the lack of transparency, standards, quality controls and implementation metrics in the Company's practices and procedures in assigning job titles.

234.     Further, KPMG management systematically takes advantage of the flaws in the assignment practices and procedures to place female employees in positions below their level of qualification.

### Disparate Pay

235.     Ms. Potter's excellent performance over the course of her eleven-year career at KPMG was not rewarded with the compensation she deserved.  Upon information and belief, the Company paid Ms. Potter at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

236.    Upon information and belief, because of her initial misassignment as "Manager," Ms. Potter's salary continued to be less than that of similarly-situated men throughout her tenure at KPMG.

237.    From 1996 to 2001, Ms. Potter received yearly pay increases, but the amounts of these increases were based on a percentage of her base salary, which, upon information and belief, was already lesser than her male peers' because of the initial misassignment.

238.    In addition, after October 2002, Ms. Potter's pay was frozen when her performance rating was lowered to "Strong Performer," even though there had been no identifiable change in Ms. Potter's performance, or KPMG's assessment of it, beyond the discriminatory instruction to "socialize more."

239.    Similarly situated male employees in her office who had previously been paid at the same rate as or higher than Ms. Potter did not have their pay frozen.  Ms. Potter was not aware of any male Senior Managers in the IES Tax practice who ceased to receive pay raises, and, on information and belief, they continued to receive the raises that Ms. Potter expected but was suddenly denied throughout the remainder of her tenure at KPMG.

240.    In addition to Ms. Potter, at least two other female Professionals in the IES Tax practice, Senior Manager Elaine Blum ("Senior Manager Blum") and Director Jeanne Jue ("Director Jue"), also had their pay frozen at this time.   Both Senior Manager Blum and Director Jue had well over a decade of experience, like Ms. Potter, and both were strong performers.

241.    After October 2002, Ms. Potter received no pay increases before her constructive discharge from the Company in July 2006, despite her consistently strong performance.  Upon information and belief, comparable men continued to make more than Ms. Potter throughout her employment at KPMG, even though their experience, skills, and responsibilities never exceeded

hers.  For example, Senior Manager David Buchner, whose qualifications, experience, and responsibilities were no greater than Ms. Potter's or Senior Manager Blum's, continued to receive pay raises after 2002.

242.    When, in May 2006, Ms. Potter asked Principal Ed Gibbons about her frozen pay, he referenced a spreadsheet with pay information and told Ms. Potter she was the fifth highest paid Senior Manager in her practice.  When Ms. Potter asked which Senior Managers earned more than her, Principal Gibbons confirmed that the four higher salaries belonged to male employees.  No male Senior Managers in IES Tax had comparable tenure at KPMG to Ms. Potter, and, on information and belief, none of them exceeded her in performance or responsibility.  Ms. Potter asked why the less-experienced men were paid more than she was, but Principal Gibbons refused to engage on the issue and instead told Ms. Potter she was "paid too much."

243.    Although Ms. Potter requested that Principal Gibbons provide her details about salary ranges at the Company – information that was heavily guarded and kept secret for employees – and he indicated that he would do so, he never did so.   Rather than taking any steps to address Ms. Potter's concerns about discriminatory compensation, Principal Gibbons became increasingly hostile toward her.   He ignored her entirely, even excluding her from discussions about her clients.

244.    Upon information and belief, KPMG's policies regarding voicing complaints of discrimination and subsequent investigations thereof lack transparency, adequate implementation metrics, standards, and quality controls, and fail to require the Company's Partners and Principals to address discrimination.  These policies, and the lack of means of redress for

unanswered complaints, have a disparate and discriminatory effect on women in the terms and conditions of their employment.

245.    Further, upon information and belief, at least two other female Senior Managers received pay cuts after their pay was initially frozen, while no male Senior Managers in her office received pay cuts.  For example, KPMG cut Senior Manager Blum's salary because she was "paid too much," and Director Jue's salary was also cut.  Senior Manager Blum's qualifications, tenure, and experience were at least as strong as her male peers'.

246.    Upon information and belief, KPMG also subjects female employees to discriminatory demotions that come with lower salaries.  For example, Senior Manager Lu Tseng ("Senior Manager Tseng") was sent on an eighteen-month assignment to Japan.  When she returned to the United States, she was told there were no Senior Manager positions available even though her previous position had not been filled.  Instead, KPMG offered Senior Manager Tseng a Manager position for a salary cut.

247.    Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly-situated male employees.  KPMG's opaque evaluation and compensation practices lack sufficient standards, quality controls, implementation metrics, transparency and opportunities for redress or challenge, and create a disparate impact on the Company's female employees.  .

248.    Upon information and belief, KPMG management systematically took advantage of the flaws in these systems and often undervalued, mismeasured, or otherwise inaccurately captured performance to the particular detriment of women.

**Denial of Promotions**

249.    Despite Ms. Potter's exceptional performance, KPMG denied her promotions in favor of lesser qualified male employees.

250.    By the summer of 2000, it had become clear to Ms. Potter that she was not going to be promoted at the rate she deserved.  Ms. Potter observed that employees who spent a significant amount of time schmoozing and socializing at office happy hours were more likely to advance, while employees who did not were less likely to be promoted.  This corporate culture and improper advancement criteria disproportionately harmed female employees like Ms. Potter, who were less likely to be welcomed into the Company's "good old boys" club and who felt uncomfortable at many social events, which tended to be hostile to women.

251.    Upon information and belief, the Company's evaluation, development, and promotion policies lacked the standards and quality controls to reward excellent performance like Ms. Potter's.

252.     In the summer of 2000, Ms. Potter informed Partner McLaughlin that she planned to resign from KPMG due to the lack of promotional opportunities.  She was prepared to accept an offer at Ernst & Young for a comparable position with a $13,000 salary increase and a $17,000 signing bonus.  Ms. Potter expected that Ernst & Young would provide greater opportunities for promotion than KPMG.  However, Partners McLaughlin, Pete Dolan, Patricia Brown (who also served as Principal in Charge of the East for IES during the time Ms. Kassman experienced discrimination and retaliation), Bill Hibbit, Dan Orchant, Sam Russo and Jeff Stein told Ms. Potter that they refused to accept her resignation and reassured her that she was just about to be promoted.  The group of Partners offered her a $20,000 retention bonus (which she

had to repay if she left within one year) and sent her a box of chocolates with a card that read, "Please don't leave."

253.    Because Ms. Potter believed, based on the Partners' representations, that she was about to be promoted, she declined the attractive offer from Ernst & Young and decided to stay at KPMG.

254.    In Ms. Potter's May 2001 review, Principal McLaughlin wrote that she "had a fabulous year" and was "clearly a leader in the group." Despite Principal McLaughlin's positive comments and Ms. Potter's "Exceptional Performer" rating, she was not promoted in 2001.

255.    In Ms. Potter's May 2002 performance review, Principal McLaughlin gave Ms. Potter a "Strong Performer" rating, lower than all her previous ratings, despite the review's overwhelmingly positive comments. The only criticism Principal McLaughlin wrote was that Ms. Potter needed to "continue to build relationships" for a promotion to Tax Managing Director.

256.    In May 2002, however, Ms. Potter was abruptly removed from the Managing Director track she had been promised. KPMG denied Ms. Potter the promotion to Managing Director because, according to Principal McLaughlin, she did not "socialize" enough. Principal McLaughlin told Ms. Potter she needed to "schmooze" more. However, Ms. Potter could not attend events on Fridays – when many of the happy hours were scheduled – because her religion dictates that she observe the Sabbath.

257.    In addition, Ms. Potter did not attend many of the Company's other informal social events because she strongly disapproved of male Partners' overtly sexual conduct toward female staff at the events. Upon information and belief, KPMG Partners accosted and manhandled junior female employees at the Company happy hours. Male Partners regularly

took "body shots" off of female employees, during which Partners would put salt or sugar on a female employee's neck and lick it off.  Senior leadership including Principal Brown were present and witnessed these events and, through their inaction, tacitly condoned the behavior of their male counterparts and subordinates.

258.    Accordingly, these socializing events were much more amenable to fostering male employees' sense of belonging and ownership than women.  Nonetheless, KPMG's promotion decisions rely heavily on personal relationships built at Company social events that are hostile to, or that tend to exclude, female employees.  Indeed, upon information and belief, the Company's evaluation, development, and promotion practices lack the transparency, standards, quality controls, implementation metrics and means for redress necessary to reward rather than disadvantage successful female employees.  Upon information and belief, Ms. Potter was not the only woman who was forced to choose between submitting to hostile social activities or allowing her career to stagnate.

259.    When Ms. Potter expressed her concerns about his assessment of her potential for promotion with Principal McLaughlin, he was unresponsive, consistent with the treatment she later received from Principal Gibbons.  When she questioned the justification for why she was not promoted, Principal McLaughlin told her this was the way things were at KPMG.

260.    Following this discussion, Principal McLaughlin ignored Ms. Potter, excluding her from decisions about clients and staff, ceasing to direct any new clients to her, and instead focusing his attention on Senior Manager Buchner.

261.    Because Ms. Potter did not engage in or otherwise support these hostile social events, she was marginalized, downgraded in her review, and denied a promotion.  While Ms. Potter hit a glass ceiling, she witnessed males of her same educational and experiential

background, who shared the same responsibilities as her and performed no better than her, move upward in the Company.

