```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DONNA KASSMAN, et al.,

 4                   Plaintiffs,

 5           v.                        11 CV 3743 (LGS)

 6   KPMG LLP,
                                       Argument
 7                   Defendant.

 8   ------------------------------x

 9                                     New York, N.Y.
                                       August 8, 2018
10                                     2:40 p.m.

11   Before:

12           HON. LORNA G. SCHOFIELD

13                                     District Judge

14

15

16

17           APPEARANCES

18
     SANFORD HEISLER & SHARP LLP
19       Attorneys for Plaintiffs
     BY:  THOMAS J. HENDERSON
20       KATIE MUETING
         AIMEE K. STEWART
21

22   LIEFF CABRASER HEIMANN & BERNSTEIN LLP
         Attorney for Plaintiffs
23   BY:  KELLY DERMODY
         RACHEL GEMAN
24       ANNE B. SHAVER
         MICHAEL LEVIN-GESUNDHEIT
25       TISEME ZEGEYEV
```

APPEARANCES


OGLETREE DEAKINS NASH SMOAK & STEWART P.C.
     Attorneys for Defendant
BY:  PETER O. HUGHES


SIDLEY AUSTIN LLP
     Attorneys for Defendant
BY:  COLLEEN M. KENNEY
     WENDY M. LAZERSON

1          (Case called)

2          THE COURT:  Good afternoon.

3          I got your email with your proposal for how you would

4    like to use your time.  As far as I'm concerned, that is

5    between you.  I will let whoever is planning to start start .

6          MS. KENNEY:  Good afternoon, your Honor.  I'm here to

7    speak to you today on KPMG's motion to strike Dr. Vekker,

8    testimony from Dr. Vekker.  KPMG filed its motion because Dr.

9    Vekker's analysis does not fit the causes of action that

10   plaintiffs bring or the facts of this case.  It does not fit

11   how KPMG makes pay and promotion decisions.

12         An expert can be qualified, but if that expert does

13   not ask the right questions, he necessarily does not get

14   answers that are relevant to the case.  Dukes and Bolden, which

15   we have cited in our papers, say precisely that.  That's

16   exactly what we are dealing with here.

17         The question Dr. Vekker asked was whether there are

18   gender disparities in compensation in the tax and advisory

19   functions at KPMG.  That's in his report.  But that is not the

20   relevant question here because it is not relevant to the

21   plaintiffs' claims or the facts of this case.

22         To support their commonality argument as to the

23   disparate impact claims, Dr. Vekker should have asked if the

24   policies identified by Dr. Goldberg in her report were applied

25   uniformly across all employees, and if so, whether even one

such policy purportedly caused any sex-based disparity in pay
or promotion.  Dr. Vekker concedes he did not do that.  He
never analyzed it.  That is a fatal flaw for disparate impact.
Plaintiffs must show that.

Slide, page Vekker 4 in your binder, your Honor, is a
piece of that testimony.  I didn't want to put everything up in
the interests of time.

For their equal pay claims -- those are the claims
arising both under Title VII and the Equal Pay Act, as we
discussed last week -- Dr. Vekker should have asked: can I
determine on a common basis across all 13,000 class members in
the collective, across all 1100 collective members and their
comparators whether a single statistical regression can prove
whether women received unequal pay for equal work?

That is important, your Honor, equal work, work of the
same actual job duties based on their gender.  Here, clearly
the answer is no, it cannot be done in a single regression
because the actual job context varies so dramatically across
the practices.

But it doesn't even matter, because Dr. Vekker never
even looked at job content.  As we explained last week, it
matters in the circuit and under Dukes.  It matters for an
Equal Pay Act claim what are people actually doing.  It can't
be comparable.  It can't be slightly similar.  It isn't based
on job title.  It's based on actual job content.

1          All the plaintiffs have done here is resort to bland

2     abstractions and say therefore the jobs are similar.  The

3     circuit has repeatedly cautioned that mere generalizations

4     drawn from job titles are not sufficient to prove equal work.

5     That's the Chiaramonte case.

6          Dr. Vector didn't look at that, and he actually

7     admitted that he wasn't even interested in that.  At his

8     deposition he testified that it would not be important to his

9     analysis to learn about the job contents of any opt-ins or any

10    named plaintiffs.

11         Instead, he assumed that anyone holding the same

12    overarching title, such as associate, tax associate or advisory

13    associate, was performing equal work.  But, your Honor, there

14    is no dispute in the record that the actual job content of

15    KPMG's employees differs.  It differs from group to group and

16    sometimes even within a group.

17         The record also shows that the factors that affect

18    compensation, the very factors that the expert Dr. Vekker is

19    controlling for, such as experience, time at job,

20    certification, and the relative impact that each one of those

21    has on pay vary widely by practice.  That's why in his reply

22    report, not his initial report, Dr. Vekker finally controls for

23    service line, never for practice but he controls for service

24    line.

25         But in controlling for service line, instead of

1    running separate regressions, Dr. Vekker is making the same

2    false assumption that the factors that affect pay -- education,

3    certification -- have the same impact on the pay of everyone

4    within that service line.  That is simply contrary to the

5    record evidence.

6            For example, Dr. Vekker assumes that an extra year

7    reviewing individual income taxes will have the same return on

8    your pay as an extra year of flying around the world doing

9    complex merger and acquisition tax work.  Consider, an example.

10   I'm going to ask you to turn to page 6, Vekker 6 in your

11   binder.  We are not going to put this one up.  It contains

12   confidential KPMG salary information.

13           If you look at two associates in tax, one is employed

14   in global mobility services and the other is employed in merger

15   and acquisition.  Both are associates.  The average pay for

16   associates in M&A is nearly $40,000 higher than the average pay

17   in someone in global mobility.  Global mobility, your Honor,

18   just to remind you -- I don't need to go into excruciating

19   detail again -- those are people who prepare, or review if they

20   are in the compliance center, individual income taxes for

21   expatriate employees.

22           This makes sense.  It makes perfect sense.  Someone

23   who reviews individual income taxes is not going to be as

24   highly valued in the market as someone who has the detailed

25   understanding and is able to be writing hundred-page opinions

1     on complex cross-border tax issues.  Certain skills are just

2     more highly valued in the market than others are.

3              As another example, a CPA, which Dr. Vekker controls

4     for as well, he assumes, explicitly assumes, it has the same

5     value for every person in every practice within a service line.

6     But that is just not true, your Honor.  It is true that for

7     some services, certain practices, it is very important.

8              In accounting advisory services, your Honor, it is

9     vital to have either a CPA or a foreign equivalent.  In fact,

10    you have to have one to be made manager because what those

11    people do, they provide expert advice on accounting issues,

12    like a new revenue recognition standard that is affecting the

13    software industry.  They have to be CPAs to do that.  But

14    someone that works perhaps in people and change or technology

15    enablement, there is no value to a CPA; they are not going to

16    get a return on that certification.

17             Dr. Vekker says on the slide we have before you, yes,

18    I assume it applies the same to everybody.  He is not clear

19    what the relevance of this was.  On the left side as you are

20    facing it, your Honor, he says it applies the same to everybody

21    and I'm not sure what the relevance of this is.  That's the

22    problem, your Honor.  He didn't bother to investigate what is

23    the relevance of this.  The relevance is that a CPA and the

24    other factors that Dr. Vekker controls for mean something

25    different in the various practices.  That's why it matters.

         1          We have included in the binder at slides Vekker 15 and

         2    16 --

         3          THE COURT:  I don't have a defense binder.

         4          MS. KENNEY:  Why don't I hand it to you.  Sorry.

         5          Slide Vekker 15 and 16, your Honor, we separated it by

         6    witness.

         7          THE COURT:  All right.

         8          MS. KENNEY:  They list by service line how common

         9    certain educational or education certifications are in the

        10    various service lines.  You can see it varies dramatically.

        11          THE COURT:  I have it.  Dr. Vekker slide 15 is titled

        12    "Dr. Bloom Report Appendix 1," right?

        13          MS. KENNEY:  Yes, your Honor.  It is coming directly

        14    from Dr. Bloom's report.

        15          THE COURT:  Got it.  Thank you.

        16          MS. KENNEY:  For example, if you look at Vekker 15,

        17    you can see that the only service line that actually has

        18    doctorates of any number that reaches a percentage is EVS, and

        19    that's 4 percent.  The testimony of Rima Serafi, one of the

        20    declarants, tells you that those 4 percent are in a subpractice

        21    in EVS; they are in the economic consulting practice.  They are

        22    Ph.Ds.  They do massive, big data projects.  It is important

        23    for them to have that qualification.  But it isn't important

        24    for one in transfer pricing to be a Ph.D.  Transfer pricing is

        25    also in EVS.

1        When you are talking about what Dr. Vekker came up

2   with, alleged pay disparities of 1 to 3 percent, these things

3   matter.  Dr. Vekker assumes that the control variables he

4   applies apply the same to everyone, but he admits that he never

5   tested to see if it was true, and that makes his report

6   inadmissible and irrelevant.  Dr. Bloom, on the other hand,

7   tested to see whether the assumptions and controls were the

8   same in all these practices.

9        THE COURT:  Can you give me an example from Vekker 15

10  from a different column?  It seems to me that the doctorate

11  example doesn't really tell your story because it is not as

12  though there are people in other areas who have same

13  qualification but it has no value.  Apparently, this 4 percent

14  all work in the same area.  But I see a much broader

15  distribution of percentages for other columns.

16       MS. KENNEY:  Sure, your Honor.  Let me give you

17  another example.  Let's go to BTSTAX.  You see that 5 percent

18  are JDs.

19       THE COURT:  Yes.

20       MS. KENNEY:  If you look down in IES -- IES was the

21  old name of GMS -- those are people who are doing individual

22  tax returns.

23       THE COURT:  Right.

24       MS. KENNEY:  A JD isn't going to be very valuable

25  there.  Not very many people have that.

1          THE COURT:  What is BTS?

2          MS. KENNEY:  BTS is federal tax.  Do you know who has

3    those JDs?  Do you remember that subpractice called tax

4    controversy?  They are required to be JDs.  Your Honor, you

5    actually hit two things by that question.  One is there are

6    differences across service lines.  But more importantly, there

7    are differences across the practices within the service lines.

8          In BTS you have tax controversy.  They have to be JDs

9    or tax LLMs.  That's going to have value.  They are going to

10   get paid for that because it's important to what they do.  They

11   advocate before the IRS.  Also in BTS there are people who did

12   high-volume trust tax returns.  They do 5,000 trust tax returns

13   a year.  They don't need a JD.  And if they had one, they are

14   not going to get compensated any more because of it.

15         THE COURT:  I presume those people don't, though,

16   because if there were someone in that group who had JDs, they

17   would be doing the tax controversies.  But I understand your

18   point as compared between lines.

19         MS. KENNEY:  Right.  Or they made a conscious decision

20   they don't want to be an advocate, it stresses them out too

21   much.  I get that.  Maybe instead what they want to do is trust

22   tax returns.  That's their choice.

23         Dr. Vekker tested this, your Honor.  He found that the

24   effect of these various control variables, it matters what

25   practice you're in.  That's why you can't run a lumped

1    regression in just control.  Because there are so many

2    differences and there is such heterogeneity of the data, the

3    only way Dr. Vekker could correctly run these regressions is to

4    run separate regressions that properly account for all of this.

5    Adding control variables doesn't fix the problem.

6            The same is true for promotions.  Dr. Vekker assumes

7    that all of the factors that go into promotion -- time in job;

8    education; experience; and even rating, performance rating --

9    have the same effect every year, whether it is 2008 and '9,

10   when promotions were scarce because of the economy, or whether

11   it is 2015 and '16.

12           But in compounding this error, Dr. Vekker controls for

13   but again doesn't run separate regressions for service lines in

14   his promotion analysis either.  I want to give you a couple of

15   examples of why this matters, your Honor.

16           Some of the service lines have what is called a more

17   annuity type practice.

18           THE COURT:  More what?

19           MS. KENNEY:  Annuity.  I'm not going to say the same,

20   because it is never exactly the same, but they have work coming

21   in, similar work, from the client year after year.  Let's take

22   someone who is doing state and local use tax sales returns at

23   the compliance center.  They have their clients.  They fill out

24   state and local use tax, a fairly regular stream of work,

25   fairly regular promotions, aren't going to be affected as much

108skasm

1      by outside factors.  And there are some advisory, too.  For

2      example, internal or IT audit might be such an example.

3              But there are other practices that are the exact

4      opposite, they are project-driven: something like M&A or the

5      restructuring practice that are affected by the economy.  They

6      are affected by things like what if the number one business

7      generator leaves and takes her projects to another consulting

8      firm; it's really hard to get promoted when there is no work in

9      the pipeline.

10             Because that varies so dramatically year to year,

11     controls for year don't fix that.  It assumes every factor is

12     the same every year.  When no one is being promoted, it doesn't

13     matter if you're a number 1 rated, it doesn't matter if you

14     have been in the job for five years.

15             Dr. Vekker actually admits that service lines have an

16     explanatory effect on pay and promotion, but he excuses his

17     failure to run regressions that way because he claims, and this

18     is really without any record evidence, that it is a tainted

19     variable.

20             What he means by that and how he explains it is that

21     KPMG has, quote, control over where someone goes, what practice

22     they go into.  The implication is that KPMG is shuffing women

23     off into some low-paid practice areas.  But there is absolutely

24     no evidence of that, none, no evidence of that in the record.

25             In fact, it is contrary to the record.  Dr. Vekker

1  admits he never analyzed how people are put into service lines.

2  He never analyzed the hiring practices.  He didn't analyze

3  campus and he didn't analyze experience at hire.  He never

4  spoke to anyone at KPMG about this.

5          The only evidence in the record is to the contrary.

6  People apply for specific practice areas and indeed specific

7  offices in which they have an interest.  In other words, it is

8  the employee who has control over what practice they go into.

9  This is clear from the testimony of the plaintiffs, the

10  opt-ins, and KPMG witnesses.

11          THE COURT:  I am going to interrupt you and assume

12  that either you are keeping time or that someone is.

13          MS. KENNEY:  The fabulous Kathy Cooper is keeping

14  time.