262.    Indeed, upon information and belief, after Ms. Potter was removed from the partnership track, Senior Managers Tom Condon and Roger Koferl – who lacked Ms. Potter's years of experience, advanced degree in Tax, and record of exceptional performance – were prioritized in her place.  Both were eventually promoted, and both took part in the male-dominated after-hours culture that Principal McLaughlin criticized Ms. Potter for avoiding.

263.    Upon information and belief, because of their lack of clearly defined and implemented  standards and  transparency, KPMG's promotion practices consistently result in males being promoted more rapidly, developed more purposefully, and assigned more frequently to higher level positions than women across the Company.

264.    Upon information and belief, KPMG took advantage of the professional development and performance evaluation systems' lack of transparency, quality standards and controls, implementation metrics, and opportunities for redress by including unfounded criticism against many female employees, resulting in their exclusion from promotion opportunities.

**Constructive Discharge**

265.    Ms. Potter was forced to end her career at KPMG in July of 2006 because the Company had deliberately made her working conditions so intolerable that she was compelled to resign involuntarily.  While she had hopes to continue building a long career at KPMG, and to become a Partner, it became clear that she was not valued and would always be subject to discrimination.

266.    Ms. Potter found her situation at KPMG increasingly intolerable as she witnessed men who were no more qualified than she surpass her in pay and status within the Company.

This, along with the explicit devaluing of her contributions through comments like Principal Gibbons' that she was "paid too much," made her feel worthless.  KPMG's failure to provide her a legitimate justification for her stagnant pay caused her particular distress as she saw her performance reviews altered downward for the first time in her tenure.  She foresaw being pushed out of the Company.

267.    Because the Company provided her with no suggestions for becoming eligible for pay increases or promotion beyond submitting to social activities that were degrading to women, Ms. Potter saw no avenue for a continued role at KPMG.

268.    Her experience of Principal Gibbons' and Principal McLaughlin's unresponsiveness and hostility to her concerns about discriminatory pay and advancement opportunities led her to believe there would be no recourse within the Company.  Not only did the latter individuals fail to respond to her concerns, but they also responded with open hostility, which went beyond just unkindness to freezing Ms. Potter out of assignments and information about her clients that was necessary for her to succeed at work.

269.    Reaching out to Human Resources within her division would be a fruitless exercise, as she had been provided no literature about the Company's policies and procedures, and had observed that HR was controlled by the very Principals who tormented her.  An atmosphere of hostility pervaded the office, such that she feared any complaints would result in the retaliation and marginalization she experienced from Principals Gibbons and McLaughlin, which led her to fear termination.

270.    As doors closed for Ms. Potter at KPMG in 2006, she became increasingly anxious and depressed.  She had persistent headaches, which escalated at this time, along with back pain and frequent sleeplessness.

271.     Thus, after more than a decade as a Senior Manager with no hope for promotion and four years with no salary increase, Ms. Potter had no choice but to resign from KPMG in July 2006.  Ms. Potter was forced to accept a job for half her exiting salary before finding permanent employment in the financial services industry.

### D.     PLAINTIFF ASHWINI VASUDEVA

272.     Ms. Vasudeva suffered discrimination in pay, denial of promotional opportunities, and discrimination as a result of pregnancy.  She was ultimately constructively discharged.

273.     KPMG employed Ms. Vasudeva, the mother of a young child, full-time from January 2005 until her constructive discharge from the Company in September 2009.

274.     In the summer of 2004, Ms. Vasudeva began working at KPMG's Mountain View office as an Intern.  She returned to KPMG as a full-time Associate in the same office in January of 2005, first working in the External Audit practice, then in Contracts Compliance Services within the Advisory practice approximately a year and a half later. In June 2007, Ms. Vasudeva was promoted to Senior Associate.

275.     Prior to working at KPMG, Ms. Vasudeva earned her first Bachelor's Degree in Commerce and Economics from University of Mumbai in India, then worked for two years in India in accounting and sales.  Ms. Vasudeva then earned a second Bachelor of Science Degree in Accounting from California State University, Hayward in 2005.

276.     Throughout her nearly five-year tenure, Ms. Vasudeva proved herself to be a stellar performer. During her reviews, Ms. Vasudeva's performance managers consistently rated her as a "strong" or "exceptional performer."  In or around 2005 and 2006, KPMG also awarded Ms. Vasudeva "Encore" awards, reserved for employees who go "above and beyond the call of duty."

**Disparate Pay**

277.    Upon information and belief, KPMG paid Ms. Vasudeva at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

278.    For example, KPMG paid Ms. Vasudeva less than her male peer Ryan Wood-Taylor, who had started at KPMG around the same time as Ms. Vasudeva after graduating from University, and had similar job duties as a Senior Associate in Contracts Compliance Services. For example, both Ms. Vasudeva and Mr. Wood-Taylor managed projects for clients, managed staff and travelled to client sites to perform their work.  Indeed, Mr. Wood-Taylor even lagged behind Ms. Vasudeva in key respects, having performed fewer audits in less diverse settings than Ms. Vasudeva.

279.    Although Ms. Vasudeva and Mr. Wood-Taylor held the same roles on projects, often working under the same supervisor, and although were both strong performers, she came to believe during the time that they were both Senior Associates that he was paid more than her. Eventually, she learned from her colleague, Manager Sarabdeep Narang, that Mr. Wood-Taylor's salary was in fact $10,000 higher than hers.

280.    Mr. Wood-Taylor was not the only similarly situated male Senior Associate paid more than Ms. Vasudeva.  Upon information and belief, Ms. Vasudeva's salary has been lower than that of other similarly situated male colleagues throughout her employment.

281.    Upon information and belief, KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

282.    For example, while Ms. Vasudeva was an Associate, she saw the pay stub of male Senior Associate Nishant Shah, who was working with her and Senior

Associate Kathryn Harris ("Senior Associate Harris") on a project. She was shocked to discover that he earned approximately $10,000 more than Senior Associate Harris though both held MBA degrees and had the same job duties.

283.   Moreover, KPMG also discriminates in bonus pay. In 2008, when Ms. Vasudeva took maternity leave, KPMG denied Ms. Vasudeva a bonus despite the fact that her overall performance did not decrease. With the same level of performance in previous years, Ms. Vasudeva had received a bonus.

284.   When she questioned her Performance Manager, Director Abhijit Joshi ("Director Joshi"), about the reason she had been denied a bonus, Director Joshi told her she was denied a bonus due to "economic" reasons. However, upon information and belief, Ms. Vasudeva's male peers, including Mr. Wood-Taylor, received bonuses.

285.   The only difference was that Ms. Vasudeva is a woman who had taken maternity leave. In addition and upon information and belief, women and women with child-rearing responsibilities were primarily those who did not receive bonuses for 2008.

### Denial of Promotions

286.   Despite Ms. Vasudeva's stellar qualifications and performance, KPMG denied her promotions in favor of lesser qualified male employees.

287.   Initially, Ms. Vasudeva progressed along KPMG's standard career track, receiving a promotion to Senior Associate in June 2007. However, her career progression suddenly stalled once she became pregnant.

288.   After Ms. Vasudeva returned from maternity leave, KPMG placed a number of obstacles in her path, in a seeming attempt to derail her advancement. Among other things, Ms. Vasudeva's supervising Principal Matt Behan ("Principal Behan") abruptly removed her from

her largest engagement, assigned her to a client an hour and a half away, and regularly imposed unrealistic demands on her.

289.    In May 2009, KPMG promoted Senior Associate Ryan Wood-Taylor, a less-experienced male, to Manager instead of Ms. Vasudeva.  As a result, Ms. Vasudeva had to report to Manager Wood-Taylor, who had previously been her peer.  Manager Wood-Taylor did not have comparable audit experience to Ms. Vasudeva.  Manager Wood-Taylor had only worked on one or two software engagements, while Ms. Vasudeva had diverse experiences in a variety of audits.

290.    Senior Associate Bryan Dillon, another male employee, was also promoted to Manager in May 2009 over Ms. Vasudeva, even though the two had comparable experience. Senior Associate Dillon had also joined KPMG after receiving his Bachelor of Science degree. He held her same role within Contracts Compliance Services under the same Partners and generally performed her same job duties.  On information and belief, his performance was not substantially or meaningfully better than Ms. Vasudeva's.

291.    When Ms. Vasudeva asked Director Joshi, her male Performance Manager, why her male colleagues were promoted instead of her, Director Joshi told her that Managers Wood-Taylor and Dillon were "friends" with the management, and that was "how things work around KPMG."  When asked, he was unable to provide Ms. Vasudeva any ways in which she could improve her performance or develop her skill set to better position herself for a promotion.

292.    Ms. Vasudeva also asked Partner Vanessa Lo why she was not promoted, and was told that management counted her six months of maternity leave against her tenure and considered her "too inexperienced" with Manager duties.  However, Ms. Vasudeva had ample exposure to Manager-level work.  She had regularly performed Manager-level tasks such as

budgeting and forecasting and had even trained new Managers on their duties for certain projects.

293.    Upon information and belief, Ms. Vasudeva was not the only woman to suffer the effects of the evaluation, development, and promotion systems at KPMG, which lacked sufficient standards, quality controls, implementation metrics, transparency, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals who took FMLA leave.

294.    Upon information and belief, KPMG management systematically took advantage of the flaws in these systems and often undervalued, mismeasured, or otherwise inaccurately captured performance to the particular detriment of women.