15          THE COURT:  The multitalented person.  Thank you.

16          MS. KENNEY:  Yes, your Honor.  Finally, for both

17  plaintiffs equal pay and promotion claim, to show commonality

18  Dr. Vekker should have asked who actually makes not the

19  approval process but who makes the individual pay and promotion

20  decisions instead of assuming they were all made by someone at

21  a corporate level or at a top firm level.  I'm not going to go

22  through that again, your Honor.  I'm sure you appreciate that.

23          THE COURT:  I heard it last time.

24          MS. KENNEY:  Yes, you heard it last time and we showed

25  you that evidence last time.

1    Here, your Honor, practice matters too.  That's what
2    we showed you.  Decisions are made by the practice, led by
3    hundreds of individuals every year who know their own people.
4    Dr. Vekker's aggregated data at a national level doesn't tell
5    you anything about what is happening out in those practices.

6    These flaws matter, and they go to core certification
7    issues.  As the Seventh Circuit said in <u>Bolden</u>, and I won't
8    read it to you again, by aggregating this all together, you
9    can't tell if there is discrimination or where it is.

10    As we noted last week, Dr. Vekker also analyzed
11    compensation by year but not job level and promotion the
12    opposite way, by job level and not year.  He had no legitimate
13    reason for doing that.  That's Vekker 13 in your book, your
14    Honor.  You've seen this before.  I'm not going to walk through
15    it again.

16    Why don't we put up 14 for a moment.  All this is is
17    Dr. Bloom using the exact same programming that he got from Dr.
18    Vekker, simply doing promotion by year and pay the opposite.
19    Both are reported out by level and year, in other words making
20    it consistent.  This is a far cry from proof, let alone
21    significant proof that KPMG operates under a general policy of
22    discrimination, and it tells you nothing about whether any
23    woman was paid less than any man for equal work.

24    Before statistics can be used in an EPA or Title VII
25    equal pay case, the statistics must address the issues relevant

 1    to the issues being litigated.  They must fit the employer's

 2    model: how do they make pay, how does KPMG make promotion.

 3    Dukes and Bolden and other cases also reject expert analyses

 4    that don't fit the facts.

 5          The Supreme Court in Dukes expressly rejected the type

 6    of aggregated analysis Dr. Vekker performs here.  The Supreme

 7    Court didn't strike it on a Daubert motion.  It was the Supreme

 8    Court.  In fact, the court underneath said that Daubert didn't

 9    apply, and the Supreme Court said it doubts that's true.

10          The Supreme Court rejected the aggregated statistics

11    in Dukes despite the fact that the expert there controlled for

12    store, ran regressions at the regional and national level but

13    the control for store.  And the court recognized that that was

14    not appropriate when the decisions were made at the store

15    level.  Dr. Vekker's analyses are nothing more that an attorney

16    is an attorney is an attorney.

17          For plaintiffs' Equal Pay Act claims, Dr. Vekker's

18    analysis is of no help at all.  He didn't do any analysis on

19    the opt-ins, none.  He didn't ask any questions.  He didn't ask

20    any questions about the New York State or New York City claims,

21    so his analysis is of no use in those either.

22          THE COURT:  Let me ask a foundational question.  The

23    traditional purpose of Daubert motions is to serve a

24    gatekeeping function and to basically make a threshold finding

25    to ensure that there is some reasonable -- I don't want to

 1   enunciate the standard -- basically some reasonable basis for

 2   the opinion before a jury hears it.  Obviously, we are not

 3   talking about a jury hearing anything.  I'm not performing a

 4   gatekeeping function for myself.

 5        I presume what you are really saying is that you

 6   should discredit or discount what Dr. Vekker is saying because

 7   of all these flaws that you find, and we are not really talking

 8   about Daubert and various levels of reliability or

 9   admissibility.

10        MS. KENNEY:  Your Honor, I would respond that when

11   court after court after court disregards these types of

12   analyses, it's Daubert.  If it's not reliable and it doesn't

13   fit the facts and you have court after court after court saying

14   I'm going to disregard it, I'm going to disregard it -- I guess

15   your question is it any different than Daubert.

16        THE COURT:  It's just a semantic question, I think.

17   It doesn't feel like Daubert to me.  It feels like a challenge

18   to the arguments that are being made.  But you can call it

19   whatever you like.

20        MS. KENNEY:  Your Honor, as I said, when multiple

21   courts, including the Supreme Court, disregard something, that

22   means it is not of any value and that actually does fit under

23   Daubert.  But I hear you.  We would be happy if you would

24   disregard his results.

25        The plaintiffs claim that Dr. Vekker's analysis is

1    appropriate, and they rely in part on a case called <u>Paige v.</u>

2    <u>California</u>, which is a 2001 case.  That is pre-<u>Dukes</u>.  What

3    <u>Paige</u> said was, actually quoting from it, "aggregated

4    statistical data may be used when it is more probative than

5    subdivided data."  That's just not the case here.  That's just

6    absolutely not the case here.  And we talked last week about

7    bigger is not going to be better if bigger isn't properly

8    constructed.

9          Your Honor, if you don't have more questions for me,

10   at this point I'm done.  Thank you, your Honor.

11         THE COURT:  Thank you.

12         MR. HENDERSON:  Good afternoon again, your Honor.

13   Thomas Henderson.  As you know, a <u>Daubert</u> motion does provide a

14   gatekeeping function and is governed by federal rule of

15   evidence 702, where the Supreme Court held that we essentially

16   require experts to use their specialized knowledge in a way

17   that is both relevant and reliable.  It is important, I think,

18   to emphasize that in this motion KPMG only makes assertions

19   with respect to relevance.  They raise no issue about

20   reliability.  They claim only that Dr. Vekker's analysis is not

21   relevant.

22         You asked about <u>Daubert</u> at the class certification

23   stage.  Let me just say that I think in general courts apply

24   the <u>Daubert</u> standard with respect to admissibility for the

25   purpose of making the determinations necessary: for example,

1   for class certification under rule 23 or under the EPA but not,

2   as you point out, as to whether it goes to the jury or not.  So

3   it is confined to that purpose.

4         In fact, in making their relevance argument, you have

5   expressed the view that we intend to argue, which is that in

6   essence they are making arguments about the weight to be given

7   to the evidence and not its admissibility.  More specifically,

8   courts generally reject relevance challenges that go to

9   experts' statistical models and the level of aggregation, which

10  is what Ms. Kenney was talking about as going to the weight of

11  the evidence and not its admissibility.

12        THE COURT:  Let me interrupt for one second so you

13  don't spend your time on something that I don't think is that

14  significant.  That is, when I said to Ms. Kenney that I thought

15  that the issue was one of semantics, what I really mean is that

16  it is all on a continuum.  When there is no jury, the court

17  gives whatever weight the evidence is worth and that's it.  It

18  might be nothing, it might be everything, or something in the

19  middle.

20        So, to make distinctions between at what point it is

21  admissible versus at what point you give it more weight or less

22  weight, that isn't very meaningful.  I'm much more interested

23  in the substance and what you have to say about their criticism

24  of the aggregation of all of this data and doing one regression

25  analysis rather than many.

1            MS. KENNEY:  Yes, your Honor.  It is important also to

2       point out that in its papers KPMG formally makes only one

3       argument with respect to rule 23 certification and they make

4       three arguments directed to relevancy with respect to the Equal

5       Pay Act collective fund certification.  I am going to start by

6       talking about the Title VII one, which is last in their papers,

7       but we will do that first.

8            This argument contends that Dr. Vekker's analysis at

9       the level of KPMG function, that is, tax or advisory, is not

10      relevant to the rule 23 question of commonality based entirely

11      upon the Supreme Court's Wal-Mart decision.  First, Wal-Mart,

12      as Ms. Kenney pointed out, is not a decision to admit or

13      exclude evidence under the Daubert standard.  Instead, it

14      simply decided that the statistical evidence presented by the

15      plaintiffs in that case was insufficient to satisfy the

16      commonality requirement when Wal-Mart had no companywide

17      centralized policies and vested pay-making authority entirely

18      in individuals who were management.

19           Second, the argument relies on KPMG's attempt to

20      recharacterize itself as though it were Walmart.  That is

21      KPMG's attempt to transform the documentary evidence of its

22      firmwide compensation policies and practices discussed last

23      week.  I don't want to go there again.

24           They want to translate that or transform that into

25      Wal-Mart, in which the Supreme Court decided at the opposite

1   end of the corporate compensation policy, where the Supreme

2   Court decided there is no policy.  The compensation decisions

3   were left entirely to individual store managers.  It is the

4   level at which the policy applies, your Honor.

5       Because KPMG is not Wal-Mart and its policies are the

6   opposite, Dr. Vekker's analysis by KPMG function is relevant in

7   rule 23 commonality and in fact is common evidence on

8   predominant questions that will decide important issues as to

9   the class as a whole.  That is, do KPMG's compensation and

10  promotion policies and practices systematically disfavor women

11  at levels that support disparate impact and pattern and

12  practice claims?

13      THE COURT:  Let me make sure I understand.  What you

14  are saying is it comes down to a disputed issue of fact.  You

15  say there are common policies and practices, which is what we

16  talked about last week, and because of that Dr. Vekker's

17  approach is appropriate.  Is that basically it?

18      MR. HENDERSON:  That's correct, your Honor.  He is

19  analyzing at the level at which the policies apply.  In other

20  words, what group of employees are covered by the common

21  companywide policy, he analyzes that group.  You can contrast

22  that with Wal-Mart where, because the decisions were made in

23  each store, you had to analyze it as operating like totally

24  separate entities.

25      THE COURT:  Thank you.

1        MR. HENDERSON:  Your Honor, I'll turn to the EPA

2   claims which will get us a little further into the substance.

3   In an attempt to evade final certification of the EPA claims,

4   KPMG argues that the salaries of women and men within tax and

5   advisory functions at the firm cannot be compared at that

6   level.

7        Instead, KPMG argues that collective members and

8   comparators must be analyzed individually or separately in much

9   smaller groups, a technique that does not reflect reality or

10  the law and reduces the power of the statistical test: that is,

11  making it far less likely that the test, the regression

12  analysis, will be able to detect discrimination that actually

13  exists.

14       KPMG makes this argument in three ways in addition to

15  some of the demonstratives that they have shown.  I'll address

16  those, your Honor.

17       First, KPMG argues that you can't do a statistical

18  analysis of all employees because the jobs involve differing

19  activities, so you have to analyze each employee separately.

20  KPMG can cite no case for the proposition that you can't use

21  statistical analysis in certification and trial of class or

22  collective actions.

23       It relies on Port Authority and Chiaramonte.  In both

24  of those cases the plaintiffs said these are lawyers, all

25  lawyers are the same, therefore any paid differences are

1    discrimination.  On the other hand, essentially the court said

2    you are asking me to say that all veterinarians are the same

3    and therefore any disparities are going to be discrimination.

4    There was no statistical analysis in those cases.  There was no

5    statistical analysis that controlled for important variables

6    that would be expected to determine pay, and that is the reason

7    those cases rejected the plaintiffs' arguments there.

8           But in Lavin-McEleney the Second Circuit made clear

9    that a regression analysis controlling for key variables

10   accurately captures the quality of skill, effort, and

11   responsibility.  Thus, statistical analysis is common evidence

12   supporting certification and proof at trial that among those

13   who are subject to the same pay policies and practices in

14   positions KPMG treated the same for purposes of pay, with

15   comparable qualifications relevant to pay, women are

16   systematically paid less than men at a level that indicates a

17   probability of 5 percent or less.

18          THE COURT:  Could I interrupt you for just a minute.

19   As I understand it, you are trying to address KPMG's argument

20   that you have to analyze for different activities.  You can't

21   just look at job title, for example, because people with the

22   same job title may do vastly different things depending on

23   where they are in the organization.  Can you tell me just as a

24   matter of reason, why that doesn't make sense?  That has an

25   intuitive appeal.  You can't compare apples and oranges.

 1          MR. HENDERSON:  I understand, your Honor.  The point,

 2    and the Lavin-McEleney case makes this point and describes it a

 3    little bit, is that when you control for important variables,

 4    those are the things that actually determine pay and those are

 5    the things that the employer treats as determining pay, and

 6    those are the appropriate ways.

 7          THE COURT:  My question is, why isn't what somebody

 8    actually does an important variable on the facts of this case?

 9          MR. HENDERSON:  Let me try to answer that question

10    this way.  We contend that as KPMG has already structured its

11    pay system, the fact that it organizes its workforce by

12    function, and across function organizes it by uniform jobs that

13    have similar qualifications, and so forth, that is in fact a

14    sufficient specification that the work that people do in those

15    positions is substantially similar.  The activities may be

16    different in some respects, but the core issues with respect to

17    compensation, skill, effort, and responsibility KPMG has

18    already figured out and put that together.  That is the basis

19    on which they structured that.

20          THE COURT:  Ms. Kenney spent a lot of time last week

21    and this week telling us that associates, for example, people

22    with the same job title, don't have similar qualifications or

23    responsibilities; it very much depends on what group they are

24    in, what their assignment is.

25          MR. HENDERSON:  Let me say this, your Honor, with

1    respect to that.  It's easy to get things confused here.  What

2    is important is the equal skill, effort, and responsibility of

3    the job, not the person who holds the job.  You are comparing

4    what level of work and responsibility is required.

5          THE COURT:  I understand.  You're saying that an

6    associate who is working in an M&A group has the same skill

7    qualification and responsibility as someone who works in a

8    trust tax preparation group.

9          MR. HENDERSON:  Yes, your Honor.  They do different

10   things, but their job requires the same levels of skill,

11   effort, and responsibility.  That's exactly what we are saying.

12         THE COURT:  Now I understand your argument.

13         MR. HENDERSON:  To account for the other things that

14   Ms. Kenney was talking about, that people have different

15   qualifications -- she talked about CPA, she talked about

16   education degrees -- that's where the controls for the

17   characteristics of the employees that you would expect KPMG to

18   take account of in compensation are important.

19         For example, if I can put up a slide from last week

20   that talks about Dr. Vekker's compensation analysis.  The

21   purpose is to illustrate again these are the controls that he

22   used in his regression analysis.  As you can see, there is

23   education, experience, time in job, and performance rating.

24   You have function and job and job location.  You also have

25   characteristics of the employee, the kind of thing that Ms.