295.    Indeed, Senior Associates Dillon and Wood-Taylor, like other male employees at KPMG, were regularly invited to "client-building" events, while their female counterparts toiled away in the office.  For example, in 2008 and 2009, when Ms. Vasudeva was staffed on an audit for Engagement Manager Jared Collins ("Manager Collins"), the Partners, Managers and other Senior Associates working on the project, all of whom were male, often went golfing on the Company dime to develop relationships with clients and senior management.  Ms. Vasudeva, the sole female Senior Associate who had taken FMLA leave was systematically excluded.  For example, on one occasion, Manager Collins, Senior Associate Dillon, Senior Associate Wood-Taylor and three male Team Leads went golfing with the audit client.  Ms. Vasudeva, the only other Team Lead, was not informed about the event until it was already underway.

### Pregnancy/Caregiver Discrimination and Retaliation

296.    From 2007 until her constructive discharge in 2009, KPMG discriminated against Ms. Vasudeva based on her gender and her caregiving responsibilities as a working mother.

Because of Ms. Vasudeva's status as a working mother, and her decision to take maternity leave, KPMG made a number of adverse decisions concerning her employment.

297.    In January 2008, Ms. Vasudeva told her Engagement Partner, Principal Behan, that she planned to take maternity leave.  Principal Behan told her that, if she took maternity leave, she might not come back at the same level or same pay.

298.    When Ms. Vasudeva noted that it was illegal to penalize her for taking maternity leave, Principal Behan replied that "in England that is not the case."

299.    In July 2008, when Ms. Vasudeva returned from maternity leave, Principal Behan abruptly removed her from her largest, most lucrative engagement, to which she had been assigned for over a year.  Though Ms. Vasudeva had previously trained staff to work on the client, Principal Behan claimed it was "fully staffed" without her.

300.    Principal Behan reassigned Ms. Vasudeva to a new client in Stockton, CA, nearly an hour and a half from Ms. Vasudeva's home in Union City, CA.  The Stockton client required high volumes of unchallenging work and was not in need of Ms. Vasudeva's skill set.  Further, Ms. Vasudeva had to drive to and from Stockton each day, making her commute three hours per day.  While other employees staffed to the client stayed in Stockton during the week and returned home for the weekends, Ms. Vasudeva had to return home daily to care for her newborn.  Ms. Vasudeva's similarly situated male counterparts in Contracts Compliance Services were not reassigned to new clients at this time or in this abrupt fashion.

301.    Two weeks after being reassigned to the Stockton client, Ms. Vasudeva told Principal Behan that she believed the reassignment was unfair.  She asked to be removed from the client, but Principal Behan refused to do so.  Ms. Vasudeva's request for release was only granted when she asked the Engagement Partner on the Stockton client.

302.     Ms. Vasudeva also expressed her concerns to her Performance Manager, Director Joshi.  Shortly after her complaints she was placed on a new project, on which KPMG expected Ms. Vasudeva to achieve results as "Team Lead" for a software audit under Partner Ron Brill ("Partner Brill") and Manager Collins, but provided her no staff to fill her "team."  During the ten-month period that Ms. Vasudeva was staffed on the project, she only received assistance for two weeks, while she was traveling overseas for a client site visit.

303.     Typically, such a project would have been staffed with at least two or three other members of the team.  Indeed, the three additional "Team Leads" on the client, all of whom were male, had at least two staff members reporting to them.  Further, Senior Associates Wood-Taylor and Dillon, who were given informal promotions to "Super Senior Associates" on the same audit, had two to three Senior Associates reporting them, who in turn had three to four Associates reporting to them.  Unlike Ms. Vasudeva, who was left to fend for herself on her audit, male Senior Associates had teams of Associates conducting analysis and performing other support tasks for them.  Although Manager Collins was directly responsible for Ms. Vasudeva's engagement, he claimed he had "no expertise" and refused to support her.

304.     Once again, the Company was setting Ms. Vasudeva up for failure.  On Manager Collins' project, Ms. Vasudeva was the only female Senior Associate.  All Managers and Partners were male.  Ms. Vasudeva, without a team to lead, was put at a distinct disadvantage compared to her male peers, who had several people on their teams.

305.     Not only did Ms. Vasudeva's maternity leave affect the assignments she received, but it also permeated her year-end performance review.  The final and only comment in the Year End Overall Performance Rating Comments for Ms. Vasudeva's 2008 Fiscal Year review was that "Ashwini was on Maternity Leave for most of this performance year."

306.    After the Company had set Ms. Vasudeva up for failure, in her 2009 fiscal year end review, KPMG included unjust criticisms of her software-related skills, though her work required only business, accounting and audit skills.   Upon information and belief, these criticisms came from Managers Collins and Wood-Taylor.   In fact, Ms. Vasudeva did not need software-related skills to fulfill her job duties.   Ms. Vasudeva addressed this concern to Director Joshi, and he indicated that he understood the problem, yet declined to remove this irrelevant criticism from her evaluation.

307.    While recognizing her "excellent" work product, Director Joshi made unfounded, gendered criticisms of Ms. Vasudeva's communication style, stating that she should develop a "softer approach."   Upon information and belief, these criticisms also came from Managers Collins and Wood-Taylor.

308.    Upon information and belief, KPMG's promotion system's insufficient quality standards and controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, had a discriminatory and disparate impact on women and caretaking employees.

309.    Upon information and belief, KPMG management systematically took advantage of the flaws in the system by allowing  isolated, pretexual criticisms to infiltrate promotion decisions, overwhelmingly to the disadvantage of female employees.

310.    In December 2008, Manager Collins told Ms. Vasudeva that she should sign up for a flex schedule because she was "working only from 9 a.m. to 5:00 p.m."  Although Manager Collins assumed Ms. Vasudeva was working less or otherwise underperforming as a new mother, this was not true.  While Ms. Vasudeva would leave work at 5:00 p.m. to pick up her child from daycare, she would work late at night to compensate for any lost time.  Indeed, she typically

worked twelve hours per day, and had no desire to work a reduced schedule or otherwise participate in the flex time program.

311.    After female Partner Vanessa Lo reassured her that she should not go on a flexible plan if she was working full-time hours, Ms. Vasudeva told Manager Collins that she saw no need for her to go on a flex schedule, which would have come with reduced pay and lessened her chances for her promotion to manager.  Manager Collins appeared to disapprove of her decision when Ms. Vasudeva told him.

312.    Like Ms. Vasudeva, many female Professionals at KPMG are pressured to move to a flexible schedule after having children because of the predominant culture at KPMG that assumes working mothers with young children are less effective employees and less committed to their careers.  Upon information and belief, taking leave or hours reductions for pregnancy and caretaking reasons is considered a negative factor in employees' evaluations, compensation decisions and promotion considerations, resulting in an adverse impact on women and mothers at the Company.

313.    In June 2009, Ms. Vasudeva requested a ninety-day sabbatical because of stress from the unrealistic demands being imposed on her and the lack of opportunities and support. While Principal Behan—who was no longer Ms. Vasudeva's direct supervisor—approved the sabbatical requests of an employee who had not taken maternity leave in order to engage in recreational activities, he persuaded HR to reject Ms. Vasudeva's because "his client need[ed] [her]." At the time, however, Ms. Vasudeva had no work pending.  Indeed, Partner Brill, Ms. Vasudeva's Engagement Partner at the time, had previously approved her sabbatical request because Ms. Vasudeva had completed all her deliverables.

314.     In June 2009, after Principal Behan rejected her sabbatical request, Ms. Vasudeva complained to HR.   In addition to discussing her denied sabbatical request, Ms. Vasudeva complained about the ongoing discrimination she was experiencing.   She also discussed her complaints of discrimination with Ethics and Compliance.   However, KPMG never addressed Ms. Vasudeva's complaints prior to her constructive discharge.

315.     Upon information and belief, during Ms. Vasudeva's tenure with KPMG, she was the only pregnant female at the Associate or Senior Associate level in both the Audit and Advisory Practices at KPMG Mountain View.   The only other pregnant female employee in either practice who Ms. Vasudeva was aware of was Shanti Krishnaswamy, a Director whom Principal Behan asked to leave approximately a year after her she gave birth to her child.

316.     Upon information and belief, KPMG has subjected and continues to subject female employees with caregiving responsibilities and/or young children like Ms. Vasudeva to disparate terms and conditions of employment.

**Constructive Discharge**

317.     Ms. Vasudeva was forced to end her career at KPMG in September of 2009 because the Company had deliberately made her working conditions so intolerable that she was compelled to resign involuntarily.

318.     When Ms. Vasudeva began at KPMG, building a career at the Company was her lifelong dream.   However, despite her hard work, her dream steadily grew more and more elusive. During Ms. Vasudeva's tenure at KPMG, she was paid less than male counterparts, denied opportunities for mentorship and advancement, and experienced discrimination and retaliation when she became pregnant and took maternity leave.   Although she continued to be a

top performer, she bore the burden of unrealistic demands, insufficient resources to complete her work, and regular hostility from male superiors such as Principal Behan.

319.    For example, in 2007, when Principal Behan noticed that Ms. Vasudeva worked well with her female colleague, Senior Associate Kathryn Harris, he attempted to sabotage their working relationship.   Speaking with each woman privately, Principal Behan told Ms. Vasudeva and Ms. Harris that one had made negative comments about the other, though neither had done so.  Ultimately, the two women reconciled and discovered that Principal Behan had lied to them both.  Upon information and belief, Principal Behan's divide-and-conquer strategy was intended to further marginalize the female Professionals in his group, who already constituted a minority.

320.    In another example of Principal Behan's hostility to women, in July 2009, Principal Behan made overt sexual innuendos to Ms. Vasudeva including a suggestion that, to women, the flavor of certain Indian food was similar to semen "in their mouth[s]."   The comment made Ms. Vasudeva extremely uncomfortable.  Upon information and belief, Principal Behan regularly made degrading comments to and about other women.