1    Kenney was referring to in terms of education, and so forth.

2            In fact, in education, to respond to the table that

3    was put up there, Dr. Vekker controlled for Ph.D, he controlled

4    for MBA, he controlled for JD, he controlled for Master's

5    degree other than MBA.  Those controls are already built into

6    the analysis and therefore take account of the fact that people

7    may have different levels of qualification that they bring that

8    you would expect KPMG's policies would treat differently with

9    respect to pay.

10           THE COURT:  What about Ms. Kenney's argument that you

11   would expect people to be treated differently with respect to

12   pay in some areas where that degree is valued but not

13   necessarily in other areas where it is not?

14           MR. HENDERSON:  Let's assume that's true.  That's a

15   logical assumption.  The point is when Dr. Vekker does his

16   regression analysis, the regression analysis, by taking all

17   those controls, essentially within the larger dataset

18   mathematically compares only people that are the same with

19   respect to those characteristics.

20           For example, if we are talking about JDs, the analysis

21   that Dr. Vekker did controls for JDs.  In that analysis the

22   regression mathematically compares people with JDs to each

23   other and determines whether women are paid less than men,

24   women with JDs.

25           THE COURT:  Regardless of what they do, it makes the

 1   general point that JDs who are women may be paid less than JDs

 2   who are men, is that it?

 3         MR. HENDERSON:  That's exactly right, controlling for

 4   these other variables as well that are here.  You're not

 5   comparing JDs who are managing directors to JDs who are

 6   associates.  You are comparing people in the same job, in the

 7   same function with the same degree.  Experience, time in job,

 8   tenure, other factors that you would logically expect would

 9   affect pay, all of those things are taken account of in the

10   regression analysis.

11         That is why, I contend, the Second Circuit held in

12   Lavin-McEleney that when you do a regression that has these

13   important controls, that is enough, that is proof that they are

14   substantially equal work, they are performing substantially

15   more.  That is, in essence, the argument, your Honor.

16         The next side slide, the results slide.  When Dr.

17   Vekker does that analysis, as you can see in tax, for example,

18   he finds that women are paid on average 2.7 percent less than

19   men in this matched set, as it were.  Mathematically comparing

20   people who are the same with respect to all of these variables,

21   women still are paid 2.7 percent less than men in tax and 2.8

22   percent less in advisory.

23         When looking at the standard deviations, as I'm sure

24   you heard, two standard deviations is generally the standard

25   for an inference of intentional discrimination or to make out

 1    disparate impact, and in this case you can see the standard

 2    deviations are well above that legal threshold.

 3           Let me talk about two other things.  In their papers

 4    KPMG cites to the example from the reference manual on

 5    scientific evidence showing a business school and an

 6    engineering school and men and women applicants to that, and if

 7    you aggregate everything, it would look like a disparity when

 8    there is not.  I believe on one of Ms. Kenney's slides, the

 9    assumption was from the Seventh Circuit case said, gee, if you

10    aggregate this, it's going to look like there is a disparity,

11    but in fact if you look at the schools separately, there would

12    be no disparity.

13           The point is those are tables.  What Dr. Vekker did is

14    a regression analysis that controls for gender, controls for

15    the school to which they applied in the reference manual as an

16    example, and would have controlled for the factors that Ms.

17    Kenney is referring to in the Seventh Circuit case.  All of

18    those things are taken into account simultaneously so that you

19    can get a picture of whether, when you compare all those

20    things, all those people within the data, there are disparities

21    or not.

22           The reason why it is important to aggregate the data

23    at that level, your Honor, is that when you break KPMG into

24    pieces --

25           I think at one point Dr. Bloom was talking about

1    breaking it into like 700 pieces, including the very small

2    subunits, but within subunit doing separate regressions by job;

3    he is treating KPMG as though it were 740-some entirely

4    different entities.

5              -- when you break the data down like that, it is so

6    small that you lose statistical power.  That is, the test

7    itself, the regression, is unable to detect discrimination that

8    is actually occurring.  So, it is important to analyze the data

9    at the level at which the policy worked.

10             THE COURT:  I understand you are saying that you need

11   to analyze the data at a high enough level in order to detect

12   or be able to measure discrimination.  On the other hand, you

13   also need to ensure that on the facts of your case it makes

14   sense to be aggregating and comparing the data.  I guess that's

15   where the tension is here.

16             MR. HENDERSON:  Yes, I think you properly stated the

17   question.  The issue is being argued here, but I don't think

18   the issue actually exists here for the reasons we talked about

19   in terms of the way KPMG organized itself and its policies

20   berate.  Also, with respect to power, there is absolutely no

21   basis on which to say that you should subdivide this company

22   into 700 pieces for purposes of running then separate

23   statistical analyses.

24             THE COURT:  I understand you're saying if you did

25   separate it into 700 different pieces, what you get from that

1    data would be worthless, so there is no point in doing that.

2         MR. HENDERSON:  It is the exact opposite of the

3    purpose of a regression analysis.  The purpose of a regression

4    analysis is to be able to analyze a body of data and do the

5    kind of matched comparisons that I was talking about so that

6    you can see the full result of what is happening, the various

7    decisions.

8         There may be discrimination against managing

9    directors.  There may be discrimination against associates.

10   There may be discrimination here or there.  If you break it all

11   down, all you're seeing is, perhaps, little pieces.  You don't

12   see the full effect of it.  It is only when you look at the

13   company the way it operates that you see the full effect of

14   those policies and how they operate.

15        Let me quickly try to deal with a few other things,

16   your Honor.  These tables from Dr. Bloom's report showing the

17   distribution of people, for example, average salaries, and so

18   forth --

19        THE COURT:  Talking about Vekker 15?

20        MR. HENDERSON:  The one before that as well.  There

21   was a pay one, Dr. Bloom report table 6A.  It's just showing

22   average salaries by service line within --

23        MR. HUGHES:  Vekker 6, your Honor.

24        THE COURT:  Thank you.

25        MR. HENDERSON:  -- within tax.  The discussion about

1    regressions doesn't help with this point, but I want to make

2    the point these tables are not statistical analyses.  They are

3    merely simple averages of people who happen to work in a

4    particular place in the firm.  They don't control or account

5    for any of the factors that affect pay.  Service line is not

6    one of the factors that determines pay.

7           When you consider the factors that do affect pay, you

8    find the gender disparities that Dr. Vekker did in his

9    regression analysis.  Dr. Vekker does not concede that service

10   line is appropriate, but if you add service line even as a

11   control, there are still statistically significant disparities

12   across the firm in compensation.

13          The point, your Honor, is that the fact that different

14   people have different characteristics in different parts of the

15   firm is completely irrelevant to whether or not they are paid

16   differently, that women are paid differently than men, when you

17   are considering the factors that should determine pay.

18          Ms. Kenney made some point about talking about CPAs

19   and CPAs make a difference.  I think slide 15 is the one.  Your

20   Honor asked, can you show me some examples that would show the

21   value of the degree, the CPA degree or even the other higher

22   ed. degrees.  The point I wanted to make simply is this table

23   doesn't tell you anything about whether those degrees have any

24   value.  It is simply a distribution of people across various

25   segments of the firm.

1          The value of the degree with respect to compensation

2     is measured in Dr. Vekker's regression analysis.  For each of

3     those that is a variable --

4          THE COURT:  In his analysis he is assuming that all of

5     the CPAs are equal and that the CPA degree is and should be

6     equally valuable, is that right?

7          MR. HENDERSON:  No, I don't believe that is correct.

8     Let me explain why that would not be an accurate statement.

9     CPA is not a factor that has been identified in KPMG's

10    documents as something that determines pay, so neither Dr.

11    Vekker nor Dr. Bloom, KPMG's expert, controlled for CPA when it

12    came to pay.  Therefore, notwithstanding the fact that Ms.

13    Kenney makes much of the fact that some are CPAs and some

14    aren't, it is a factor that is irrelevant to pay.

15         It is relevant to promotion because some promotions

16    require the person to have a CPA.  For that reason Dr. Vekker

17    controlled for CPA in the promotion analysis.  There you are

18    taking account of any value that CPA might have with respect to

19    promotion.

20         The other degrees that we have talked about and that

21    you were talking about when you asked the question of Ms.

22    Kenney, again, because Dr. Vekker controls for Ph.D., LLM, JD,

23    etc. in the compensation analysis, to the extent those things

24    affect pay, the regression analysis tells you whether they are

25    valuable or not and, as I said before, mathematically compares

 1    only people with those qualifications; so where they are in the

 2    firm is irrelevant to the pay disparities.

 3          Ms. Kenney talked a good bit about the fact that Dr.

 4    Vekker didn't control for service line.  When he looked at

 5    KPMG's documents, service line it was not a factor that

 6    determined pay.  Your Honor, so you understand, I'm going to

 7    walk through Dr. Vekker's initial analysis, not controlling for

 8    service line.  We are going to compare that to when he did

 9    control for service line in his reply report.

10          I also want the talk about the third analysis he did

11    where he controlled for education specialty, also discussed in

12    his reply report, because one of these tables Ms. Kenney put up

13    talked about both the degrees and also education specialties.

14    This all goes to the point that service line is a tainted

15    variable.  We are going to show how that is so and, number two,

16    that even when you do control for service line, there is still

17    a disparity.

18          If we can start with the initial base pay analysis,

19    your Honor.  As you can see, this is base pay rates in tax.

20    The controls here are Dr. Vekker's controls.  As you can see,

21    there is a 2.5 percent disparity, negative, for women, and the

22    standard deviations of that disparity occur at a magnitude of a

23    negative 9.16 standard deviations.  That is a huge disparity.

24          Second, in his reply report, Dr. Vekker then added

25    service line to test whether in fact service line either

1  explained or made a difference or made the disparity go away.

2  If you take a look at his table R, base pay in tax, same

3  period, this time you can see he adds the control service line

4  to his control.

5        What we see is that where his initial analysis showed

6  a coefficient of 2.5 percent, that is, women were paid 2.5

7  percent less than men, when you control for service line, it's

8  still negative 1.5 percent.  It drops significantly but it is

9  still a disparity.  And if you look at the standard deviations

10  the standard deviations in his initial analysis were negative

11  9.16.  It goes down to negative 6.11.  The point is the 6.11 is

12  still a very substantial disparity, well above the legally

13  actionable level.  And if you look at the years, it is also

14  statistically significant for all these years.

15        So it tells us that even when you control for service

16  line, supposedly the distribution of people across the firm,

17  where people are in the firm does not explain or account for

18  the gender disparity, the fact that there is a statistically

19  significant gender disparity.

20        If you go to the third slide, this is Dr. Vekker's

21  analysis in his reply report.  This time he adds the education

22  including specialty, so he is adding a control for education

23  specialty.  A word about that for a moment.  It's like your

24  college major.  The easiest way to say it is your college

25  major, the area of study at college.  There is not a lot of

1    data on it, it's not very good data.  Dr. Bloom did an analysis

2    like this.  There are lots of questions about how he did it.

3    But for purposes of illustration, Dr. Vekker includes in his

4    analysis education specialty the same way Dr. Bloom did.

5              When you look at this, you see the same facts, same

6    base pay, same time frame.  You see now the disparity is

7    actually 2.3 percent, negative 2.3 percent for women, and the

8    standard deviations is 8.61, still a very substantial,

9    statistically significant disparity.

10             What does this tell us?  It tells us that neither

11   service line nor education specialty makes the disparity goes

12   away.  There is still a statistically significant disparity in

13   the pay of women even when you take those things into account,

14   first of all.

15             Secondly, when you control for service line, for

16   example, the disparity goes from negative 2.5 to negative 1.5

17   and it drops the standard deviations from 9 to 6.  What that

18   tells you is that service line in fact explains some of the

19   disparity.

20             THE COURT:  I'm sorry to ask such a basic question.

21   Remind me which level is service line.

22             MR. HENDERSON:  Service line are the ones illustrated

23   in the tables from Dr. Bloom's report that Ms. Kenney had up

24   during her argument.

25             THE COURT:  I remember the charts from last week.  I'm

35

1   just trying to remember which level.

2           MS. KENNEY:  Your Honor, they are in the book that we

3   provided.  I think they are charts Vekker 1 and 2.  I'm sorry

4   to interrupt.

5           THE COURT:  That's helpful.  Remind me, which level is

6   the service line level?  Is it the dark gray one?

7           MS. KENNEY:  Your Honor, in tax it goes function and

8   then service line and then practice area.

9           THE COURT:  Tax is function, then --

10          MS. KENNEY:  Service line, and then the practice areas

11  in there are called service areas and tax.  In advisory it is a

12  little more complicated because they have so much that they do.

13  It goes function, service group, service line, service network.

14  I think there should be a legend on those which tells you what

15  everything is.

16          THE COURT:  That helps.

17          I understand your point.  You are saying even when you

18  are accounting for service line, you can still see a disparity

19  in pay between men and women.

20          MR. HENDERSON:  Yes.

21          THE COURT:  I understand that you are also saying that

22  if you did your regression analysis on a granular enough level,

23  you wouldn't be able to see or detect pay disparities because

24  there is not enough data there.  Let's look at tax because it

25  is not as complicated.  How am I to know that if KPMG were a

1    much bigger organization -- I know it is big, but let's assume

2    that it were much, much bigger -- how am I to know that that

3    disparity wouldn't be less if you were to control for practice

4    area in a larger organization?  Do you understand what I am

5    saying?

6              What I'm really asking is when you are showing a

7    lesser degree of discrimination at the service line level, what

8    is to say that you wouldn't show an even lesser degree of

9    discrimination if you weren't also controlling for practice

10   area, which is the point that people do different things in

11   different areas?

12             MR. HENDERSON:  I think I disagree with a few of the

13   premises of your question.

14             THE COURT:  All right.  It is helpful for you to tell

15   me.

16             MR. HENDERSON:  Let me try to walk through that, first

17   of all.  Let's just talk about service line for a second.  Then

18   we can talk about the smaller units.

19             Just so I'm being clear, because perhaps I'm not, when

20   Dr. Vekker includes the control for service line, just like I

21   said that Ph.Ds are only being compared to each other or JDs

22   are only being compared to each other within the regression

23   analysis, that means that people are only being compared within

24   service line.

25             THE COURT:  I understand.

 1          MR. HENDERSON:  When you do that, which we don't think

 2    is appropriate, but even when you do that, the point is not

 3    that it is somewhat less.

 4          THE COURT:  I understand your point is that it is

 5    still there.  Their point is that it is somewhat less but your

 6    point is that it is still there.