321.    Even once he was no longer her direct supervisor, Principal Behan saw to it that Ms. Vasudeva would not be able to take sabbatical, compounding the retaliation to which he had already subjected her to in moving her to the Stockton project.

322.    Manager Collins, too, made it clear that he disapproved of Ms. Vasudeva's status as a full-time working mother, and, accordingly, increased demands on her by declining to provide her support in working on his software audit.

323.    While Ms. Vasudeva had originally hoped that things might get better with time – as she proved herself and her skills to the Company – her treatment upon her return from maternity leave proved that to be a false hope.  Although Ms. Vasudeva had long experienced

hostility at KPMG, these conditions escalated dramatically when she returned from maternity leave. She was not only singled out for overly-burdensome unchallenging work, but also was denied adequate resources, excluded from opportunities for further advancement, subjected to criticisms regarding an assumed lack of commitment to the company, and otherwise isolated and devalued.

324. Ms. Vasudeva found herself constantly unhappy and irritable, detrimentally affecting her relationships with her family. Her misery at work suffused not only her life at KPMG, but also her home life. Ms. Vadudeva was frequently unhappy and overcome by anxiety about work, disrupting even the simplest of moments at home.

325. As a result of ongoing discrimination, hostility and retaliation, Ms. Vasudeva also developed stress-induced pain in her neck and lower and middle back, severe enough eventually to necessitate treatment by a physician.

326. KPMG took no action whatsoever in response to her concerns despite the fact that she voiced them to senior management, Human Resources, and Ethics and Compliance. KPMG's deliberate and purposeful indifference to her concerns, and its active steps to deny her a sabbatical, exacerbated and otherwise contributed to her distress. Once it became clear to Ms. Vasudeva that even HR and Ethics and Compliance were not going to ameliorate the situation, her work environment became more oppressive. Eventually, she could not even think about going to work day to day; resignation was her only option.

327. Once it became clear to Ms. Vasudeva that HR and Ethics and Compliance were not going to step in—and that they were going to be indifferent to her concerns and even complicit in her torment—she could not even think about going to work day to day. Resignation became her only option.

328.    Like Ms. Vasudeva, other female employees in Ms. Vasudeva's practice group have complained to HR and/or through other reporting channels about the Company's "old boys' club."  Upon information and belief, since Ms. Vasudeva's constructive discharge from KPMG, at least four female Associates and one female Senior Associate from her practice group have left the Company due to frustration about the lack of opportunities.  Upon information and belief, only one male employee has left Ms. Vasudeva's group, while most of the other men have been swiftly and steadily promoted.

329.    Upon information and belief, KPMG's flawed evaluation, development, mentoring and promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher-level positions than women across the Company.

### E.    PLAINTIFF TINA BUTLER

330.    Ms. Butler, a current employee of the Company, has suffered and continues to suffer discrimination in pay and denial of promotional opportunities.

331.    In October of 2004, Ms. Butler transitioned from her Client Services Support role to an Associate role in Business Performance Services Advisory, which became Performance Advisory Services in 2009.  When she joined KPMG in 1999, she brought with her eight years of relevant work experience.  She was promoted to Senior Associate in 2007 and to Manager in Federal Advisory Services in 2013.

332.    Ms. Butler worked out of KPMG's Atlanta, Georgia and Tysons, Virginia offices during her tenure at the Company.

333.    Ms. Butler's experiences at KPMG have been similar to those of the other Named Plaintiffs and the class.

334.    Ms. Butler has been paid less than similarly situated men during the class period. She has consistently earned less than similarly or worse performing men in her position, function, and service line, despite having the same or more experience and tenure in job.

335.    Despite her stellar performance ratings, Ms. Butler has been denied promotions at KPMG.  In 2009, for example, Ms. Butler's male colleague Jesse Traylor was promoted to Manager.  Though the two performed similar work at the time, Ms. Butler was forced to wait until 2013 to be similarly promoted.

336.    As she languished in the Senior Associate position, Ms. Butler saw less qualified and less experienced men promoted over her.

337.    Upon information and belief, Ms. Butler is not the only woman to suffer the effects of the compensation and promotion policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.  Other women were similarly underpaid and underpromoted relative to men.

338.    Upon information and belief, KPMG management systematically takes advantage of the flaws in the system by paying female employees less than similarly situated male employees.  KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

339.    Moreover, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.

340.     Ms. Butler is a member of the opt-in EPA collective and would be a member of any Rule 23 class.  She alleges both disparate impact and treatment claims consistent with the other Named Plaintiffs in this action.

### F.     PLAINTIFF CHERYL CHARITY

341.     Ms. Charity, a current employee of the Company, has suffered and continues to suffer discrimination in pay and denial of promotions at KPMG.

342.     In March of 2001, Ms. Charity began working at KPMG as a Senior Associate in IT Advisory, bringing with her a decade of prior work experience.  She had previously earned her Bachelor of Science from Virginia Commonwealth University in 1991.  She earned her Master's in Management Information Systems from the University of Maryland University College in 2003 and her MBA from the same in 2004.  Ms. Charity was promoted to Manager in 2004 and to Senior Manager/Director in July 2010.

343.     Ms. Charity has worked out of KPMG's Washington, DC and Tysons, Virginia offices during her tenure with the Company.

344.     Ms. Charity's experiences at KPMG have been similar to those of the other Named Plaintiffs and the class.

345.     Ms. Charity has been paid less than similarly situated men at KPMG during the class period.  She has consistently earned less than similarly or worse performing men in her position, function, and service line, despite having more experience, qualifications, and tenure in job.

346.     At the same time, poorly designed and implemented performance management and promotion systems systematically undervalue women's contributions to KPMG.

347.    Ms. Charity's performance ratings at KPMG have also been unfairly lower than those of her male colleagues who performed similar work at the same level, which has led to her being denied promotions and fair compensation increases.  These discriminatory reviews have consistently barred her from receiving promotions the first year she was eligible, and have limited her compensation.

348.    Upon information and belief, KPMG's performance management system's insufficient quality standards and controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, has a discriminatory and disparate impact on women.

349.    Upon information and belief, Ms. Charity is not the only woman to suffer the effects of the compensation and promotion policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.  Other women were similarly underpaid and underpromoted relative to men.

350.    Upon information and belief, KPMG management systematically takes advantage of the flaws in the system by paying female employees less than similarly situated male employees.  KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

351.    Moreover, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.  KPMG management systematically takes advantage of the flaws in the system to exclude and undervalue women's contributions.

352.    For example, a male Principal frequently invited his male counselees and the men on his projects to golf with him on the weekends.  No women were invited.  While the men who

accompanied him on these trips were rated highly in their performance evaluations and promoted quickly, excluded women, like Ms. Charity, were left to languish for years without promotion. Similarly, another male Partner told Ms. Charity that he was "surprised [she] was still with the firm" because of his view that "single women" did not stay in the same job for long.

353.    Finally, Ms. Charity has firsthand experience with how KPMG not only ignores concerns regarding unfair treatment but actively dissuades women from reporting them.  For example, when Ms. Charity raised the possibility of filing a formal HR complaint, a Partner told her, "if you go to HR, it will turn on you."

354.    Upon information and belief, KPMG's HR and Ethics and Compliance offices and procedures lack standards, quality controls, transparency, implementation metrics, means of redress, and requirements that concerns of discrimination be addressed and resolved.  Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed, or worse, to result in further or increased discrimination and retaliation.  Women and mothers are negatively affected by these insufficiently designed and implemented procedures, as unresponsiveness to complaints about discrimination disproportionately falls upon such employees.

355.    Ms. Charity is a member of the opt-in EPA collective and would be a member of any Rule 23 class.  She alleges both disparate impact and treatment claims consistent with the other Named Plaintiffs in this action.

G.    **PLAINTIFF HEATHER INMAN**

356.    Ms. Inman suffered discrimination in pay and denial of promotional opportunities until she left the KPMG in October 2014.

357.    In August of 2005, Ms. Inman began working at KPMG as a Manager in IT Advisory, bringing with her over twelve years of work experience.  She previously earned her Bachelor of Science in Accounting in 1991 from University of Missouri-Columbus School of Business.

358.    Ms. Inman worked out of KPMG's St. Louis, Missouri office during her tenure at the Company.

359.    Ms. Inman's experiences at KPMG have been similar to those of the other Named Plaintiffs and the class.

360.    Ms. Inman was paid less than similarly situated men during the class period.  She consistently earned less than similarly or worse performing men in her position, function, and service line, despite having the same or more experience and tenure in her job.

361.    Upon information and belief, Ms. Inman is not the only woman to suffer the effects of the compensation policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.  Other women were similarly underpaid relative to men.

362.    Despite her positive performance ratings, Ms. Inman was denied a promotion at KPMG.  Though she worked at KPMG as a Manager for over nine years, she was never promoted to Senior Manager.  During that time period, Ms. Inman saw less qualified and less experienced men be promoted over her.

363.    Upon information and belief, Ms. Inman is not the only woman to suffer the effects of the promotion policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would

otherwise have ensured there was no disparate impact on female professionals. Other women were similarly passed over for promotion compared to male peers.