 7          MR. HENDERSON:  The primary purpose, and I think the

 8    guiding purpose, is that it is there and it is there at levels

 9    that establish the basis for liability.

10          THE COURT:  I understand that is your point.

11          MR. HENDERSON:  Yes.  Then your question is what if

12    you did the analysis in smaller units.  Two responses to that.

13    First of all, you probably can't do it because they are so

14    small that you can't get any results.

15          THE COURT:  That's why I said if KPMG were a bigger

16    organization so that you could have data that were more

17    meaningful, how am I to know that it wouldn't show that there

18    is even less of a disparity?

19          I understand you're controlling for service line.  But

20    given that there are people who do different things in these

21    practice areas, it sounds like Dr. Vekker hasn't told us, and

22    perhaps can't -- perhaps it is likely the data won't yield a

23    meaningful result -- but isn't it possible, and certainly Dr.

24    Vekker can't tell us, that within these practice areas, given

25    the unique things people do in the practice areas, that there

1    is no disparity that is meaningful?

2          MR. HENDERSON:  Perhaps I failed at my earlier point,

3    your Honor.  You are still saying people do different things as

4    a determinant.  The point I tried to make earlier was that the

5    Lavin-McEleney case said --

6          THE COURT:  The problem is each case depends on its

7    facts and what people in a particular business do.  I

8    completely understand your point, your very first point, which

9    is there is a question here and a tension between what the

10   defendants are saying is the reality of the payment practices

11   at this firm and what the plaintiffs are saying is the reality

12   of the payment practices at the firm, and it matters.  In every

13   case that you might cite, it matters.  The facts matter.

14         MR. HENDERSON:  I agree, your Honor, they matter.

15         THE COURT:  Okay.

16         MR. HENDERSON:  What determines the level at which you

17   analyze the data in the case law is the level at which the

18   policy applies.  KPMG, as I understand it, is not arguing that

19   they don't have firmwide compensation policies.  They do.  They

20   plainly do.  They have a firmwide compensation office, etc.

21         THE COURT:  I actually think they would disagree with

22   you.  But I understand your position is different.

23         MR. HENDERSON:  I think their disagreement is not that

24   they don't have those policies and not that they don't have a

25   firmwide compensation unit that does this work.  Their only

1    argument, as I think Ms. Kenney repeated again today, is that

2    managers, mid-level managers, in this process of companywide

3    determination of pre-populated pay increases, there is a part

4    in that companywide process where it goes down and they are

5    permitted some discretion within --

6                THE COURT:  This is last week, but yes.

7                MR. HENDERSON:  I am going to try to get out of it as

8    quickly as I can.

9                THE COURT:  Actually, let's not, because it's last

10   week and it's in the papers.

11               MR. HENDERSON:  The only point I was trying to make is

12   instead of policy, they are saying look at the decision-makers

13   and they are claiming that there are just these low-level

14   manager designation, which isn't actually how it operates.  But

15   that's last week.

16               THE COURT:  Where are we on time?

17               MS. KENNEY:  41 minutes for plaintiffs, your Honor.

18               THE COURT:  How many minutes have I allowed each side

19   total?

20               MS. KENNEY:  80 each, your Honor.

21               THE COURT:  I'm holding both sides to 80 each.  When

22   you have used 80 minutes up on each side, we are done.

23               MR. HENDERSON:  I had a discussion, but I'm not going

24   to do it, about the F-test, which is what Ms. Kenney referred

25   to as this test which tells you whether you go aggregate or

1    not.  We have discussed it in the papers.  There are good cases

2    in the papers for you to read that explain why the F-test is

3    not an appropriate measure of whether or not you aggregate in a

4    case with these facts.

5            Thank you, your Honor

6            THE COURT:  Someone tell me how much time we have

7    used.

8            MS. KENNEY:  25, your Honor, and going to probably

9    have a 3-minute rebuttal.  I'll keep it short, I promise.

10           THE COURT:  You can talk as long as you like, but at

11   80 we stop.

12           MS. KENNEY:  I think they may have some objections to

13   that.

14           THE COURT:  Okay.

15           MS. KENNEY:  Thank you, your Honor.  We disagree with

16   much of what Mr. Henderson said and I'm not going to repeat

17   anything I said last week.  You are correct, it was last week.

18           One of the things we disagree with is that Mr.

19   Henderson got the standard wrong.  The <u>Belfi</u> case, 191 F.3d 129

20   in the Second Circuit, equal pay for equal work is what the

21   plaintiffs need to show and requiring equal skill, effort, and

22   responsibility and under similar work circumstances.  It is

23   clear, even the opt-ins admitted, that they didn't have the

24   skills or experience to do the work of other people in other

25   practice areas at KPMG.

 1          There is a reason the market values different

 2   practices, differently and it really cannot be contested that

 3   KPMG considers practice when setting pay.  Dr. Vekker does not.

 4   It's all over the documents.  It really can't be contested.  It

 5   can't be that what Mr. Henderson is saying, for example, that a

 6   staff attorney who has the skills and education to do complex

 7   M&A deals but chooses to be a staff attorney, perhaps reviewing

 8   documents, should be paid the same as the M&A attorney.  It is

 9   the same throughout KPMG.

10          A control does not match like to like.  A control does

11   what I said.  It assumes that the payoff, the reward structure,

12   is the same for everybody in the population that is being

13   controlled.  We have walked through that.

14          Statistical power, I want to talk about that for a

15   minute.  I want you to understand something, your Honor.  Dr.

16   Bloom did some of the analyses that you asked about.  He also

17   did some more fine-grained analyses.  That is in footnotes 28,

18   30, and 31 of his report.  Most of his sample sizes were over

19   100.  Many of the other ones were 30.  Dr. Vekker never

20   criticizes that, never says it's wrong.

21          Your Honor, I want to mention one other thing that's

22   become apparent in the slides that came to us today.  You might

23   recall that plaintiffs did not file a Daubert motion on Dr.

24   Bloom.  Instead, they filed a motion seeking to strike KPMG's

25   citation to some of the things in his report from their papers.

1          The slides we got this morning from plaintiffs, it is

2   clear to us that they are going to spend time today criticizing

3   Dr. Bloom's methodology itself.  That has not been briefed.  It

4   isn't a subject of Daubert.  In fact, if the Court remembers,

5   when we said what they filed was a Daubert, they said, oh, no,

6   we are not filing a Daubert.  So we are going to object to any

7   effort to start attacking Dr. Bloom's methodology as part of

8   the motion to strike.  KPMG would be happy to stand on its

9   papers as long as the plaintiffs are required to do the same

10  thing.

11         Thank you.

12         THE COURT:  Thank you.  Let's take a five-minute

13  break.  Actually, let's take a ten-minute break.

14         (Recess)

15         THE COURT:  You are Ms. Shaver?

16         MS. SHAVER:  Yes.

17         THE COURT:  You may proceed.

18         MS. SHAVER:  Good afternoon.  I am here to address

19  plaintiff's motion to exclude expert Dr. Cristina Banks, who is

20  an industrial-organizational psychologist, who I will refer to

21  in shorthand is an I-O psychologist.  Plaintiffs are moving to

22  exclude Dr. Banks' opinion for two reasons: first, because it

23  was not based on a reliable methodology, and second, because it

24  is not helpful to the Court.

25         KPMG retained Dr. Banks to, in her words, offer

opinions regarding the similarities and differences in the jobs

held by the opt-in plaintiffs.  As your Honor knows from last

week's arguments, those similarities and differences are

relevant to whether the Equal Pay Act's criterion of equal work

can be determined on a collective basis.

To inform her opinion, Dr. Banks performed a job

analysis.  I think it will be helpful to take a step back and

explain a little bit about what a job analysis typically is in

I-O psychology.  I-O psychologists are frequently hired by

companies to help impose formal organizational structures, such

as job titles, levels, and other categorizations on employees

that will help firms administer compensation and other terms of

employment in a fair and consistent way.

The term "job analysis" is actually a term of art in

I-O psychology.  It refers to determining what people will do,

who is similar, who is different, so they can be grouped

together.

Dr. Banks' job analysis here was different and it was

flawed.  Here she claims that she performed a, quote,

individualized job analysis, end quote, because after

consulting with high-level KPMG managers who were hand-picked

for her by KPMG, she determined that what the opt-ins do is

just so different that she could not perform a standard job

analysis.

Her individualized job analysis.  What she did was she

1    selected individuals to mirror the population of opt-ins at

2    issue in this case.  She interviewed them using a standard set

3    of interview questions and coded the majority of the responses

4    in such a way that they could be assigned a set of values.  In

5    this way a dataset was created from which you could compare the

6    similarities and differences in the responses to those

7    interview questions.

8         This methodology was problematic, unreliable at two

9    levels, your Honor.  First, it is not the sort of objective and

10   neutral methodology that one would expect from an expert

11   witness but instead is biased towards helping employers defeat

12   class and collective certification.

13        This is a slide from a presentation that Dr. Banks

14   gave to one of her professional associations along with lawyers

15   from the Proskauer Rose firm stating how I-O psychologists can

16   help defeat class certification by explaining organizational

17   hierarchy and structure.  From a different page in that

18   presentation, "I-O psychologists can demonstrate to the court

19   how certain employees, even those who share the same title, are

20   dissimilar and not performing comparable work such that they

21   should be members of the same class."

22        THE COURT:  Are these in your notebook?

23        MS. SHAVER:  Yes, your Honor.  Every slide is in the

24   notebook, and it has the source where it is in the record on

25   the slide.

1          This is the same point made in connection with a

2     presentation made with attorneys from the firm Morrison

3     Foerster.  What these presentations make clear is that I-O

4     psychologists can perform job analyses in such a way as to

5     focus on the most granular level of what people do explicitly

6     in order to defeat certification.  And that's what Dr. Banks

7     did here.

8          Critically, at her deposition Dr. Banks could identify

9     only one other I-O psychologist who has used this methodology.

10    There have been no scientific studies or peer reviewed analyses

11    evaluating whether this is a reliable and valid way to do a job

12    analysis.  In a minute I'm sure you will hear from defense

13    counsel that Dr. Banks has received professional awards for her

14    work in this area.  But that is not a substitute for the rigors

15    of peer testing and review.

16         In fact, when plaintiff's expert Dr. Hanges, also an

17    I-O psychologist, looked at what Dr. Banks did here, he found

18    that it fell well short of the standards in the field.  Courts

19    regularly exclude expert methodologies that are litigation-

20    generated and untested by peers in this manner.

21         The second level at which her methodology is

22    unreliable is that even if we were to assume that

23    individualized job analysis is a valid way to proceed, she

24    deviated even from that in what she did here in the following

25    way.  She acknowledged at her deposition that she typically

identifies a common core of tasks among employees that she is
looking at by making job task statements and task lists.  That
is her typical practice.  She didn't do so here.

          We are aware of no authority, and Dr. Banks could
point to no authority, that a job analysis done without that
task list and task statement is accepted in the field of I-O
psychology.  In fact, Dr. Hanges in his report says this is
typical practice in job analysis and cites several authorities
for that proposition.

          What is most unreliable about Dr. Banks' report is the
way that she reports out her results.  Paragraph 52 is the
beginning of her result section.  She says that she is going to
report out the results in two ways: first, the variation in job
characteristics and work performed across all interviewees in
general, that's everyone at every function and level grouped
together; then, second, the same thing by job level and by
function.

          It is important to keep in mind that plaintiffs do not
claim that tax employees do equal work to advisory employees,
and we do not claim that even within tax advisory associates do
equal work at every other level.  Our burden is not to show
that everyone in the collective is the same.  We are only
comparing employees in the same function and in the same job
title to comparators in that same function and job title.

          If you go back to Dr. Banks' results, her first

1   analysis, all interviewees in general lumped in together, is

2   actually completely irrelevant to this case.  Yet this is the

3   only place where she did any meaningful quantitative analysis.

4           What she did for all interviewees is she went through

5   every category of interview questions and indicated what

6   percentage of employees gave a similar answer or a different

7   answer.  Of course, she found that employees in every category

8   gave very dissimilar answers.  That is hardly surprising given

9   that all of the opt-ins, all of those job levels, were lumped

10  in together.  When Dr. Hanges did the same exact analysis, he

11  grouped it.  He looked at it by function and by job level.  He

12  found that the answers that were given had very high degree of

13  similarity.

14          Dr. Banks says here, number 2, that she also reports

15  out her results by job level and by function.  But does she

16  repeat her analysis in the same way?  No, she did not do that

17  same quantitative analysis.  What she did was cherry-pick 26

18  individuals, write narrative summaries of what they did, and

19  put those into her report.

20          Her only justification for doing so, your Honor, is

21  that by doing so, differences in the way individuals perform

22  their jobs in tax versus advisory and at different levels of

23  the organization could be fully revealed and assessed.  So by

24  her own admission she did it to emphasize the differences.

25          For the sake of time, I am not going into depth on the

1    other issues they have identified in their papers, such as

2    choosing interview questions designed to pull out

3    specializations, and so forth.  It is all in our papers.  But

4    in sum, Dr. Banks' methodology is not reliable and should be

5    excluded.

6            The second basis on which we have moved to exclude Dr.

7    Banks' report is that it is not helpful to the Court as an

8    expert opinion because she explicitly disavowed offering one.

9    This is in her deposition.  She says, I do the study, I let the

10   facts speak for themselves, and it's up to the court whether

11   they would draw the same conclusion.

12           Here again, when given a hypothetical about two types

13   of jobs interview and asked whether they are different, she

14   says that is for the Court to decide.  Of course, this

15   contradicts her report because it is replete with conclusions

16   that opt-ins perform very different work such that they cannot

17   be compared even within function and level.

18           Note that Dr. Banks also says that the standards she

19   is applying to reach that conclusion is a reasonable person

20   standard.  So what is the criterion that you are using to

21   determine that it sounds like it's similar work?  What a

22   reasonable person listening to those two descriptions might say

23   one way or the other.  I have given another example of that in

24   my slides, which I will skip in the interest of time.

25           The point is that not only is she usurping the role of

1    the jury in drawing conclusions from the facts, but she is

2    doing it based on no expertise, nothing beyond what the jury

3    could apply themselves.  The Second Circuit has been clear that

4    expert testimony is not admissible for that purpose.  That's

5    United States v. Grenage and United States v. Londono-Tabarez

6    case.