364.    Ms. Inman was also denied professional opportunities due to her status as a mother. After she returned from maternity leave in 2007, Ms. Inman's manager, Rob Wolf, denied her opportunities to work on the best accounts, which included travel. Ms. Inman was willing to travel, but Mr. Wolf told her that she could not because she had young children. When Ms. Inman pointed out that a male colleague was given these assignments despite having a young child, Mr. Wolf responded that it was different because "you're the mom."

365.    Finally, Ms. Inman has firsthand experience with how KPMG ignores concerns regarding unfair treatment. For example, Ms. Inman submitted multiple complaints of sexual harassment from male Partners while working for KPMG. In one instance, the Partner received a verbal warning. In two instances, KPMG took no action in response to her complaints. In addition, Ms. Inman also observed her male colleagues frequently having lunch at a local restaurant where the waitresses dressed in skimpy lingerie or body paint, and taking clients to strip clubs. They told Ms. Inman she could not accompany them on such outings. As a result, she lost out on valuable networking opportunities with her peers and with clients.

366.    Upon information and belief, KPMG's HR and Ethics and Compliance offices and procedures lack standards, quality controls, transparency, implementation metrics, means of redress, and requirements that concerns of discrimination be addressed and resolved. Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed, or worse, to result in further or increased discrimination and retaliation. Women and mothers are negatively affected by these insufficiently designed and implemented procedures, as

unresponsiveness to complaints about discrimination disproportionately falls upon such employees.

367.    Ms. Inman is a member of the opt-in EPA collective and would be a member of any Rule 23 class.  She alleges both disparate impact and treatment claims consistent with the other Named Plaintiffs in this action.

**H**.    **PLAINTIFF NANCY JONES**

368.    Ms. Jones suffered discrimination in pay and denial of promotions until her constructive discharge from KPMG in June 2014.

369.    In November of 2010, Ms. Jones began working at KPMG as a Senior Associate in Performance Advisory, bringing with her five years of previous work experience.  She had previously received her Bachelor of Business Administration in Actuarial Science and Finance from Georgia State University.

370.    Ms. Jones worked out of KPMG's Atlanta, Georgia office during her tenure at the Company.  She worked with employees from the Chicago, Boston, and New York offices, and her mentor was based in KPMG's Dallas office.  Ms. Jones also spent time working in KPMG's San Francisco, Houston, and Chicago offices.

371.    Ms. Jones' experiences at KPMG have been similar to those of the other Named Plaintiffs and the class.

372.    Ms. Jones was paid less than similarly situated men at KPMG during the class period, despite her stellar performance and additional experience .

373.    Ms. Jones was eligible for promotion, but despite her stellar performance ratings, and the fact that she was consistently performing work at or above the level of her male peers, Ms. Jones was not promoted during her tenure at KPMG.

374.    Ms. Jones asked her PML repeatedly about her denied promotion and lack of advancement opportunities.  While her PML assured her she would be promoted, Ms. Jones was not promoted during her tenure at KPMG.  She also raised her concerns with the leader of her department, who failed to take any action in response.

375.    Ms. Jones found herself constantly unhappy and stressed, detrimentally affecting her relationships with her family and loved ones.  As a result of ongoing discrimination and hostility, Ms. Jones began taking anti-depressants in January 2012.

376.    KPMG took no action in response to her concerns despite the fact that she repeatedly voiced them to management.  KPMG's deliberate and purposeful indifference to her concerns contributed to her distress.   Once it became clear to Ms. Jones that KPMG was not going to ameliorate the situation, her work environment became more oppressive.  Eventually, she could not even think about going to work day to day; resignation was her only option.

377.    Having been repeatedly denied opportunities for advancement and faced with a stalled career, Ms. Jones had no choice but to leave KPMG in June 2014.

378.    Upon information and belief, Ms. Jones is not the only woman to suffer the effects of the compensation and promotion policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.  Other women were similarly underpaid and underpromoted relative to men.

379.    Upon information and belief, KPMG management systematically takes advantage of the flaws in the system by paying female employees less than similarly situated male employees.   KPMG underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

380.     Moreover, KPMG's flawed promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women across the Company.

381.     Ms. Jones is a member of the opt-in EPA collective and would be a member of any Rule 23 class.  She alleges both disparate impact and treatment claims consistent with the other Named Plaintiffs in this action.

### I.     CAROL MURRAY

382.     Ms. Murray, a current employee of the Company, has suffered and continues to suffer discrimination in pay at KPMG.

383.     After working at KPMG as an Intern in the summer of 2007, Ms. Murray completed her Bachelor of Science (Finance) and Bachelor of Arts (Philosophy) degrees *summa cum laude* from Azusa Pacific College in May 2008.  She returned to KPMG in October 2008 as an Associate in Financial Risk Management Advisory.  Ms. Murray was promoted to Senior Associate in 2010.  In March 2011, Ms. Murray transferred to become a Senior Associate in Economic and Valuation Services Tax, and she was promoted to Manager in October 2013.

384.     Ms. Murray has worked out of KPMG's Los Angeles, California and Seattle, Washington offices during her tenure with the Company.

385.     Ms. Murray's experiences at KPMG have been similar to those of the other Named Plaintiffs and the class.

386.     Ms. Murray has been paid less than similarly situated men during the class period.  She has consistently earned less than similarly or worse performing men in her position, function, and service line, despite having the same or more experience and tenure in job.

387.    Upon information and belief, Ms. Murray is not the only woman to suffer the effects of the compensation policies and practices at KPMG, which lack sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.  Other women were similarly underpaid relative to men.

388.    Ms. Murray is a member of the opt-in EPA collective and would be a member of any Rule 23 class.   She alleges both disparate impact and treatment claims consistent with the other Named Plaintiffs in this action.

## V.    CLASS ACTION ALLEGATIONS

389.    Class Representatives Donna Kassman, Tina Butler, Cheryl Charity, Heather Inman, Nancy Jones, Carol Murray and the class of female employees they seek to represent have been subjected to a pattern and practice of gender discrimination, and employment policies and practices which have had a continuing, unlawful disparate impact on them and their employment opportunities.   Such gender discrimination includes (a) assigning female Professionals to lower titles and classifications than their male counterparts; (b) paying female Professionals less than their male counterparts; (c) denying female Professionals promotion and advancement opportunities in favor of male employees; (d) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; and (e) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace.

390.    KPMG, in effect, bars female employees from better and higher-paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, KPMG's assignment,

development, promotion, advancement, compensation and performance evaluation policies, practices and procedures. These practices and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

391. Within these flawed structures, specific practices negatively affect KPMG's female Professionals. For example, assignments do not reflect female employees' experience and qualifications, and promotions are not based upon true comparative performance. The evaluation system lacks sufficient standards or quality controls and metrics to accurately and reliably measure performance. Within this system, unfounded criticisms may be lodged against KPMG Professionals who are female, pregnant or mothers, and legitimate criticisms given undue weight. Participation in male-dominated and exclusive social activities can improperly control or influence an employees' standing and prospects within KPMG. Partners, Managing Directors, Senior Managers and Managers mentor and develop employees selectively, without the appropriate standards or guidelines or transparency necessary to ensure an equitable workplace. Moreover, taking leave or flex time for pregnancy and caretaking reasons can constitute a negative factor in employees' evaluations, compensation and promotion prospects; and HR and management has failed to curb a corporate culture that presumes being a mother makes an employee less dedicated or productive.

392.    These problems are systemic and Company-wide, because, upon information and belief, all stem from flawed policies, practices and procedures which emanate from the Company's New York headquarters.

393.    Where Human Resources and Ethics complaint and compliance policies exist, they lack meaningful quality controls, standards, implementation metrics, and means of redress. Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed.  Worse, there is no meaningful separation between HR/Ethics complaint processes and the Managers and Partners who create discriminatory or hostile work conditions toward women and mothers, such that victims of discrimination often face retaliation or are dissuaded from voicing concerns altogether.

394.    Thus, KPMG tolerates and even cultivates a hostile environment in which women and mothers are openly devalued and where (a) retaliation for voicing gender discrimination complaints is the norm and (b) women mothers who question or even inadvertently disrupt the gendered norms are routinely pushed out of the Company.

395.    In all, KPMG demonstrates a reckless disregard – a deliberate indifference – to its female employees by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

396.    KPMG's assignment, evaluation, development, compensation, promotion and maternity/flexible schedule policies, practices, and procedures, as well as its failure to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender and pregnancy/caregiver discrimination, have had a disparate impact on the Class Representatives and the members of the class.  Such policies, practices and procedures are not valid, job-related, or justified by business necessity.

397.     Because of Defendant's pattern-or-practice of gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, promotion and other advancement opportunities, employment benefits and non-economic damages.

398.     KPMG has failed to impose adequate discipline on managers and employees who violate equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such laws regarding the employment policies, practices, and procedures described above.

399.     The Class Representatives and the class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and the class have suffered, and will continue to suffer, irreparable injury from KPMG's ongoing, unlawful policies, practices, and procedures as set forth herein unless those policies, practices, and procedures are enjoined by this Court.

**A.     General Facts Relevant to Class Claims and Class Definition**

400.     The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current and former female exempt Client Service and Support Professionals at KPMG.

401.     The class consists of all female exempt Client Service and Support Professionals, including but not limited to Associates, Senior Associates, Managers, Senior Managers/Directors and Managing Directors (collectively "Professionals"), who are, or have been, employed by KPMG nationwide during the applicable liability period until the date of judgment.  Upon information and belief, there are thousands of such employees in the proposed class.

402.     The Class Representatives seek to represent all of the female employees described

above.  The systemic and disparate impact gender discrimination described in this Complaint has been, and is, continuing in nature.