7            This is a further example of KPMG attempting to

8    disavow its own job descriptions and its own compensation

9    documents in favor of interviews conducted by paid experts.  It

10   also goes to the weight that the Court should put on these

11   conclusions.  In sum, Dr. Banks' opinion should be excluded as

12   a methodology deal unreliable and unhelpful to the Court.

13           Thank you.

14           THE COURT:  Thank you.

15           MS. LAZERSON:  Good afternoon, your Honor.

16           THE COURT:  Good afternoon.  Ms. Lazerson?

17           MS. LAZERSON:  It's Ms. Lazerson, yes.  Thank you.

18           Your Honor, I did not hear much from Ms. Shaver that

19   goes to the point of whether or not Dr. Banks should be allowed

20   to testify.  They make a blanket statement without authority

21   that her opinion is not based on a credible methodology.  Yet

22   she has been qualified as an expert in state and federal

23   courts.  Her job analysis methodology has been used in

24   countless cases.  Neither her methodology nor she herself as an

25   expert has ever been excluded.

1          THE COURT:  When you say that she has been qualified

2     as an expert and presented her methodology, are you talking

3     about the same methodology that she used here?

4          MS. LAZERSON:  Her methodology of individual job

5     analysis has been used in many cases.  She has been an expert

6     more than 80 times in cases that do use this individual job

7     analysis.  When she has testified in court, it has not

8     necessarily been based on the individual job analysis.

9          Why individual job analysis is appropriate here is

10    because, as you said, your Honor, it's about the facts.  As we

11    heard time and time again, bland job descriptions under the

12    Port Authority case tell us nothing.  We need to look at what

13    people actually do.  That's exactly what she did.

14         That is supported in her report and in her rebuttal

15    report at some length about what she did, including

16    interviewing 52 leaders at KPMG to get background information

17    and understanding of the organization and to understand that it

18    is an organization whose business model is specialization.

19    They seek out specialists.

20         Then she developed a mirror image of the opt-in group.

21    I find it quite ironic to hear that the plaintiffs are saying

22    that the opt-in group as they have defined it is not

23    meaningful.  She created a study based on the very specific

24    qualities of the opt-in group.

25              She is a fellow of the APA.  She is a member of the

1   Society of Industrial and Organization of Psychology.  She is a

2   published author on individual job analysis.  She has made

3   speeches which have been vetted by her peers.  As you will see

4   in both her rebuttal report and in her report, questioning the

5   fact that her peers have not vetted her work is just false.

6          I will put up slide 1.  I usually don't like to focus

7   on awards because people say it's just an award, but in this

8   case I find it particularly interesting.  This presidential

9   citation that Dr. Cristina Banks got from the American

10  Psychological Association, her peers, pointed out the fact that

11  she performed more than 100 studies applying her ground-

12  breaking methodologies that have resulted in millions of

13  dollars of savings to employers and millions of dollars of

14  compensation to employees who were inappropriately classified.

15         She is not a plaintiff's or defendant's expert.  She

16  testifies for both plaintiffs and defendants, and this is

17  recognized by the American Psychological Association.  To call

18  her a hired hand, or imply that she is, is just not true.

19         At the hearing on August 2nd -- if we could put up

20  slide 5 -- plaintiffs' counsel said that they are going to rely

21  on Dr. Banks' work.  In the transcript at page 50 lines 10

22  through 15, they said plaintiff will rely on its rebuttal

23  experts to Dr. Banks, Dr. John McGowan, industry experience,

24  and Dr. Paul Hanges, who looked at the underlying information

25  that Dr. Banks provided in her study.  So they are going to

1    rely on the information that Dr. Banks provided, and they will

2    use this to establish a similar work requirement.  Apparently,

3    looking at her work was helpful to their own experts.

4              There is no authority whatsoever for the proposition

5    stated by Ms. Shaver that there is something called a typical

6    job analysis or a standard job analysis.  Some job analysis is

7    done for selection purposes.  In those cases it might be

8    appropriate to cluster people to get to a particular job title.

9    That is not appropriate under the EPA.

10             As Ms. Kenney pointed out, under the <u>Belvi</u> case the

11   analysis is based on the equal work, the equal skill, the equal

12   responsibilities under a similar work environment.  That is

13   what the psychometric principles are that Dr. Banks is an

14   expert in and what she based her method of individualized job

15   analysis on, and it is a sound scientific methodology that has

16   been recognized.  It is not voodoo by any means.

17             I also do want to point out that to the extent that

18   there is some implication that she marketed herself to somebody

19   who only kowtows to employers or that this methodology is

20   somehow designed only to support employers, conveniently

21   plaintiffs only showed you a couple of the slides in that

22   61-page presentation.  I did want to put up a couple of those

23   slides for you so that you could see what it really is about.

24             First of all, this presentation was not to a law firm.

25   The law firm did participate as a speaker on this panel.  As

1    you can see from the cover page, this was presented in 2007 to

2    the Society for Industrial and Organizational Psychology.  If

3    we could go to page 1.  Your Honor, I do have a copy of the

4    whole presentation for you which I can provide.

5          Page 1 tells us that the learning objectives, in the

6    second bullet point, to identify areas where I-O methodologies

7    would be appropriate, in wage and hour cases in this instance.

8    Go to page 34.  The plaintiffs highlighted the second bullet

9    point but forgot to note that the first bullet point here says

10   that I-O psychologists can aid both parties in determining

11   class certifications by defining and distinguishing between and

12   among certain job titles.

13         Very significantly, page 39 of that study, which says

14   in the last bullet point, "Ways I-Os can contribute in this

15   area: help companies comply with the law, help employees and

16   former employees gain the compensation and benefits they

17   earned" --

18         MS. SHAVER:  Your Honor, there is an objection.  These

19   slides were not shared with plaintiffs prior to this hearing.

20   Both sides had agreed and the Court had ordered we would share

21   demonstratives.  These were not among the demonstratives

22   shared.

23         MS. LAZERSON:  Your Honor, when I saw that they were

24   putting them in their demonstratives, I had went and pulled the

25   whole document because I felt that they cherry-picked a few

1    pages, and I thought it would be fair and helpful for you to

2    see what the presentation was.  I think you get the point.

3              THE COURT:  I do.

4              MS. LAZERSON:  Thank you, your Honor.

5              Now, they mixed some criticisms of Dr. Banks' notion

6    that she lumped tax and the advisory employees together for

7    purposes of comparison.  I just sat here and for 40 minutes

8    listened to plaintiffs say that lumping everybody together is

9    what should happen.  I thought that's what they were saying

10   when they argued about Dr. Vekker.  You can't have it both

11   ways.

12             They say that she performed a layperson's analysis

13   because she used a reasonable person standard.  They again

14   cherry-picked some of the testimony.  There were questions that

15   you could see on the slide that they put up that I objected to

16   because the hypotheticals were incomplete.

17             There is no layperson in this room that could do the

18   kind of analysis using her expertise to come up with the study

19   that she did that will clearly be helpful to this Court in

20   determining whether these jobs are equal work under equal

21   circumstances with equal responsibility and equal skill.

22             In their papers they criticize Dr. Banks for other

23   reasons, such as there were no men in the survey, there are no

24   men in the class, they didn't talk to the opt-ins.  Well, you

25   can't talk to the opt-ins.  There are many things that are

1    frivolous.  Even their own expert, who is not an expert in

2    individual job analysis -- he does what they call traditional

3    job analysis; he does job analysis that looks at systems --

4    even he could not find fault with Dr. Banks for the kinds of

5    criticisms that they have leveled at Dr. Banks.

6           Her open-ended questions are cited in the Gulino v.

7    Board of Education case at 113 F.Supplement as more reliable

8    and less leading than a task list.  There is zero authority

9    cited by plaintiffs for the motion that you must have a task

10   list.

11          In short, the objections that they have raised to Dr.

12   Banks do not go to her qualifications.  She will help you, your

13   Honor, she is eminently qualified, as her peers have found, and

14   she has been doing this methodology since 1999.

15          Unless you have further questions, I will sit down.

16   Thank you.

17          MS. SHAVER:  Your Honor, 30 seconds of rebuttal,

18   please.

19          THE COURT:  Okay.

20          MS. SHAVER:  We don't argue that Dr. Banks isn't

21   qualified.  We argue that what she did here is not reliable.

22   It's a different point.

23          To the point that she has done individualized job

24   analyses in many, many instances, we asked her in her

25   deposition to please identify the litigations in which she has

1    used it as an expert witness.  She could identify two.

2         To the point that she is neither a defense nor

3    plaintiff's witness, we pulled an expert witness report for her

4    on Westlaw.  You heard them say she has been an expert witness

5    in over 80 cases.  Westlaw identified only 5 in which she

6    testified for the plaintiffs.

7         Finally, we don't lump everyone together.  We only try

8    to compare employees by function and by level.  So there is

9    nothing inconsistent in our criticisms of what Dr. Banks did.

10        Thank you.

11        THE COURT:  Thank you.

12        Next.

13        Mr. Paradis is also keeping time, so he will tell you

14   what we have.

15        THE LAW CLERK:  On my count, defendants have used 39

16   minutes and plaintiffs have used 53.

17        MS. KENNEY:  We are within 30 seconds.  That's fine.

18        THE LAW CLERK:  I was thinking of updating everyone at

19   an hour used and an hour and 10 used.  Does that make sense for

20   people?  I'll just raise my hand.

21        MR. LEVIN-GESUNDHEIT:  Thank you, your Honor.  My name

22   is Michael Levin-Gesundheit, for plaintiffs.  I will address

23   plaintiff's motion regarding Dr. Bloom.  I know time is short,

24   so I'll try to keep it to three minutes.

25        First, I would like to refer you back to the question

1    you asked about a potential regression by the subdivision of

2    cost center.  This really is about methodologies of aggregation

3    or population study.

4              MS. KENNEY:  Your Honor, I object.

5              THE COURT:  Tell me the objection.

6              MS. KENNEY:  They did not move at all on Dr. Bloom's

7    methodology.  They did not file a Daubert motion.

8              THE COURT:  I will decide on what was moved on in the

9    papers.  You may argue whatever you would like.

10             MR. LEVIN-GESUNDHEIT:  Thank you, I appreciate it.

11             That question was asked of my colleague Mr. Henderson.

12   What is important to note is that only one expert, Dr. Vekker

13   for plaintiffs, performed a regression using a subdivision of

14   KPMG below the functions of tax and advisory using a control

15   variable.  Use of a control variable is a standard method of

16   conducting a multivariable regression.  Dr. Bloom did not do

17   this.  And he did not use the lower subdivision of cost center

18   as a control variable in a regression as well.

19             If you look at slide 3 of the slides regarding the

20   Bloom motion, I have it here on the screen, we can see the

21   effect of Dr. Bloom's reliance on witness interviews outside

22   the discovery record to contradict contemporaneous company

23   policy documents produced in discovery showing the application

24   of policies at the function level.

25             KPMG relies on Dr. Bloom's factual recitation in an

1    attempt to defeat commonality.  Here we see Dr. Bloom divided

2    KPMG into 766 different slices of employees.  On this slide you

3    actually only see a portion of those slices.  There are many.

4    It would require five charts like this to show the 766

5    different slices.

6           It's important to know that even here a pattern of

7    discrimination is visible.  In most of these individual

8    analyses, the effect on women is negative, meaning they are

9    disadvantaged.  That is the coefficient in the second column

10   among the three for each job title.  And of the 76 analyses

11   that Dr. Bloom describes as statistically significant, in all

12   but two women are disadvantaged.

13          I know my time is limited, so I would like to move on

14   to plaintiffs' motion to strike Dr. Bloom's late-filed

15   supplemental declaration.  All I'll say about this as we turn

16   to the next slide is that your Honor ordered a very clear

17   expert discovery schedule with a cutoff of October 20, 2017.

18   The parties complied with that schedule.  Dr. Vekker was

19   deposed on that date.

20          Yet months later, in January 2018, Dr. Bloom provided

21   a late declaration with additional analyses that plaintiffs

22   have not been able to rebut, with no data file provided to

23   plaintiffs to evaluate what he did.  If you turn to the next

24   slide, you will see that even if it were on time, Dr. Bloom's

25   supplemental declaration is misleading.

1      Looking at the chart from the left, you will see that

2  in most of the columns there is no value provided, whether

3  negative or positive, to show what he actually analyzed.  You

4  don't see the gender effect.  There is just no number provided

5  at all.  And the few where he does tell us a direction, in 11,

6  in every single one the effect is negative.  That means in

7  every single one women are disadvantaged.

8      Knowing my time is limited, I'll step back now.  Thank

9  you.

10      THE COURT:  Thank you.

11      MS. KENNEY:  Your Honor, I know you are going to hear

12  it and I'm going to place the objection on the record.  If

13  there is going to be oral argument that strikes Dr. Bloom's

14  methodology, we should have known about it before 10 o'clock

15  this morning, when we got the slides.  It is entirely

16  inappropriate.  If you are going to hear that, your Honor, we

17  would request time to brief it and have a hearing on it.

18      What plaintiffs filed their motion on wasn't what you

19  just heard.  The second half was, but the first half had

20  nothing to do with what they filed their motion on.  What they

21  filed their motion on was to strike KPMG from using and

22  referring to certain statements in Dr. Bloom's report in KPMG's

23  papers, their motion to strike Dr. Vekker in fact, expert to

24  expert, and in KPMG's certification motion.

25      We have laid this out in the papers.  I don't know

1   that I need to go into a great deal of detail on it other than

2   to tell you that Dr. Bloom did not do anything improper.  Dr.

3   Bloom did the same thing that the plaintiffs' expert did.  He

4   incorporated his notes into his report as he went along.

5          There are slides in your binder, your Honor.  It is

6   clear what Dr. Bloom did.  He started with the facts and then

7   constructed a model; he didn't start with a model and go

8   looking for facts.  He read company documents.  He read

9   depositions.  He looked at KPMG's website.  Importantly, he

10  looked at the data itself.

11         He also spoke to KPMG representatives and had

12  questions.  That's entirely appropriate.  That's what experts

13  do.  That's what the Arista case cited by the plaintiff says.

14  It is entirely appropriate, uncontroversial.  Federal rule of

15  evidence 702 also allows it.