**B.      Efficiency of Class Prosecution of Common Claims**

403.    Certification of a class of female Professionals is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed class.

404.    The individual claims of the Class Representatives require resolution of the common question of whether KPMG has engaged in a systemic pattern and/or practice of gender discrimination against female Professionals.    The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, career and working conditions, and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.

405.    Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees generally.  KPMG caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures, as well as its disparate treatment of employees who are female, pregnant, and/or have caregiving responsibilities.  These injuries are redressible through systemic relief, such as an injunction, and other appropriate  class-wide and individual remedies sought in this action.

406.    In addition, proper relief for Plaintiffs' individual constructive discharge and wrongful termination claims can include reinstatement.  As such, each has a personal interest in the policies, practices and procedures implemented at KPMG moving forward.

407.     In order to gain relief for themselves, as well as for the class members, Plaintiffs will first establish the existence of systemic gender discrimination as the premise for the relief they seek.

408.     Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed class, and Defendant KPMG.

### C.    Numerosity and Impracticability of Joinder

409.     The class which the Class Representatives seek to represent is too numerous to make joinder practicable.  Upon information and belief, the proposed class consists of thousands of current and former female Professionals during the liability period.

410.     KPMG's pattern and/or practice of gender discrimination also makes joinder impracticable by discouraging females from applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of KPMG's class-wide liability.

### D.    Common Questions of Law and Fact

411.     The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative class they seek to represent.

412.     The common questions of law include, *inter alia:* (a) whether KPMG has engaged in a pattern and practice of unlawful, systemic gender discrimination in its compensation, assignment, selection, performance evaluation, promotion, advancement, transfer, training and

discipline policies, practices and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in assignment, compensation, evaluation, development, maternity and flex/time, and promotion systems violate Title VII, and/or other statutes; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII, and/or other statutes; (d) whether senior management and HR's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII, and/or other statutes; and (e) whether KPMG is liable for a continuing systemic violation of Title VII, and/or other statutes; and a determination of the proper standards for proving a pattern or practice of discrimination by KPMG against its female Professionals.

413.    The common questions of fact include, *inter alia*: whether KPMG has: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (b) through the use of that system of assignment placed female Professionals in job titles or classifications lower than similarly-situated male employees; (c) systematically, intentionally or knowingly  placed female Professionals in job titles or classifications lower than similarly-situated male employees; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (e) through the use of that compensation system compensated female Professionals less than similarly-situated males in salary, bonuses, and/or other perks; (f) systematically, intentionally or knowingly compensated female Professionals less than similarly-situated males; (g) used a system of development and mentoring that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress (h) through the use of that development and

mentoring system failed to develop or mentor female Professionals in a commensurate manner to their similarly-situated male counterparts; (i) systematically, intentionally or knowingly failed to develop or mentor female Professionals in a commensurate manner to their similarly-situated male counterparts; (j) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (k) through use of that promotion system precluded or delayed the promotion of female Professionals into higher level jobs traditionally held by male employees; (l) systematically, intentionally or knowingly precluded or delayed the promotion of female Professionals into higher level jobs traditionally held by male employees; (m) used a system for performance evaluations which lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (n) through use of that performance evaluation system inaccurately, unfairly or disparately measured and classified female and male employee performance; (o) systematically, intentionally or knowingly subjected female employees to inaccurate, unfair, or discriminatorily lowered performance evaluations; through its policies, practices, and procedures, developed male and female employees equitably; (p) used maternity and flex time policies, practices, and procedures that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (q) through use of those policies, practices and prrocedures treated pregnant employees and mothers differently and discriminatorily from non-pregnant employees, male employees, and non-caregivers; (r) systematically, intentionally or knowingly subjected pregnant employees and mothers to disparate and discriminatory terms and conditions of employment; (s) used HR, EEO, and Ethics systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (t) through use of those systems

minimized, ignored, or covered up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management, the human resources department, or other reporting channels; (u) systematically, intentionally, knowingly or deliberately showed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints about gender and pregnancy discrimination and harassment in the workplace; and (v) failed to adequately or meaningfully train, coach, or discipline senior management on EEO principles and compliance.

414.    The employment policies, practices, and procedures to which the Class Representatives and the class members are subjected are set at KPMG's corporate level, which is headquartered in and directed from New York, and apply universally to all class members. These employment policies, practices and procedures are not unique or limited to any department; rather, they apply to all departments and, thus, affect the Class Representatives and class members in the same ways no matter the facility, department, or position in which they work.

415.    Throughout the liability period, a disproportionately large percentage of the managers and officers at KPMG have been male.

416.    The systemic means of accomplishing such gender-based stratification include, but are not limited to, KPMG's assignment, development, promotion, advancement, compensation and performance evaluation policies, practices and procedures.  These policies, practices and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed,

and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

417.     As a result, male employees have advanced and continue to advance more rapidly to better and higher-paying jobs than do female employees.  KPMG's policies, practices, and procedures have had an adverse impact on female Professionals seeking selection for, or advancement to, better and higher-paying positions.  In general, the higher the level of the job classification, the lower the percentage of female employees holding it.

### E.     Typicality of Claims and Relief Sought

418.     The claims of the Class Representatives are typical of the claims of the class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the class.

419.     Like the members of the class, the Class Representatives are Professionals who worked at KPMG during the liability period.

420.     Discrimination in selection, assignment, performance evaluation, promotion, advancement, and training affects the compensation of the Class Representatives and all the employee class members in the same or similar ways.

421.     KPMG has failed to create adequate incentives for its management to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and has failed to discipline adequately its managers and other employees when they violate the Company policy or discrimination laws.  These failures have affected the Class Representatives and the class members in the same or similar ways.

422.     The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the class members in this case.

423.    The Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that KPMG has engaged in systemic gender discrimination against female Professionals by (1) paying female Professionals less than their male counterparts, (2) denying female Professionals promotion and advancement opportunities in favor of male employees, (3) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers, and (4) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of KPMG's assignment, promotion, transfer, training, performance evaluation, compensation, and discipline policies, practices, and procedures – so that female Professionals will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher-paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) back pay, front pay, reinstatement and/or other equitable remedies necessary to make the female Professionals whole from the Defendant's past discrimination; (f) punitive and nominal damages to prevent and deter KPMG from engaging in similar discriminatory practices in the future; (g) compensatory damages; (h) pre- and post-judgment interest; and (i) attorneys' fees, costs and expenses.

### F.    Adequacy of Representation

424.    The Class Representatives' interests are co-extensive with those of the members of the proposed class which they seek to represent in this case.  The Class Representatives seek to remedy KPMG's discriminatory employment policies, practices, and procedures so that

female Professionals will no longer be prevented from advancing into higher-paying and/or more desirable higher-level positions.  Plaintiffs are willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims in this action.

425.    The Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of Plaintiffs' counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.    Requirements Of Rule 23(b)(2)

426.    KPMG has acted on grounds generally applicable to the Class Representatives and the class by adopting and following systemic policies, practices, and procedures which are discriminatory.  Gender discrimination is KPMG's standard operating procedure rather than a sporadic occurrence.  KPMG has refused to act on grounds generally applicable to the class by, *inter alia*: (a) assigning female Professionals to job titles and classifications lower than proper for their qualifications and/or actual job duties and responsibilities; (b) failing to pay female Professionals on par with similarly-situated male employees; (c) denying female Professionals promotion and advancement opportunities in favor of male employees; (d) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; and (e) failing to prevent, respond to, adequately investigate, and/or appropriately resolve claims of gender discrimination and pregnancy/caregiver discrimination.

427.    The systemic means of accomplishing such gender-based stratification include, but are not limited to, KPMG's assignment, development, promotion, advancement,

compensation and performance evaluation policies, practices and procedures.  These practices and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge.  As a result, employees are assigned, evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

428.   KPMG's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

429.   Injunctive, declaratory and affirmative relief are the predominant relief sought in this case because they are the culmination of the proof of KPMG's individual and class-wide liability and the essential predicate for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.  Entitlement to declaratory, injunctive and affirmative relief flows directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female Professionals at KPMG.

430.   In addition, entitlement to declaratory, injunctive and affirmative relief forms the factual and legal predicate for recovery by the Class of punitive damages.

### H.      Requirements of Rule 23(b)(3)

431.   The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims.

These issues include whether KPMG has engaged in gender discrimination against female Professionals by (a) assigning female Professionals to lower job titles and classifications than their male counterparts; (b) paying female Professionals less than their male counterparts, (c) denying female Professionals promotion and advancement opportunities in favor of male employees, (d) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers, and (e) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace.

432.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

433.   The cost of proving KPMG's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

434.   By virtue of the pattern and practice of discrimination at KPMG, Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including backpay, frontpay, reinstatement, compensatory damages, and other nominal and punitive damages.

**VI.**     **COLLECTIVE ACTION ALLEGATIONS (EQUAL PAY ACT)**

435.     Plaintiffs incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based discrimination against similarly-situated female employees.

436.     Plaintiffs bring collective violations of the Equal Pay Act ("EPA") as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) on behalf of all members of the gender class – e.g. current, former, and future female Managers, during the liability period.   The EPA action includes female Professionals who (a) were not compensated equally to males who had substantially similar job classifications, functions, families, titles and/or duties, (b) were not compensated equally to males who performed substantially similar work, and (c) who were denied promotion and advancement opportunities that would result in greater compensation in favor of lesser qualified male employees.