16         What you heard today was using this motion to strike

17  as a backhanded way to come after Dr. Bloom.  We have laid out

18  for you in our responsive papers the statement that plaintiffs

19  have attacked and said that KPMG should not be able to include

20  in its papers an independent record cite for that, sometimes

21  even in the same string.

22         I'm sorry.  703.  Did I say 702?  Federal rule of

23  evidence 703.  Thank you, your Honor.

24         Their claim that what Dr. Bloom said is contrary to

25  the record is just not true.  We have walked through the record

1  with your Honor.  Some of those statements are simply that

2  there are this many cost centers.  That comes from the

3  PeopleSoft data.  There is nothing improper about it.

4          It is really laid out well in the papers.  If you

5  don't have any questions, I'll move on to the second piece of

6  it.

7          THE COURT:  That's fine.

8          MS. KENNEY:  Look at footnotes 29, 30, 31, and 32 in

9  Dr. Bloom's report.  He did control by practice area.  He also

10  ran regressions by service line.  But he did, and he's got that

11  information in there for you, your Honor.  What happens when

12  you start getting to that level is that he didn't have

13  population sizes he was comfortable with.  I want to reiterate,

14  your Honor, many of his sample sizes were over a hundred and

15  many, many more of them were over 30.  Dr. Vekker never

16  criticizes that, never.

17         Let's talk about the declaration that Dr. Bloom

18  submitted.  It's in your binder I believe at Bloom 6.  You may

19  recall from prior briefing, your Honor, when we were before you

20  earlier this year, plaintiffs waited to add a control for

21  service line and for education.  And by the way, he never

22  controlled for both at the same time; he controlled for one and

23  then the other.  They waited until after Dr. Bloom had

24  submitted his report and had been deposed.  They clearly

25  thought KPMG wouldn't be able to say anything about it.

 1          His declaration wasn't done to supplement his own

 2   report.  It was to show your Honor that even if it had run

 3   regressions by service line instead of just controlling for

 4   them, that would have been the result of it, your Honor.

 5          When plaintiffs originally challenged Dr. Bloom's

 6   declaration, you deferred ruling on it, but you said that if

 7   Dr. Vekker had done this work, it seems to me we don't need Dr.

 8   Bloom.  You would be right.  If Dr. Vekker had looked to see,

 9   we would have those analyses.  But if he hasn't done this work,

10   then it is a more serious question.

11          The analysis that Dr. Bloom has provided seems to me

12   to be relevant.  Dr. Bloom didn't create new information or new

13   data.  He took what Dr. Vekker already provided to them.  If

14   plaintiffs had wanted additional copies of those data files, we

15   would have sent them to them.

16          It was only after Dr. Vekker in his deposition refused

17   to answer questions about whether he had performed additional

18   analysis that this came to a head, your Honor.  You recognized

19   that this declaration was relevant.  Plaintiffs are not

20   prejudiced by it.  And it is appropriate to allow KPMG to

21   include this analysis to show a response to what Dr. Vekker

22   waited to put in his reply.  Thank you.

23          THE COURT:  Thank you.

24          Who's next?

25          MR. HUGHES:  Thank you, your Honor.  Peter Hughes from

1   Ogletree Deakins, representing KPMG, arguing on KPMG's motion

2   to exclude Dr. Goldberg, who is an industrial-organizational

3   psychologist witness from the plaintiff.  I plan to be

4   relatively brief.  If you see a giant shepherd's hook come out

5   and grab me by the neck if I'm too long, I hope you will

6   understand.

7          Our position is laid out thoroughly in our papers.  I

8   would just like to address a few points, primarily those

9   brought up in the plaintiff's opposition and in the slide

10  presentation we are receiving today.  You may be happy or not,

11  I have no slides to show you right now.

12         Basically, the fundamental basis of KPMG's opinion on

13  Dr. Goldberg is that Dr. Goldberg went in and identified a

14  series of policies that she says KPMG has which she thinks are

15  contrary to good business practice.  She made no effort to

16  determine whether any of those policies had any impact on any

17  women, any group of women, any of the named plaintiffs, or any

18  of the opt-ins.

19         Equally important, to address the argument that

20  plaintiffs made that the expert doesn't have to show

21  everything, Dr. Vekker, the plaintiffs' statistician, did no

22  analysis of the impact of any of the particular policies that

23  Dr. Goldberg identified as problematic.  And the policies that

24  she did identify in her report and in her reply report are

25  simply forms of delegated discretion to the managers.

1          For example, she says that KPMG allows the business to

2     move people to the middle of the pay range.  She describes that

3     as meaning putting more money toward groups that are further

4     behind.  First of all, logically, since the plaintiffs'

5     underlying claims are that women were behind men in

6     compensation, it is hard to see how a policy like that would

7     have any impact.  But regardless of whether that makes sense or

8     not, your Honor, Dr. Vekker undertook no effort to determine

9     whether that in fact had any adverse effect on any person, or

10    any woman.

11         Similarly, she claims that in pay there are

12    overlapping pay increase ranges so that theoretically under the

13    policy somebody who got a 3 rating, which is the middle of the

14    firm's rating scale, potentially could get a higher percentage

15    increase in pay than somebody who was a 1 and was at the higher

16    end of the range.  Again no analysis undertaken to determine if

17    that ever was performed.

18         In promotion she describes the process as tap on the

19    shoulder.  The process she described is that people are not

20    informed how to get promoted, that jobs are not posted at KPMG

21    to allow people to post for them, and that in general there are

22    unspecified criteria for promotion.

23         I would note as a side note that the plaintiffs

24    describe this in their brief as a common policy of vague

25    criteria.  I don't know how one can have a common policy of

1   vague criteria.  At any rate, that is what Dr. Goldberg claims.

2   That was the sum total of her opinions on what the negative

3   practices were at KPMG.

4           What she said is that because there was such

5   subjectivity and because there were such low standards, it

6   creates a fertile ground for bias.  That was her opinion.  That

7   is exactly the same opinion that the expert in Wal-Mart v.

8   Dukes offered which the Supreme Court said could be disregarded

9   because it doesn't tell you anything about what happened to an

10  individual employee.  The fact that subjectivity was used and

11  there could possibly be bias doesn't tell you whether any

12  decision was made in a biased fashion.

13          In Wal-Mart the expert testified that he could not say

14  whether half a percent or 95 percent of the decisions were

15  based on a stereotypical thinking.  In our case Dr. Goldberg

16  admitted that she cannot tell whether 2 percent or 100 percent

17  or zero percent of the decisions that were made regarding women

18  at KPMG were biased.  That is exactly the same opinion that was

19  offered that was rejected by the Supreme Court.

20          The plaintiffs say in their brief Wal-Mart wasn't a

21  Daubert motion.  It wasn't a Daubert motion only because, as

22  the Supreme Court correctly pointed out, the district court in

23  that case did not believe that Daubert applied at the class

24  certification stage, which the Supreme Court in Wal-Mart

25  indicated was an incorrect decision.

 1          The plaintiffs also tried to distinguish what the

 2     experts said in Wal-Mart from what Dr. Goldberg said.  But she

 3     offered exactly the same opinion.  The expert in Wal-Mart

 4     examined the same policies.  He called it "tap on the

 5     shoulder."  He said there is no posting.  He said people are

 6     not told how to be promoted.

 7          Your Honor, I know you are not looking for any

 8     additional things to read, but if you want to see how closely

 9     Dr. Goldberg's opinion tracks with the expert in Wal-Mart, you

10     can read the district court decision where the certification

11     was granted.  That is Dukes v. Wal-Mart, 222 F.R.D. 137.  That

12     description is between pages 148 and 154.

13          It is exactly the same opinion and should be

14     disregarded in the same way.

15          Apparently in recognition that Dr. Goldberg's opinions

16     might not be that helpful in this case, the plaintiffs in their

17     reply brief on certification, and apparently in a slide they

18     are going to show your Honor today, have now come up and said

19     that Dr. Goldberg offered an opinion that KPMG bases salary on

20     prior salary and that somehow that is a negative practice.

21          Your Honor, there is a lot of paper in this file.  Dr.

22     Goldberg wrote a 26-page report and a 48-page reply report.

23     Nowhere in either of those reports does she say that KPMG uses

24     prior salary to set pay and nowhere does she say that that

25     would be a negative practice.  She offers no opinion on it at

1     all.  Her opinions are delegated discretion.

2              In fact, your Honor, I would point out that in the

3     course of her deposition I asked a question as to whether the

4     firm used prior salary, and she told me they do not.  What she

5     said is that KPMG uses market, they do market surveys to

6     determine what people should be paid, and that is how they set

7     the pay.

8              I asked her the question on page 114 of her deposition

9     beginning at line 9:

10    "Q. So when they are setting salary for the coming year,

11    they're using the market data, correct?

12    "A. Right.

13    "Q. So that what I made in 2017 to compare what I'm going to

14    get in 2018, correct?

15    "A. No, not what you made.  What the market says you are

16    worth."

17             Now the plaintiffs are trying to claim that Dr.

18    Goldberg said something completely different.

19             I would also point out they are trying to say on the

20    slide today that Dr. Goldberg's opinion, let me get the

21    phraseology correct, uses prior salary to set the salary and

22    pay ranges and computerized pay output that disregards current

23    performance.  That is directly contrary to what Dr. Goldberg

24    said in her deposition.

25             What she said in her deposition, your Honor, was that

1  performance ratings were already built into the market survey.

2  That also is from page 114 to page 116.  What she said is even

3  though when they go out and do the surveys, the market has a

4  rate for people that are high-level performers and there is a

5  rate for people that are next-level performers.  Nowhere in Dr.

6  Goldberg's report or deposition did she ever say that prior

7  salary was a key factor, was used at all, frankly.

8         Finally, your Honor, I would point out that the

9  plaintiffs' other effort to try to preserve Dr. Goldberg is to

10  say, well, even though she didn't look at what the impact was

11  and even though Dr. Vekker didn't look at what the impact of

12  any of these specific policies was, it's relevant to the

13  disparate impact analysis because if disparate impact is found,

14  then KPMG has the opportunity to raise a defense as to whether

15  the policies are job-related and necessitated by business

16  needs.

17         But that is, to use a cliché, your Honor, putting the

18  cart before the horse.  What the disparate impact analysis

19  requires is for the plaintiffs to show that a specific practice

20  causes the disparity.  They haven't made that effort.  They

21  have basically said here are some policies that Dr. Goldberg

22  thinks are a problem, and here is Dr. Vekker, he did an

23  analysis and he came up with this statistical model, and there

24  is no effort to connect the two things.

25         The disparate impact burden of proof according to the

1    Supreme Court is that the plaintiff is responsible for

2    isolating and identifying the specific employment practices

3    that are allegedly responsible for any observed statistical

4    disparities.

5         If the plaintiff were to make that, if they were to

6    show that move to the middle has a disparate effect, then and

7    only then would the burden shift to the defendant to come

8    forward and say yes, we know this, yes, this is what causes the

9    problem, this is why do that, this is why it is important.

10   They haven't done the first step so they don't get to the

11   second step.

12        They cited <u>Chen-Oster</u> for this.  But as I my colleague

13   Ms. Kenney pointed out last week, in <u>Chen-Oster</u> the experts had

14   actually made a connection between the specific practices at

15   Goldman Sachs, the quartiling process and the 360 degree, and

16   showed that those have statistically significant effect;

17   therefore, it was appropriate, I guess, for the court to say

18   Goldman Sachs' defense to that could be common across the

19   class.

20        If your Honor has any questions, I'm happy to answer

21   them.  If not, I'll be equally happy to sit down.  Thank you.

22        THE COURT:  Thank you.

23        MS. GEMAN:  Good afternoon, your Honor.  Rachel Geman

24   for the plaintiffs.

25        THE COURT:  Good afternoon.

 1            MS. GEMAN:  If your Honor wouldn't mind referring to

 2   the binder that has the section of Dr. Goldberg.  KPMG does not

 3   challenge Dr. Goldberg's qualifications.  I want to correct.  I

 4   think I heard Mr. Hughes say that she is an I-O psychologist.

 5   She is actually a professor of management.  She has taught in

 6   psychology departments, but there was just a misstatement of

 7   her degree.  She has taught for two decades.  She has taught

 8   compensation, I-O psychology, management, etc.

 9            Nor is her methodology questioned in this case.

10   Instead, we only heard about purported relevance.  There was a

11   lot in that discussion that was factually and legally

12   incorrect.

13            As reflected in slide 3, Dr. Goldberg's opinions are

14   relevant for rule 23.  Her criticisms show common infirmities

15   not with some vague, floating policies but with the exact

16   challenged systems in this case, pay and promotion.  This is

17   relevant, as other courts in this district have held, both to

18   commonality and to the defense of business necessity.  I will

19   quote from the Chen-Oster case.  "Expert evidence that

20   addresses the reliability of the employer's evaluation goes to

21   the business necessity defense and is relevant at the class

22   certification stage to the question of commonality."

23            I want to talk about the facts in Chen-Oster and not

24   just the legal holding, because it is very similar to here.  In

25   Chen-Oster the expert looked at one of the systems plaintiffs

1    criticized, forced ranking, the equivalent to pay or promotion

2    here.  It was a challenged system.  The expert said here are

3    among the things that are wrong with forced ranking:  The use

4    of potential as a criterion, the fact that in a teamwork

5    structure creating these artificial distributions is

6    problematic.

7         The labor economist, the equivalent to Dr. Vekker

8    here, then looked at the effect of forced ranking on pay.  This

9    is a made-up requirement, this notion that he had to somehow

10   try to quantify how the company used potential or how the

11   forced ranking inherently exacerbates people.  The job of the

12   labor economist is to do statistics based on policies, in that

13   case the ranking.

14        THE COURT:  I think I'm missing something here.  As I

15   understand it, what the defendants are saying is that there is

16   nobody on your side who showed a causal connection between

17   these policies and disparate impact.

18        MS. GEMAN:  I understand.

19        THE COURT:  You're saying something different.  What's

20   different?

21        MS. GEMAN:  Yes.  Just as in Chen-Oster, we had an

22   organizational expert identify infirmities with unquestionably

23   common policies: for example, in this case the pay set.