437.     Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following: (a) whether Defendant unlawfully failed and continues to fail to compensate female Professionals at a level commensurate with similarly situated male employees; (b) whether Defendant unlawfully failed and continues to fail to promote and advance female Professionals in a fashion commensurate with similarly qualified males; (c) whether Defendant's policy and practice of failing to compensate female Professionals on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and (d) whether Defendant's failure to compensate female Professionals on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

438.     Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective

Action Plaintiffs because the claims of Plaintiff are similar to the claims of the EPA Collective Action Plaintiffs.

439.    Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, families, titles and/or duties; and (c) are subject to Defendant's common policy and practice of gender discrimination in (i) failing to compensate female Professionals on par with men who perform substantially equal work and/or hold equivalent levels and positions, and (ii) failing to provide female Professionals equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to males who perform substantially equal work.

## INDIVIDUAL, CLASS AND COLLECTIVE ACTION COUNTS

### COUNT I
### (INDIVIDUAL AND CLASS CLAIMS)

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII") -
PAY DISCRIMINATION
42 U.S.C. § 2000e, *et seq*.**

440.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

441.    This Count is brought on behalf of Ms. Kassman, Ms. Patterson, Ms. Butler, Ms. Charity, Ms. Jones, Ms. Inman, Ms. Murray, and all members of the class.

442.    This Count is brought on behalf of Ms. Patterson only in her capacity as an individual Plaintiff, and not as a Class Representative.

443.    Defendant KPMG has discriminated against Plaintiffs and all members of the class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis

of their gender. Plaintiffs have suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

444. Defendant has discriminated against Plaintiffs and all members of the class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of Title VII.

445. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiffs and all members of the class, entitling Plaintiffs and all members of the class to punitive damages.

446. By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiffs and the members of the class, Plaintiffs and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

447. As a result of Defendant's conduct alleged in this complaint, Plaintiffs and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

448. Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiffs and the members of the class with respect to the terms and conditions of their employment.

449. By reason of Defendant's discrimination, Plaintiffs and the members of the class are entitled to all remedies available for violations of Title VII, including an award of punitive damages.

450. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II
## (INDIVIDUAL AND CLASS CLAIMS)

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII") - PROMOTION DISCRIMINATION
## 42 U.S.C. § 2000e, *et seq.*

451.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

452.    This Count is brought on behalf of Ms. Kassman, Ms. Patterson, Ms. Butler, Ms. Charity, Ms. Jones, Ms. Inman, and all members of the class.

453.    This Count is brought on behalf of Ms. Patterson only in her capacity as an individual Plaintiff, and not as a Class Representative.

454.    Defendant KPMG has discriminated against Plaintiffs and all members of the class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender.  Plaintiffs have suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

455.    Defendant has discriminated against Plaintiffs and all members of the class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of Title VII.

456.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiffs and all members of the class, entitling Plaintiffs and all members of the class to punitive damages.

457.   By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiffs and the members of the class, Plaintiffs and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

458.   As a result of Defendant's conduct alleged in this complaint, Plaintiffs and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

459.   Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiffs and the members of the class with respect to the terms and conditions of their employment.

460.   By reason of Defendant's discrimination, Plaintiffs and the members of the class are entitled to all remedies available for violations of Title VII, including an award of punitive damages.

461.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT III
### (INDIVIDUAL AND CLASS CLAIMS)

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII") – PREGNANCY AND CAREGIVER DISCRIMINATION
### 42 U.S.C. § 2000e, *et seq*.

462.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

463.   This Count is brought on behalf of Ms. Kassman, Ms. Patterson, Ms. Inman, and all similar members of the class.

464.     This Count is brought on behalf of Ms. Patterson only in her capacity as an individual Plaintiff, and not as a Class Representative.

465.     Defendant KPMG has discriminated against Plaintiffs and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of KPMG's wrongful conduct and its policies, practices and procedures.

466.     KPMG has discriminated against the class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them to differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional and discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of Title VII.

467.     KPMG's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Plaintiffs and the members of the proposed class, entitling the Plaintiffs and the members of the class to punitive damages.

468.     As a result of Defendant's conduct alleged in this complaint, Plaintiffs and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, and non-economic damages.

469.     By reason of Defendant's discrimination, Plaintiffs and members of the class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

470.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT IV
## (INDIVIDUAL AND COLLECTIVE ACTION CLAIMS)

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
### AS AMENDED BY THE EQUAL PAY ACT OF 1963 – 29 U.S.C. §§ 206, *et seq.*
### DENIAL OF EQUAL PAY FOR EQUAL WORK

471.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

472.    This Count is brought on behalf of Ms. Kassman, Ms. Patterson, Ms. Vasudeva, Ms. Butler, Ms. Charity, Ms. Jones, Ms. Inman, Ms. Murray, and the EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

473.    Defendant, an employer of Plaintiffs and the EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act, has discriminated against Plaintiff and EPA Collective Action Plaintiffs in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA"), by subjecting them to unequal pay on the basis of sex.

474.    Defendant has discriminated against Plaintiffs and EPA Collective Action Plaintiffs by treating them differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.  Defendant so discriminated by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the Equal Pay Act.

475.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act.  Moreover,

Defendant knew of or showed reckless disregard for the fact that its conduct was in violation of the Equal Pay Act.

476.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing and intentional discrimination, Plaintiffs and EPA Collective Action Plaintiffs have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

477.    Plaintiffs and EPA Collective Action Plaintiffs are therefore entitled to all remedies available for violations of the EPA, including liquidated damages for all willful violations.

478.    Attorneys' fees should be awarded under 29 U.S.C. §§ 216, et seq.

**COUNT V**
**(INDIVIDUAL AND CLASS CLAIMS)**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a) –**
**PAY DISCRIMINATION**

479.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

480.    This Count is brought on behalf of Ms. Kassman and all members of the class who live or lived and or work or worked in New York at any point after September 29, 2005.

481.    Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting them to different treatment on the basis of their gender.

482.    Defendant has discriminated against Plaintiff and all members of the class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of the New York Executive Law.

483.     As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

484.     By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York Executive Law.

**COUNT VI**
**(INDIVIDUAL AND CLASS CLAIMS)**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a) –**
**PROMOTION DISCRIMINATION**

485.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

486.     This Count is brought on behalf of Ms. Kassman and all members of the class who live or lived and or work or worked in New York at any point after September 29, 2005.

487.     Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting them to different treatment on the basis of their gender.

488.     Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of the New York Executive Law.

489.     As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost

earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

490.     By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York Executive Law

**COUNT VII**
**(INDIVIDUAL AND CLASS CLAIMS)**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a) –**
**PREGNANCY AND CARETAKER DISCRIMINATION**

491.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

492.     This Count is brought on behalf of Ms. Kassman and all similar members of the class who live or lived and or work or worked in New York at any point after September 29, 2005.

493.     Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting them to different treatment on the basis of their gender.

494.     KPMG has discriminated against the class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them to differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotions and discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of the New York Executive Law.

495.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

496.    By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York Executive Law.

**COUNT VIII**
**(INDIVIDUAL AND CLASS CLAIMS)**

**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a) –**
**PAY DISCRIMINATION**

497.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

498.    This Count is brought on behalf of Ms. Kassman and all members of the class.

499.    Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment on the basis of their gender.

500.    Defendant has discriminated against Plaintiff and all members of the class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of the New York City Administrative Code.

501.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

502.     By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## COUNT IX
### (INDIVIDUAL AND CLASS CLAIMS)

**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a) –**
**PROMOTION DISCRIMINATION**

503.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

504.     This Count is brought on behalf of Ms. Kassman and all members of the class.

505.     Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment on the basis of their gender.

506.     Defendant has discriminated against Plaintiff and all members of the class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of the New York City Administrative Code.

507.     As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

508.     By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## COUNT X
### (INDIVIDUAL AND CLASS CLAIMS)

### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a) – PREGNANCY AND CAREGIVER DISCRIMINATION

509.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

510.     This Count is brought on behalf of Ms. Kassman and all similar members of the class.

511.     Defendant KPMG has discriminated against Plaintiff and all members of the class in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment on the basis of their gender.

512.     KPMG has discriminated against the class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them to differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotions and discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of the New York City Administrative Code.

513.     As a result of Defendant's conduct alleged in this complaint, Plaintiff and all members of the class have suffered and continue to suffer harm, including but not limited to lost

earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

514.    By reason of Defendant's discrimination, Plaintiff and all members of the class are entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## **COUNT XI**
## **(INDIVIDUAL AND CLASS CLAIMS)**

## **VIOLATION OF THE NEW YORK EQUAL PAY LAW–**
## **N.Y. LABOR LAW § 194**
## **DENIAL OF EQUAL PAY FOR EQUAL WORK**

515.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

516.    This Count is brought on behalf of Plaintiffs and all members of the class.

517.    Defendant, an employer of Plaintiffs and all members of the class within the meaning of the New York Equal Pay Law, has discriminated against Plaintiffs and all members of the class in violation of the New York Labor Law § 194, by subjecting them to unequal pay on the basis of sex.

518.    Defendant has discriminated against Plaintiffs and all members of the class by treating them differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.   Defendant so discriminated by subjecting them to discriminatory pay, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the New York Equal Pay Law.

519.     Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying women less than men.

520.     Plaintiffs and all members of the class are therefore entitled to all remedies available for violations of N.Y. Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations.