24        THE COURT:  I understand.

25        MS. GEMAN:  In the case of Chen-Oster, an aspect of

 1    the evaluation system.  In both cases the organizational expert

 2    made particularized criticisms --

 3              THE COURT:  Of the policies.

 4              MS. GEMAN:  -- of the specific policies.  For example,

 5    Dr. Goldberg talked about structural mechanisms that separate

 6    pay from performance.  She talked about in promotions how

 7    eligibility to go up one level was based on criteria for two

 8    levels up.  These are common infirmities.

 9              There are analogous infirmities identified in

10    Chen-Oster.  We don't need to go into them.  The point is the

11    statistical analysis both in our case and in Chen-Oster looked

12    at the effects of the policies -- pay, evaluation -- and that

13    allows us to make an inference of causation.

14              THE COURT:  Did Dr. Vekker look at the effects of the

15    policies?  The only reason I ask is because I just heard from

16    the defendants that he didn't.

17              MS. GEMAN:  Yes, and that was a misstatement.  What

18    they are trying to say is something very different than looking

19    at the effect of the policies.  Dr. Vekker absolutely did look

20    at pay, he looked at promotion.  We talked earlier about all

21    the variables, and so forth, that made it a precise and

22    appropriate analysis.

23              What KPMG is saying without really quite saying it,

24    but just to come clean with what they are arguing, what they

25    are arguing is a made-up rule.  The notion that regardless of

1   whether there is any data, Dr. Vekker should have somehow gone

2   even further than showing that women were statistically and

3   adversely disadvantaged by pay and promotion, that he had to do

4   a special mix-and-match with every microlevel criticism.  But

5   that is not the law.

6          THE COURT:  Just so I understand, what you are saying

7   is that if you have these policies that are disadvantageous and

8   that if you show on the other hand that women were

9   disadvantaged, one can draw an inference, and that you don't

10  have to show beyond that the connection between the policies

11  and the disparate treatment.  Is that right?

12         MS. GEMAN:  I might rephrase it to say under rule 23,

13  under substantial case law, that is the connection.  It is not

14  some made-up other connection.

15         THE COURT:  Okay.

16         MS. GEMAN:  The business necessity.  It may be your

17  Honor might say I'm not at business necessity yet.  But for all

18  of this, we are looking at does common evidence drive answers.

19  The question of business necessity is front and center.  It's

20  also relevant for the EPA because you look at whether there are

21  justifications.

22         Let's briefly revisit Dr. Goldberg's key opinions on

23  slide 4.  I won't belabor this because we did this last week.

24  She talks about how outcomes are untethered to performance.

25  KPMG concedes that women perform as well as men.  That's kind

1   of a problem because you are not paying them the way you're

2   paying the men.

3          Dr. Goldberg spoke with great specificity after a very

4   substantial review of documents to discuss the pay-setting tool

5   that uses past pay as a beginning.  I don't understand where it

6   came from.  She didn't talk about that.  She spoke in great

7   detail about the entire setting.  I would read from her opening

8   report on page 12 where, for example, she discusses not only

9   the pay system but how early disparities exacerbate later pay.

10          The immediate context is overlap in ranges.  Dr.

11   Goldberg's report is not that long.  Obviously, your Honor will

12   read it.  I do just note that this notion that the

13   recursiveness of the pay system was not at issue in this case

14   for many months is simply false.

15          So, we have Dr. Goldberg's key opinions.  Many of

16   these are similar to systems that have been found suitable for

17   class cert. in other cases.  The tap-on-the-shoulder promotions

18   under these facts is similar, in fact even more structured than

19   Ellis v. Cosco.  The issues with the relationship between

20   performance and pay, that is at issue in Chen-Oster.

21          So her opinions are relevant.  I would like to speak

22   very briefly about the arguments that they are not.  I will,

23   however, talk about her opinions against the larger context.

24          Defendants seem to think that there was some sort of

25   gotcha by the fact that the whole case is not resting on Dr.

Goldberg's shoulders.  Of course it's not.  Her role is very

important, but it is not her role to demonstrate some mythical

level of causation that the law does not require.  Her job is

identifying common infirmities to pay and promotion, and then

the statistics test them.

To this question that Dr. Goldberg cannot show that

the alleged policies have a negative impact on female employees

or to say that this notion as reflected on page 6 that they

haven't been applied to the class is demonstrably false, she

said repeatedly that the policies apply to everyone.

I would note, your Honor, that this is the same

argument we saw in Chen-Oster, this exact proffered view of

causation that isn't correct.  Page 78 shows some sample

colloquies at deposition that put this into context.  I won't

go through that.

Mr. Hughes mentioned that he thought that Dr. Goldberg

had misunderstood the relationship of pay-setting.  That is

absolutely not correct.  I would refer your Honor to the same

pages he referred to, 110 through 125, where she discusses how

notwithstanding KPMG's effort to say that there should be

different pay systems in different groups, that in fact the

common system takes into account aspects of the market.  At

some point she quoted a witness and she did so accurately.

Much of this stuff goes to weight.  The bottom line is

that there is no question that Dr. Goldberg is qualified and

1    criticized common pay systems.

2           THE COURT:  Plaintiffs have three minutes left.  I

3    don't know if you are using all of the remaining three minutes.

4           MS. GEMAN:  Three minutes left?

5           MS. DERMODY:  Your Honor, we got the 60-minute sign.

6    I thought we had 80 minutes per side.

7           THE COURT:  He needs to explain this because he is

8    keeping the time.

9           THE LAW CLERK:  I'm sorry.  It's 13 minutes.

10          MS. GEMAN:  Unless your Honor has questions, thank

11   you.

12          THE COURT:  Thank you.

13          MS. KENNEY:  Your Honor, we agree with the revised

14   time.

15          THE COURT:  That's fine.

16          MR. HUGHES:  Your Honor, if I may very briefly

17   respond.  I would say that Ms. Geman's opposition proves my

18   point.  She cites to Chen-Oster.  In Chen-Oster they cited a

19   specific practice, forced ranking.  The statistical expert

20   looked at the effect of forced ranking and determined that that

21   forced ranking caused a statistically significant effect.

22          That's not here, where plaintiffs are saying we're

23   looking at the pay system or we're looking at the promotion

24   system.  The Second Circuit has said you can't just wave

25   generally to the hiring process or the promotion process and

1    say that is a practice.  I would come back that.  I think your

2    Honor understands this.  Simply Dr. Vekker looking in isolation

3    at some statistics and Dr. Goldberg saying these are these

4    policies, that is the logical fallacy of post hoc ergo procter

5    hoc: because the cock crowed, the sun came up.  That is

6    essentially what Dr. Goldberg has said.

7              Thank you.

8              MS. ZEGEYEV:  Good afternoon, your Honor.  Tiseme

9    Zegeyev for the plaintiffs.

10             Plaintiffs move to exclude two opinions proffered by

11   KPMG's expert Dr. Margaret Stockdale.  First, plaintiffs seek

12   to strike as unreliable Dr. Stockdale's opinion on the utility

13   of codes of conduct.  This opinion is based on one source,

14   which does not support Dr. Stockdale's conclusion that written

15   codes of conduct impact actual practices.  This article, as

16   admitted by Dr. Stockdale in her deposition, makes the point

17   twice that its purpose is to identify practices, ethics,

18   education, and training, and not to validate the effectiveness

19   of best practices.

20             Additionally, in her deposition Dr. Stockdale admitted

21   that she has never even studied whether codes of conduct are

22   effective at affecting behavior at a company.  Because Dr.

23   Stockdale has no knowledge of the utility of codes of conduct

24   on the actual practices at the company and because she cites no

25   authority to support her conclusion, her opinion should be

1    stricken as unreliable speculation.

2            Second, plaintiffs seek to strike Dr. Stockdale's

3    opinion on KPMG's work environment survey, which is KPMG's

4    annual employee attitude survey.  This opinion should be

5    stricken as both unreliable and unhelpful to the trier of fact

6    because here Dr. Stockdale has merely adopted the defendant

7    KPMG's analysis.

8            Dr. Stockdale, despite being the expert put forth by

9    KPMG, did not conduct her own analysis but merely is a conduit

10   for KPMG's work environment survey analysis conducted by one of

11   its employees.  She did not independently assess the

12   reliability or the validity of the data.  She didn't even have

13   the data.  She didn't ask KPMG what the validity and

14   reliability results actually were, what the figures were, and

15   she didn't know what dataset the tests were run on.

16           Because Dr. Stockdale's opinion on the work

17   environment survey is merely a restatement of a party, here the

18   defendant's view, and is not the product of an independent

19   analysis, plaintiffs respectfully request that it be stricken

20   as both unreliable and unhelpful to the trier of fact.

21           Thank you, your Honor.

22           THE COURT:  Thank you.

23           MR. HUGHES:  Your Honor, I would respond very briefly

24   to this.  Regarding the opinion number 1, the plaintiffs are

25   moving to strike opinion number 1 of Dr. Stockdale.  They claim

1    in their motion and apparently here that Dr. Stockdale's

2    opinion is that having a code of conduct prevents

3    discrimination.

4          That is not what Dr. Stockdale's opinion number 1 is.

5    This is in her report.  I will not take time reading it, but it

6    is a fulsome opinion in which the code of conduct plays a part

7    but is not the entirety of it.

8          Additionally, as we pointed out in our papers -- I

9    thought I had a slide, your Honor, and there it is -- her

10   opinion was that KPMG's code of conduct program and its ethics

11   and compliance program are the opposite of what Dr. Goldberg

12   claimed was an overarching policy of discrimination.  She also

13   opined that the system and all of its elements worked to

14   prevent discrimination.

15         She cited 11 separate authorities that are recognized,

16   none of which have been challenged by the plaintiffs other than

17   this Sekurka one which I will come to.  Dr. Stockdale went

18   through each of these elements to show the code of conduct is a

19   part of this program, it is not the entirety of the program.

20   Dr. Stockdale never claimed that it was.

21         Regarding the Sekurka article, as we pointed out in

22   our papers, your Honor, the Sekurka article comprised two

23   parts.  Part of it was to identify best practices that had been

24   identified by researchers in the field.  A best practice was

25   something that was identified as a practice that had a positive

1    effect in the workplace.  Having a code of conduct was among

2    the items that were found to be a best practice in that area.

3        The second part of the plaintiffs' argument, I don't

4    know if your Honor has any questions on that.  It is a straw

5    man.  It is an argument to knock down an opinion that Dr.

6    Stockdale did not assert.

7        THE COURT:  Okay.

8        MR. HUGHES:  Regarding the second part, the work

9    environment surveys, the doctor looked at those.  She put in

10    her report that is a tool that industrial and organizational

11    psychologists look at to gauge employee opinions and feedback

12    on programs that employers were putting forth, and they are

13    used for a business purpose.  That is the common use for them

14    by someone in her area of expertise.  In addition, KPMG uses

15    these.  Tori Farmer in her declaration paragraphs 21 and 22

16    testified about the manner in which KPMG uses these work

17    environment surveys.

18        Dr. Stockdale received these reports.  The individual

19    who was in charge of the work environment surveys at KPMG is

20    another Ph.D. in industrial and organizational psychology, Dr.

21    Steven Katzman.  Dr. Katzman oversees the practices.  Dr.

22    Katzman has regularly done the validation studies on those work

23    environment surveys.  He is of the same expertise as Dr.

24    Stockdale.

25        Dr. Stockdale, based on his expertise and conducting

1   of the validation studies as well as her own familiarity with

2   these types of surveys, concluded that that was appropriate

3   data that she could use for her opinion in this case.  It is

4   not merely a lay issue.  This was a survey that was conducted,

5   a feedback from employees.  It is not hearsay.  It was entirely

6   appropriate to rely upon.

7        The cases cited by plaintiff in their brief are

8   inapposite.  Specifically, the one they rely upon is the <u>Dooney</u>

9   <u>& Bourke</u> case.  That proves our point.  In the <u>Dooney & Bourke</u>

10  case the court said that an expert could not rely on a

11  regression analysis performed by another expert where the

12  testifying expert didn't have the expertise either to conduct a

13  regression analysis or to interpret regression analysis.  But

14  the court in that same case said if the expert testifying and

15  the expert validating the data, conducting the study, were the

16  same, that would be admissible.

17       Again, there is no basis to exclude any portion of Dr.

18  Stockdale's opinion.  I don't know if your Honor has any

19  questions.  Thank you.

20       THE COURT:  Is there anything else?

21       MS. LAZERSON:  There is, your Honor: our motion to

22  exclude Dr. Hanges.

23       MS. KENNEY:  Could we have the official time?

24       THE LAW CLERK:  I have 103 for defendants and 109 for

25  plaintiffs.

 1               MS. LAZERSON:  I am going to be brief because this is

 2     quite simple, your Honor.

 3               THE COURT:  All right.

 4               MS. LAZERSON:  Dr. Hanges' opinions are not relevant

 5     and they will not help you for the very simple reason that he

 6     did one kind of study that may be wonderful and appropriate for

 7     finding commonality for job title analysis, but it does not

 8     relate at all to the relevant issue of the day here, which is

 9     what do these people actually do.

10               We can only turn to his own words for you to see that

11     what he said was a job analysis: the purpose of it is to look

12     for a common core, to cluster individuals into job titles, and

13     that you try to get a comprehensive list of various activities

14     performed by people in the job title and you look for

15     commonalities.  That is at his deposition 44 lines 18 through

16     45/9.

17               He admits that when he does such an analysis he treats

18     differences as error.  So he doesn't even consider the

19     differences.  That is at his deposition at 58/13 through 59/10.

20               THE COURT:  I think you are about out of time, so you

21     need to wrap up.  How much?  I'm sorry.

22               MS. KENNEY:  We have 17 minutes, your Honor.

23               THE COURT:  17, okay.  I misheard.

24               MS. LAZERSON:  Here he specifically did not look at

25     the responses that these individual employees in the study

1    gave.  He said, "I had access to their individual descriptions

2    of what they did but I scanned them.  To tell you the truth.  I

3    did not read them."  That's at his deposition eight page 65/23

4    through 66 line 8.

5           How can he be helpful to you when he did not even look

6    to see what these people actually do?  What you have said, your

7    Honor, is the facts matter.  And what matters here is whether

8    these people are doing equal work.

9           What he did look at he didn't even look at all of it.

10   He looked at 15 of 94 questions, 14 in advisory, 14 of 94

11   questions for the tax interviewees.  He did not conduct his own

12   interviews.  He could have done that.