## INDIVIDUAL ONLY COUNTS

### COUNT XII
### (INDIVIDUAL CLAIM – PLAINTIFFS KASSMAN AND PATTERSON)

### VIOLATION OF TITLE VII – RETALIATION
### 42 U.S.C. § 2000e-3

521.     Plaintiffs Kassman and Patterson re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

522.     In their final years of employment with Defendant, Ms. Kassman and Ms. Patterson repeatedly voiced concerns about KPMG's discriminatory treatment of them, complaining through various reporting channels, including the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

523.     In retaliation for their complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against Ms. Kassman and Ms. Patterson.

524.     Defendant retaliated against Ms. Kassman by, *inter alia*, giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations.  Defendant ultimately bullied Ms. Kassman into resigning by subjecting her to escalating gender discrimination and harassment.

525. Defendant retaliated against Ms. Patterson by, *inter alia*, subjecting her to unfounded criticism, refusing to give her billable work, and denying her the pay and promotion she deserved.

526. Upon information and belief, other women at KPMG who opposed or complained about unlawful gender discrimination were similarly retaliated against.

527. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Kassman and Ms. Patterson, entitling them to punitive damages.

528. As a result of Defendant's conduct alleged in this Complaint, Ms. Kassman and Ms. Patterson have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

529. By reason of Defendant's retaliation, Ms. Kassman and Ms. Patterson are entitled to all remedies available for violations of Title VII, including an award of punitive damages.

530. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT XIII**
**(INDIVIDUAL CLAIM – PLAINTIFFS KASSMAN, PATTERSON, AND VASUDEVA)**

**VIOLATIONS OF THE EQUAL PAY ACT,**
**U.S.C. § 215(a)(3)-RETALIATION**

531. Plaintiffs Kassman, Patterson and Vasudeva re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

532. While employed by Defendant, Plaintiffs voiced concerns about KPMG's discriminatory treatment of them, complaining through various reporting channels, including the

Office of Ethics and Compliance, the Office of General Counsel, Human Resources, and management.

533.   In retaliation for their complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against Ms. Kassman, Ms. Patterson and Ms. Vasudeva.

534.   Defendant retaliated against Ms. Kassman by, *inter alia*, giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations.  Defendant ultimately bullied Plaintiff into resigning by subjecting her to escalating gender discrimination and harassment.

535.   Defendant retaliated against Ms. Patterson and Ms. Vasudeva by, *inter alia*, subjecting them to unfounded criticism, denying them the pay and promotions they deserved, and ultimately terminating them or forcing them to resign.

536.   By reason of Defendant's conduct as alleged herein, Ms. Kassman, Ms. Patterson and Ms. Vasudeva are entitled to all remedies available under the EPA, including liquidated damages for all willful violations.

537.   Attorneys' fees should be awarded under 29 U.S.C. § 216, et seq.

**COUNT XIV**
**(INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296**
**RETALIATION**

538.   Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

539.    In the final year of her employment with Defendant, Ms. Kassman repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

540.    In retaliation for Ms. Kassman's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations.    Defendant ultimately bullied Ms. Kassman into resigning by subjecting her to escalating gender discrimination and harassment.

541.    By reason of Defendant's conduct as alleged herein, Ms. Kassman is entitled to all remedies available under the New York Executive Law.

## COUNT XV
## (INDIVIDUAL CLAIM – PLAINTIFF KASSMAN)

## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 7 – RETALIATION

542.    Plaintiff Kassman re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

543.    In the final year of her employment with Defendant, Ms. Kassman repeatedly voiced concerns about KPMG's discriminatory treatment of her, complaining to the Office of Ethics and Compliance, the Office of General Counsel, and Human Resources.

544.    In retaliation for Ms. Kassman's complaints regarding KPMG's unlawful employment practices, Defendant took adverse employment actions against her, including giving her a disciplinary "coach," failing to provide her equal pay or promote her, and subjecting her to stressful meetings and interrogations based on baseless accusations.    Defendant ultimately

bullied Ms. Kassman into resigning by subjecting her to escalating gender discrimination and harassment.

545.     By reason of Defendant's retaliation, Ms. Kassman is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## COUNT XVI
### (INDIVIDUAL CLAIM – PLAINTIFFS PATTERSON AND VASUDEVA)

### VIOLATION OF FAMILY AND MEDICAL LEAVE ACT ("FMLA")
### 29  U.S.C. § 2601, et seq.

546.     Ms. Vasudeva and Ms. Patterson re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

547.     KPMG discriminated against Ms. Vasudeva and Ms. Patterson on the basis of their pregnancy, childbirth, and related conditions in violation of the Family and Medical Leave Act ("FMLA").

548.     Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

549.     After Ms. Patterson returned from maternity leave, KPMG refused to give her billable work, suggested she work part-time or move to a different practice, and denied her equal pay and promotional opportunities, ultimately forcing Ms. Patterson to leave the Company.

550.     After Ms. Vasudeva returned from maternity leave, KPMG reassigned her to less desirable projects, refused to provide her with staffing support, and denied her equal pay and promotional opportunities, ultimately forcing Ms. Vasudeva to leave the Company.

551.     Defendants acted willfully, intentionally, and with reckless disregard for Ms. Vasudeva and Ms. Patterson's rights under the FMLA.

552.     As a direct and proximate result of defendants' actions, Ms. Vasudeva and Ms. Patterson suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs, and are entitled to all legal and equitable remedies available.

553.     By reason of KPMG's discrimination, Ms. Vasudeva and Ms. Patterson are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, on their own behalf and on behalf of the class and collective action members, pray that this Court:

A.     Certify the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff class, and designate Ms. Kassman, Ms. Butler, Ms. Charity, Ms. Inman, Ms. Jones, and Ms. Murray  as the representatives of this class and their counsel of record as class counsel;

B.     Designate this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.      Designate Plaintiffs Kassman, Patterson, Vasudeva, Butler, Charity, Jones, Inman, and Murray as representatives of the EPA Collective Action;

D.      Declare and adjudge that Defendant's employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and members of the class under Title VII of the Civil Rights Act of 1964, as amended, the New York Executive Law, the New York City Administrative Code, the New York Labor Law, the Equal Pay Act, and the Family and Medical Leave Act;

E.      Issue a permanent injunction against the Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiffs, class members, and collective action plaintiffs, and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F.      Issue a permanent injunction against Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, gender discrimination or retaliation by the Defendant as set forth herein;

G.      Order Defendant to initiate and implement programs that will: (i)  provide equal employment opportunities for female Professionals; (ii) remedy the effects of the Defendant's

past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

H. Order Defendant to initiate and implement systems of assigning, training, transferring, evaluating, compensating, developing and promoting female Professionals in a non-discriminatory manner;

I. Order Defendant to establish a task force on equality and fairness to determine the effectiveness of the programs described in G through H above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in G through H above;

J. Order Defendant to adjust the wage rates and benefits for Plaintiffs, class members and collective action plaintiffs to the level that they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures;

K. Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Defendant has remedied the practices complained of herein and is determined to be in full compliance with the law;

L. Award nominal, compensatory and punitive damages to Plaintiffs, class members and collective action plaintiffs, in excess of 400 million dollars;

M. Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiffs, the class members, and the collective action plaintiffs;

N.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiffs, class members and collective action plaintiffs to be determined at trial;

O.      Order Defendant to make whole Plaintiffs, class members and collective action plaintiffs by providing them with appropriate lost earnings and benefits, reinstatement opportunities, and other affirmative relief;

P.      Award any other appropriate equitable relief to Plaintiffs, class members and collective action plaintiffs; and

Q.      Award any additional and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable of right by jury.

DATED: May 13, 2016

Respectfully submitted,

*Katherine Kimpel* /JMC

Katherine M. Kimpel (admitted *pro hac vice*)
Kate Mueting (admitted *pro hac vice*)
Maya Sequeira (admitted *pro hac vice*)
**SANFORD HEISLER KIMPEL, LLP**
1666 Connecticut Avenue, N.W., Suite 300
Washington, DC 20009
Telephone: (202) 499-5200
Facsimile:  (202) 499-5199
kkimpel@sanfordheisler.com
kmueting@sanfordheisler.com
msequeira@sanfordheisler.com

Kelly M. Dermody (admitted *pro hac vice*)
Anne B. Shaver (admitted *pro hac vice*)
Michael Levin-Gesundheit (admitted *pro hac vice*)
Yaman Salahi (admitted *pro hac vice*)
**LIEFF CABRASER**
**HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94608
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
kdermody@lchb.com
ashaver@lchb.com
mlevin@lchb.com
ysalahi@lchb.com

*Attorneys for the Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing and all documents attached hereto were served May 13, 2016 upon the following counsel of record via ECF:

Peter O. Hughes, Esq.
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
10 Madison Avenue, Suite 400
Morristown, NJ 07960
peter.hughes@ogletreedeakins.com

Steven W. Moore, Esq.
**CONSTANGY, BROOKS,**
**SMITH & PROPHETE, LLP**
600 17th Street
Suite 2700-S
Denver, CO 80202
smoore@constangy.com

Diane M. Saunders, Esq.
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
One Boston Place, Suite 3220
Boston, MA 02108
diane.saunders@ogletreedeakins.com

Colleen M. Kenney, Esq.
John G. Levi, Esq.
**SIDLEY AUSTIN, LLP**
One South Dearborn St.
Chicago, IL 60603
ckenney@sidley.com
jlevi@sidley.com

Wendy M. Lazerson, Esq.
**SIDLEY AUSTIN, LLP**
1001 Page Mill Road
Building 1
Palo Alto, CA 94304
wlazerson@sidley.com

s/  Julia Coppelman
Julia Coppelman