13          And he did not do any of his own analysis of the

14   responses.  Basically, what he did was he generalized to the

15   point of abstraction.  For example, he says there are

16   commonalities, people all do the same thing because they all

17   had training.  But he doesn't look at what kind of training.

18   They all work on projects.  What are they doing, what kind of

19   projects?  It is so abstract as to not be helpful.  It is

20   apples and oranges.

21          I do not want to take anything away from Dr. Hanges

22   when he does what he calls traditional job analysis, but we are

23   not talking about traditional job analysis here.  What we are

24   talking about is what do these people actually do, because that

25   is the relevant issue of the day.

1          Do you have any questions, your Honor?

2          THE COURT:  I don't.

3          MS. LAZERSON:  Thank you.

4          MS. STEWART:  Good afternoon, your Honor.  Aimee

5    Stewart for the plaintiffs.

6          THE COURT:  Good afternoon.

7          MS. STEWART:  As you heard, Dr. Hanges looked at Dr.

8    Banks's underlying data and her opinions about what the

9    underlying data shows, and he concludes that her methodology is

10   flawed in design for many of the reasons my colleague Ms.

11   Shaver just explained.  He shows that when looked at properly,

12   the data reveals a meaningful structure in employee task and

13   work behaviors and that structure is encapsulated in the job

14   titles and functions that KPMG has established.

15         Like all of the other motions here today, this motion

16   is about the weight of his testimony.  His argument is

17   undeniably relevant and important to this litigation for two

18   reasons.  The first is, if you turn to the first slide, for all

19   of the reasons my colleague Ms. Shaver just mentioned.  He

20   illustrates how Dr. Banks's analysis is flawed.  She did not

21   even follow her own individualized job analysis study

22   technique.

23         He also had a number of additional concerns about her

24   study, but found together those concerns and her flawed

25   methodology determined that her analysis led to the false

1    conclusion of unique and nonoverlapping jobs.

2            When Dr. Hanges looked at Dr. Banks's underlying data

3    and he looked at all of the data that she coded, your Honor, he

4    found a pattern in the responses.  He found a meaningful

5    relationship, and he evaluated that pattern with a statistical

6    analysis.  That notably starts with the hypothesis that there

7    is no relationship among the group of responses.  He was able

8    to reject that hypothesis in the results that he reported out.

9            On pages 42 and 43 of his deposition he testified that

10   his analysis looks to see if there is a common core, but it

11   does not force a common core.  And when he looked for a common

12   core in this case, he found it.

13           He found that associates in tax responded similarly to

14   these questions as other associates in tax, senior associates

15   in advisory responded similarly to these questions as other

16   senior associates in advisory, and so on.  The variation that

17   he found was not error.  What he did is he looked, and when he

18   found a cluster, he treated the cluster appropriately and

19   appropriately treated outliers as such.

20           As you heard, your Honor, these are the factors that

21   Dr. Vekker included in his analysis.  He controlled for job

22   title and function.  Dr. Hanges shows that the pattern he found

23   mirrors that structure, function and job title.  There are

24   clear clusters indicating that people within these groups have

25   similar requirements for their jobs.

1          If you have no other questions, your Honor, because he

2    is relevant to show why Dr. Banks's opinions should be excluded

3    or, if not excluded, given little weight.  And because he

4    provides that common evidence that goes to the merits, the

5    Court should deny this motion.

6          Thank you.

7          THE COURT:  Thank you.

8          MS. LAZERSON:  Your Honor, I have six minutes.  I

9    won't take them all.  I do have a couple of things to say.

10          THE COURT:  All right.

11          MS. LAZERSON:  My first point is this is not about the

12   merits, about the weight.  This is about the fact that their

13   expert didn't look at the data.  You will note that counsel

14   conveniently said he looked at all the coded data.  Then there

15   is this body of uncoded data where people actually said what

16   they do every day.  He didn't look at it.  As I said to you, he

17   scanned it, he didn't read it.  How can you give an opinion

18   when you haven't looked at the data?  It's not relevant.  So

19   this isn't about the weight.

20          Again generalities: they cluster; yes, they all get

21   training; yes, they all work on projects.  That's meaningless.

22   It is not going to be helpful.  It is not relevant.

23          I thought I heard counsel say something when she was

24   responding to something about Dr. Banks, but I want to make

25   sure.  I believe that counsel in the portion of the hearing

 1   transcript that I quoted said something that indicated that Dr.

 2   Hanges is not just being used as a rebuttal witness but he is

 3   going to give affirmative opinions about work being similar.

 4   That would be completely inappropriate.  I want to make sure

 5   that that point is clear, that that would be inappropriate.

 6              Thank you, your Honor.

 7              THE COURT:  Is that everything?

 8              MS. MUETING:  Could we get a check on time?  There are

 9   a couple of evidentiary things we want to address.

10              THE LAW CLERK:  You have about eight minutes left.

11              MS. KENNEY:  We have six.

12              MS. MUETING:  I have a couple of minutes.  May it

13   please the Court.  Briefly I want to touch on plaintiffs'

14   motion to strike three of KPMG's exhibit.  This was submitted

15   on July 6th along with the proposed order.

16              First, plaintiffs have moved to strike KPMG's

17   exhibit consisting of a compilation of experts from the opt-in

18   plaintiff résumés as it violates this Court's order at docket

19   724.  This order was issued in February, after KPMG moved after

20   reviewing plaintiffs' exhibits filed in conjunction with our

21   motion for class certification.

22              KPMG saw that we had filed a compilation exhibit

23   consisting of the opt-in plaintiffs discussing their job duties

24   in their interrogatory responses, and KPMG moved to strike

25   that.  The Court agreed and issued that order at docket 724,

1   stating "Exhibits shall not include excerpts."  Exhibit 2,

2   however --

3          THE COURT:  You have to slow down for the court

4   reporter.

5          MS. MUETING:  Certainly, your Honor.  Exhibit 2 that

6   KPMG filed is a compilation of experts from the opt-in

7   plaintiffs' résumés.  KPMG is seeking an unfair advantage here

8   by doing the very same thing it prevented plaintiffs from

9   doing.  Plaintiffs withdrew their exhibit and revised their

10  class certification brief accordingly.  Therefore, Exhibit 2

11  from KPMG's opposition should be stricken.

12         Second, very briefly, plaintiffs move to strike

13  portions of KPMG's declaration of Joseph Kovach.  That's

14  Exhibit 6.  In paragraphs 5 and 6 of his declaration, KPMG

15  purports to assert the number of people management leaders or

16  alleged number of decision-makers.  Plaintiff asked KPMG to

17  provide a basis for these figures.

18         KPMG first said that one of the figures in there was

19  wrong, also asserted the day before our brief was due that we

20  talked about 1100 opt-in plaintiffs and try to add up the

21  numbers that way.  Ultimately, KPMG said that you can rely on

22  the PeopleSoft data and a spreadsheet that she provided to us

23  the day before our brief or day of our reply brief being due.

24         Your Honor, the figures in his declaration are not

25  based on anything before the Court and not based on things that

1   were produced to plaintiffs in discovery, and therefore should

2   be stricken to avoid unfair prejudice.

3           Third and finally, your Honor, and I think this is the

4   most important, plaintiffs have moved to strike the newly

5   disclosed organizational charts that you saw blown up there

6   last week.  These demonstratives were created solely for

7   purposes of this argument.  They were not produced in

8   discovery.

9           More importantly, they contradict the organizational

10  charts that were produced in discovery.  They contained 160

11  subgroups, 160 boxes that were not contained in the

12  organizational charts that KPMG produced in discovery.  We have

13  no way of assessing if these 160 subgroups are things that have

14  any meaning at the firm, that they are actually used in any

15  way.  We can't challenge that because we got them for the first

16  time when KPMG filed its opposition brief.

17          Your Honor, this is really consistent with an overall

18  practice that you have heard over and over today of KPMG trying

19  to discredit what it said previously in this case and what it

20  produced in discovery, like their compensation policy

21  documents, instead relying on declarations; like their job

22  descriptions and role descriptions, instead relying on

23  interviews from Dr. Banks or Dr. Bloom; and trying to

24  discredits own organizational chart that it produced in

25  discovery, instead relying on newly created for the purposes of

1   this argument.

2          This is substantially prejudicial to plaintiffs.  They

3   relied on it substantially, and that reliance is prejudicial.

4   Those organizational charts, those demonstratives, should be

5   also stricken from the record.

6          Thank you.

7          THE COURT:  Thank you.

8          MS. KENNEY:  Your Honor, you might recall that KPMG

9   moved to strike what attorney Ms. Mueting did in the

10  declaration when they refiled their certification papers.

11  Instead of submitting additional documents that set forth the

12  same thing from 187 declarations, in an attorney declaration

13  they said 187 declarants said the following thing: I do the

14  same work as men in my same service line and function.

15         At the hearing, your Honor, when you denied our motion

16  to strike that as just, in effect, the same thing they had done

17  before, plaintiffs said that's a rule 106 compilation.  And I

18  said, your Honor, if you're going to let them do that, then we

19  will need to do something of the same sort.  You said, like

20  what?  And I said, like résumés, which shows what people really

21  do.

22         Unfortunately, there isn't a transcript of that

23  hearing, but I'm hoping that you recall that.  We told the

24  plaintiffs that we had to be able to respond to that.  We told

25  the Court that.  It's easy to say everybody does the same

1    thing; it's much harder to show you the detail.  I would urge

2    you not to strike that.

3           For Dr. Kovach, what counsel didn't tell you is the

4    Friday before the 4th of July, after having had the papers for

5    9 weeks, plaintiffs did ask us some questions and we provided

6    them answers.  Your Honor, I have emails between one of my

7    colleagues that explains what happens and how Mr. Kovach came

8    up with his numbers.  To make things even easier for the

9    plaintiffs as it came to opt-ins, and I have a copy for your

10   Honor, we provided them with a detailed spreadsheet that gave

11   them the employee ID of every opt-in and who their PML was so

12   they could themselves check it.

13          Finally, your Honor, as to the org chart, there is no

14   great secret here.  First of all, it's a demonstrative.  Second

15   of all, it comes from the PeopleSoft data.  Plaintiffs don't

16   only know that those exist, they know how many people were

17   employed in each of them every year.  Dr. Vekker has all that

18   information.

19          There is nothing secret about that.  PeopleSoft data

20   was produced in discovery.  To the extent that it is different

21   from a chart that was, by the way, also a demonstrative and not

22   a KPMG org chart, in 2013 or perhaps it was early 2014, it's

23   not surprising.  This chart went down another level.  It's not

24   surprising that there are going to be some differences.  In any

25   event, plaintiffs have had that data for years, and there is

1    nothing prejudicial about it.

2              Thank you, your Honor.

3              THE COURT:  Thank you.

4              MS. DERMODY:  Good afternoon, your Honor.  Kelly

5    Dermody for the plaintiffs.  Very, very briefly.  This has come

6    up a few times today.  As a closing commentary about the

7    standard of admissibility for various types of evidence at rule

8    23, I know the Court and all the parties share a common desire

9    to get this right, to protect the Court's record whichever way

10   it goes on the motions.

11             The Second Circuit hasn't been all that helpful in

12   clarifying that.  I would suggest that the court in the Ninth

13   Circuit in May of this year in the Sali v. Corona case actually

14   addressed the question of the admissibility of expert evidence

15   versus record evidence and found or held that expert evidence

16   should be admitted under the Daubert standard while record

17   evidence need not be admissible, need not be subject to the

18   rules of evidence at rule 23 to be acceptable to show rule 23

19   factors.  That is not the Second Circuit, but I think generally

20   the district courts in the Second Circuit have been following

21   the admissibility part of that, the Daubert part of it.

22             THE COURT:  May I have a citation to the Ninth Circuit

23   case?

24             MS. LAZERSON:  Yes, your Honor.  If I can pull it up

25   in a moment.  I don't have it right in front of me.

1          THE COURT:  That's fine.  If you don't have it handy,

2    you can put it in a letter and file it on ECF.

3          MS. DERMODY:  Yes, your Honor, I'll do that.  In this

4    district the Flores case, 284 F.R.D. at 124, note 3, and

5    Spencer v. No Parking Today, also Southern District, which is

6    Westlaw citation 2013 Westlaw 1040052, *1 note 5, are both

7    talking about the admissibility of evidence.  Not experts, but

8    just looking at a rule 23 record and whether it has to meet the

9    federal rules of evidence standard, and they believe you do

10   not.

11         What is important here from our perspective is that if

12   the Court is considering objections to the scientific method,

13   we think it would be appropriate for the Court to at least look

14   at Daubert.  But we don't think the Court needs to apply that

15   standard for the factual record in understanding whether there

16   is common evidence to meet the rule 23 threshold here.

17         Finally, the overarching theme is that we are not at a

18   merits determination.  If, for example, your Honor thought

19   there were very good presentations by the experts on both

20   sides, the Court doesn't have to decide which expert is right.

21   What the Court is charged with is figuring out is there common

22   evidence to go to the merits stage.  It could be that the

23   plaintiffs get to the merits stage and they fail on a class

24   basis.  But the Court's job here isn't to understand whether or

25   not we have proven an actual violation of the law.

 1            With that, your Honor, we appreciate your time.  You

 2   have given us a lot of it.  Thank you for that.

 3            THE COURT:  Thank you.

 4            Any responses to the legal issue?

 5            MS. KENNEY:  Your Honor, we will address the legal

 6   issue when we see the cites.  This, of course, was not

 7   presented to us, and we were not told that they were going to

 8   do this, once again.  I will say that you don't have to decide

 9   the merits, but you have to decide whether they can meet their

10   burden on commonality.  I don't want to bore your Honor.  They

11   can't do that and they certainly can't do it with common

12   evidence.  I am not going to repeat what I said, so I will say

13   thank you very much for your patience, your Honor.

14            THE COURT:  Thank you, everyone, for your patience as

15   well.  I look forward to digging into this.  I'll make one

16   comment.  This is the first time I've done this exactly this

17   way.  The papers were so voluminous that I thought it would be

18   helpful to have an introduction, as it were, from the lawyers

19   as opposed to the kind of oral argument you have at the end.

20   This has been an excellent introduction, I think very helpful.

21   Thank you to all of you.  I know it has been a lot of work.

22            (Adjourned)

23

24

25