## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DONNA KASSMAN, SPARKLE PATTERSON, JEANETTE POTTER, ASHWINI VASUDEVA, TINA BUTLER, CHERYL CHARITY, HEATHER INMAN, NANCY JONES AND CAROL MURRAY, *et al*., individually and on behalf of a class of similarly-situated female employees, | : : : : : : : : : | Hon. Lorna G. Schofield Case No. 11-cv-03743 (LGS) *Civil Action* |
| Plaintiffs, | : : | |
| v. | : : | |
| KPMG LLP, | : : | |
| Defendant. | : | |

# KPMG LLP'S MEMORANDUM OF LAW OPPOSING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER RULE 23 AND FINAL CERTIFICATION OF THE EQUAL PAY ACT COLLECTIVE

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ............................................................................................. 1

**FACTS** ............................................................................................................... 4

   **I.**   **Diversity of Job Skills, Duties, Responsibilities, Effort and Working Conditions**...... 5

      A.   KPMG's Practice Areas and Job Diversity.................................................... 5

      B.   Plaintiffs and Comparator Testimony Confirm These Differences ................................ 8

   **II.**   **Decentralized Performance Assessment, Promotion, and Pay Determinations**........ 10

      A.   Assessment Meetings Are Done by Practice Area and Sometimes Geography ........... 10

      B.   Promotion Decisions Are Decentralized and Not Based on Gender ........................... 12

      C.   Compensation Decisions Are Decentralized and Not Based on Gender ..................... 13

      D.   Hiring and Office/Work Assignment Decisions are Decentralized............................. 14

      E.   Numerous Plaintiffs Admitted KPMG Did Not Discriminate Against Them in Their Pay or Promotions, or Had No Evidence of Discrimination......................................... 15

      F.   Expert Testimony Corroborates the Lack of Systemic Discrimination ....................... 16

   **III.**   **KPMG's Commitment to Equality, Ethics, Inclusion and Diversity** ..................... 16

      A.   KPMG's EEO and Ethics Policies, and Inclusion & Diversity Training .................... 17

      B.   Inclusion & Diversity Structures and Generous Work-Life Balance Benefits ............. 19

      C.   KPMG's Inclusion and Diversity Monitoring ................................................. 20

      D.   External Recognition of KPMG's Efforts........................................................ 21

      E.   Plaintiffs' Limited and Sensationalized Anecdotes Are Not Representative of Women's Experiences or the Seriousness with Which KPMG Treats Complaints...... 22

**ARGUMENT** ................................................................................................... 25

   **I.**   **Legal Standards for Trial of Disparate Treatment and Disparate Impact Claims**................................................................................................ 25

   **II.**   **Plaintiffs Fail to Meet Their Burden of Proving Compliance with Rule 23** ............. 27

      A.   Plaintiffs Fail to Prove Commonality Under Rule 23(a)(2) for Their Title VII Claims ............................................................................ 27

          1.   Plaintiffs' Title VII Disparate Impact Claim Does Not Satisfy Commonality ................................................................................. 29

             a.   Plaintiffs Fail to Identify a Specific Employment Practice or Policy.................. 29

                i.   Plaintiffs Attack KPMG's Entire Subjective Pay and Promotion Processes .......................................................... 29

                ii.   Dr. Goldberg's "Fertile Ground for Bias" Theory and Critiques of KPMG's HR Practices Challenge Discretion and Do Not Prove Any "Specific Practice"........................................................................ 32

                iii.   *Chen-Oster* Is a Case-in-Point as to Why This Case Cannot Be Certified .......................................................................... 34

i

b.   Plaintiffs' Statistics Are Fatally Flawed and Lack "Significant Proof" of Causation.................................................................................................. 36

2.   Plaintiffs' Title VII Disparate Treatment Claims Do Not Meet Commonality ..................................................................................................... 39

a.   KPMG's Deep Commitment to Equality, Inclusion and Diversity Refutes Plaintiffs' Claims of Systemic Discrimination Against Women ......................... 40

b.   Decentralized Decision Making and Job Diversity Preclude Commonality ........ 44

c.   Plaintiffs' Flawed Statistics Are Not "Significant Proof" of Systemic Bias ........ 45

d.   Plaintiffs' Anecdotes Are Not "Significant Proof" of Systemic Bias.................. 46

B.   Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3) ......................................... 48

C.   Plaintiffs Fail To Prove Adequacy Under Rule 23(a)(4) .............................................. 50

D.   Plaintiffs Cannot Satisfy the Requirements for a Rule 23(b)(2) Class ......................... 50

E.   Plaintiffs Cannot Satisfy the Requirements for a Rule 23(b)(3) Monetary Class ....................................................................................................... 52

1.   Plaintiffs Fail to Prove Predominance ......................................................... 52

a.   Individualized Liability Issues Overwhelm Any Common Issues ...................... 52

b.   Individualized Damages Issues Also Overwhelm Any Common Issues.............. 54

2.   Plaintiffs Cannot Prove Superiority ............................................................. 55

F.   Rule 23(c)(4) Issue Certification Is Not Appropriate .................................................. 57

G.   Plaintiffs Fail to Prove That Any New York Class May Be Certified............................. 58

III.   **Plaintiffs Do Not Meet Their Burden to Sustain EPA Collective Certification** ...................................................................................................... 58

A.   Plaintiffs' Burden of Proof at Step-Two Certification Is a High One .......................... 58

B.   Plaintiffs Fail to Prove They Meet the Heightened Step 2 Certification Standard...................................................................................................................... 59

1.   Plaintiffs' Nationwide Collective Violates the EPA's "Establishment" Limitation . 59

2.   Plaintiffs Fail to Meet Their Burden to Prove the Collective Is Similarly Situated ....................................................................................... 60

a.   Disparate Factual and Employment Settings of the Individual Plaintiffs............ 61

b.   Defenses Available to Defendants Which Appear to be Individual to Each Plaintiff.................................................................................... 64

c.   Fairness and Procedural Considerations Warrant Decertification ...................... 65

**CONCLUSION** ......................................................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Morgan Stanley*,
   307 F.R.D. 119 (S.D.N.Y. 2015) ......................................................................31, 47, 52, 55

*Alonso v. Uncle Jack's Steakhouse, Inc.*,
   2011 WL 4389636 (S.D.N.Y. Sept. 21, 2011) .........................................................................64

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..........................................................................................................31, 52, 55

*Apsley v. Boeing Co.*,
   691 F.3d 1184 (10th Cir. 2012) ....................................................................................32, 41

*Ayers v. SGS Control Servs.*,
   2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) .........................................................................64

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ................................................................................................49

*Bastian v. N.Y.C. Dep't of Educ.*,
   2008 WL 2930529 (S.D.N.Y. July 29, 2008) .........................................................................62

*Beck v. Boeing Co.*,
   203 F.R.D. 459 (W.D. Wash. 2001) ................................................................................47

*Beck-Wilson v. Principi*
   441 F.3d 353 (6th Cir. 2006) ..........................................................................................64

*Bell v. Lockheed Martin Corp.*,
   2011 WL 6256978 (D.N.J. Dec. 14, 2011) ................................................................ *passim*

*Benner v. Becton Dickinson & Co.*,
   214 F.R.D. 157 (S.D.N.Y. 2003) ......................................................................................56, 57

*Bennett v. Nucor Corp.*,
   656 F.3d 802 (8th Cir. 2011) ..............................................................................33, 37, 44, 45

*Bolden v. Walsh Constr. Co.*,
   688 F.3d 893 (7th Cir. 2012) ............................................................................ *passim*

*Boykin v. Viacom Inc.*,
   1997 WL 706323 (S.D.N.Y. Nov. 12, 1997 ................................................................ *passim*

*Brackett v. St. Louis Bd. of Police Comm'rs*,
2014 WL 1377460 (E.D. Mo. Apr. 8, 2014)..........................................................64

*Brennan v. Goose Creek Consol. Indep. Sch. Dist.*,
519 F.2d 53 (5th Cir. 1975) .................................................................................60

*Brown v. Nucor Corp.*,
785 F. 3d 895 (4th Cir. 2015) ..............................................................................48

*Byrne v. Telesector Res. Grp., Inc.*,
339 F. App'x. 13 (2d Cir. 2009) ...........................................................................62

*Chen-Oster v. Goldman, Sachs & Co.*,
2018 WL 1609267 (S.D.N.Y. Mar. 30, 2018) ............................................. *passim*

*Chiaramonte v. Animal Med. Ctr.*,
677 F. App'x 689 (2d Cir. 2017) ..................................................45, 61, 62, 64

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012)................................................................26, 29, 57

*Collins v. Dollar Tree Stores, Inc.*,
788 F. Supp. 2d 1328 (N.D. Ala. 2011) .........................................................60, 64

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)........................................................................................27, 56

*Coser v. Moore*,
739 F.2d 746 (2d Cir. 1984)...................................................................... *passim*

*Cottle v. Falcon Holdings Mgmt., LLC*,
892 F. Supp. 2d 1053 (N.D. Ind. 2012) ...............................................................64

*Davis v. Cintas Corp.*,
717 F.3d 476 (6th Cir. 2013) .................................................30, 31, 32, 56

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014)................................................................................32

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
27 F. Supp. 3d 313 (E.D.N.Y. 2014) .......................................................62, 63, 65

*Diaz v. S & H Bondi's Dep't Store*,
2012 WL 137460 (S.D.N.Y. Jan. 18, 2012) ........................................................64

*Donaldson v. Microsoft Corp.*,
205 F.R.D 558 (W.D. Wash. 2001) ..........................................................48, 49, 50

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992)..............................................................................50

*Dukes v. Wal-Mart Stores, Inc.*,
   964 F. Supp. 2d 1115 (N.D. Cal. 2013) ....................................................... *passim*

*Earl v. Norfolk State Univ.*,
   2014 WL 6608769 (E.D. Va. Nov. 18, 2014).......................................................64

*Easterling v. Conn. Dep't of Corr.*,
   278 F.R.D. 41 (D. Conn. 2011)...................................................48, 55, 56, 57

*EEOC v. Bloomberg L.P.*,
   778 F. Supp. 2d 458 (S.D.N.Y. 2011)........................................................ *passim*

*EEOC v. Port Auth. of N.Y. & N.J.*,
   768 F.3d 247 (2d Cir. 2014)....................................................45, 61, 62, 63, 64

*EEOC v. Sterling Jewelers Inc.*,
   788 F. Supp. 2d 83 (W.D.N.Y. 2011) ..............................................................56

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012)...........................................................38, 47, 57

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...........................................................................45

*Emilio v. Sprint Spectrum L.P.*,
   2017 WL 3208535 (S.D.N.Y. July 27, 2017) ...................................................48

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ...........................................................................59

*Fisher v. Vassar Coll.*,
   70 F.3d 1420 (2d Cir. 1995).........................................................38, 39, 47

*Forte v. Liquidnet Holdings, Inc.*,
   675 F. App'x. 21 (2d Cir. 2017) .......................................................................58

*Gardner v. W. Beef Prop., Inc.*,
   2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013)..............................................59, 65

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2015)............................................................................52

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014).....................................................................22

*Grant v. Morgan Guar. Trust Co.*,
    548 F. Supp. 1189 (S.D.N.Y. 1982)..........................................................50

*Grover v. Smarte Carte, Inc.*,
    836 F. Supp. 2d 860 (D. Minn. 2011)......................................................60

*Gulino v. Bd. of Educ. of City Sch. Dist. of N. Y.*,
    2013 WL 4647190 (S.D.N.Y. Aug. 29, 2013)......................................48, 55, 56, 57

*Gupta v. N.Y.C. Sch. Constr. Auth.*,
    305 F. App'x. 687 (2d Cir. 2008) ..........................................................44

*Hoffman v. Parade Publ'ns*,
    933 N.E.2d 744 (N.Y. 2010)..................................................................58

*Hoffmann-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989)............................................................................61

*Houser v. Pritzker*,
    28 F. Supp. 3d 222 (S.D.N.Y. 2014)..................................................48, 55

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)..................................................................52

*Int'l Bhd. of Teamsters v. U.S.*,
    431 U.S. 324 (1977)........................................................................ *passim*

*Jackson v. Harvard Univ.*,
    721 F. Supp. 1397 (D. Mass. 1989) ......................................................41

*Jacob v. Duane Reade, Inc.*,
    2016 WL 3221148 (S.D.N.Y. June 9, 2016) ..........................................64

*Jacob v. Duane Reade, Inc.*,
    293 F.R.D. 578 (S.D.N.Y. 2013) ..........................................................57

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ..............................................................64

*Johnson v. Nextel Comm. Inc.*,
    780 F.3d 128 (2d Cir. 2015)..........................................................53, 55, 56

*Jones v. Nat'l Council of YMCA*,
    34 F. Supp. 3d 896 (N.D. Ill. 2014) ................................................ *passim*

*Kassman v. KPMG LLP*,
    925 F. Supp. 2d 453 (S.D.N.Y. 2013)..................................................58

*King v. Enterprise Rent-a-Car Co.*,
  231 F.R.D. 255 (E.D. Mich. 2004) ......................................................................33

*Ladik v. Wal-Mart Stores, Inc.*,
  291 F.R.D. 263 (W.D. Wis. 2013) ................................................................ *passim*

*LaMarr-Arruz v. CVS Pharm., Inc.*,
  2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017) ...................................................31

*Lapointe v. Target Corp.*,
  2017 WL 3288506 (N.D.N.Y. Mar. 24, 2017) ...................................................22

*Lavin-McEleney v. Marist Coll.*,
  239 F.3d 476 (2d Cir. 2001) ..............................................................54, 62, 63, 64

*Leopold v. Baccarat, Inc.*,
  239 F.3d 243 (2d Cir. 2001) ...............................................................................47

*Lusardi v. Xerox Corp.*,
  122 F.R.D. 463 (D.N.J. 1988) ............................................................................62

*Maggio v. City Univ. of N.Y.*,
  2008 WL 466211 (E.D.N.Y. Feb. 17, 2008) ......................................................64

*Matthews v. Waukesha Cty.*,
  937 F. Supp. 2d 975 (E.D. Wis. 2013) ...............................................................38

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ...................................................................... *passim*

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,
  672 F.3d 482 (7th Cir. 2012) .......................................................................47, 57

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,
  2010 WL 3184179 (N.D. Ill. Aug. 9, 2010) ......................................................47

*Meeks v. Computer Assocs. Int'l*,
  15 F.3d 1013 (11th Cir. 1994) ...........................................................................60

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) .............................................................50, 51, 57

*Moore v. Napolitano*,
  926 F. Supp. 2d 8 (D.D.C. 2013) .......................................................................56

*Moore v. Publicis Group SA*,
  2014 WL 11199094 (S.D.N.Y. May 15, 2014) ............................................ *passim*

*Morano v. Intercont'l Cap. Grp., Inc.*,
  2012 WL 2952893 (S.D.N.Y. July 17, 2012) ...........................................................59, 63, 65

*Moss v. Crawford & Co.*,
  201 F.R.D. 398 (W.D. Pa. 2000) .............................................................................64

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)................................................................... *passim*

*Oakley v. Verizon Comm. Inc.*,
  2012 WL 335657 (S.D.N.Y. Feb. 1, 2012).........................................................53, 55, 56, 57

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
  875 F.2d 365 (2d Cir. 1989)......................................................................41, 45

*Parra v. Bashas' Inc.*,
  291 F.R.D. 360 (D. Ariz. 2013) ...............................................................47, 57

*Perkins v. S. New Eng. Tel. Co.*,
  669 F. Supp. 2d 212 (D. Conn. 2009) ........................................................64

*Pippen v. Iowa*,
  2012 WL 1388902 (Polk Cty. Dist. Ct. Apr. 17, 2012).........................................36

*Porter v. Pipefitters Ass'n Loc. Union 597*,
  208 F. Supp. 3d 894 (N.D. Ill. 2016) ......................................................47

*Randall v. Rolls-Royce Corp.*,
  2010 WL 987484 (S.D. Ind. Mar. 12, 2010)..........................................33, 50, 55

*Reynolds v. Barrett*,
  685 F.3d 193 (2d Cir. 2012)......................................................................43, 45

*Richman v. Goldman Sachs Grp., Inc.*,
  274 F.R.D. 473 (S.D.N.Y. 2011) .............................................................50

*Robinson v. Metro-North Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001)................................................................... *passim*

*Rodolico v. Unisys Corp.*,
  199 F.R.D. 468 (E.D.N.Y. 2001) .............................................................64

*Rollins v. Traylor Bros Inc.*,
  2016 WL 5942943 (W.D. Wash. May 3, 2016)......................................................55

*Ross v. Lockheed Martin Corp.*,
  267 F. Supp. 3d 174 (D.D.C. 2017) ......................................................... *passim*

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*,
  2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018) .........................................................................52

*Scott v. Chipotle Mexican Grill, Inc.*,
  2017 WL 1287512 (S.D.N.Y. Mar. 29, 2017) .......................................................................59

*Scott v. Family Dollar Stores, Inc.*,
  2016 WL 9665158 (W.D.N.C. June 24, 2016) .........................................................47, 57, 65

*Serrano v. Cintas Corp.*,
  2009 WL 910702 (E. D. Mich. Mar. 31, 2009) ............................................................ *passim*

*In re Simon II Litig.*,
  407 F.3d 125 (2d Cir. 2005) .................................................................................................56

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) .............................................................................................................30

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .............................................................................................................56

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) .................................................................................................27

*Tomka v. Seiler Corp.*,
  66 F.3d 1295 (2d Cir. 1995) ...........................................................................................37, 63

*Toomey v. Car-X Assocs. Corp.*,
  2013 WL 5448047 (N.D. Ill. Sept. 30, 2013) ......................................................................60

*Tracy v. NVR, Inc.*,
  293 F.R.D. 395 (W.D.N.Y. 2013) ..................................................................................52, 55

*Trawinski v. KPMG LLP*,
  2012 WL 6758059 (S.D.N.Y. Dec. 21, 2012) ................................................31, 45, 48, 50

*U.S. v. City of New York*,
  717 F.3d 72 (2d Cir. 2013) ....................................................................................22, 40, 48, 57

*Valerino v. Holder*,
  283 F.R.D. 302 (E.D. Va. 2012) ..........................................................................31, 32, 41, 44

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................... *passim*

*Wilkerson v. Martin Marietta Corp.*,
  875 F. Supp. 1456 (D. Colo. 1995) ......................................................................................64

*Wilks v. Pep Boys*,
    2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) .................................................................64

*Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*,
    869 F. Supp. 2d 378 (S.D.N.Y. 2012) .......................................................................47

*Zivali v. AT & T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011) .......................................................... *passim*

*Zuniga v. Bernalillo Cty.*,
    319 F.R.D. 640 (D.N.M. 2016) ....................................................................... *passim*

## Statutes

29 C.F.R. § 1620.9 ........................................................................................................60

42 U.S.C. § 1981a(a)(1), (b) ........................................................................................57

42 U.S.C. § 1981a(c) ....................................................................................................26

42 U.S.C. § 2000e-2(k)(1)(A)(1) .................................................................................36

29 U.S.C. § 206(d) ............................................................................................. *passim*

29 U.S.C. § 216(b) ..........................................................................................................1

N.Y. Lab. Law § 194(3) ...............................................................................................58

## Other Authorities

Fed. R. Civ. P. 23(a) ......................................................................................... *passim*

Fed. R. Civ. P. 23(b) ......................................................................................... *passim*

Fed. R. Civ. P. 23(c)(4) ................................................................................................57

Fed. R. Civ. P. 53 ...................................................................................................55, 56

Fed. R. Civ. P. 65(d) ....................................................................................................50

**INTRODUCTION**

Plaintiffs filed this case almost seven years ago, weeks prior to *Wal-Mart Stores, Inc. v. Dukes*, in which the Supreme Court held that a "'policy' of *allowing discretion* by local supervisors over employment matters" is "presumptively reasonable" and does not warrant class treatment. 564 U.S. 338 (2011). While Plaintiffs struggled to repackage their claims and evade *Dukes*, years of discovery left them with the very same fatally flawed theory as their original pre-*Dukes* Complaint: that KPMG's "policy" is to let each decision maker use "highly subjective" "procedures and practices" that "allow stereotypes to dictate" pay and promotion. Dkt. 1 ¶¶ 11, 15. They still attack tens of thousands of decentralized discretionary decisions made over nearly a decade, by nearly 1,000 decision makers as to more than 10,000 women doing vastly different work in over 90 offices, across hundreds of distinct practice areas, using varying considerations and processes tailored to their own business needs. Many putative class members participated in decisions as to others, creating irreconcilable conflicts. On this full record, Plaintiffs' Motion to certify a Rule 23 Title VII class and Equal Pay Act ("EPA") collective plainly should be denied.[1]

Plaintiffs do not identify a single common policy, and their own experts concede they have no evidence that any supposed "policy" Plaintiffs attempt to conjure up (*e.g.*, alleged "vague" criteria or "insufficient training") actually causes even a single alleged disparity or bias affecting even one employee, much less the entire putative class. Instead, they litter their brief with terms like "common" and "centralized," and attach "policy" labels to decision making aspects that even they admit are discretionary and *un*guided. This case squarely aligns

---

[1] As detailed in Arg. III below, the EPA, 29 U.S.C. § 206(d), incorporates the collective action "similarly situated" mechanism of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), of which the EPA is a part. Plaintiffs' Memorandum in Support of their Motion for Class/Collective Certification ("Motion" or "Br.") alleges that 1,112 individuals opted into their EPA claims ("Opt-Ins"). Their expert Dr. Vekker calculates "more than 10,000 women" in the putative Fed. R. Civ. P. ("Rule") 23 class. Vek. R. at 2. KPMG does not concede such exact figures. In fact the putative class, *e.g.*, exceeds 12,500 women. Kx G ¶ 4. Precise differences are not material here. Plaintiffs' class claims run back to October 30, 2009 (Title VII), March 16, 2009 (EPA) and June 2, 2008 (New York), collectively called the "class period." Their Fourth Amended Complaint, Dkt. 548, is referred to herein as the "FAC."

with the many denying certification for "Repackaged Delegated Discretion," and fails to unify

a class or collective "no matter how cleverly lawyers may try to repackage local variability as

uniformity." *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012); *Dukes v. Wal-*

*Mart Stores, Inc.* ("*Dukes II*"), 964 F. Supp. 2d 1115, 1126 (N.D. Cal. 2013) (on remand).

Despite countless depositions and voluminous discovery, Plaintiffs lack any coherent

theory or proof that satisfies Rule 23 or the EPA's stringent "Step 2" certification standard:

- They first claimed that KPMG's "performance review system" was biased and impacted pay

  and promotions, FAC ¶¶ 15-17, 29, but now admit that ratings were not biased—telling since

  the various decision makers for pay and promotions participate in determining ratings too.

- Their expert found *no statistically significant gender gaps* in promotions for nearly half of all

  job levels even with his flawed methods, and KPMG's expert found any such promotion *and*

  pay variances to be only "sporadic and isolated" after accounting for practice, job and year.

- They allege "systemic" bias, yet target only Tax and Advisory, quietly ignoring KPMG's

  other apparently unimpacted functions, Audit and Business Process Group ("BPG"), that

  comprise approximately 50% of the entire firm.

- They say unnamed "male-dominated leadership…ultimately control[s]" pay and promotion

  decisions, yet assert that KPMG "does not review" such decisions or alleged "policies" used

  to make them, Br. at 4-5, 15-16, all the while ignoring that women are, and long have been,

  many of these "senior leaders," including the firm's Chief Executive Officer ("CEO").

- They abandon their pregnancy/caregiver bias claims, conceding they have no such proof.

Nor is there any pervasive evidence of systemic bias directed at women as a class.

Plaintiffs' sensationalized anecdotes, cherry-picked from over nearly a decade and averaging at

most 0.2% of women per year, are not representative of women's experiences at KPMG. Many

also are hearsay, misrepresented, and omit key facts, including KPMG's diligent action to address inappropriate conduct. Women across KPMG read Plaintiffs' FAC and confirmed under oath that neither it nor the "culture" Plaintiffs allege in any way reflects their own experience at KPMG. The reality reflected in the evidence is that women across the firm *including* many Plaintiffs themselves: have participated in making pay and promotion decisions and believed them to be fair and not based on gender; have been supported by their colleagues (men and women) in career development and in navigating the challenges of a working parent; have been promoted more quickly than their peers based on their performance; have never experienced unfair or inappropriate treatment based on their gender at KPMG, but would not hesitate to make a complaint if they did; and have been highly successful, including rising to the highest levels of the firm and myriad practice areas.

This speaks not only to the talent and quality of KPMG's professionals, but also to KPMG's extensive structures, benefits and other efforts to promote an ethical culture, respect, inclusion and diversity. KPMG works hard at such matters and takes even isolated incidents seriously. It spent over $30 million on such efforts in fiscal 2016 alone, which has increased annually and will exceed $40 million this year—far from what Plaintiffs dismiss as "window dressing." This is not to say that women's representation at *all* levels is unaffected by work-life choices and other such factors that impact businesses nationwide. But it simply is not due to discriminatory policies at KPMG. As a court in this District recognized, employers cannot be charged with "systemic" bias due to family and other external factors that may affect choices. *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 485 (S.D.N.Y. 2011) (Preska, J.).

The impediments to Rule 23 certification also doom certification of an EPA collective. After full discovery, it is clear that the collective members are not similarly situated but instead

embody over 1,000 different stories with no unifying thread. They do widely divergent work in over 90 offices across many practices requiring varying skill, responsibility, effort and working conditions. The decisions on their pay were made by a multitude of different individuals. They are as different from each other as they are from their alleged male "comparators."

There simply is no way to address these diverse stories across the class or collective through "representative" proof or a single tailored injunction that complies with Rules 23(b)(2) and 65, absent violence to KPMG's Due Process rights—particularly given Plaintiffs' vague and sweeping request to enjoin KPMG's "compensation and promotion processes" *in toto*. Indeed, a class or collective action would enmesh this Court—not a "special master"—in thousands of individual jury and/or bench trials on both *liability* and damages for years. KPMG is entitled to defend its pay and promotion decisions as to each putative class and collective member by demonstrating that those decisions were based on lawful factors other than sex, and is prepared to do so in their home courts should they choose to pursue them there. But after seven years, it is time for Plaintiffs' unsupported quest to transform individual complaints into scandalous systemic and *intentional* gender bias class and collective claims to come to an end.

## **FACTS**[2]

KPMG is a professional services firm with more than 34,000 employees in over 90 offices nationwide. KPMG has three Functions with client-facing professionals—Advisory, Tax and Audit—and BPG, which provides internal support. Kx A ¶ 3. Audit and BPG comprise about 50% of the firm's personnel. Kx G ¶ 4. But Plaintiffs' claims involve only exempt client-

---

[2] Where a single cite is given for several sentences, it supports all such preceding text. Cites to Plaintiff or Opt-In testimony begin with **bold** font. KPMG exhibits are cited as "Kx __ [: page nos.] or [¶ _]" referring to the Exhibit compendium submitted as Ex 1 to the Declaration of Melanie Walker (the "Ex 1" prefix is omitted from such cites). "KPMG-KASS" Bates label prefaces from cited documents are omitted; only the 5 or 6-digit number is cited. Such documents are attached in numerical order as Ex 1 to the Walker Declaration. Plaintiffs' exhibits are cited as "Px." Their expert reports are cited by the expert's abbreviated name and "R." or "Reb." (for main or rebuttal report).

facing[3] Advisory and Tax professionals in ten job levels (one in each Function unless otherwise noted): Associate, Senior Associate, Manager, Senior Manager (Tax), Director (Advisory) and Managing Director ("MD"). No Named Plaintiff[4] ever was a Managing Director.

## I.   Diversity of Job Skills, Duties, Responsibilities, Effort and Working Conditions

KPMG provides a wide array of services to businesses across the U.S. and a broad range of industries.[5] To serve their diverse needs, Tax and Advisory have over 150 specialized practice areas. Advisory divides those into four distinct Service Groups—Management Consulting, Risk Consulting, Deal Advisory and Strategy—subdivided into approximately 15 Service Lines, and then progressively more focused practice areas: over 40 Service Networks, over 80 subpractice areas (called Cost Centers) and numerous Service Offerings, many of which serve particular industries. Tax has six Service Lines, delineated into nearly 70 Cost Centers and other subpractices. Exhibit A-A illustrates each Function's structure and practice areas.[6] Each practice area generally has its own lead Partner (or in a few instances a Managing Director) and budget down to at least the Service Network (Advisory) or Cost Center (Tax) level. Kx A ¶ 5.

### A.   KPMG's Practice Areas and Job Diversity

KPMG's diverse services and industries require a diversity of skills, responsibilities, effort and working conditions across jobs. Plaintiffs admit such differences between Tax and

---

[3] Plaintiffs' proposed class and collective erroneously exclude this "exempt client-facing" criterion, which applied to each Named Plaintiff and has framed this litigation. Br. at 1 n.1; *e.g.*, Dkt. 408 at 4 (Plaintiffs' letter to Court stating that "non-client facing employees" are "outside the class definition"); FAC ¶ 400-01 (limiting class to "exempt" professionals); Dkt. 416 (Order limiting certain discovery to "client-facing, exempt employee[s])."

[4] Proposed Rule 23 representatives are Kassman, Butler, Charity, Inman, Jones, and Murray (the "Representatives").

[5] Examples include banking; finance; insurance; investment management; construction and real estate; automotive and manufacturing; energy and chemicals; technology, including electronics, software and the internet; business services; media; consumer goods; hospitality; retail; healthcare; and government/public sector. Kx A ¶ 3.

[6] Kx A ¶ 4; Kx H ¶ 6. "Cost Centers" and other practices are not mere budget concepts. They reflect real differences in services offered, work done and employee skills. Kx A ¶ 4. Names and exact numbers of some practices changed over the years (*e.g.*, "Risk Consulting" was called "Risk & Compliance"), as did some subpractice structures (*e.g.*, Service Networks were implemented in 2012 to reflect the decentralized way in which Advisory already operated). Kx A ¶ 5; Kx 3: 6, 9, 10. But these structures remained largely stable and no variance is material to certification. Kx A ¶ 5. The cited figures are as of 2016, for consistency with the data analyzed by Dr. Bloom. Kx 3: 6, 9.

Advisory, and across job levels even in the same Function. Br. at 52-53; Han. Reb.¶ 16. They are magnified not only across but within practices. Employees simply are not fungible. For example, in **Tax**, the ***Business Tax Services ("BTS") Service Line*** (formerly Federal Tax) has specialties with unique required duties, skills and experience well beyond Plaintiffs' generic description of "tax return" work, including the ***Accounting Methods and Credits*** practice. Its scientists, engineers and other specialists have non-fungible industry expertise and, *e.g.*, collect data at oil facilities to analyze R&D tax credits, or review construction sites to gauge asset useful life. ***Tax Controversy Services*** professionals, *e.g.*, advocate in IRS mediations, make opening statements, and have a JD and have or work toward an LLM. Kx F ¶ 12-13; **Kx** 40: 152-53.

This is in sharp contrast to practices in the ***Global Mobility Services ("GMS") Service Line***. GMS ***Tax Compliance Service Center*** ("TCSC") offers an option for those who want far fewer demands and a longer career path. About 90% of those who choose to join TCSC work at home, many on part-time or other alternative work arrangements ("AWAs"), and have workloads individually arranged with their supervisor. They mainly review (not prepare) in/expatriate tax returns, and virtually all have no client contact and no managerial or business development duties. The vast majority thus are Senior Associates. By contrast, ***Mobility Consulting Services*** professionals, though in GMS Tax, do not do Tax work (such as tax advice or reviewing returns), are not accountants, and advise on *non-tax* aspects of expatriate tax programs. Kx O ¶ 5.

And the above examples could not be more different from ***Economic and Valuation Services ("EVS") Tax Service Line*** practices, *e.g.*, the ***Economic Consulting Service Offering*** with PhD- and Masters-level analysts and economists who help clients make econometric models for public policy, healthcare, and other projects, and serve as testifying experts. By contrast, the ***Valuation Service Offering*** requires a background in accounting or finance, such as an MBA or

CPA, and assists clients in valuing businesses and tangible/intangible assets. Kx K ¶¶ 12, 17.

**Advisory** practices and jobs are distinct as well, *e.g.*, in the **Risk Consulting Service Group**, the **Forensic practice** has varied subpractices, such as ***Forensic Technology***, which collects electronic data, performs computer forensics, and has artificial intelligence experts who analyze massive data sets. ***Investigations*** professionals frequently work with law firms, *e.g.*, on forensic fraud investigations, often in specific industries (*e.g.*, healthcare). And ***Dispute Advisory*** has professionals who arbitrate a variety of disputes. This differs from, *e.g.*, **Deal Advisory Service Group** members in the ***Corporate Finance Service Network***, who have investment banking experience and unique pay arrangements to compete for such talent. *Infra* n.33. And in the **Management Consulting Service Group**, the ***Corporate Services Service Line*** has a ***People & Change ("P&C") Service Network*** with, *e.g.*, a *Learning* subpractice that develops learning/ training content, and a *Talent* subpractice that improves human resources ("HR") and diversity programs. By contrast, in the ***Technology Enablement Service Line***, the ***Enterprise Solutions ("ES") Service Network*** customizes complex financial, HR and other software platforms, such as SAP, Oracle and Workday, and has dedicated teams for many platforms because they require distinct skill sets.  Kx I ¶ 7-8 (For.); Kx J ¶¶ 8, 12 (P&C); Kx B ¶¶ 6 (Deal Adv.), 12 (ES).

Other skills, responsibility, effort and job aspects also vary widely across practices:

• Niche industries require specific expertise, and often are concentrated in certain markets, *e.g.*, hedge fund (NY), technology (Silicon Valley), and energy (Houston). Kx A ¶ 7; Kx M ¶ 10.

• Over 750 employees are in special practices that serve Federal government clients, and that maintain distinct rosters of professionals who must be U.S. citizens and meet special skill, education, in some cases security clearances and other requirements set by the government.[7]

---

[7] Kx G ¶ 4 (# of Federal EEs); Kx M ¶ 12 (labor categories). For example, Plaintiff Charity testified that her area of

- Travel requirements (and the related effort and risks entailed, *e.g.*, of illness or injury) vary widely across practice areas, up to 100% for some, and modest or little to none for others.[8]

- Some practices have consistent work all year; others such as BTS-Compliance have intense "busy seasons," then slow periods. Kx H ¶ 7; **Kx** 27: 58-59; Kx R ¶ 10; **Kx** 11: 147.

### B.    Plaintiffs and Comparator Testimony Confirm These Differences

Many Opt-Ins and declarants admitted at their depositions that other professionals in their same Function—in many cases including their named male "comparators"—did *not* have the skills, credentials, or experience to do the Opt-Ins' and declarants' jobs and did not have the same duties. *See also* Kx 2 (resume duties compilation); *infra* at 15-16, 61-62. For example:[9]

- Opt-In Elisa Wu, a Senior Manager in the Accounting Advisory Services ("AAS") Service Network, has a CPA, specializes in revenue recognition, and testified that an accounting background is required in AAS but that other credentials would not be valuable. Declarant Jessica Luke, former Manager in the Risk Analytics Service Network, is not a CPA and knows nothing of revenue recognition standards. **Kx** 43: 14, 17-20, 44; **Kx** 28: 23-26.

- Opt-In Debbie Bonner, a Manager in the Transfer Pricing subpractice of the EVS Service Line, analyzed intercompany pricing for goods and services to determine whether they met IRS requirements. She did not prepare valuations or tax returns. By contrast, Opt-In Holly Barnes, a Manager in BTS, had no such duties, but rather specialized in preparing federal tax returns.[10]

- Opt-In Anita Dunn, an Anti-Money Laundering ("AML") subpractice Manager, was an expert

---

expertise was *Federal* IT Audit, *i.e.*, evaluating IT system controls specifically for Federal government clients, whereas Advisory has a distinct IT Audit practice for non-Federal clients. **Kx** 14: 14, 40.

[8] *E.g.*, in the Advisory P&C Service Network, employees travel frequently and are often at a client site all week. Kx J ¶ 13. Core BTS and State and Local Tax professionals typically do little to no travel. Kx U ¶ 20 (about two days a month including day trips); **Kx** 29: 56-57 (always worked at client, half hour from home). Others travel modestly. *E.g.*, **Kx** 27: 75 (IES Tax Sr. Manager; Philadelphia to N.Y.C. 2-3 times/month, usually not full weeks).

[9] KPMG could cite countless other examples of these and other distinctions described above, but is mindful of the Court's page limitations, and respectfully refers the Court to KPMG's submitted declarations and other evidence.

[10] **Kx** 11: 102-3, 107, 109-10, 154; **Kx** 8: 31, 57, 68, 85-86.

in Bank Secrecy Act of 1970 rules. Her only named "comparator," ███████, a Forensic Technology subpractice Manager, once worked on an engagement with her. But he created computer programs to "identify suspicious transactions" out of voluminous data, a job function in which she had no expertise. Dunn reviewed the transactions that ███ identified to see if they complied with AML rules, a job function in which he had no expertise.[11]

- Opt-In <u>Artemis Koch</u>, a GMS-Core Senior Manager, prepared expatriate tax returns and analyzed individual compensation issues. Two of her "comparators" were M&A Tax Senior Managers. One analyzed treaties and prepared dynamic tax deal models. He never heard of a GMS Senior Manager staffed in an M&A role or vice-versa. Neither could do the other's job. The last, an International Tax Senior Manager, advised on high-value international *corporate* tax issues, often writing lengthy tax opinions. **Kx** 27: 6-8, 55; Kx BB ¶ 11, 14; Kx CC ¶ 8-11.

- <u>Sabrina Starnes</u>, a BTS Managing Director, admitted that one of her "comparators," ████ ████, "didn't do the same work that [she] did," and another, ███████, was an expert in SALT, M&A, and tax transformation, none of which she did. **Kx** 38: 17, 77, 121, 125.[12]

- Other Opt-Ins admitted their unique job duties in their depositions, contradicting the banal descriptions in their declarations, such as <u>Hillary Bennetts</u>, whose generic declaration stated she "provid[ed] quality work," "effectively utilize[ed] resources" and "provid[ed] technical knowledge," yet who admitted at deposition that she "assign[s] value to" and computes interest

---

[11] Kx AA ¶¶ 8-10; **Kx** 18: 65, 80, 111-12, 174. The following Opt-Ins (among others) also admitted they did not do the following work done by other employees: **Kx** 43: 45-49 (Wu: Oracle data conversion, AML services, advising on digital ecosystems, e-discovery); **Kx** 28: 26-32 (Luke: assisting with IPOs, pension fund investment strategies, HR process review, PeopleSoft reconciliations); **Kx** 40: 26-34 (Underhill: value added tax, customs, indirect tax, trust tax returns, IRS mediations, expat policies); **Kx** 24: 77, 79 (Inman: actuarial and due diligence projects).

[12] Other Opt-Ins also admitted they did different work from one or more of their "comparators." *E.g.*, **Kx** 10: 62, 70-73 (Blum, GMS Sr. Manager, does individual tax return compliance work while "comparator" does not); **Kx** 30: 82-83 (Opt-In McSherry, Sr. Associate in State and Local Solutions ("SLS"), had different duties than two male Sr. Associates in SLS working on the same projects as her); **Kx** 41: 16-19 (Plaintiff Vasudeva admitting she did non-technical contract compliance work while her "comparators" did technical compliance work for software vendors involving licenses); **Kx** 43: 97 (Wu: purported comparator did not have experience in her AAS practice).

rates for "intercompany transactions" and conducts "supply-chain planning." **Kx** 9: 71-73.[13]

- And nearly 30% of Opt-Ins subject to discovery failed to name a *single* male comparator in *any* practice whom they claim did the same, or even "similar," work to them. *Infra* at 14-16, n. 39.

"Common" proof cannot capture this diversity, which also explains the "extreme lack of mobility" across Service Lines that Dr. David Bloom[14] found in Tax and Advisory. Kx 3, 15-16. Industrial/Organizational Psychologist Dr. Cristina Banks[15] reconfirmed these job distinctions with her individualized "job analysis of the job characteristics and work performed by KPMG employees in the Tax and Advisory functions throughout the U.S. following established practice in industrial-organizational psychology." Kx 5 ¶ 2. Dr. Banks concluded that "KPMG professionals differ widely in job characteristics and work performed." *Id.* ¶ 193.[16]

## II. Decentralized Performance Assessment, Promotion, and Pay Determinations

Performance assessment, career development, assignments, pay, promotions and hiring[17] are highly decentralized by practice area and often within a geography. Decisions are made by practice leaders and/or members familiar with each employee and the practice's unique needs.[18]

### A. Assessment Meetings are Done by Practice Area and Sometimes Geography

Each employee has a People Management Leader ("PML")—a Partner or more senior

---

[13] *Also e.g.*, **Kx** 21: 30, 12810 (resume: "Developed IT data flow diagrams," "identify gaps in system integration and data transfer," assess "controls on multiple computing platforms") *vs.* **Px** 18 ¶6 (took "direction from others").

[14] Dr. Bloom is the Clarence James Gamble Professor of Economics and Demography, T.H. Chan School of Public Health, Harvard Univ., and Director, Harvard Univ. Program on the Global Demography of Aging. Kx 3: 2.

[15] Dr. Banks was awarded the Presidential Citation for Innovative Practice by the American Psychological Association ("APA") for her job analyses work, and developed the widely used individualized job analysis. Kx 7: 48. She was elected a Fellow of the APA and the Society for Industrial-Organizational Psychology ("SIOP"), largely due to such work. Kx 6 ¶ 4. She is widely published and has presented in this area, including its use in employment litigation. *Id.*

[16] Plaintiffs' expert Dr. Hanges agreed with Dr. Banks' conclusion but argued that the differences involved job level and not practice area. He relied only on a small subset of the information collected by Dr. Banks. Kx 6 ¶¶ 2, 55.

[17] Plaintiffs have not brought a hiring or assignment bias claim, but such decentralization is another reason why the "establishment" for Plaintiffs' EPA claim can be no larger than a single office. *Infra* at 60-65; 29 U.S.C. § 206(d).

[18] Dr. Stockdale analyzed these structures and resources, and concluded: "KPMG's performance management structures, including performance evaluations and the manner in which performance links to compensation and promotion, exceed what is recommended by the literature." Kx 4: 33-34.

employee (Manager or higher)—typically in the same practice. The PML works closely with each "counselee" to tailor her or his performance and career development, and personal goals, based *e.g.*, on the counselee's practice area, objectives and other individual factors.[19] Each employee's performance against goals is assessed at a year-end assessment meeting held by the employee's individual practice, resulting in hundreds of such meetings each year across the many Tax and Advisory practices. The employee's PML, Partners and more senior employees[20] with knowledge of their work, and a designated HR representative participate. Local practice leaders structure their own meetings and decide who attends, how to run them, and factors to consider.[21]

Meeting scope varies by practice area and may cover, *e.g.*, one practice in one office; a subpractice in a few offices; an entire practice area nationwide; or a regional subgroup of a Service Network.[22] How participants conduct their assessments also varies widely, *e.g.*, Opt-In Jody Underhill testified that Tampa BTS ranked all their Associates to Senior Managers *regardless* of job level, in order of "which one could you not live without in this practice?" **Kx 40: 137-41.** But Opt-In Elisa Wu testified that the San Francisco Accounting Advisory Services practice ranks its employees only *within* job levels by performance. **Kx 43: 203, 208.** The Pacific Southwest region of the IAER Service Network does not rank, but discusses each employee and

---

[19] One employee, *e.g.*, may have major business development goals; another may not. Kx 17: 196-97. Per Dr. Stockdale, such goals comport with best practices, and in "KPMG's complex, decentralized and differentiated structure as a professional services firm, it is not possible to have a one-size-fits-all set of goals for all employees in a given job title or necessarily even in a given practice area." Kx 4: 34.

[20] Kxs C ¶ 18; P ¶ 14. *E.g.*, for some practices, Senior Associates stay only for Associates, and so forth up job levels.

[21] Kx 32: 194-95; Kx A ¶ 10; Kx M ¶ 13; Kx C ¶ 18. Dr. Goldberg claimed KPMG risks "halo error" (not rating on individual characteristics). But Dr. Stockdale confirmed that having multiple participants with personal knowledge of an employee's work is a best practice that reduces any such risk. Kx 4: 37-38, 44-45. Dr. Goldberg conceded halo error "may not be bad," and did not know if it harmed KPMG women or if her cited studies had multiple raters as at KPMG. Kx 19: 143-44, 162-63, 187.

[22] *E.g.*: <u>One practice, one office</u> (*e.g.*, Chicago professionals in the Asset Management Cost Center in BTS; Kx V ¶¶ 3, 15); <u>One subpractice, a few offices</u> (*e.g.*, Transfer Pricing in EVS (Tax), solely for Metro NY and Short Hills, NJ; Kx P ¶ 13); <u>Whole Practice Area Nationwide</u> (*e.g.*, Shared Services & Outsourcing Advisory Service Network; Kx R ¶ 15)); <u>Regional Subgroup of a Service Network</u> (*e.g.*, Financial Due Diligence Service Network within Transactions Service Line of Deal Advisory for Boston, New York, Philadelphia and Tysons Corner; Kx Y ¶¶ 3, 8).

notes any low performers. Kx Z ¶ 12. And Amanda Rigby, leader of the Advisory Forensic practice, along with two of her practice Partners, interview each Forensic Manager being considered for promotion to Director in connection with assessment meetings. Kx I ¶ 17.

Until 2016, each group assigned each of its employees a rating using one of two rating systems. As of 2016, in lieu of ratings, the relative percentile of an employee's variable compensation ("VC") award into the applicable range denotes performance.[23] Practices also track performance distinctions not reflected in a single rating or VC percentile (*e.g.*, not all who "meet expectations" have equal performance). Partners at more senior levels may review aggregate performance data, but do not review individualized determinations.[24]

### B.    Promotion Decisions are Decentralized and Not Based on Gender

Plaintiffs' claim that KPMG maintains a "uniform and centrally managed" promotion process is contrary to the record. They only refer to vague "approval" of decisions, but it is undisputed that individual practices make promotion decisions based on the consensus at their assessment meetings,[25] since personnel "on the ground" are best able to gauge an employee's practice-specific skill development and promotion business case (where needed). *See* Kx B ¶ 17.[26] Aggregate promotion data is reviewed at higher levels against budgets—the only "approval" Plaintiffs cite—but *not* to review or second-guess individual decisions. *Id.*; Br. at 11 & n.49.

Plaintiffs' "tap on the shoulder" claim—that employees purportedly must "express an

---

[23] A 5-point rating system was used from 2011 through 2015; and a "9-box" was system used before then. Kx 33: 347. Dr. Stockdale noted that using VC range percentile is sensible since VC is driven by performance, and "[n]o literature supports Dr. Goldberg's criticism of this approach," particularly given its recency. Kx 4: 56.

[24] Kx J ¶ 17; Kx A ¶¶ 15-16; Kx B ¶ 17; Kx M ¶ 15; Kx C ¶ 20, Kx H ¶ 22.

[25] Kx K ¶ 20; Kx B ¶ 16; Kx H ¶¶ 20, 22. The job level after Sr. Manager now is Managing Director. Until 2010, some Tax Sr. Managers advanced directly to Partnership, as not all practices had MDs. Kx 32: 209-11.

[26] *E.g.*, in P&C, "[a] BCM Manager [is evaluated] on how well s/he compiles, analyzes and conveys Change Readiness information." Kx J ¶16. Entrepreneurial practices (*e.g.*, Deal Advisory) or larger markets (*e.g.*, NYC) generally have higher business development goals than those with "repeat" clients or smaller markets. Other varying promotion criteria can include, *e.g.*, client base, managed revenue and utilization. Kx 17: 196-97, 212, 235; Kx 32: 222-25. It can take longer to acquire skills for promotion in practices with "busy seasons." Kx 32: 183-88.

interest" in promotion yet "are not informed of whether they are eligible or what they need to do to be promoted" (Br. at 11)—also conflicts with the record. While there are many self-evident ways for employees to express interest,[27] Partners and employees across KPMG, including Opt-Ins, testified that promotion readiness is considered in assessment meetings as a matter of course.[28]And given such decentralization, an employee's PML is the principal and best resource as to the specific skills and achievements necessary for promotion. Kx I ¶¶ 10-11. PMLs spend a great deal of time on such efforts, and they and their counselees are encouraged to discuss these issues regularly.[29] Many Opt-Ins admitted to doing so as PMLs or counselees.[30]

KPMG also has extensive resources, including an online Employee Career Architecture explaining basic job level differences and providing a goal and career library for employees to choose from and tailor with their PMLs. Kx L ¶¶ 20-21. Thousands of publicly announced promotions occur each year across Tax and Advisory—among them a number of Named Plaintiffs who were promoted several times including to high-level positions—further reinforcing employees' understanding of the process and confirming their successes.[31]

### C.   Compensation Decisions are Decentralized and Not Based on Gender

Plaintiffs again claim that unnamed "senior leaders" control pay decisions. But the facts confirm that individual practice leaders, at times in a specific office or region, decide their own

---

[27] Plaintiffs falsely claim CEO Lynne Doughtie testified that "there is no one way for KPMG employees to express interest in promotion." Br. at 11 & n.51. She testified extensively about the *many* ways they *could* express interest, concluding: "I cannot give you every scenario of an individual person in the ways that they express interest. I've tried to give you a lot of different examples, and I think I've done a pretty good job of giving you a sense of how people are encouraged to express an interest…." Kx 17: 256-69. She never was asked if employees *had* to "express interest"—a very different question as Dr. Goldberg admitted—and never said they did. Kx 19: 175-76.

[28] Kxs H ¶19; W ¶19; N ¶18; T ¶¶ 15, 18; R ¶ 16; X ¶ 13; **Kx** 43: 205 (Wu as PML); **Kx** 27: 21-22 (same; Koch).

[29] *E.g.,* Kx N ¶ 15; Kx R ¶ 16; Kx T ¶ 15; Kx X ¶ 9; Kx I ¶ 11; *see also* **Kx 40:** 132-33; **Kx** 27: 10-11; Kx 32: 176-77; Kx W ¶ 17; 20216 (counselees to prepare for PML "career conversations" on "what you need to do to be considered for promotion" and "skills you need to develop and experiences that may help you move up in the firm"); 20190 (PMLs to help counselees identify "which skills I need or what is required to move me to the next level").

[30] **Kx** 43: 201; **Kx** 13: 92-93; **Kx** 18: 118-19; **Kx** 47: 130, 135; **Kx** 40: 132-34.

[31] Kx A ¶ 13; **Kx** 26: 197 (Kassman: timing of promotion fair); **Kx** 14: 361 (Charity: several promotions).

employees' pay.[32] Over the class period, there have been nearly 1,000 different compensation decision makers in Advisory and in Tax, *e.g.*, two Partners—both women and one initially a Managing Director and thus a class member—decide pay for Dallas office GMS Service Line employees. Kx G ¶ 6; Kx O ¶ 8. In the P&C Service Network, the Principals in charge of the three P&C subpractices decide pay for employees in their respective subpractices. Kx J ¶ 18. The P&C Service Network leader reviews them against the budget and may ask questions, but rarely revises them and never without consensus from the relevant subpractice leader. *Id.*

Decision makers use their discretion to decide pay as they deem appropriate for each employee in their practices and markets. Dr. Goldberg admits KPMG does not prescribe any particular factors or weighting.[33] For information only, Partners have access to market ranges and employee reference points for merit increases and VC based on external surveys and internal research.[34] But KPMG recognizes that such data cannot reflect all factors known to practice leaders that impact an employee's pay. As Plaintiffs ignore, KPMG tells decision makers that they are *not* bound by such ranges or reference points, and *expects* that they will deviate from them in their judgment – which they routinely do.[35] Any higher-level review before decisions are announced is against budget, not to review them individually.[36]

### D.   Hiring and Office/Work Assignment Decisions are Decentralized

Individual hiring decisions, and office and work assignments, in Advisory and Tax also

---

[32] Kxs J ¶15; K ¶ 19; F ¶ 19; B ¶ 16; N ¶ 19; Kx 33: 427-32. Managing Directors, including Opt-Ins, who are the most senior practice members in an office also may do so. **Kx** 40: 137-38; Kxs O ¶8; C ¶ 18. Employees scheduled for at least 1,000 hours a year are eligible for salary increase and VC even if on an AWA or leave. Kx G ¶ 8. Salary, VC and performance targets are adjusted ratably for those on reduced schedules, *e.g.* Kassman. Kxs 26: 203; G ¶6.

[33] Gold. R. 10-11. Some practices have other unique compensation arrangements, *e.g.*, Corporate Finance competes against investment banks and puts weight on VC over salary. Kx B ¶ 6. Salary of TCSC employees, most of whom work at home on AWAs, depends on the target hours each employee sets with his or her supervisor. Kx C ¶¶ 13, 20.

[34] Kx 12: 161-66; Kx 17: 218-19; Kx 53: 68-70; Kx X ¶ 15.

[35] Kx 53: 73; Kx I ¶ 14; Kx J ¶ 18; Kx C ¶ 19; *e.g.*, 2013 "Guidelines for Advisory and Tax," telling Partners to use "best judgment" to assign pay "that accurately reward[s] each employee's contribution." 11351 at 55; Kx V ¶ 20.

[36] Dr. Stockdale opined that KPMG's compensation structures are "strongly linked to employee performance," and that its pay and promotion structures comport with scholarly literature. Kx 4: 38-42.

are made by hundreds of individual Partners and Managing Directors. Employees receive offers

to join a particular practice area and office, and are not unilaterally "assigned." Experienced hire

decisions receive limited business case and budget review, with nearly all approved. Kx H ¶ 17.

### E. Numerous Plaintiffs Admitted KPMG Did Not Discriminate Against Them in Their Pay or Promotions, or Had No Evidence of Discrimination

Numerous Plaintiffs across practices and offices conceded that KPMG treated them fairly

as to pay and/or promotions, or had no evidence of discrimination, including, *e.g.*, *Susan Ulrey*

(IARCS, Indianapolis) who testified she "thought [opting in] would be like the financial services

fee on the AMEX one, that I would sign it and send it in and maybe down the road I would get a

check for a hundred bucks, but it is not the case," **Kx 39: 133**; *Debra Bonner* (EVS, Houston),

who admitted KPMG did not treat her "unfair[ly] on the basis of [her] gender" in promotion,

pay, or otherwise, **Kx** 11: 56-57, 145-46; and *Jody Underhill* (BTS, Tampa): "I simply raised the

fact that I'm not being paid at my level as a TMD. It had nothing to do with my gender," **Kx** 40:

177. Many other Plaintiffs admitted the same,[37] and many declarants and deponents admitted

they were promoted shortly before or after a maternity or other leave.[38] And numerous Opt-Ins

admit they do *not* do equal work to their male "comparators" (*supra* at 8-10); nearly 30% of

those selected for discovery (53 out of 186) fail to identify any "comparators" at all; over 100

Opt-Ins were the highest paid person in their job title and Cost Center across all KPMG offices;

and of the Opt-Ins who named one or more "comparators," several were paid more than all of

---

[37] *E.g.*, **Kx** 40: 130 (reviewed employee pay in her practice; never told anyone an employee's pay was unfair due to gender); **Kx** 43: 101 (admitted promoted to Director early and has no promotion claim); **Kx** 28: 157 (admits had "accelerated" promotion track); **Kx** 22: 54, 60, 98 (admits did not seek promotion due to health; was told she was highest paid Sr. Associate in High Volume Trust); **Kx** 23: 69 (admits not impacted by "promotion policy"); **Kx** 20: 48 (admits *woman* doing same work promoted instead of her); **Kx** 36: 182 (no promotion claim); **Kx** 35: 92 (same).

[38] *E.g.*, Kx P ¶ 5 (promoted to Sr. Manager upon return from maternity leave ("MLOA"); promoted to MD shortly before MLOA); Kx N ¶ 7 (promoted to Sr. Manager after return from leave); Kx X ¶ 20 (promoted to Manager about 2 months before MLOA); Kx R ¶ 8 (promoted to MD same year had second child); Kx Y ¶ 5 (promoted to MD after return from MLOA); **Kx** 8: 59-60 (Opt-in Barnes: promoted to Manager while on MLOA).

their comparators, and more than 50% were paid more than at least one in one or more years.[39]

### F. Expert Testimony Corroborates the Lack of Systemic Discrimination

This evidence comports with the statistical evidence. KPMG's expert Dr. Bloom accounted for KPMG's decentralized pay and promotion decisions, and found "*no statistically significant within-job sex disparities in pay or promotion* in the Tax function or the Advisory function of KPMG during 2008 through 2016" in the "overwhelming majority" of practices, job levels and years, with only "*sporadic and isolated…scattered*" exceptions. Kx 3: 3 (emphasis added); *infra* at 37-39. This is unsurprising since Plaintiffs' expert Dr. Vekker found no significant gender gaps in performance assessments, which also drive pay and promotions. Vek. R. at 8, n. 7. And even he did not find *systemic* disparities across Tax, Advisory, or the firm. *Infra* at 37. He admits there were *no statistically significant promotion disparities* from 2008 to 2016 for *50%* of Advisory job levels and *three of eight* total job levels (nearly 40%) at higher and lower levels (promotions from Advisory Director and Advisory/Tax Associate). He also ignores *half* of KPMG's Functions and personnel—Audit and BPG—even as Plaintiffs claim systemic bias by *firm-wide* "senior leaders."[40] Moreover, neither Dr. Vekker nor Plaintiffs' HR expert Dr. Caren Goldberg could point to a single "policy or practice" that *caused* a single pay or promotion disparity. Kx 42: 179-82; Kx 19: 109-10. Dr. Vekker's other findings resulted from aggregated "gerrymandered" analyses unrelated to KPMG's decentralized decision making, and appear calculated to obscure lawful variations by practice area, job level and year. *Infra* at n. 78.

### III.   KPMG's Commitment to Equality, Ethics, Inclusion and Diversity

To mask their flawed claims, Plaintiffs paint a distorted picture of KPMG that is

---

[39] <u>No equal work</u>: **Kx** 10: 70-74, 172; **Kx** 35: 49; **Kx** 9: 70-73, 135-38; **Kx** 38: 125; **Kx** 18: 111-12, 147-148. <u>No comparators identified</u>: Kx DD ¶ 4. <u>Highest paid and/or paid more than all or some named comparators</u>: Kx G ¶ 9.
[40] Vek. R. Tabs. 5-6 & Kx 44 Tabs. 5R-6R, 11R-12R & Kx 42: 191. KPMG gave Plaintiffs data for Audit, and they never bothered to ask for BPG data. Kx DD ¶¶ 5-6.

unrecognizable to women who work there. It also is contrary to KPMG's deep commitment to equal employment opportunity ("EEO"), ethical culture, inclusion and diversity ("I&D"), backed by a more than $100 million investment over the most recent three years alone, and recognized by I&D organizations for over a decade. Kx D ¶¶ 3-8; Kx L ¶¶ 3-6. As Dr. Stockdale found: "KPMG employs state-of-the art ethics and compliance, diversity and inclusion efforts and programs that not only combat systemic and other bias, but also create the conditions to assist women's career success." Kx 4: 5. As a testament to its commitment, women have held many of the highest positions in KPMG, its Board, Functions, and myriad practices and offices during *and before* the class period, including well beyond its current CEO Lynne Doughtie.[41] This coincides with significant increases over the class period in women's promotion into and within management. *Infra* at 21-22 & 40-43. And numerous women, including Plaintiffs, attested to the firm's and their colleagues' (men and women) support for their success. *Infra* at 19-23.

### A.    KPMG's EEO and Ethics Policies, and Inclusion & Diversity Training

KPMG's EEO policy and Code of Conduct ("Code"), both in force before the class period, strictly prohibit gender and other discrimination, harassment, and retaliation; instruct employees to report violations without fear of reprisal; and, in the Code, enumerate KPMG's Core Values including "Respect[ing] the Individual" and "Act[ing] with Integrity." Kx L ¶¶ 11-12. KPMG CEOs have long set this "tone from the top," which per Dr. Stockdale is important to put such principles into action. Kx 4: 11; *see* Kx A ¶¶ 20-22. To further do so, in 2005, KPMG

---

[41] Doughtie, CEO since 2015, was the Advisory National Managing Partner ("NMP") and then Advisory Vice Chair. Other senior executives include Advisory NMP Tracy Benard; Laura Newinski, firm Vice Chair of Operations and previously Tax NMP; Tori Farmer, Executive Director of Diversity and Corporate Responsibility; Margaret Teegan, MD of HR Communications & Culture; Sue Townsen, Chief Diversity Officer; Linda Imonti, National Advisory Office Leader; Kelly Watson, Lead Board Director & National Risk Consulting Group Leader; Rema Serafi, National Service Line Leader–EVS; Manal Corwin, National Service Line Leader–International Tax and Principal-in-Charge of Washington National Tax–International Tax Policy; and Kathy Hannan, then Co-Chair of Inclusion and Diversity Executive Council & NMP of Diversity & CSR. Kx A ¶¶ 2, 23. Also, Miriam Hernandez-Kakol, Global Customer and Operations Leader, and Amanda Rigby, National Leader of Forensic, are both putative class members who have submitted declarations. Kx E ¶ 3; Kx I ¶ 3. This all is in addition to prior leadership roles held.

hired well-respected former U.S. District Court Judge Sven Holmes to serve as its Vice Chair,

Legal Affairs (now Legal, Risk & Regulatory). He directs KPMG's ethics and compliance

functions and Office of General Counsel, and serves as its Chief Legal Officer, Counsel to the

Board and member of the Management Committee. In 2008, KPMG named former Federal

prosecutor and investigator Thomas DiLeonardo as its Chief Compliance Officer, reporting to

Judge Holmes. Under their tenure, KPMG implemented an Incident and Event Monitoring

("IEM") system in 2008 to manage complaints and a sophisticated retaliation monitoring system

("RMS"), as well as many reporting avenues including an anonymous 24/7 Hotline hosted by an

outside vendor. Dr. Stockdale deemed these structures best practices and even industry leading.[42]

KPMG ingrains these principles in Partners and employees through robust training from

the first day they are onboarded at orientation and throughout their careers, including, *e.g.*:

• Interactive (non-passive) EEO, Code of Conduct, *Respect and Dignity* and *Lens of Inclusion*

  trainings during first-day orientation covering non-discrimination, harassment, retaliation,

  diversity, inclusion, reporting of violations, and principles of professional ethics and respect;

• Mandatory Code refresher training every two years, with required annual recertification of

  Code compliance that reiterates their reporting obligation and the ways of doing so;

• I&D training for new Managers and PMLs, as well as bias training for PMLs on avoiding

  stereotypes and "halo error" (rating on an overall judgment, not individual characteristics);

• Training for Partner decision makers on considering individual performance and merit; and

• Bias training for field HR representatives, who support practices and assessment meetings.

Kx L ¶¶ 11-17. Dr. Stockdale found such trainings "comprehensive and grounded in research"

---

[42] Kx 16: 22, 26-27. The RMS tracks various metrics (*e.g.*, utilization, pay, rating and other "conduct or indicia of retaliation") for at least 18 months after a person files or serves as a witness to a complaint. *Id.* at 278. Other listed reporting channels include, *e.g.,* HR, Chief Compliance Officer, Office of General Counsel, Ethics and Compliance group, Ombudsman, Firmwide Security and Risk Management. Kx 55: 7-9, 16; Kx 4: 16-19, 32-34.

for "addressing bias and gender equity in performance evaluation." Kx 4: 31-32, 52-56.[43]

### B.  Inclusion & Diversity Structures and Generous Work-Life Balance Benefits

KPMG also has extensive I&D structures and benefits. In 2003, it formed the Women's

Advisory Board (WAB), charged to significantly increase women's retention and advancement.

In 2003, the WAB established KPMG's Network of Women ("KNOW"), a network now with

over 60 local office chapters that tailor WAB strategies including on networking, work-life

balance, mentoring/sponsorship and career development. In 2007, partly due to the WAB's

success, KPMG formed the Inclusion and Diversity Executive Council ("IDEC") (f/k/a the

Diversity Advisory Board ("DAB")) to implement strategies to recruit, retain and advance

diverse professionals, including women.[44] Dr. Stockdale concluded that these "robust,

comprehensive, and far-reaching programs…assist and promote women's career development,

advancement, and job satisfaction, which address the best practices of developing women by

positioning them to be KPMG leaders." Kx 4: 30.

Plaintiffs' disparaging claim that KNOW is "ineffective and instead reinforces outmoded

gender stereotypes," with little more than "fashion shows" and "window dressing," is belied by

---

[43] Dr. Goldberg's nitpick of KPMG's I&D and bias training as "ineffective" is baseless. Her sole cited study found that combined diversity efforts positively affect women and that diversity committees and staff are "quite effective" –all of which KPMG uses. She criticized computer training, but her cited study found "a small to medium effect of training on even cognitive knowledge of diversity issues" with potentially stronger effects over time, which she did not consider; it mainly studied *student* trainees who did worse than employees; it found "active" training to be "very effective," which she could not distinguish from KPMG's "interactive" learning; and it involved small trainings that could have been non-interactive in the 1980's using archaic programs. She also could not identify any specific pay and promotion training needed beyond what KPMG provides. Kx 19: 208-09, 212-59, 268-69.

[44] Kx 15: 61-63, 92-93, 121-22; 05047; 05123-24; Kx D ¶¶ 3-6. Other I&D initiatives include, *e.g.*: WAB Senior to Senior Committee: provides women above Associate with career and networking opportunities; Executive Leadership Institute for Women: since 2009, an annual year-long award-winning series giving leadership training and interaction with female client leaders to Sr. Managers/Directors, Managing Directors and Partners; Stacy Lewis Rising Stars Invitational for Women: going on its sixth year, this two-day event for high-performing women Sr. Managers/ Directors includes leadership development and a day-long session led by professional golfer Stacy Lewis on golf as a networking tool; Accelerate Your Career Potential Program: commenced in 2015, this day-and-a-half program has provided nearly 500 women Managers per year with guidance and group discussions on career skill. Kx 15: 148-49,158-60, 191, 194; 05046-49; 05123-26; 05098-122. Additional detail on these and other I&D programs is in Latoria Farmer's Declaration, Kx D hereto.

the women who attend these events, including many Opt-Ins, and ample documents produced in discovery. All such evidence underscores the professional value of KNOW and KPMG's many other networking and career opportunities.[45] KPMG also has significant benefits and policies that dovetail with these I&D structures, such as generous paid maternity, family and other leaves; AWAs; protection of performance rating/VC-percentile for a year in which an employee takes a family, medical or certain other leaves of at least six consecutive weeks; new parent mentoring (including via Moms/Parents in the KNOW), and online resources. Many women testified about how these benefits, as well as their colleagues' support, helped them achieve work-life balance, eased their transitions into and back from leaves, and furthered their success. *Infra* at 22-23.[46]

## C.    KPMG's Inclusion and Diversity Monitoring

The record flatly refutes Plaintiffs' claim that KPMG does not conduct I&D monitoring, including "by level." In 2010–before this lawsuit–the IDEC launched a Key Performance Indicator ("KPI") web tool that tracks diversity data, including for women, by Function, Service Line, *and level* in five areas: headcount, turnover, high performance turnover, *promotions*, and mentoring. The IDEC reviews updated KPI data monthly, including against I&D goals for the retention and advancement of women Partners and employees, and also annually monitors

---

[45] *E.g.*, Kx P ¶ 22 (KNOW "events are usually attended by clients and provide unique opportunities for me to network with clients and other women…"); Kx Q ¶13 ("KNOW provides an effective way for interested women to engage with leaders in their group and office."); Kx N ¶ 22 ("I do not consider KNOW events to be "window-dressing" and have found them to be valuable for several reasons."); Kx O ¶14 ("One event I recall in particular addressed career development, including how to expand your network within and outside of KPMG."); **Kx** 20: 155-56, (KNOW "provide[s] women with the opportunity to network with other women in the firm"); **Kx** 45: 133-34; 17689-90 (co-authored article that I&D are "top priority" for KPMG and describing KNOW as one of six diversity efforts that was "key" to success); **Kx** 43:146, 148-49 (admitting KNOW event did not reinforce stereotypes and that some KNOW programs are very substantive); *also, e.g.*, Kx J ¶ 6; 465331; 134404; 678141.

[46] *E.g.*, Kx F ¶¶ 21-22; **Kx** 43: 85-88 (at her request she and Principal are developing a new role for her in AAS with less travel); Kx P ¶ 19 ("I can pick up my daughters during business hours, but later on continue to work from home to complete my projects as necessary."); Kx Q ¶16 ("I like the work, the people, the flexibility that KPMG offers to me, and KPMG's commitment to work/life balance."); Kx N ¶¶ 6-8 (supported in 4 leaves; worked from home 2 days/week for past 10 years); Kx O ¶10 (single mother to twins and "a strong believer that KPMG is a friendly place for working mothers"); Kx X ¶24 ("KPMG provided me with the flexibility I needed to manage my work and my family without a formal AWA."); Kx R ¶20 ("my AWA worked well for me, my career, and my family.").

diverse promotions to Senior Manager/Director and above through "pipeline lists." Many levels

of leadership, including Office Managing Partners and Service Line Leaders, have I&D goals

and are given KPI data to aid those efforts, and employees also have long had I&D goals as part

of their performance criteria. KPMG's CEO also makes I&D a focus when she visits offices.[47]

As to pay, benchmarking against the market inherently monitors pay equity. Kx 4: 27.

HR also reviews "exception reports" of any significant "outliers" (high or low) for diligence,

which Dr. Goldberg admitted "may often flag discrimination." Gold. Reb. 17. Dr. Stockdale

reviewed Work Environment Surveys for 2006 to 2016, showing "[w]omen's perceptions of

their compensation and benefits tend to be slightly more positive than men's" to a statistically

significant degree in most years, and that over 70% of women had favorable views of diversity

and fair treatment.[48] Such efforts have borne fruit, including women's material representation at

the highest firm-, Function-, and practice-leader levels, and their "sizeable" advantage in

promotions into and within management. *Supra* n. 45; Kx 19: 284-87; 529020 at 31, 39.

### D.     External Recognition of KPMG's Efforts

KPMG has received numerous recognitions for its industry-leading I&D efforts and

results as to women, even well before this lawsuit. In 2009, KPMG won the prestigious and

difficult-to-achieve Catalyst Award, "a highly respected award in this area" that "'honors

innovative organizational approaches *with proven, measurable results* that address the

recruitment, development and advancement of all women, including diverse women' (Catalyst,

2017)." Kx 4: 25 (emphasis added). Other significant recognitions include *Working Mother's*

100 Best Companies for Working Mothers (past 21 years; Top 10 since 2011; Hall of Fame) and

25 Best Companies for Multicultural Women (past 9 years); DiversityInc's Top 50 Companies

---

[47] Kx D ¶¶ 17-22; Kx I ¶ 4; Kx M ¶ 6; Kx J ¶¶ 5, 7; Kx A ¶¶ 21-22; Kx B ¶ 3; Kx K ¶ 3.
[48] Kx 4: 59-63. Dr. Goldberg's criticisms of the surveys' validity and reliability are misplaced. *See id.* 59-66.

for Diversity (past 10 years); and *FORTUNE's* 100 Best Companies to Work For (11 times since 2007; top "Big Four" firm for third consecutive year).[49] KPMG succeeded despite being "in the most competitive industry in diversity management" according to DiversityInc. 529020 at 51.

### E.   Plaintiffs' Limited and Sensationalized Anecdotes are Not Representative of Women's Experiences or the Seriousness with Which KPMG Treats Complaints

Women across a wide range of practice areas, offices and job levels in Tax and Advisory described under oath their positive experiences, opportunities and fair treatment as KPMG employees–even after reading Plaintiffs' inflammatory FAC.[50] *See* Kxs N-Z. As Lauren Brown, an employee for eight years of the class period in the Houston BTS practice, aptly stated:

> I read the allegations and description of KPMG in the plaintiffs' [FAC], and it does not resemble the firm that I know or reflect my own experience at KPMG. I have always been treated with respect, treated as an equal, promoted ahead of my peers, and repeatedly acknowledged based on my performance throughout my career at KPMG. I have been given fantastic opportunities for career development and growth throughout my career. I have been treated fairly in terms of pay and promotion at KPMG. In fact, I believe the firm has gone above and beyond in its support of my personal goals and unexpected personal events.

Kx N ¶ 24. A host of other women similarly reject Plaintiffs' "boys' club" claims.[51]

Still others testified to the professional support, opportunities and respect they have

---

[49] Kx L ¶ 6; *see id.* ¶¶ 4-5, 7 for other significant recognitions and awards.

[50] Plaintiffs may argue that KPMG's declarations should be disregarded as purportedly "coerced." This would be false and unfair. *Cf. U.S. v. City of New York*, 717 F.3d 72, 85 (2d Cir. 2013) ("No plaintiff can limit the type of evidence that a defendant must produce to rebut a prima facie case by its selection of particular evidence to support that case."). All declarants read Plaintiffs' FAC and also received the opt-in notice as to their EPA claims. Dkt. 175; 189. KPMG expressly informed them, *e.g.*, that they had no obligation to give a declaration, and would not receive a benefit or detriment either way; and that KPMG may use any declaration they gave to defend against Plaintiffs' claims, which could affect the declarant's eligibility for relief in the lawsuit. *See, e.g.*, Kx T ¶ 2. Courts routinely consider a defendant's employee declarations at the class certification stage and on the merits. *E.g.*, *Gordon v. Kaleida Health*, 299 F.R.D. 380, 397 (W.D.N.Y. 2014); *Lapointe v. Target Corp.*, 2017 WL 3288506, at *5–6 (N.D.N.Y. Mar. 24, 2017) (rejecting plaintiff's claim of inherent coercion). Cases declining to consider employer declarations at "Step 1" *conditional* certification, at which stage courts do not assess the merits, are inapposite.

[51] *E.g.*, in declarants' personal experience: Kx P ¶25 (KPMG not "a 'boys' club,'" people act respectfully); Kx N ¶21 (KPMG "very inclusive," "not a 'boys' club.'"); Kx Q ¶16 (KPMG "does not have a culture that is hostile to women," "is not a 'boys' club"); Kx U ¶ 27 (KPMG is "great place to work for women and mothers," "does not have a 'boys club' culture"); Kx X ¶ 28 (not her experience that KPMG has "'boys' club' culture that is hostile to women"); Kx R ¶24 (KPMG not "a 'boys club,'" "I personally have always been treated professionally") Kx Z ¶ 18 (no "hostile boys club culture," always treated "with respect," practice "has strong female leadership.").

received. Liz Evans, who was an employee for nearly six years of the class period, described how her mentor, a man, gave her "great career guidance, including providing leads to me for business generation," and was "extremely supportive." Kx R ¶ 25. And Noel Ellison's (male) Partner-in-Charge nominated her, and she was selected, for KPMG's inaugural "Rising Star" program in which 25 KPMG women across the firm attended a summit with firm leadership. Kx O ¶ 13. KPMG has respected the Court's declaration limit set after the parties' briefing on that issue, Dkt. 708 & n.3; Dkt. 711, but as noted was not permitted to submit more declarations from a further diverse range of other accomplished professional women whose positive experiences and success at KPMG also bear absolutely no relation to the picture Plaintiffs strain to paint.[52]

Yet out of the well over ten thousand women who have worked in Tax or Advisory over the nearly decade-long class period, Plaintiffs cherry-pick sensationalized and *un*representative accusations to try to impugn KPMG. The 128 IEM reports[53] they cite from 2008 to 2016 average to fewer than 15 per year across 10,000 women per year – less than 0.2% of women per year, and materially the same even adding in the allegations in Plaintiffs' Motion. And Plaintiffs cite and submit just 32 of these reports. None are representative of Tax or Advisory as a whole. Plaintiffs also inflate their evidence, citing several IEM reports multiple times and various decades-old allegations, including for example Ilene Kassman's (Plaintiff Kassman's sister) and Plaintiff Jeannette Potter's salacious (and in some cases hearsay) stories from the 1980's and 1990's. Br. 19-26; **Kx** 26: 213-14; **Kx** 34: 320-21. Much testimony is entirely conclusory and lacks objective proof, *e.g.*, stating only what the employee "felt." *E.g.*, Br. at 19-20 & n.87-88. And many allegations, including 25% of all cited IEM reports and one by Plaintiff Kassman, allege conduct

---

[52] *E.g.*, Kx N ¶14 ("very helpful" male/female mentors gave "invaluable professional advice"); Kx Y ¶ 9 (held "path to promotion" events," male/female leaders "very supportive"); Kx V ¶ 11 (her "quick progression from Associate to Partner" bolsters view that KPMG "very supportive of women's careers"); *see* Kx Z ¶ 17; Kx S ¶ 17.

[53] This number is 128 and includes, for example, four complaints by Inman. Kx DD ¶ 9.

by Associates and Senior Associates, who did not make or control pay or promotion decisions.[54]

Plaintiffs also omit IEM and other evidence contradicting the same reports they cite, *e.g.*, they cite an anonymous IEM report that a man "groped" women at an after-work event. Yet the very same report indicates that KPMG interviewed every woman who attended and all flatly denied the allegation, variously calling it "preposterous" and stating men in their practice were "very professional and respectful."[55] Plaintiffs also blatantly misstate KPMG's report-handling. They cite all of *two* reports to broadly claim that KPMG often classifies reports as "simply a 'lack of professionalism.'" Each makes plain that it was handled as a harassment complaint. Br. at 22-23, n.93. And Plaintiffs ignore and misstate KPMG's extensive investigations and significant remedies for violations, *e.g.*, of the 36 substantiated discrimination/ harassment reports, 12 resulted in termination—including of Partners—and the others resulted in pay cuts, promotion denial, alcohol rehab, and individual training, depending on the severity.[56]

Plaintiffs try to excuse their low quantum of anecdotes with almost entirely conclusory "canned" declarations stating, *e.g.*, that the person "fears" retaliation or "believes" reporting was futile. Br. at 25, n.109-10; *id*. n.108 (citing *three* local instances as systemic "discouragement"). Evidentiary issues aside, the record shows any such "concerns" to be *un*representative. Women across practice areas and offices testified that they felt free to report concerns (if they had them) without reprisal, as KPMG's EEO policy and Code of Conduct require.[57] This is consistent with KPMG's robust complaint reporting, retaliation monitoring, and anonymous and other reporting

---

[54] Kx DD ¶ 10; 148490; 148527; 148776; 149147; 149245; 149267; 631942.

[55] 632594 at 598; *see, e.g.*, 631062 (Associate claimed *female* PML unprofessional; in investigation, admitted not meeting AWA terms, not returning PML's call as she "did not always feel like speaking" to her, not completing work, missing client deadline); 632442 (anonymous claim that male had inappropriate discussions with female at lunch; female denied all allegations, said she loves to go to lunch with him and invited him to her wedding).

[56] Kx DD ¶ 9. *E.g.*, all 3 employees accused of sexual assault immediately fired, including for an alleged incident at a non-KPMG party, not a work event as Plaintiffs claim.

[57] Kx X ¶ 27; Kx Q ¶ 15; Kx N ¶ 23; Kx O ¶ 17; Kx P ¶ 26; Kx W ¶ 23.

structures, which Dr. Stockdale concluded are "industry-leading" and "increase[] the likelihood" of reports by "obviating concerns (if any) about possible repercussions." Kx 4: 16-17.[58]

**ARGUMENT**

Plaintiffs fail to cite any case, much less one certifying a nationwide Title VII class or EPA collective, remotely like this one. Certification would violate core legal requirements and proliferate the proceedings in this Court, not streamline them as Rule 23 and the EPA require.

## I.   Legal Standards for Trial of Disparate Treatment and Disparate Impact Claims

Plaintiffs falsely claim that if the Court denies certification, it must try thousands of cases, but if it certifies "class-wide" disparate impact and treatment issues, they assert the hard part is over, only "damages" issues remain, and the Court can shunt off "mini-trials" to a "special master" or use "questionnaires." Br. at 42-47. The opposite is true. If certification is denied, only the Named Plaintiffs' individual claims remain, and any class members may sue in their home courts if they wish.[59] But certifying would enmesh this Court, not a Special Master, for years in thousands of individual *jury* and/or bench trials on both *liability* and damages.

Plaintiffs fundamentally disregard the way in which pattern-and-practice and disparate impact claims are tried−standards that directly affect the certification analysis and render class treatment totally unmanageable here. A pattern-or-practice claim alleges that an employer engaged in disparate treatment−*intentional* discrimination−as its "standard operating procedure." *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 336, 358 (1977); *Dukes*, 564 U.S. at 352 n.7. A disparate impact claim alleges that a *specific* facially neutral (non-intentional) employment practice actually *causes* an identifiable disparate impact on a protected group. *Dukes*, 564 U.S. at

---

[58] Dr. Stockdale's cited studies facially refute Plaintiffs' claim they are unsupportive. Kx 54: 79-82, 85; Kx 56: 171-72. Plaintiffs falsely claim the WAB told management many women "do not believe 'they can report unethical treatment without fear of reprisal.'" Br. at 26, n. 111. Their cite shows 75% of women *agreed* "I can report unethical practices without fear of reprisal," and 84% agreed "people are treated fairly regardless of...gender" 553873 at 81.
[59] EPA Opt-Ins also should be dismissed to their home venues, as discussed *infra* Arg. III.

350; *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012).

Critically, neither a pattern-and-practice nor a disparate impact finding proves *liability* to a *single* class member. Rather, even if Plaintiffs prove a pattern-and-practice, KPMG then "will have the right to raise *any individual affirmative defenses* it may have, and to 'demonstrate that *the individual [claimant]* was denied an employment opportunity *for lawful reasons*.'" *Dukes*, 564 U.S. at 367 (emph. added) (quoting *Teamsters*, 431 U.S. at 362). So too for disparate impact:

> Should the plaintiffs succeed in establishing a Title VII disparate impact violation, the court may order prospective class-wide injunctive relief. Still, *in order for an employee to obtain individual relief (e.g., back or front pay), an inquiry similar to the remedial stage of a pattern-or-practice disparate treatment claim is generally required. Each class member* must show that he or she was *among those adversely affected* by the challenged policy or practice. If this showing is made, the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory *reason* existed *for the particular adverse action.*

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 161-62 (2d Cir. 2001) (emphasis added), *abrog. on other grounds*, *Dukes*, 564 U.S. 338. These hearings go to individual liability—"*why was I disfavored*"—and must be conducted by the Court, as *Dukes* recognized. 564 U.S. at 352; *Robinson*, 267 F.3d at 158 & n.4 ("Referring to the first phase of a pattern-or-practice disparate treatment suit as the 'liability phase' is something of a misnomer…the remedial phase also implicates questions of liability…to each individual class member….").

KPMG would be entitled to a *jury* trial on each class member's disparate treatment claim since they seek compensatory and punitive damages, 42 U.S.C. § 1981a(c), or a "bench trial of the disparate impact claim" of each class member, even if Plaintiffs do not prove a pattern-and-practice. *Robinson*, 267 F.3d at 170.[60] KPMG has the Due Process right to individual trials: "a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory

---

[60] *Id.* at 169 n.13 (recognizing jury trial right on pattern-and-practice claims at both "liability" and "remedial" phases); *id.* at 170 (when pattern-or-practice claim pled with disparate impact claim, "the pattern-or-practice claim must be tried first to a jury if there are common factual issues necessary to the resolution of each claim").

defenses to individual claims." *Dukes*, 564 U.S. at 367; *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (predominance avoids "sacrificing procedural fairness") (internal quote marks omitted). "Special masters" and "questionnaires" will not do. Neither Rule 23 nor *Teamsters*—a government action not subject to Rule 23—can infringe on these rights. *Dukes*, 564 U.S. at 367 (Rule 23 cannot "abridge, enlarge or modify any substantive right" per Rules Enabling Act).

Plaintiffs wholly fail to meet their burden of proving their compliance with Rule 23's requirements, including without limitation "significant proof" of any true common issue *and* a realistic trial plan that would avoid the proliferation of litigation sure to flow from certification.

## II.   <u>Plaintiffs Fail to Meet Their Burden of Proving Compliance with Rule 23</u>

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is…prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.," *Dukes,* 564 U.S. at 350, and satisfy "at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The Court must conduct a "rigorous analysis," *Dukes*, 564 U.S. at 350-51, including "to assess all of the relevant evidence admitted at the class certification stage, to resolve factual disputes relevant to each Rule 23 requirement, and to find that whatever underlying facts are relevant to a particular Rule 23 requirement have been established, notwithstanding an issue's overlap with the merits." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (internal quote marks and alterations omitted). Plaintiffs must prove each Rule 23 element by a preponderance of the evidence. *Id.* Failure to satisfy even one precludes certification. *Id*. Aside from numerosity, Plaintiffs here fail to prove a single Rule 23 requirement.

### A.   Plaintiffs Fail to Prove Commonality Under Rule 23(a)(2) for Their Title VII Claims

Plaintiffs must prove "questions of law or fact common to the class." One such question may do, but the question(s) must "generate common *answers*" that "drive the resolution of the

litigation." *Dukes*, 564 U.S. at 345, 350 (cite, internal quote marks omitted; emphasis original).

The merits are relevant because, "in resolving an individual's Title VII claim, the crux of the

inquiry is 'the reason for a particular employment decision.'" *Id.* at 352 (cite omitted). Thus:

> Commonality requires the plaintiff to demonstrate that the class members "have
> suffered the same injury" … not…merely that they have all suffered a violation of the
> same provision of law…. [T]he mere claim by employees of the same company that
> they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives
> no cause to believe that all their claims can productively be litigated at once. [….]
> Without some glue holding the alleged reasons for all those decisions together, it will
> be impossible to say that examination of all the class members' claims for relief will
> produce a common answer to the crucial question *why was I disfavored*.

*Id.* at 349-52 (emphasis original, cite omitted, alterations added). Because that "glue" is lacking

here (as discussed below), certification would necessitate thousands of individual jury and/or

bench trials as to "the reason for a particular employment decision" for *each* class member.

      Plaintiffs ignore *Dukes*, instead posing generic "common questions" of whether disparate

treatment or impact exists—mere variants of "Is that an unlawful employment practice?" which

are "not sufficient to obtain class certification." *Id.* at 349; Br. at 32-36. Proof that "the employer

'used a biased testing procedure'" or "the same supervisor" made all decisions, or "[s]ignificant

proof that an employer operated under a general policy of discrimination," *might* be the "glue" if

it explains "why was I disfavored" for all those affected. *Id.* at 349-53 (citations omitted). But

Plaintiffs here challenge only myriad individual discretionary decisions. *Supra* at 12-14.

      A "policy" of "allowing discretion by local supervisors over employment matters" gives

no common answer to the question "*why was I disfavored*?" *Id.* at 353, 355. Rather:

> [T]hat is just the opposite of a uniform employment practice that would provide the
> commonality needed for a class action; it is a policy *against having* uniform employment
> practices. It is also a very common and presumptively reasonable way of doing
> business—one that we have said "should itself raise no inference of discriminatory
> conduct"….*[T]he recognition that this type of Title VII claim "can" exist does not lead
> to the conclusion that every employee in a company using a system of discretion has such
> a claim in common.* To the contrary, left to their own devices most managers in any
> corporation—and surely most managers in a corporation that forbids sex discrimination

—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact—such as scores on general aptitude tests or educational achievements. And still other managers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.

*Id*. at 355-56 (emphasis and alteration added, cites omitted).

Where decisions are decentralized and discretionary, Plaintiffs must prove "a common mode of exercising discretion that pervades the entire company"—"common direction" causing each person to act in a common way. *Id.* at 356. But in a firm of KPMG's "size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." *See id.* Indeed, KPMG's myriad diverse jobs, practice areas and local decision making are infinitely more complex than anything at issue in the Wal-Mart stores in *Dukes*. Even in terms of just class size, Plaintiffs "simply have created a smaller version of the same problem" in *Dukes* – a lack of "glue" necessitating myriad individual trials that are anathema to Rule 23. *Ladik v. Wal-Mart Stores, Inc.*, 291 F.R.D. 263, 270 (W.D. Wis. 2013).

1. Plaintiffs' Title VII Disparate Impact Claim Does Not Satisfy Commonality

While Plaintiffs need not prove a *prima face* case, they still "must offer 'significant proof' of disparate impact to demonstrate commonality." *Chen-Oster v. Goldman, Sachs & Co.*, 2018 WL 1609267, at *11 (S.D.N.Y. Mar. 30, 2018); *supra* at 27 (merits relevant). They must: "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin*, 685 F.3d at 151 (cites omitted).

a. *Plaintiffs Fail to Identify a Specific Employment Practice or Policy*

i. Plaintiffs Attack KPMG's Entire Subjective Pay and Promotion Processes

A "specific employment practice" is "all the more necessary when a class of plaintiffs is sought to be certified." *Dukes*, 564 U.S. at 357. But Plaintiffs instead spend many pages

purportedly describing KPMG's entire pay and promotion processes. Br. at 5-12. *Jones v. Nat'l*

*Council of YMCA*, 34 F. Supp. 3d 896, 904-05 (N.D. Ill. 2014), rejected just such a tactic:

> [T]he plaintiffs have attempted to avoid the import of *Wal–Mart* by combining what they had previously characterized as different policies and downplaying the degree of discretion afforded by those policies to supervisors by describing the combined system as a single "forced," *i.e.,* a mandatory, non-discretionary, "employment practice."... [A]t that level of generality, every company—even Wal–Mart—could be said to have a company-wide policy, and would be liable if there were a disparity in compensation or other conditions affecting employees who were members of a protected class.

*See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (must identify specific plan provision).[61]

Plaintiffs' FAC, Brief and Dr. Goldberg's report, which they claim "identifies the

common problems with KPMG's pay and promotion practices" Br. at 2, belie the existence of

any practice that is common – much less applied in a common way – across the class:

- "KPMG's assignment, development, promotion, advancement, compensation and performance evaluation policies, practices and procedures…all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge." FAC ¶ 416.

- Pay is based on "vague, and unweighted criteria," Br. at 9, and "KPMG's goals are standardless and not calibrated to any objective standards….[This] affords KPMG the opportunity to make assessments that are decoupled from consistent standards." Gold. R. 10.

- "[T]he criteria for making the recommendations and decisions of who actually gets promoted are ill-defined and subject to myriad interpretations…. KPMG policy also fails to provide instruction on how criteria should be weighted…." *Id.* at 17-18.

As a case in point, Dr. Goldberg criticized the rating of employees on "identifying opportunities"

and meeting "personal goals," saying the first is vague—"I can make it whatever I want to make

it"—and the last "precludes comparability across employees." Kx 19: 201; Gold. R. 10. But

therein lies the rub: if each decision maker can "make it whatever I want," and comparability is

---

[61] *See also Serrano v. Cintas Corp.*, 2009 WL 910702, at *5 (E.D. Mich. Mar. 31, 2009) (no commonality where "hiring process has many different steps….Putative class members would have suffered the alleged discrimination in different ways at different stages of the hiring process"), *aff'd in part, rev'd in part on other grounds sub nom*, *Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013); *Ladik*, 291 F.R.D. at 272 ("By challenging so many different matters…plaintiffs have made it impossible to craft a cohesive class.").

impossible, there is no common answer to "*why was I disfavored*?" *Dukes II*, 964 F. Supp. 2d at 1126 ("the criteria were so vague or numerous that they imposed no real constraints").

Courts, including in this District, find commonality lacking in such cases, even where discretion is *not* unlimited. This includes *Moore v. Publicis Group SA*, 2014 WL 11199094, at *7 (S.D.N.Y. May 15, 2014), in which plaintiffs similarly sought (without success) to obscure their lack of any "specific employment policy," and to overcome "evidence… that local managers exercised discretion over pay and promotion decisions" with unsupported claims of a "cabal," central oversight of budgeting and decisions, and loose aggregated statistics (discussed below).[62]

The number of decision makers and class years here magnifies these complexities, as do the many varying jobs and practice areas over which they exercise that discretion. *Trawinski v. KPMG LLP*, 2012 WL 6758059, at *6-7 (S.D.N.Y. Dec. 21, 2012), recognized KPMG's job and practice diversity and found commonality lacking in an overtime case, even though it involved just one job level in one Service Line in one state – and despite a "common" job description:

> Even within the same service network, though the types of assignments given to Associates may be similar, the specifics can vary widely. In particular, KPMG submitted declarations from four members of the Financial Due Diligence network who worked in the company's New York City office, as did Trawinski herself. While all four reported working on similar engagements, specifically potential corporate acquisitions and the raising of capital, their actual assignments showed minimal overlap. In such a situation, the applicability of exemptions, and, in turn, the "proof of liability will not turn on what [the employer] did or did not do vis-a-vis the entire class, but rather what each member of the class does on a daily basis." Under these circumstances, the Court determines that Trawinski has not met the commonality requirement of Rule 23(a).[63]

---

[62] *See Bolden*, 688 F.3d at 898 (decisions absent "objective criteria" is "policy of on-site operational discretion"); *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 198 (D.D.C. 2017) (using "same allegedly ill-defined numerical rubric to grade employee performance…says nothing about how individual supervisors exercised what discretion was left to them") (settlement; besides manageability, Rule 23 "undiluted" in settlement context, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)); *Valerino v. Holder*, 283 F.R.D. 302, 312, 314 (E.D. Va. 2012) (no commonality in "subjective, discretionary decision making" despite "*some* common structure"); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 145 (S.D.N.Y. 2015) ("a range within which acts of discretion take place will not suffice to establish commonality"), *aff'd*, 656 F. App'x. 555 (2d Cir. 2016); *Davis*, 717 F.3d at 488-89; *LaMarr-Arruz v. CVS Pharm., Inc.*, 2017 WL 4277188, at *5-6 (S.D.N.Y. Sept. 26, 2017); *Zuniga v. Bernalillo Cty.*, 319 F.R.D. 640, 688-90 (D.N.M. 2016); *Bell v. Lockheed Martin Corp.*, 2011 WL 6256978, at *6 (D.N.J. Dec. 14, 2011).

[63] *Trawinski's* grant of permissive "Step 1" conditional certification under the FLSA is inapposite. *Infra* Arg. III.

Here too, the Court would need to analyze each class member's individual job and practice.

    ii.  Dr. Goldberg's "Fertile Ground for Bias" Theory and Critiques of KPMG's <u>HR Practices Challenge Discretion and Do Not Prove Any "Specific Practice"</u>

Dr. Goldberg's "fertile ground for bias" theory cannot bridge this gap. *Dukes* held that a virtually identical expert theory–that "culture" and practices made a company "'vulnerable' to gender discrimination'"– did not prove a "specific practice" or commonality. 564 U.S. at 346, 354-55 (cite omitted). Courts routinely find commonality lacking in claims that discretion or practices allow for bias. *Publicis*, 2014 WL 11199094, at *3; *Dukes II*, 964 F. Supp. 2d at 1127 (no commonality; claim that "vague criteria" caused managers to rely on "stereotyped view of women"); *Jones*, 34 F. Supp. 3d at 899 (same; claim of "subjective criteria" posing "greater risk" of "bias or stereotypes") (internal quote marks omitted).[64] Dr. Goldberg critiques KPMG's business judgment (*e.g.*, "dissociate[s] pay from performance"), Gold. R. 5, but courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am.*, 766 F.3d 163, 169 (2d Cir. 2014) (cite and internal quote marks omitted). Their role "is not to determine whether…process[es] could have been better…." *Apsley v. Boeing Co.*, 691 F.3d 1184, 1205-06 (10th Cir. 2012) (Dr. Goldberg's "fertile ground for bias" not relevant).

Plaintiffs offer no "significant proof" of any "specific practice" proving commonality. *E.g.*, Dr. Goldberg claims KPMG "moves employees to the middle" of pay ranges regardless of performance, and "overlaps" pay raise percentages for different ratings. But Plaintiffs have no proof that these are "practices" *in fact* occurring *across the class*. Dr. Goldberg did not know of a "move to the middle" for even *one* employee, or of *any* actual overlap in raises for differently rated employees. Kx 19: 92-93, 121-27. The record shows that this is *not* an actual "practice."

---

[64] <u>For no commonality</u>: *Ross*, 267 F. Supp. 3d at 178, 183-84 ("flaw[ed]" rating system"; no "measurable indicators for managers to use"; "inadequate safeguards against bias") (internal quote marks omitted); *Bell*, 2011 WL 6256978, at *6 (pay policy "can be charged with bias"); *Zuniga*, 319 F.R.D. at 688 (policies "vulnerable" to manager's "gender bias"); *Valerino*, 283 F.R.D. at 313 (same); *Davis*, 717 F.3d at 489 ("white male business culture").

*Supra* at 13-14 (some kept low in their range, some exceed midpoint, due to performance and other factors). Kx J ¶ 19; Kx O ¶ 8; Kx 4: 8, 58; Kx G ¶ 15. Dr. Goldberg admits that claims need "evidence that, in practice, this is happening at KPMG."  Gold. Reb. 14. Speculation that decisions *could* be made in a common way does not suffice. Plaintiffs need "significant proof" that they *are in fact* being so made. *Chen-Oster*, 2018 WL 1609267, at *11. They have none.

Nor do salary ranges, reference points, budgets or an alleged "cabal" supply the requisite "glue." Partners can and routinely do depart from ranges and points. *Supra* at 14-15. Plaintiffs also offer no proof of a "cabal" of "senior leaders"–whose names and genders they tellingly never identify–or that they control the decisions at issue. Aside from the fact that many "senior leaders" long have been women, it is undisputed that Function leaders (as opposed to practice leaders who actually make the decisions) look at aggregate data against budgets, but do not make or approve individual pay, promotion or performance decisions across the class. *Supra* at 11-14, n. 32; *Dukes*, 564 U.S. at 343 (no commonality though pay subject to "limits," "ranges," and "limited corporate oversight"). Plaintiffs' claims of "tap on the shoulder," and inadequate bias training and monitoring, also fall short. Besides being wrong, they allege a *lack* of controls or common order over decisions. *Id.* at 343 (no commonality despite manager discretion to pick promotion candidates); *supra* at 11-14, 17-22. Cases routinely find such allegations insufficient to prove commonality. *E.g.*, *Publicis*, 2014 WL 11199094, at *2 (claim that "cabal" "keeps a tight rein on employment decisions…through rigorous financial reporting and monitoring…").[65]

---

[65] No commonality despite centralization, approval, limited discretion: *Jones*, 34 F.Supp.3d at 908 (no proof "senior management changed pay or promotion recommendations submitted to them for approval with any frequency"); *Bell*, 2011 WL 6256978, at *7 (pay "deviation" limits "substantially identical in nature to Wal-Mart[]"); *Randall v. Rolls-Royce Corp.*, 2010 WL 987484, at *8 (S.D. Ind. Mar. 12, 2010) (central pay ranges still "are broad…the fact that hundreds of supervisors have the discretion to apply adjustments, bonuses and other incentives…is significantly subjective and unique to the individual"), *aff'd*, 637 F.3d 818 (7th Cir. 2011); *Dukes II*, 964 F. Supp. 2d at 1123; *Zuniga*, 319 F.R.D. at 688-90; *King v. Enterprise Rent-a-Car Co.*, et al., 231 F.R.D. 255, 259, 261 (E.D. Mich. 2004); *Bennett v. Nucor Corp.*, 656 F.3d 802, 814-15 (8th Cir. 2011); *cf. Coser v. Moore*, 739 F.2d 746, 753 (2d Cir. 1984) (pay "decentralized" despite higher approvals); *Bloomberg*, 778 F. Supp. 2d at 480 (summary judgment) ("[it

While Plaintiffs vaguely allege "common" training and promotion criteria—conflicting with their claims of *insufficient* training and *too much* discretion—they never identify specific criteria that "commonly" guide discretion, because there are none. Dr. Goldberg admits Partners are "trained" that there are *no* set individual limits in pay decisions. Kx 19: 109-10 (Partners told "feel free to go above or below" ranges). Beyond baselines like Code compliance and time recording, pay and promotion "criteria" vary widely and are applied in myriad ways across jobs, practice areas and assessment meetings. *Supra* at 10-14. And while Plaintiffs have not proved "pay secrecy," they do not claim such a "policy" to be unlawful (particularly nationwide). Dr. Goldberg admits that pay privacy is not uncommon, and knows of no study finding it harms women. Kx 19: 153-56. With no "common" unifying "policy" to materially advance this case, the Court would face a quagmire of individual trials irreparably multiplying these proceedings.

### iii. *Chen-Oster* Is a Case-in-Point as to Why This Case Cannot Be Certified

The recent *Chen-Oster* decision granting Rule 23(b)(3) certification on certain pay and promotion gender claims (but *not* "boys' club" claims), puts this case in stark relief.[66] It involved only two job titles, one division, and a much smaller class (about 2,000) "largely centered in one office in New York City"—a far cry from this case, especially given the focus of commonality on "employment decisions" (here over 100,000), not just class size. 2018 WL 1609267, at *13

---

is] hardly surprising" that "[i]n a company of over 10,000 individual employees," "higher-level executives… approved decisions to manage business units with a view toward the company's financial performance"). No commonality as to "tap on shoulder" and monitoring/training claims: *Bolden*, 688 F.3d at 898 ("No Policy/Practice to investigate claims of race discrimination" or to "analyz[e] their own employment data to determine whether" bias was "actually occurring"); *Dukes II*, 964 F. Supp. 2d at 1119, 1127 ("'tap on the shoulder' system"); *Bell*, 2011 WL 6256978, at *6 (lack of posting; "permit[ted] discretion"); *id.* at *8 (no "measures to identify and redress gender discrimination"); *Zuniga*, 319 F.R.D. at 647-48 (deficient efforts in "identifying and monitoring gender bias in the workplace"); *Ladik*, 291 F.R.D. at 266, 271 (managers "aware" of disparities, "failed to take any remedial action").

[66] KPMG's discussion of *Chen-Oster* is based on the text of the opinion itself. Goldman filed a Rule 23(f) petition for leave to appeal (No. 1:10-cv-06950, Dkt. 579-1), alleging in part that the court did not properly account for all of the relevant facts, in turn affecting the legal analysis. To the extent such contentions are found accurate, *Chen-Oster* would be even more distinguishable and inapposite, irrespective of whether the appeal is accepted and sustained.

n.11; *Dukes*, 564 U.S. at 356.[67] *Chen-Oster* reaffirmed that plaintiffs must provide "significant proof" of a "specific employment practice," which it found in two alleged uniform, specific class-wide policies with explicit numerical and other criteria—"360 review" and "manager quartiling" (forced ranking).[68] 2018 WL 1609267, at *11, 13. The court held these were "critical facts" distinguishing *Dukes*, *id.* at 13, but no such specific policy or proof exists here (besides the fact that, again, Plaintiffs' own expert found no gender bias in KPMG's performance ratings). The wide decision making discretion that even Plaintiffs allege, and that the undisputed record shows, far exceeds the narrow constraints imposed by the explicit policies found in *Chen-Oster*.

*Chen-Oster* also cited "cross-unit collaboration" and centralized top-down control—not just review—of *individual* decisions.[69] *E.g.*, the court stated that firm and division leaders and firm-wide HR adjusted individual rankings to enforce "quartiling"; a central "cross ruffing" team evaluated VPs *across business units* for promotion with "standardized forms and criteria to be discussed in interviews"; division and firm leaders assessed, added and removed candidates; and VP promotions were "made by the firm's management committee." *Id.* at *5, 12, 14 ("the firm's senior management wield a great deal more influence."). This is not even close to the facts here.

Nor can Plaintiffs bootstrap certification onto later-stage *defenses*—"whether the policies are based on business necessity and whether there are less discriminatory alternatives"—where, unlike *Chen-Oster*'s finding, they fail to prove commonality as to their threshold claim.[70] Br. at

---

[67] The class here also far exceeds that in *Chen-Oster* (as well as the "averages" it cites) in both class members and decisions (over 10,000 women/year x 9 years of pay decisions, plus nearly a decade of promotion decisions).

[68] For example, 360 reviews required quantitative assessments of various defined criteria, while manager quartiling required managers to follow a prescribed distribution of ratings (e.g., top 25% in quartile 1, and so forth) based on seven specific factors that included their 360 review ratings. *Id.* at *3.

[69] Notably, *Chen-Oster* did *not* cite as evidence of commonality or centralization the fact that business unit managers' individualized compensation decisions were subject to budgets and higher-level review. *Id.* at *4.

[70] This is even truer given Dr. Goldberg's lack of "significant proof" on these issues. *Dukes*, 564 U.S. at 354-55 (inapposite opinion immaterial to commonality). Asked for non-vague criteria that KPMG *should* use, she suggested even vaguer ones: whether a candidate "has the potential to motivate others [or]…to have the group work together." Kx 19: 193. She testified it is not her role to identify alternative practices, and her Report contains none. *Id.* 192-95.

32; *Ladik*, 291 F.R.D. at 270-71 (rejecting essentially the same questions). "Business necessity" also is *position-specific* and individualized. 42 U.S.C. § 2000e-2(k)(1)(A)(1); *Robinson*, 267 F.3d at 161. While *Chen-Oster* found "business necessity" to be a common question, it did not cite cases or analyze this statute, likely finding no need given the uniform policies found there.[71]

> *b. Plaintiffs' Statistics are Fatally Flawed and Lack "Significant Proof" of Causation*

Plaintiffs claim Dr. Vekker's analyses are "common evidence" of disparate impact. Not so. They offer no causal link between any "disparity" and the "policies and practices" Dr. Goldberg alleges. Neither expert studied or opined on the cause of any alleged disparity or bias, or showed that any KPMG "policy"—rather than societal or other factors—affected a single class member. Kx 19: 179-82 (never studied if any policy "had a negative impact on 2 percent of the women or 100 percent of the women or none"); Kx 42: 109-10. This total lack of proof again contrasts with *Chen-Oster*, for example, which found "no dispute that each of the class members was subject to [these] processes"—proof also deemed "critical" by the court in that case. 2018 WL 1609267, at *13. "Merely showing that [a] policy of discretion has produced an overall sex-based disparity does not suffice." *Dukes*, 564 U.S. at 354, 357 (disregarding opinion where expert "could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking"—"the essential question….").[72]

---

[71] Under 42 U.S.C. § 2000e-2(k)(1)(A)(1), liability for a proven disparate impact arises if "respondent fails to demonstrate that the challenged practice is job related *for the position in question* and consistent with business necessity." (emphasis added). To the extent *Chen-Oster* intended that the "business necessity" and "alternative employment practice" prongs *never* require a position-specific analysis, KPMG respectfully submits that such a holding would be in error. *Supra* text at 35-36; *Robinson*, 267 F.3d at 161 (business necessity defense requires proof "that 'something about the [particular] position'" requires use of the practice) (alteration in original; cites omitted).

[72] *See Ross*, 267 F. Supp. 3d at 200 (no commonality "[w]ith neither an account of how the common features of the performance appraisal system led to racially disparate outcomes…nor "statistical evidence of a kind and degree sufficient to show that the practice in question has caused" discrimination) (citation omitted); *Dukes II*, 964 F. Supp. 2d at 1127 (no commonality: "Plaintiffs do not argue in substance that the criteria themselves, faithfully applied, led to disparate impact. For example, Plaintiffs never suggest that prioritizing the 'ability to communicate' over some other trait had a disparate impact on women."); *Pippen v. State of Iowa*, 2012 WL 1388902, at *55 (Polk Cty. Dist. Ct. Apr. 17, 2012) ("implicit bias evidence does not prove causation."), *aff'd*, 854 N.W.2d 1 (Iowa 2014).

Dr. Vekker's analyses also do *not* show disparities across Tax, Advisory, the firm, or the whole class period: "Practices that do not apply during the entire class period across the class cannot provide a common question tying the class together." *Dukes II*, 964 F. Supp. 2d at 1126. He omits Audit and BPG – 50% of the firm; admits there were *no* statistically significant promotion disparities from 2008 to 2016 for *50%* of Advisory job levels and *three of eight* total job levels; and admits that performance ratings, which impact pay and promotions, show no bias against women. *Supra* at 15-16. Dr. Vekker also improperly aggregates results across each of Tax and Advisory, with no account for practice area or decentralization that impact and thus can explain promotions and pay. *Id.*; Kx 44: 8 ("Service line provides some explanatory power for pay"); Kx 42: 139-41, 182. He simply assumed, without investigating, that role summaries by job title indicate common jobs, but the summaries and the record show this to be false.[73] *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310-12 (2d Cir. 1995) ("job content and not job title or description" matters; EPA standards also apply to Title VII equal pay claim).

This is a fatal defect: "[D]isparities at the regional and national level do[] not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." *Dukes*, 564 U.S. at 356-57 (internal quote marks, cites omitted).[74] Dr. Vekker's "controls" for Service Line, job title and year show only the *average* effects of these variables over pay and promotion decisions, and mask significant variations *between* Service Lines, job titles and years

---

[73] *Supra* at 5-10; Vek. R. 3-4; Kx 42: 125-28; Kx 44: 8-9. Dr. Vekker also says KPMG unilaterally "assigns people to Service Lines," making it "tainted." Kx 42: 129, 136-37. But he never analyzed hiring and had no such proof. *Id.* at 135-38. The only evidence is to the contrary. *Supra* at 14-15.

[74] *Id*. at 357 ("regional pay disparity…may be attributable to only a small set of Wal-Mart stores"); *Coser*, 739 F.2d at 750 ("Where uncoordinated and independent employment decisions are made by different persons, statistics as to hiring by the overall entity may be less significant in demonstrating bias than where a single office makes all employment decisions…The same is true when highly specialized jobs are in issue, as opposed to identical positions requiring only general skills."). Other no-commonality cases with aggregated statistics: *Bell*, 2011 WL 6256978, at *8; *Boykin v. Viacom Inc.*, 1997 WL 706323, at *4 (S.D.N.Y. Nov. 12, 1997); *Bennett*, 656 F.3d at 815-16.

that defeat commonality.[75] Vek. R. 9 (showing "average…disparities"). As *Bolden* noted:

> If Walsh had 25 superintendents, 5 of whom discriminated…aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality.

688 F.3d at 896; *Publicis*, 2014 WL 11199094, at *3, 7 (no commonality from "average" gap).

However, Dr. Bloom assessed what employees actually did and found: "Practice areas …define the skills, credentials, relationships, knowledge, and expertise needed by employees as well as the pay and promotion rewards corresponding to each of those attributes [….] [J]ob titles do not capture information about" such issues. Kx 3: 3, 5, 23-24. To avoid improper "averaging," he used separate regressions, not controls, to discern any varying impact of practice area, job title and year on pay and promotions, and concluded:

> The *overwhelming majority* of my analyses show *no statistically significant within-job sex disparities in pay or promotion* in the Tax function or the Advisory function of KPMG during 2008 through 2016. Moreover, the relatively small number of statistically significant disparities that I do find are *sporadic and isolated instances*, scattered (a) among the various jobs within the Tax and the Advisory functions and (b) over time.

*Id.* at 3 (emphasis added). This is the polar opposite of "common" results. *Supra* 34-36; *Serrano*, 2009 WL 910702, at *6-7 (no commonality where discrepancies varied by location and year).[76]

By contrast, *Chen-Oster* accepted aggregation of statistics and business units where the

---

[75] Dr. Vekker's "controls" assume, *e.g.*, that the chance of promotion was the same in 2009, mid-financial crisis, as in 2016. Even he knows it was not. Kx 42: 232-36. By "controlling" for practice area, he falsely assumes, *e.g.*, that a TCSC Sr. Associate reviewing tax returns at home does the same work and commands the same pay as an employee who travels often for high-value matters. *Id.* at 181-83; Kx 3: 5 (Dr. Vekker "imposes a common reward structure").

[76] Dr. Vekker claimed that Dr. Bloom's analysis "diminish[es]" its "statistical power" by using groups with too few individuals. Kx 44: 4. Even if that were true, it still would not justify Dr. Vekker's flawed approach. It also is wrong. Dr. Vekker never explains when a data set is too small, and Dr. Bloom found that the vast majority of his were sufficient (typically 50 to 100 data points or more), well beyond what courts typically deem too small. Kx 3: 25-38 & Tabs. 8A-13B ("N" data); *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1451 (8 employees over 13-year period; examples of 8 to 15 decisions over several years); *Ellis v. Costco Wholesale Corp.* ("*Ellis II*"), 285 F.R.D. 492, 522 (N.D. Cal. 2012) ("under 20, and frequently under 10"). As to Dr. Vekker's claim that promotions are a "low probability event" resulting in smaller samples—a term he never defines or provides a standard for—the thousands of promotions each year in Tax and Advisory refute that claim. *Supra* at 12-14. In any event, Dr. Bloom used Fisher's Exact Tests for promotions, a "[w]ell known small-sample technique[]." *Matthews v. Waukesha Cty.*, 937 F. Supp. 2d 975, 986 (E.D. Wis. 2013) (internal quote marks omitted) (citing authorities), *aff'd*, 759 F.3d 821 (7th Cir. 2014); Kx 3: 36 n.42, 36-37 & Tabs 12A-13B; Kx 44: 4; Kx 42: 211-12, 225-31.

court found: (a) "it is being used to explore the impact of a firm-wide policy such as 360 review or quartiling" with top-down control; (b) these *specific policies* had a statistically significant *class-wide* impact on women's ratings, which then drove significant pay and promotion gaps;[77] and (c) every year, about 11% of employees changed business units, which themselves had widespread "volatility," e.g., 20% "disappear[ing] from one year to the next," and 277 units dropping to 94 in just two years. 2018 WL 1609267 at *14-15. It thus held methodology disputes immaterial since the analyses conformed to the way the specific policies and the employer were found to operate and make decisions. *Id.* No such "significant proof" exists here, and Dr. Bloom found an "extreme lack of mobility" in Tax and Advisory over the class period. Kx 3: 15-16.

Under *Dukes, Publicis* and many other cases, Dr. Vekker's complete failure to link his statistics to a specific policy, show causation, or track KPMG's decision making or business structures means this Court "can safely disregard what he has to say" and deny certification. *Dukes*, 564 U.S. at 352-53; *supra* at 37-38 & n.76. These cases do not simply "kick the can down the road" based on a claim that "whether Plaintiffs' statistical evidence is inaccurate or insignificant" is a "common" question. Br. at 41-42; *Ladik*, 291 F.R.D. at 270 (rejecting essentially the same question). Plaintiffs no doubt knew that a proper analysis would not achieve their desired results, and cannot hide their lack of "significant proof" behind that question.[78]

2. Plaintiffs' Title VII Disparate Treatment Claims Do Not Meet Commonality

There is a "wide gap" between an individual's intentional discrimination claim and "'the

---

[77] *E.g.*, Chen-Oster's expert found statistically significant sex disparities in 360 review ratings and quartile rankings; that female VPs and Associates earned 21% and 8% less, on average, than male counterparts; that about 22% to 50% of such gaps can be explained by sex disparities in 360 reviews and quartiling; that ratings affected VP promotions, which occurred less often for women; and that all such results were highly statistically significant. *Id.* at *14-15.

[78] As further evidence of Plaintiffs' knowingly calculated approach, Dr. Vekker "gerrymandered" his results, analyzing *pay* by *year* but not job level, and *promotion* by *job level* but not year. He admitted that counsel told him to report promotions as he did. Kx 42: 211-12, 225-31. Tellingly, Dr. Bloom showed that a consistent approach would not produce "systemic" disparities, as Dr. Vekker surely was aware. Dkt. 713-1 (Bloom Jan. 16, 2018 Dec.) (only 7 of 45 pay results and 4 of 36 promotion results significant); *Coser*, 739 F.2d at 754 ("inconsistent aggregations" flawed); *Fisher v. Vassar*, 70 F.3d at 1443 (same; "gerrymandered data").

existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common questions of law or fact….'" *Dukes*, 564 U.S. at 352-53 (internal cite omitted). Bridging that gap under Rule 23(a)(2) requires "'*[s]ignificant proof* that an employer operated under a *general policy of discrimination*'" that "'manifested itself in…[pay and] promotion practices in the same general fashion….'" *Id.* at 353 (emphasis and second alteration added). Plaintiffs must prove that bias "was directed at a class of victims." *U.S. v. City of N.Y.*, 717 F.3d 72, 83 (2d Cir. 2013).

There is no such "significant proof" here. Plaintiffs string together discrete salacious accusations over nearly a decade, misrepresent facts, and ignore KPMG's *actual* policy and practice of equality and inclusion—the opposite of a "general policy of discrimination." As with their disparate impact claims, certification of Plaintiffs' disparate treatment claims would immerse this Court in innumerable trials regarding individualized anecdotes, decision maker intent, and other fact-specific questions–all contrary to the efficiencies contemplated by Rule 23.

### a. KPMG's Deep Commitment to Equality, Inclusion and Diversity Refutes Plaintiffs' Claims of Systemic Discrimination Against Women

KPMG's robust ethics and compliance, equality, inclusion and diversity efforts, many of which Dr. Stockdale found industry-leading, belie Plaintiffs' systemic bias and commonality claims. *Supra* at 16-25; *Dukes*, 564 U.S. at 353 (EEO policy relevant to lack of biased intent); *City of N.Y.*, 717 F.3d at 86; *Coser*, 739 F.2d at 751; *Serrano*, 2009 WL 910702, at *6 (no commonality where employer made "sincere attempts to achieve greater diversity"). Plaintiffs impugn unnamed "senior leaders" at KPMG, yet ignore that its CEO and many other past and present firm and practice leaders are women, including well before this case. *Supra* at 17-18 & n. 45; Kx 19: 86-87 ("[h]aving women well-represented at top levels" furthers diversity). Innuendo that these accomplished women are props for an unproven male cabal, and that KPMG duped the

myriad I&D organizations long recognizing its leading efforts, is not "significant proof" of bias.

Nor are Dr. Goldberg's "fertile ground for bias" theory or claims of inadequate training and monitoring "significant proof." Besides being factually wrong (*supra* at 16-21, 32-35 & *infra* at 41-44), they do not bear on KPMG's *intent*: "Disparate treatment analysis is concerned with intentional discrimination, not subconscious attitudes." *Jackson v. Harvard Univ.*, 721 F. Supp. 1397, 1432 (D. Mass. 1989), *aff'd*, 900 F.2d 464 (1st Cir. 1990). *Dukes* dismissed an identical "vulnerability to bias" theory as "worlds away from 'significant proof'" of a general policy of discrimination. 564 U.S. at 354-55; *Apsley*, 691 F.3d at 1205-06 (Dr. Goldberg's claim that "process was 'excessively subjective,' provided 'fertile grounds for bias,' and was otherwise unfair and unreliable" insufficient, even if true, to prove pattern or practice).[79]

Plaintiffs also habitually misrepresent KPMG's diversity documents which, upon even a casual read, show "sincere attempts to achieve greater diversity." *Serrano*, 2009 WL 910702, at *6. Such misstated evidence again cannot constitute "significant proof." As just a sample:

• *2009 DAB Minutes (526032-34)*: Plaintiffs excerpt a partial phrase and claim: "KPMG acknowledged as early as 2009 that 'compensation disparities still exist.'" Br. at 13. Yet they ignore the full quote and other text relaying DiversityInc. findings, telling a very different story:

> KPMG has dramatically increased its position as a diversity leader through concerted efforts in talent development, mentoring and employee resource groups….Our efforts with women have strongly contributed to the increase in ranking….While we have done a good job in developing and retaining women, compensation disparities still exist.

526032-34. They also ignore KPMG's lowered turnover, increased promotions of women, and other robust efforts. *Id.* at 32. And the "disparities" referred to were raw data comparisons, not

---

[79] *See Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 369, 376 (2d Cir. 1989) ("methods for identifying and correcting existing salary inequities…were either flawed or non-existent" did not prove disparate treatment). Other claims lacking commonality: *Bell*, 2011 WL 6256978, at *6 ("'can be charged with bias'"); *Ross*, 267 F. Supp. 3d at 183 ("'allow[s] for racially biased assessments'"); *Valerino*, 283 F.R.D. at 312 ("strong culture…permits bias against women" and "infects discretionary decision making"); *Zuniga*, 319 F.R.D. at 688 ("vulnerable to individual managers' gender bias").

accounting for factors that lawfully impact pay such as experience, as even Dr. Vekker admits is needed. *Id.* at 34. The document is devoid of evidence of "bias," much less "knowledge" thereof.

- *2011 DiversityInc. Benchmarking Report (529020)*: Plaintiffs falsely say this report "alerted KPMG to gender bias in compensation and promotions." Br. at 14. But in their cited excerpts, DiversityInc. compared KPMG to a tiny sample of 5 "peers" in two categories (women CEOs/direct-reports and top-10%-highest-paid) involving only KPMG *Partners*. It did not compare their pay to men, and measured only their representation, which *increased* in the second group. It also expressly did not assess "why…disparities exist" or cite "gender bias." And Plaintiffs ignore its findings rebutting bias, *e.g.*, a "sizeable" advantage in women's promotion to management.[80]

- *2015 Advisory Diversity Plan (578794)*: Plaintiffs again cherry-pick a single phrase, noting "[e]xternal research suggests evidence of bias in performance and promotion process." But this "external research" was just DiversityInc. raw data compared to the Top 10 entities, again with no account for relevant factors; it did not involve Tax at all, nor did the statement identify any issue as to women in particular; and as noted, Dr. Vekker refuted any claim of bias in performance ratings. *Id.* at 798-802. The Plan neither alleges nor proves gender bias, and is replete with KPMG's I&D successes and efforts. *Id.* at 797-99.

- *Diversity and Bias Monitoring*: Plaintiffs falsely claim that KPMG does not monitor "gender representation by level…." Br. at 15. But the footnoted cite they rely on says no such thing. It references KPMG counsel's response to a very specific question by Plaintiffs seeking "analyses"

---

[80] 529020 at 31, 43-44; Kx 19: 284-87. DiversityInc. noted other strengths, *e.g.*: "KPMG is a very good company for diversity"; "is in the most competitive industry in diversity management"; "Representation of women managers promoted exceeds the industry and DiversityInc. Top 50 averages"; and "Workforce, recruitment and promotions into management representation of women exceed the industry averages". 529020 at 51, 31. By 2012, DiversityInc. also found that KPMG women's representation one level below the CEO was on par with the industry average, and exceeded the Top 50 average in promotions to management. 525357 at 369, 373; Kx D ¶ 25.

of the "gender impact" of various "systems."[81] *Id*. at n.74. The undisputed record detailed above demonstrates that KPMG robustly tracks women's representation and takes numerous measures to check for and guard against bias. *Supra* at 16-21. "Gender impact" studies are not the only way to monitor, and Plaintiffs cite no legal mandate to do a "system impact analysis."

• *Focus Group Reviews (471475, 466863, 466768)*: Plaintiffs claim that in focus group summaries, women "express frustration with pay equity" and KPMG "acknowledged the flaws in the process…." Br. at 14. None mentions "pay equity" or admits "flaws." One from 2011 (471470, 75), says unidentified "women state [in exit surveys] that they leave KPMG due to perceived limitations in … - Work-life balance[;] - Career development[;] - Compensation." But a "pay" concern does not equate to a "gender pay equity" concern and is not itself probative of bias.[82] The main expressed concern was "work-life" balance—endemic today across genders.[83]

    None of these documents allege, discuss, or are probative of intentional gender bias. Nor can Plaintiffs "spin" KPMG's good faith candor in always striving to further its I&D efforts— which should be encouraged—into proof of bias.[84] *Serrano*, 2009 WL 910702, at *7 ("Plaintiffs' attempt to turn these examples of Cintas's commitment to diversity into evidence that Cintas has a problematic culture of discrimination that requires remedying and, thus, into evidence that Cintas discriminated against the putative class members is entirely unpersuasive."); *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) ("purposeful discrimination requires more than 'intent

---

[81] The full sentence is: "We are not aware of any analyses being conducted of any alleged gender impact of KPMG's compensation, promotion, or evaluation systems on the firm, function, service line, region, cost center or office level" from 2008 to 20[17]–not even close to an "admission" that KPMG does not conduct "basic monitoring." *Id.*

[82] *See Bloomberg*, 778 F. Supp. 2d at 473-75 (desire "to be paid more amounts to a disagreement with Bloomberg's business decisions" and did not prove "pattern of discrimination"); *id.* at 477 (same).

[83] The cited 2012 report noted the need "to increase retention of senior associate *men* and women." 466861 at 68 (emphasis added). Men were not in the focus groups but raised the same concerns. 466861 at 63.

[84] This includes KPMG's candor that certain efforts as of 2011 did not meet its or its clients' expectations; concerns about career path clarity; and goal to continue increasing women's representation. Br. at 13-14. Kathy Hannon's remark that unspecified "[w]omen are beginning to say that KPMG is not serious about diversity" lacks foundation and proves neither bias nor commonality, *id.* at 14, as her latter comment shows: "The individual and collective actions within the firm make this [preceding statement] true or not true for any particular female." 569541 at 45.

as volition or intent as awareness of consequences….It instead involves a decision-maker's undertaking a course of action 'because of, not merely in spite of, the action's adverse effects upon an identifiable group.'") (cites omitted)); *Gupta v. N.Y.C. Sch. Constr. Auth.*, 305 F. App'x. 687, at *2 (2d Cir. 2008) (federal anti-bias laws "do not mandate perfect diversity").

As the foregoing also reflects, women's (and men's) representation at all levels turns on individualized work-life choices. *Supra* at 3, 43. KPMG works hard to help each person find the right balance, but need not fully solve all these larger societal issues itself or face a class action:

> [P]erhaps unfortunately, women tend to choose to attend to family obligations over work obligations [after having a child] more often than men in our society….Work-related consequences follow. Likewise, men tend to choose work obligations over family obligations, and family consequences follow. Whether one thinks those consequences are intrinsically fair, whether one agrees with the roles traditionally assumed by the different genders in raising children in the United States, or whether one agrees with the monetary value society places on working versus childrearing is not at issue here….The fact remains that the law requires only equal treatment in the workplace.

*Bloomberg*, 778 F. Supp. 2d at 485-86 (Preska, J.); *supra* 17 (no HR-like second-guessing).

### b. Decentralized Decision Making and Job Diversity Preclude Commonality

Courts consistently hold that where many decision makers across locations exercise discretion in different ways, there is no commonality as to a pattern-and-practice claim, and thus certification would greatly *expand*, not economize, the proceedings given the need to analyze each decision. *Dukes*, 564 U.S. at 355-56 ("the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's"); *Publicis*, 2014 WL 11199094, at *6-7 ("That many different female MSL employees may have been denied equal pay by a variety of individuals 'for a variety of reasons under a variety of policies in a variety of locations, does not make the questions in each class member's case common to the others.'") (cite omitted).[85] KPMG's diverse practice areas and jobs—as again admitted by numerous Opt-Ins themselves—

---

[85] *See Boykin*, 1997 WL 706323, at *4; *Ross*, 267 F. Supp. 3d at *16; *Serrano*, 2009 WL 910702, at *5-6; *Bennett*, 656 F.3d at 814-15; *Zuniga*, 319 F.R.D. at 688-90; *Valerino*, 283 F.R.D. at 314; *Ladik*, 291 F.R.D. at 270.

further defeat commonality because they drive varying exercises of discretion, and Plaintiffs also must prove "actual job duties," not "common characteristics," for their Title VII equal pay claims (which incorporate EPA equal work standards). *Supra* at 8-10; *infra* Arg. III; *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 249 (2d Cir. 2014); *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 692-93 (2d Cir. 2017); *Trawinski*, 2012 WL 6758059, at *6-7.

   *c.  Plaintiffs' Flawed Statistics Are Not "Significant Proof" of Systemic Bias*

Plaintiffs' statistics—aggregated, gerrymandered and not even reflecting Function- or class-wide disparities—are miles from "significant proof" of systemic bias (*supra* at 36-40): "[S]tatistics showing entity-level discrimination shed little light on whether a particular individual defendant engaged in purposeful discrimination." *Reynolds*, 685 F.3d at 204; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) ("If…promotion decisions are based on the biased attitudes of the CEO and upper management, one would expect disparities in all, or at least most, regions"); *compare Chen-Oster*, 2018 WL 1609267, at *15 (statistics analyze specific policies).[86] Even Dr. Goldberg admits that, as early as 2011, women's promotion likelihood into and within management exceeded men's.[87] Kx 19: 283-87. Again, Plaintiffs cannot excuse their failure of proof by recasting it as a "common question." *Supra* at 32-34.

---

[86] *See Coser*, 739 F.2d at 750 (aggregate statistics did not prove pattern and practice where decisions decentralized); *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372-74 (2d Cir. 1989) (no pattern and practice; 9 of 33 results insignificant; results not significant every year). Cases finding no commonality based on aggregated statistics and/or inconsistent results across the class: *Dukes II*, 964 F. Supp. 2d at 1121 (8 of 19 results insignificant in one region, 7 of 13 insignificant in another, 8 of 10 in a third); *Serrano*, 2009 WL 910702, at *6 (some sites under-hired, some over-hired, results varied by year); *Bennett*, 656 F.3d at 815; *Bolden*, 688 F.3d at 896.

[87] The "simple arithmetic" that Attorney Zegeye used to inflate Plaintiffs' anemic Tax promotion statistics lacks foundation and is irrelevant. Br. at 12 & Px (Dec. of T. Zegeye). She still ignores Advisory, and cannot negate Dr. Vekker's findings of no significant promotion disparities at many job levels. *Supra* at 16. Dr. Vekker also disclaimed her purported "method," saying he did not analyze the percent of people promoted by year or practice because it was irrelevant. Kx 42: 222, 230-31, 235-37. Ms. Zegeye also mixes "apples-and-oranges" with no expert support. She uses the 3.4% alleged promotion differential from Dr. Vekker's *controlled* regression and an *uncontrolled* 25% "average rate of promotion in tax" derived from *raw* data: "the number of total promotions divided by the total number of employee years in the population." Px (Dec. of T. Zegeye ¶ 27). Had she been consistent and used all raw data (again, not proper, but noted to prove a point), her "arithmetic" would have shown that women's average promotion rates across Tax *exceeded* men's. Kx DD ¶ 7.

### d. Plaintiffs' Anecdotes Are Not "Significant Proof" of Systemic Bias

Even standing alone, Plaintiffs' anecdotes – averaging less than 15 per year, or 0.2%, out of more than 10,000 women per year over almost a decade – fall far short of "[s]ignificant proof that [KPMG] operated under a general policy of discrimination." *Dukes*, 564 U.S. at 360 & n.9 ("a few anecdotes selected from literally millions of employment decisions prove nothing at all"; notes *Teamsters* had one declaration per eight members); *Bloomberg*, 778 F. Supp. 2d at 479 (no pattern based on anecdotes over "nearly six years");[88] *Chen-Oster*, 2018 WL 1609267, at *3 (commonality found; anecdotes covered 10% of smaller class, two jobs, largely in one office).[89]

"[P]laintiffs do not show how these incidents can be tied together as part of a policy of discrimination," even without testimony from (a) women whose success and fair treatment bear no relation to Plaintiffs' mischaracterization, and (b) many Plaintiffs who admitted KPMG did not discriminate against them, or had no such proof. *Ladik*, 291 F.R.D. at 270; *supra* at 22-25. They highlight each woman's individualized experience, for which there is no "common" proof, thus necessitating individualized trials. *Bolden*, 688 F.3d at 898 ("bad experience with one of the five supervisors…does not present any question about the conduct of…many other[s]"). *Chen-Oster*'s holding that "individualized inquiries into each incident" defeated predominance as to "boys' club" allegations likewise refutes commonality. 2018 WL 1609267, at *22.

The quality of Plaintiffs' anecdotal proof also is lacking. *See Bloomberg*, 778 F. Supp. 2d at 474 (evidence quality relevant to pattern-and-practice). Most involve unproven allegations; conclusory statements lacking foundation (*e.g.*, "I feel…"); mischaracterizations of complaints or KPMG's handling of them; and material omissions from the IEM reports themselves that refute the complaint or affirm KPMG's strong remedial actions tailored to the conduct, including

---

[88] It is immaterial that the EEOC did not introduce statistics in *Bloomberg*. Plaintiffs' flawed statistics amount to an absence of such proof, and Plaintiffs' anecdotes are not representative irrespective of their statistics.

[89] *See id*. No. 10-cv-06950, Dkt. 247 at 47 (plaintiffs' certification motion with 133 complaints and 8 declarations).

terminations of Partners and employees. *Supra* at 22-25; *see Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 397 (S.D.N.Y. 2012) (complaint is an unproven allegation); *Fisher*, 70 F.3d at 1439 ("'sense of being discriminated against' is not evidence").

Even if one ignores these profound evidentiary problems, Plaintiffs' anecdotes are "at best a mixed bag" of individualized allegations over many years, lacking any common core. *Bloomberg*, 778 F. Supp. 2d at 477. They do "not link the alleged culture of gender bias to the challenged pay and promotion decisions." *Dukes II*, 964 F. Supp. 2d at 1120. Nor can Plaintiffs blame their scant proof on alleged "futility" or retaliation concerns. These again rest almost entirely on conclusory claims lacking foundation or detail, fly in the face of KPMG's robust (and anonymous) reporting and anti-retaliation structures, and vividly contrast with the many women affirming their comfort in reporting any concerns. *Supra* 17-19, 24. Unsupported concerns do not excuse non-reporting in individual cases, nor here. *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001) ("A credible fear must be based on more than the employee's subjective belief," or "conclusory assertions" of "apprehension"). Plaintiffs' claim that many Opt-Ins did not first file complaints is immaterial, particularly where many admit they have no claim. *Supra* at 23-25. Indeed, the fact that 210 current employees opted in belies claims of systemic retaliation. Plaintiffs' cited cases (Br. at 32-35 & n.116) are all inapposite factually and legally. [90]

---

[90] *Beck v. Boeing Co.*, 203 F.R.D. 459, 463-64 (W.D. Wash. 2001) (*denied* certification of class over many jobs, 4 locations; certified only for "Puget Sound area"); *Ellis II*, 285 F.R.D. at 497-99 (2 jobs, uniform description, 700 class members; "consistent, and pervasive, classwide" involvement by CEO and "Top management" in promotions, including in-store evaluations; CEO dictated promotion criteria); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488-89 (7th Cir. 2012) (700 class members, one job; *specific* centralized "teaming" policy allowing brokers to share clients, exclude others like "little fraternities," and policy for "account distribution" per "company establishe[d] criteria"; evidence that policies *caused* racial disparities, *see* 2010 WL 3184179, at *5 (N.D. Ill. Aug. 9, 2010), *rev'd on other grounds*, 672 F.3d 482) (*see* cases distinguishing *McReynolds*, *e.g.*: *Bolden*, 688 F.3d at 898; *Adkins*, 307 F.R.D. at 145); *Porter v. Pipefitters Ass'n Loc. Un. 597*, 208 F. Supp. 3d 894, 899-900, 906 (N.D. Ill. 2016) (union previously held liable for racial bias; knowingly allowed contractors to make biased referral hiring decisions and thus "promoted favoritism and discrimination"); *Parra v. Bashas' Inc.*, 291 F.R.D. 360, 365, 374-75, 391 (D. Ariz. 2013) (hourly employees, same duties, one state; "written, non-discretionary, centralized wage scale" gave Hispanic employee stores lower pay than white employee stores); *Scott v. Family Dollar Stores, Inc.*, 2016 WL 9665158, at *1, 3-4, 6-7 (W.D.N.C. June 24, 2016) (1 job; central pay cap for "overwhelmingly female"

### B.    Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3)

Commonality and typicality "tend to merge." *Dukes*, 564 U.S. at 349 n.5. The six

Representatives must prove that "'as goes the claim of the named plaintiff, so go the claims of

the class.'" *Emilio v. Sprint Spectrum L.P.*, 2017 WL 3208535, at *8 (S.D.N.Y. July 27, 2017).

This is impossible in KPMG's decentralized and discretionary environment. *See Trawinski*, 2012

WL 6758059, at *7; *Boykin*, 1997 WL 706323, at *5. First and foremost, none of the

Representatives are typical of *any* class members because Plaintiffs' experts admit they have *no*

*evidence* that a single Representative or other employee was harmed by even a single "policy" or

"practice" they allege. *Supra* at 15-16. The Representatives fail typicality for additional reasons:

• None were Managing Directors. *Boykin*, 1997 WL 706323, *5 (not typical as to job not held).

• Several received numerous promotions (Kassman, Charity, Butler, Murray), and Kassman was

  the most highly paid Senior Manager in her practice in her region.[91]

• Four of six were materially excluded from Dr. Vekker's analyses due, *e.g.*, to their AWAs, and

  therefore cannot rely on his analyses as "representative" of their or others' claims.[92]

• The Representatives' claims are not even typical of those in their same job levels and practice

  areas. Analyses of pay and promotions for all other employees in the same job title and same

---

internal promotes below "overwhelmingly male" outside hires; caused systemic gender gap; *mandatory* central pay ranges and raise caps perpetuated gap; "personally enforced" by leaders, who reviewed individuals' pay; exceptions favored men); *Brown v. Nucor Corp.*, 785 F.3d 895, 910-13 (4th Cir. 2015) (class of 100 African-Americans at single S. Carolina plant; "ubiquitous" plant-wide animus, "bigoted epithets and monkey noises broadcast across the plant radio system"; one anecdote per 6.25 members); *Houser v. Pritzker*, 28 F. Supp. 3d 222, 228-29 (S.D.N.Y. 2014) (selection criteria "excluded applicants with prior arrests for nearly all felonies and most misdemeanors," excluding of 93% of applicants, mostly non-white); *Gulino v. Bd. of Educ. of City of N.Y. Sch. Dist.*, 907 F. Supp. 2d 492, 497, 500 (S.D.N.Y. 2012), *aff'd*, 555 F. App'x. 37 (2d Cir. 2014) (tests); *Easterling v. Conn. Dept. of Corr.*, 278 F.R.D. 41, 44 (D. Conn. 2011) (test); *U.S. v. City of N.Y.*, 276 F.R.D. 22, 27, 44 (E.D.N.Y. 2011) (test).

[91] *Donaldson v. Microsoft Corp.*, 205 F.R.D 558, 568 (W.D. Wash. 2001) (no typicality: "the named plaintiffs each describe both successes and failures"); Kx G ¶ 10; *see also* **Kx** 26: 197; **Kx** 14: 257, 361, 377.

[92] Vek. R. at 9 nn. 11, 13; *id*. at 10 n. 14. Data was given for 2008-2016. Dr. Vekker excluded these Representatives from these years/analyses: <u>Base Pay</u>: *Kassman*: 2008-09 (she resigned in 2010), *Murray*: 2014-16, *Inman*: 2008; <u>Total Compensation</u>: *Kassman*: 2008-09, *Murray*: 2008, 2014-16, *Inman*: 2008-09, 2012, *Jones*: 2010; <u>Promotion</u>: *Kassman*: 2008-09, *Murray*: 2008, 2014-16, *Inman*: 2008-09, 2012, *Jones*: 2010. Kx 3: 39-41 & Tab. 14.

Service Line as a given Representative in a given year (*e.g.*, as to Kassman, all other Senior

Managers in SALT in 2008) show *few or no statistically significant disparities*.[93]

Typicality also is lacking because each "representative is subject to unique defenses

which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec.

Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal quote marks omitted). As just a sample:[94]

- <u>Kassman and Inman</u>: Each asserts individual pregnancy and caregiver discrimination claims,

  which constitute a material component of their claims and would divert the proceedings, as

  well as confuse the jury and prejudice KPMG, given their abandonment of such class claims.

- <u>Kassman</u>: Individual constructive discharge and retaliation claims and unique defenses,

  including based on her part-time status (*not* addressed by Dr. Vekker) and mitigation, again

  would materially distract. *E.g.*, on a full-time equivalent ("FTE") basis, she was paid *more* than

  her male "comparator" for reduced goals; he was not promoted until *2 years after* she quit.

- <u>Jones</u>: Claims severe emotional distress, but treated for psychological issues prior to KPMG;

  her behavior, *e.g.*, sharing a PowerPoint of sexual partners at work, impacted her performance.

- <u>Butler</u>: Admits she lacked college degree; was in Federal practice, and government rules most

  often require degrees for engagements; asked not to be promoted in 2009 for personal reasons.

- <u>Inman</u>: Clients asked that she be removed from engagements due to poor performance.

- <u>Murray</u>: Putative male comparators all had more experience, higher degrees or performance

---

[93] *See* Kx 3: 39-41. Dr. Bloom determined that "Donna Kassman was a Senior Manager in State and Local Tax throughout 2008 and a Senior Manager in Global Mobility Services at the end of 2009. Of the six reported analyses relevant to Donna Kassman, <u>five indicate statistically insignificant sex disparities</u>." *Id.* at 39 (emphasis in original) & Tab. 14. Other class Representative results were similarly insignificant (expressed as # insignificant results / # total results): *Carol Murray*: 36/36; *Cheryl Charity*: 27/29; *Heather Inman*: 21/23; *Tina Butler*: 28/33; *Nancy Jones*: 11/16. *Id.* 39-40 & Tab. 14; *see also id.* 39 (out of 500 possible job-year cells (a job level/practice area combination in a given year), the nine Named Plaintiffs appear in 41; for such job levels in those practice areas in those years, results were statistically insignificant for 88% in base pay, 100% in total pay, 85% in promotions). *Id.*

[94] Citations for the following bullet points are as follows. <u>Kassman and Inman</u>: FAC ¶¶ 71, 364. <u>Kassman</u>: Kx 37: 304-07; 12888; 12892-93. <u>Jones</u>: FAC ¶ 375; **Kx** 25: 19-24. <u>Butler</u>: **Kx** 13: 93-95, 151. <u>Inman</u>: **Kx** 24: 45-46. <u>Murray</u>: *e.g.,* 383039-40 (Santos Employee Profile/Resume); 382520 at 23 (Ebert Employee Profile; Professional License/Certification Form); 382934 at 49 (Paria Employment Application). <u>Charity</u>: **Kx** 14: 192; 140-43.

ratings, and/or worked in different Service Lines.

• Charity: Poor people management and business development skills; clients asked that she be removed from engagements due to poor performance.

### C.    Plaintiffs Fail To Prove Adequacy Under Rule 23(a)(4)

Commonality and typicality also "tend to merge with" adequacy of representation. *Dukes*, 564 U.S. at 349 n.5. Here, the former doom the latter. *Trawinski*, 2012 WL 6758059, at *8. Plaintiffs also must prove that "the interests of the class members are not antagonistic to one another." *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 479 (S.D.N.Y. 2011); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *Boykin*, 1997 WL 706323, at *5. The putative class here, as with the Representatives, is rife with conflicts. *E.g.*, 207 of the Opt-Ins–nearly one-fifth–and five of the Named Plaintiffs served as PMLs during the class period, 56 of whom were PMLs specifically for other Opt-Ins. Those conflicts multiply across the even larger putative class, covering an even broader swath of class members who were PMLs, counselees, and/or assessment meeting participants or reviewers who made or contributed to decisions on other members' pay and promotions.[95] *Grant v. Morgan Guar. Tr. Co.*, 548 F. Supp. 1189, 1193 (S.D.N.Y. 1982) (class had "managers who process promotions and employees who apply for them"); *Donaldson*, 205 F.R.D. at 568 ("insurmountable" conflict as to ratings).

### D.    Plaintiffs Cannot Satisfy the Requirements for a Rule 23(b)(2) Class

Plaintiffs seek to enjoin "KPMG's existing compensation and promotion processes." Br. at 39. This sweeping request fails Rule 65(d)'s specificity requirement—not surprising since they never identify any specific "process" *causing* a disparity—and thus fails Rule 23(b)(2). *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Lit.*, 209 F.R.D. 323, 343 (S.D.N.Y. 2002).

---

[95] *Supra* at 3; Kx G ¶ 5; **Kxs** 26: 62, 76; 34: 173; 14: 54; 24: 21; 31: 19; 40: 137-39, 159; 43: 201-06; 11: 202-04; 39:71; 13: 64; 27: 11-14; *King*, 231 F.R.D. at 264; *Randall*, 637 F.3d at 824.

Of their many pages describing KPMG's "processes," what *specifically* would they enjoin? Using market pay data or budgets? Having people familiar with employees' work assess them? Giving Partners discretion over pay and promotions–"a very common and presumptively reasonable way of doing business"? *Dukes*, 564 U.S. at 355. And what "non-vague" criteria *should* KPMG use? Strict pay and progression scales? Plaintiffs never say. *MTBE*, 209 F.R.D. at 345 (denying certification and order seeking "broad guidelines" *e.g.*, for "the provision of clean water"). Such a request also would invade KPMG's business judgments. *Supra* at 32-33.

Plaintiffs similarly fail to prove that "final injunctive relief or corresponding declaratory relief is appropriate respecting *the class as a whole*" (emphasis added).[96] As *Dukes* made clear:

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class….[not] when each individual class member would be entitled to a *different* injunction or declaratory judgment….

564 U.S. at 360.[97] With no "glue," what Plaintiffs actually seek are thousands of individual injunctions, *e.g.*, Donna Kassman claims discrimination by specific New York Employment Tax ("ET") Partners, even though she was the highest paid ET Senior Manager in her region on an FTE basis, neither she nor her male "comparator" were promoted during the Recession, and he was promoted two years after she left. Kx G ¶ 11; **Kx** 26: 329-33. Her injunction−to unwind these decisions and bar those Partners from such acts−would do nothing for challenges by others to different decisions on different facts. This is anathema to Rule 23(b)(2).[98] Plaintiffs' note that Rule 23(b)(2) was added in 1966 partly to cover "civil rights" cases does not change this result.

---

[96] Plaintiffs do not seek to certify any of their damages claims under Rule 23(b)(2), nor could they. Br. at 38-40; *Dukes*, 564 U.S. at 345-46 (Rule 23(b)(2) inapplicable where "monetary relief is not incidental to the injunctive or declaratory relief," and "claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule").
[97] *Robinson*, 267 F.3d at 155-56, 164, finding Rule 23(b)(2) met, is not to the contrary. *Dukes* rejected its holdings that: (a) "the delegation of discretionary authority to supervisors for discipline and promotion constitutes a policy or practice sufficient to satisfy the commonality requirement"; (b) expert disputes are "not relevant" to certification; and (c) individual damages claims can be certified under Rule 23(b)(2), even if not "incidental." 564 U.S. at 366-67.
[98] *MTBE*, 209 F.R.D. at 343 (Rule 23(b)(2) "presume[es] that the interests of the class members are cohesive and homogeneous such that the case will not…require a remedy that differentiates materially among class members.").

*Dukes*, 564 U.S. at 361 (Rule history "reflects a series of decisions involving challenges to racial segregation–conduct that was remedied by a single classwide order," not "individualized relief"); *Boykin*, 1997 WL 706323, at *6 (injunction of subjective "practices and policies… insufficient to meet" Rule 23(b)(2)). Their other cases, Br. at 38-40, are inapposite, *infra* at 55-56, n. 104.

### E. Plaintiffs Cannot Satisfy the Requirements for a Rule 23(b)(3) Monetary Class

#### 1. Plaintiffs Fail to Prove Predominance

"Even if Rule 23(a)'s commonality requirement may be satisfied," predominance "is far more demanding." *Amchem*, 521 U.S. at 623-24; Rule 23(b)(3) (plaintiffs must prove "questions of law or fact common to class members predominate over any questions affecting only individual members."). Any common issues must be "more substantial than the issues subject only to individualized proof." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2015); *Royal Park Investments SA/NV v. Wells Fargo Bank*, *N.A.*, 2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018) (no predominance, despite finding commonality). The myriad individualized issues behind each decision here would overwhelm any common issues and swamp this Court in thousands of individual jury and/or bench trials on liability and damages for each class member.

#### a. *Individualized Liability Issues Overwhelm Any Common Issues*

Individualized class member liability issues detailed above, including as to diverse job duties, decision maker intent and causation[99] over nine years, would dwarf any common issues.

---

[99] <u>Duties</u>: *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 400 (S.D.N.Y. 2013) (no predominance or superiority: "Because the plaintiffs' claims pertain to different locations, under different managers, who performed duties outside of their offices to varying degrees and in different ways, the plaintiffs' claims─as well as any determinations to be made concerning damages—are too highly individualized to form the basis for a class action."), *aff'd sub nom*, *Gavin v. NVR, Inc.*, 604 F. App'x. 87 (2d Cir. 2015); *Myers*, 624 F.3d at 549-50 (no predominance; overtime claims require "examining the employee's actual duties," despite "blanket exemption policy"); *Glatt*, 811 F.3d at 539 (no predominance; interns' claims require "individualized proof"). <u>Intent</u>: *Cf. In re Initial Public Off. Sec. Lit.*, 471 F.3d 24, 44 (2d Cir. 2006) ("ascertaining each purchaser's intent would require an individualized determination."). <u>Causation</u>: *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008) (no predominance where "issue of loss causation…cannot be resolved by way of generalized proof"), *partially abrogated on other grounds*, *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *Adkins*, 307 F.R.D. at 143 (no predominance where

*Supra* at 25-27; *Teamsters*, 431 U.S. at 371-72 ("The task remaining for the District Court on remand will not be a simple one. Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees *were actual victims* of the company's discriminatory practices.") (emphasis added). Individualized defenses, including timeliness and releases among others, exacerbate these complexities. *Myers*, 624 F.3d at 551 ("courts must consider potential defenses in assessing…predominance"); *supra* at 49-50.[100]

There is no predominance here: "These questions are not collateral issues that could be determined in individual hearings after common questions are resolved for the class—they go to the heart of defendants' liability for each class member's alleged injury." *Johnson v. Nextel Comm., Inc.*, 780 F.3d 128, 146 (2d Cir. 2015). Notably, *Chen-Oster* focused its predominance analysis only on whether alleged "class-wide" issues of pattern-and-practice and disparate impact (such as "business necessity") could be addressed with generalized proof, concluding that they could after finding specific uniform policies *and* statistics deemed *appropriate* as matching those policies and the employer's decision making − all of which are missing here. 2018 WL 1609267, at *19-22. It did not, however, analyze the impact on predominance of the *individualized* causation and other liability issues that *Dukes*, *Teamsters*, *Robinson* and other cases require to be adjudicated thereafter in separate jury and/or bench trials. *Id.*

Those matters would swamp any "common" proof here, particularly given the materially greater scope and complexity of KPMG's organization and this case relative to *Chen-Oster*. *Supra* at 34-36. The required analyses of nearly 1,000 decision makers' decisions over many jobs, practices and years, as well as of Plaintiffs' anecdotal evidence, necessarily involve

---

"causation is simply not subject to classwide proof."), *aff'd*, 656 F. App'x. 555; *Oakley v. Verizon Comm., Inc.*, 2012 WL 335657, at *16 (S.D.N.Y. Feb. 1, 2012) (same for "individualized questions of causation and damages").
[100] *McLaughlin*, 522 F.3d at 234 ("plaintiffs have offered no reliable means of collectively determining how many class members' claims are time-barred.").

scrutiny of "the considerations and intentions of individual managers or business units" and "individualized inquiries into each incident" – the very same problems that caused *Chen-Oster* to hold plaintiffs' "boy's club" allegations insufficient to prove predominance. 2018 WL 1609267, at *22. This case falls squarely within the *Publicis* (and *Dukes*) line of cases holding that even "constrained" discretion in decision making did not predominate given the many "individualized inquiries" still required. 2014 WL 11199094, at *8.

### b. *Individualized Damages Issues Also Overwhelm Any Common Issues*

Individualized damages are "a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues," even if not dispositive alone. *McLaughlin*, 522 F.3d at 231. Here, damages determinations would be highly complex, and intertwined with liability for Plaintiffs' Title VII equal pay claims (which apply EPA standards). *Supra* at 25-27. The Court must determine each class member's "comparators" (if any) over nine years—itself a fact-intensive inquiry involving practice areas, specializations, education, past experience, certifications and more—then assess whether any must be excluded as outliers, and determine both liability and damages based on a composite of the remainder. *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 481-82 (2d Cir. 2001) ("comparing plaintiff's pay only to that of a single male employee…may create the impression of an Equal Pay Act violation where no widespread gender discrimination exists."). "[I]ndividualized calculation of damages— compensatory, punitive, back pay, and front pay[101]—based on the circumstances of each class member's case" complicate these issues, *Publicis*, 2014 WL 11199094, at *8, as do damages

---

[101] Examples include Representative Jones' psychological history refuting her non-"garden-variety" emotional distress damages, Dkt. 651, and mitigation defenses to Kassman's and Jones' (as well as Plaintiff Vasudeva's) constructive discharge claims. Class members' emotional distress and other compensatory damages claims further compound these complexities even beyond the *Dukes* class, which did not seek any such damages. 564 U.S. at 345.

analyses for nine years of class promotion denials. *Randall*, 637 F.3d at 826.[102]

## 2.   Plaintiffs Cannot Prove Superiority

The superiority requirement ensures that a class is certified only when it will "achieve economies of time, effort, and expense…without sacrificing procedural fairness...." *Amchem*, 521 U.S. at 615 (internal quote marks and citation omitted). A class action is unmanageable here and would require far more "mini-trials"—a misnomer since they would each require proof on the reasons for each decision as to each class member—than have defeated superiority in other cases. Rule 23(b)(3)(D); *Publicis*, 2014 WL 11199094, at *8 (150 mini-trials); *Tracy*, 293 F.R.D. at 401 (hundreds), *aff'd*, 604 F. App'x. 87.[103] Plaintiffs' claims again closely resemble the "boy's club" claim that *Chen-Oster* found did not satisfy Rule 23(b)(3). 2018 WL 1609267, at *48.

Plaintiffs' skeletal proposed "trial plan," Br. at 46-48, fails to solve these problems and still would require thousands of liability and damages trials, which Plaintiffs entirely gloss over. *Rollins v. Traylor Bros Inc.* rejected a substantially identical trial plan for precisely this reason:

> [T]he Court now finds that "given all of the individual issues that must be litigated in this matter, trial administration would be overwhelming." Indeed, there may well be complex individual issues for every potential class member.

2016 WL 5942943, at *1 (W.D. Wash. May 3, 2016) (vacating certification); *id.* Dkt. 73 at 5 (trial plan). Special masters cannot decide *liability*, also making Plaintiffs' cited cases on damages calculations inapposite. *Supra* at 26; Rule 53.[104] And "bifurcating…would not

---

[102] *See id.* ("Because Rolls–Royce [like KPMG] does not have a fixed compensation schedule for employees in the compensation categories at issue, individualized hearings would be required to determine how much higher an employee's pay would have been had she received a promotion denied her on the ground of her sex."); *McLaughlin*, 522 F.3d at 227 (no predominance; "the acceptable measure of injury–out of pocket damages–would require individualized proof"); *Oakley*, 2012 WL 335657, at *17 (same; damages vary on "individualized circumstances").

[103] *See Adkins*, 307 F.R.D. at 146-47 (hundreds; manageability concerns outweighed other factors), *aff'd*, 656 F. App'x. 555; *Johnson*, 780 F.3d at 146-47 (superiority); *cf. Randall*, 637 F.3d at 826 ("calculating the amount of back pay…would require 500 separate hearings. The monetary tail would be wagging the injunction dog.").

[104] *Houser*, 28 F. Supp. 3d at 254 (damages); *Gulino*, 2013 WL 4647190, at *13 (same, citing Rule 53); *Easterling*, 278 F.R.D. at 50 (citing *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006), which notes special master use for "damages")). Rule 53 allows a special master to "hold trial proceedings and make or recommend

remedy this situation—the individual trials must address both liability and damages issues." *Publicis*, 2014 WL 11199094, at \*8.[105] Plaintiffs cite *Teamsters* as talismanic, but it again was not a Rule 23 case and does not supersede KPMG's rights. *Supra* at 26-27.

Plaintiffs' trial plan also proposes class-wide assessments of backpay and punitive damages. Br. at 46-47. That would be unlawful. *Dukes*, 564 U.S. at 366 (no Trial by Formula; "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay");[106] *In re Simon II Lit.*, 407 F.3d 125, 138-39 (2d Cir. 2005) (class punitive damage award prior to "determination and award of compensatory damages" is "likely to run afoul of" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)).[107]

Plaintiffs' rhetoric that class members "fear … retaliation and blacklisting by KPMG," Br. at 45, is unfounded, *supra* at 24, and insufficient to prove superiority—particularly since this case has been well-publicized, including via the EPA opt-in notice, and about *1,100* women opted-in, belying any claim that these professionals are "afraid." Class members have ample

---

findings of fact on issues to be decided without a jury if appointment is warranted by: (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages." KPMG will not consent to special master liability trials; pattern-and-practice claims require jury trials; these are not pre- or post-trial matters; and Rule 53 does not list "liability"–hardly an "exceptional condition"–as a matter for special masters. *Id*.

[105] *See Johnson*, 780 F.3d at 147 n.23 ("if damages were the only issue requiring individualized treatment, then bifurcation from classwide liability issues might well provide an expeditious way to conduct the litigation. But because many of the liability issues are not susceptible to common proof, the individualized nature of the damages inquiry in this case further weighs against class certification."); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 170 (S.D.N.Y. 2003) (rejecting bifurcation "[w]here substantial individual actions, or an atomized second class action, would still be necessary after the… class trial"); *Oakley*, 2012 WL 335657, at \*13-15 (subclasses not a cure).

[106] *Dukes* did not limit this statement to disparate treatment claims. *See also McLaughlin*, 522 F.3d at 231 ("Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability."). Discussions of damages aggregation in *Easterling* and *Gulino* (cited by Plaintiffs), and *Chen-Oster* (which cited only *Easterling*), did not address the contrary holdings in *Dukes* or *McLaughlin.* 2018 WL 1609267, at \*23; *supra* n. 104. *Comcast*, 569 U.S. 27, also did not obviate the need for individual Title VII trials. It found no predominance where plaintiffs' damages theory (there, as to antitrust issues) did not match their liability theory. *Id.*

[107] *See Johnson*, 780 F.3d at 149 ("determining a punitive damages ratio without any grounding in a compensatory damages award is impracticable and fails to give the jury an adequate basis for determining what measure of punitive damages is appropriate."); *EEOC v. Sterling Jewelers Inc.*, 788 F. Supp. 2d 83, 89-92 (W.D.N.Y. 2011) (rejecting *EEOC v. Dial Corp.* cited by Plaintiffs, Br. at 46); *Davis*, 717 F.3d at 490 (prohibits Trial by Formula).

incentive to bring claims in their home courts, as is common, and even more so as highly paid professionals with claims for compensatory and punitive damages and attorneys' fees.[108] *Oakley*, 2012 WL 335657, at *18 ("these are not cases where it makes no economic sense for an individual to pursue his own claim") (FMLA); *Benner*, 214 F.R.D. at 173-74 (same; per-member claim over $75,000).[109] These damages and individual issues also heighten "class members' interests in individually controlling the prosecution or defense of separate actions." Rule 23(b)(3)(A); *Oakley*, 2012 WL 335657, at *18-19 (employee not bound by employer win in another non-class case). "[C]oncentrating the litigation" here is not superior. Rule 23(b)(3)(C).[110]

### F.      Rule 23(c)(4) Issue Certification is Not Appropriate

Plaintiffs make passing reference to Rule 23(c)(4). Br. at 2, 27, 44. They seek "issue" certification mainly of pattern-and-practice and/or disparate impact liability, but neither these nor other issues meet the Rule's requirements. Plaintiffs must satisfy Rules 23(a) and (b)(2) or (b)(3) (except predominance) as to each "issue." *MTBE*, 209 F.R.D. at 351; *McLaughlin*, 522 F3d at 234. They do not. And "given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy," and is improper. *McLaughlin*, 522 F3d at 234 (internal quote marks omitted); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013) (issue "must materially advance the disposition of the litigation as a whole"), *aff'd*, 602 F. App'x. 3 (2d Cir. 2015).

---

[108] *See* Ex 3: Tab. 6A & 6B (average base pay rates); 42 U.S.C. § 1981a(a)(1), (b); *id.* § 2000e-5(k).

[109] The fact that non-class plaintiffs cannot use the pattern-and-practice framework, Br. at 45 is irrelevant: "a pattern and practice of discrimination–in the ordinary sense of those words, rather than in the technical sense describing a theory of liability for discrimination–remains relevant in assessing whether the plaintiffs proved discrimination using the *individual* disparate treatment and disparate impact methods of proof." *Chin*, 685 F.3d at 147 (emphasis added); *Benner*, 214 F.R.D. at 174 (that "some class members may not seek to bring an individual action…does not override the concerns…as to the superiority and manageability problems…" (internal quote marks omitted).

[110] As noted, Plaintiffs' other cites involve "glue" as to liability, not just damages, that is absent here, or were abrogated by *Dukes*. *Supra* at 54-55 & nn. 97, 103; *Robinson* and *Velez* (abrogated by *Dukes*; only Rule 23(b)(2)); *Moore v. Napolitano*, 926 F. Supp. 2d 8, 12-13, 25, 29 (D.D.C. 2013) (test caused disparate impact; Director made decisions); *supra* n.90 re: *Ellis II*, *Easterling*, *Gulino*, *City of N.Y.*, *Parra*, *Scott*, *McReynolds*. "Trial plan" cases, Br. 47-48, involved Rule 23(b)(2) and/or merely recited the black-letter *Teamsters* framework (*Hill*, *City of N.Y.*, *Velez*).

### G.        Plaintiffs Fail to Prove that any New York Class May Be Certified

Similarly, Plaintiffs ask this Court to certify a New York State class (yet also cite a New York City law, Br. at 1), but fail to present any New York class proof. Dr. Vekker's *averaged* results say nothing about class-wide *New York* pay or promotions, nor do their scant anecdotes from a few New York employees. *Supra* at 36-39. This is a waiver and a total failure of proof. *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x. 21, 26 (2d Cir. 2017) (waiver); *Hoffman v. Parade Publ'ns.*, 933 N.E.2d 744 (N.Y. 2010) (must work in N.Y. state or city to invoke human rights acts); N.Y. Lab. Law § 194(3) ("establishment" limit, confirmed in 2015 as "workplaces located in the same geographical region, no larger than a county"). In any event, Plaintiffs concede that their "state and local anti-discrimination claims are analyzed under the Title VII framework," and thus fail Rule 23 in kind. Br. at 28 (internal quote marks and cite omitted).

### III. Plaintiffs Do Not Meet Their Burden to Sustain EPA Collective Certification

### A.        Plaintiffs' Burden of Proof at Step-Two Certification is a High One

The above impediments also doom Plaintiffs' request to "confirm" certification at "Step 2" of a nationwide Equal Pay Act collective.[111] The EPA provides:

> No employer having employees…shall discriminate, *within any establishment in which such employees are employed*, between employees on the basis of sex by paying wages to employees *in such establishment* at a rate less than the rate at which he pays wages to employees of the opposite sex *in such establishment* for *equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions*, except where such payment is made pursuant to…(iv) *a differential based on any other factor other than sex*….

29 U.S.C. § 206(d) (emphasis added). Plaintiffs admit they bear the burden at "Step 2"—"a more 'stringent standard' of proof" than the "low standard" used at "Step 1" conditional certification. Dkt. 702:3; *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). At Step 2:

> the district court will, on a fuller record, determine whether a so-called "collective

---

[111] Claims for failure to promote are not cognizable under the EPA. *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013) ("[T]he EPA does not afford a remedy for denial of promotions. . . .").

action" may go forward by determining whether the plaintiffs who have opted in are in fact "similarly situated" to the named plaintiffs [under 29 U.S.C. § 216(b)].

*Myers*, 624 F.3d at 555; *Publicis*, 2012 WL 2574742, at \*8-9 (S.D.N.Y. June 29, 2012) (EPA).

Plaintiffs' burden is high with a 1,100-member collective: "The 'similarly situated' analysis can be viewed, in some respects, as a sliding scale. The more opt-ins there are in the class, the more the analysis under § 216(b) will mirror the analysis under Rule 23." *Gardner v. W. Beef Prop., Inc.*, 2013 WL 1629299, at \*6 (E.D.N.Y. Mar. 25, 2013); *Scott v. Chipotle Mexican Grill, Inc.*, 2017 WL 1287512, at \*8 (S.D.N.Y. Mar. 29, 2017).[112] Step 1 conditional certification is not binding at Step 2, and courts commonly decertify at Step 2, dismissing opt-ins to pursue claims in their home courts. *Myers*, 624 F.3d at 555; *Zivali*, 784 F. Supp. 2d at 460; *Morano v. Intercont'l Cap. Grp., Inc.*, 2012 WL 2952893, at \*9 (S.D.N.Y. July 17, 2012).[113]

## B. Plaintiffs Fail to Prove They Meet the Heightened Step 2 Certification Standard

### 1. Plaintiffs' Nationwide Collective Violates the EPA's "Establishment" Limitation

Plaintiffs cannot certify a multi-office or nationwide collective. The EPA's prohibition applies only "within any establishment," which presumptively means those within a single site:

(a) [T]he term "establishment"...refers to a distinct physical place of business rather than to an entire business or "enterprise" which may include several separate places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment.

(b) *[U]nusual circumstances* may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions. Barring unusual circumstances, however, the term "establishment" will be applied as described

---

[112] *See also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("the case law has largely merged the [Rule 23 and FLSA Step 2 certification standards], though with some terminological differences.").

[113] As this Court recognized at "Step 1": "Defendant's arguments are more suited to a later, more demanding stage of the proceedings, such as a motion to decertify or for summary judgment. The 'modest factual showing' required for conditional certification requires 'a low standard of proof.' Accordingly, '[a]t this stage, Plaintiffs' assertions are sufficient, but remain vulnerable during a motion for de-certification.'" Dkt. 175 at 15 (internal cites omitted).

in paragraph (a) of this section.

29 C.F.R. § 1620.9 (emphasis added). To be "similarly situated," members of the putative

collective must work in the same "establishment." *See id.*; 29 U.S.C. § 206(d).

Plaintiffs ignore the "establishment" requirement, instead promising in a footnote that,

someday, they "will show that KPMG qualifies as a single establishment…." Br. at 59, n.168.

They fail to do so, much less prove "unusual circumstances." Given its decentralized hiring, pay,

promotions and assignments and job variance, KPMG has at least 90 establishments,[114] requiring

decertification. The court in *Collins v. Dollar Tree Stores, Inc.* decertified a nationwide EPA

collective with a *single* job, despite a common job description, pay ranges and central policies:

> [ ] Plaintiffs likely do not share common facts, even where they work in stores of the
> same grade level, because a different decision-maker determined their pay. Indeed, this
> is precisely why the existence of several establishments presents serious questions
> regarding the appropriateness of a collective action. By its terms, an EPA violation only
> occurs within a single establishment. Thus, the court would necessarily have to
> investigate the pay determination within each establishment if it allowed multiple
> establishments to proceed in this case. This would necessitate hundreds, or, perhaps,
> thousands, depending on [District Manager] turnover, of mini-trials regarding whether
> an EPA violation occurred in each given establishment.

788 F. Supp. 2d 1328, 1331-34 (N.D. Ala. 2011) (citation omitted); *Meeks v. Computer Assocs.*

*Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994) ("establishment" limited to plaintiff's site; offices

decentralized and pay set locally, despite central approval and ranges).[115]

2.  Plaintiffs Fail to Meet Their Burden to Prove the Collective is Similarly Situated

Plaintiffs fail to demonstrate that they and all Opt-Ins are "in fact" similarly situated

under §216(b), irrespective of the number of "establishments." To assess that issue at Step 2:

---

[114] And there are *well over* 90 if each of the hundreds of individual practice areas that make these decentralized decisions is deemed its own "establishment." *See also Toomey v. Car-X Assocs. Corp.*, No. 12 C 4017, 2013 WL 5448047, at *7 (N.D. Ill. Sept. 30, 2013) (no unusual circumstances despite central pay guidelines).

[115] The few cases Plaintiffs cite involve centralization, few sites, and a handful of substantially equal jobs. Br. at 59 n.168; *Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53, 56, 58 (5th Cir. 1975) (one janitor position, essentially identical duties, central school district administration hired, set wages and made assignments for all janitors across 11 schools in district); *Grover v. Smarte Carte, Inc.*, 836 F. Supp. 2d 860, 867-68 (D. Minn. 2011) (single plaintiff case involving single comparator, both senior executives reported to CEO, pay set by same entity).

> [D]istrict courts in this circuit typically look to the (1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment.

*Zivali*, 784 F. Supp. 2d at 460 (internal quote marks omitted); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting efficiency of resolving "common issues of law and fact" from "same" violation).[116] These standards compel decertification. Plaintiffs do not even bother addressing the EPA's "equal work" standard. They instead argue that the procedural "similarly situated" standard somehow supplants it, and make conclusory claims of "similar" work. *Supra* at 10, 15-16, n.40; Br. at 49, 55-56 & n.160-61 (177 rote interrog. answers and testimony alleging "similar" work). But this does violence to the EPA's standards, which Plaintiffs admit must govern certification: "The nature of the 'similarly situated' inquiry depends on the nature of the plaintiffs' claims." *Id.* & 49 n.124.[117]

### a. Disparate Factual and Employment Settings of the Individual Plaintiffs

The EPA's "equal work" standard is "demanding" and focuses on "actual job content; broad generalizations drawn from job titles [or] classifications…cannot suffice." *Port Auth.*, 768 F.3d at 255-56; *Chiaramonte*, 677 F. App'x at 692-93 ("common characteristics" insufficient):

> From the first, the EPA concerned equal pay for—emphatically—equal work. To that end, Congress rejected statutory language encompassing "comparable work" to instead mandate equal pay for "equal work…."

*Port Auth.*, 768 F.3d at 254. The diversity of skills, responsibilities, duties, effort and working conditions across the 1,100 Opt-Ins detailed above and in Dr. Banks' job study defeats

---

[116] As Plaintiffs note, the § 216(b) collective action mechanism also applies under the FLSA and the Age Discrimination in Employment Act ("ADEA"). Cases decertifying FLSA and ADEA collectives due, e.g., to individualized issues are relevant to the EPA. *See* Br. at 48 n.122; *Myers*, 624 F.3d at 554 n.9. But Plaintiffs cannot dilute the EPA's substantive "equal work" standard into a "similar work" standard. *Infra* at 62-64.

[117] *Myers* itself tied the certification showing to the elements of the claim: "*[i]n a FLSA exemption case*, plaintiffs accomplish this by making some showing that 'there are other employees...who are similarly situated with respect to their job requirements and with regard to their pay provisions,' *on which the criteria for many FLSA exemptions are based*…." 624 F.3d at 555 (emphasis added; cite omitted). Plaintiffs' quote to *Myers* also was at Step 1.

certification. *Desilva v. N. Shore-Long Isl. Jewish Health Sys., Inc.*, 27 F. Supp. 3d at 317-18,

323 ("Plaintiffs work or worked in a wide variety of departments at a vast array of locations and

held a diverse collection of positions….Plaintiffs' job duties differed and their compensation—or

lack thereof—for overtime work…likewise differed accordingly.").[118] Many Opt-Ins also admit

that they do *not* do equal work to other Opt-Ins or their male "comparators," fail to identify any

"comparators," or were paid more than their "comparators," making them all "dissimilar." *Supra*

at 8-10, 15-16, n.43; **Kx** 38: 17, 77, 121, 125; *Lavin*, 239 F.3d at 480-81 (also citing cases).[119]

The "work" upon which Plaintiffs rely for "similarity"—*e.g.*, "review work," "manag[e]

engagements," and "take direction" (Br. at 52-55)[120]—is precisely the "bland abstractions" and

"'an attorney is an attorney is an attorney'" argument that the Second Circuit soundly rejected:

> [T]he EEOC alleged that the Port Authority required all of its nonsupervisory attorneys to have similar "experience, training, education, or ability," bar admission, and the capacity to call upon "problem-solving and analytical skills" as well as "professional judgment." However, such bland abstractions—untethered from allegations regarding Port Authority attorneys' *actual* job duties—say nothing about whether the attorneys were required to perform "substantially equal" work. Thus, the EEOC's complaint provides no guidance as to whether the attorneys handled complex commercial matters or minor slip-and-falls, negotiated sophisticated lease and financing arrangements or responded to employee complaints, conducted research for briefs or drafted multimillion-dollar contracts. The EEOC asserts that…"all lawyers perform the same or similar function(s)" and that "most legal jobs involve the same 'skill.'" But accepting such a sweeping generalization as adequate to state a claim under the EPA might permit lawsuits against any law firm—or, conceivably, any type of employer—that does not employ a lockstep pay model.

*Port Auth.*, 768 F.3d at 256-57 (cites omitted). Plaintiffs misleadingly excerpt as well from Dr.

---

[118] *See Zivali*, 784 F. Supp. 2d at 464 (decertifying FLSA collective: "the evidence points to an extremely wide range of company practices in the context of varied factual and employment settings"); *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465 (D.N.J. 1988) (decertifying ADEA collective where termination decisions local and discretionary).

[119] While *Lavin* "express[ed] no opinion" on whether an EPA plaintiff must prove a specific comparator in *every* case, the Second Circuit has emphasized that Lavin herself did so, and affirmed judgments against plaintiffs who do not. *Id.* at 480; *Chiaramonte*, 677 F. App'x. at 689; *Port Auth.*, 768 F.3d at 256; *Byrne v. Tele. Res. Grp., Inc.*, 339 F. App'x. 13, 15-16 (2d Cir. 2009) (summary judgment; plaintiff failed to detail comparator actual duties); *Bastian v. N.Y.C. Dep't of Educ.*, 2008 WL 2930529, at *17 (S.D.N.Y. July 29, 2008) (same; no higher-paid comparator).

[120] *See id.* at 52-53 (Tax employees, *e.g.*, "ensure…the completion of projects"; "manag[e] the working capital of the firm"); *id.* at 53 (Advisory employees, *e.g.*, "help clients improve business performance, leverage information technology"; "prepar[e] work papers, and us[e] the same computer programs; "have strong decision-making skills").

Banks' report and ignore the significant variations she found in actual work. *Supra* at 10 & n.17.

But Opt-Ins contradicted their boilerplate declarations alleging "similar" work at their depositions, *supra* at 8-10, and KPMG need not prove that every Opt-In does different work. Plaintiffs must prove *all* Opt-Ins' "equal work" claims can be resolved with common proof.[121] They have not. Role summaries do not meet Plaintiffs' burden. They expressly state that they cover the "basic function and purpose" of a title, not "each and every task that might be performed," and state that "additional experience/qualifications are typically required…." *Supra* at 34-36; *Tomka*, 66 F.3d at 1310 ("job content and not job title or description" matters). Plaintiffs' claim that employees "easily move around between service lines and functions" also is false and irrelevant. Kx 3: 15-16 ("extreme lack of mobility"); *Port. Auth.*, 768 F.3d at 258 ("transfer of attorneys between divisions supports the inference that some attorneys had multidisciplinary skill sets, not that all…were required to be so skilled."). The use of salary ranges also cannot certify a collective, nor can the boilerplate and unsupported claims of a nebulous "discriminatory policy" that Plaintiffs relied upon at "Step 1." *Supra* at 33-34; *Port Auth.,* 768 F.3d at 258 ("identical evaluative criteria" and salary ranges not probative).[122]

Plaintiffs also fail to submit *any* statistics focused on the Opt-Ins or their "comparators," and the broader class-wide statistics they proffer remain deficient. *Supra* at 16. The Second Circuit emphasized that the regression in *Lavin*, unlike here, was probative (a) "*in conjunction with her identification of a specific male comparator*," and (b) "because the plaintiff offered

---

[121] The fact that Plaintiffs survived a motion to dismiss before *Port Authority* was decided does not make it less relevant or excuse Plaintiffs' failure to meet its requirements at Step 2 decertification. Br. at 60 n.170; Dkt. 69.

[122] *Desilva*, 27 F. Supp. 3d at 317 (must prove "lawful policies are or were consistently and systematically violated in such a way that would be possible to generalize across the 1,196 opt-in Plaintiffs"); *Morano*, 2012 WL 2952893, at *6-7 (while evidence "allows the Court to find a unified policy, plan or scheme of FLSA violations," plaintiffs did not prove "they were all *impacted* by a single decision, policy, or plan") (internal quote marks omitted; emphasis added); *Zivali*, 784 F. Supp. 2d at 463 (plaintiffs must prove "'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment"); *Harper*, 2015 WL 9673810, at *5 (while "policies tend to show how plaintiffs are similarly situated *in theory*, the record…belies that notion *in practice*.").

'substantial evidence' that the comparisons 'isolate[d] comparable positions [to] accurately capture[] equality of skill, effort, and responsibility.'" *Chiaramonte*, 677 F. App'x. at 692 (first quote; emphasis in original) (also rejecting "across-the-board discriminatory pay" statistics that did not "explain what each [employee] did"); *Port Auth.*, 768 F.3d at 256 (second quote); (both quoting *Lavin*, 239 F.3d at 481). Plaintiffs' statistical and non-statistical cases are inapposite.[123]

      *b.   Defenses Available to Defendants Which Appear to be Individual to Each Plaintiff*

      Individualized defenses also abound, including because the EPA permits "a differential based on any other factor other than sex" as to each employee. 29 U.S.C. § 206(d). Defenses include varying performance that affects pay, yet cannot be entirely captured by a rating (*supra* at 12); prior work experience; education; certifications (such as a CPA); and defenses to equitable tolling since many employees knew of the facts underlying their alleged claims well before opting in. Dkt. 355 at 29, 355-1, 355-2; **Kx** 8: 102-04; **Kx** 10: 10-14. *Collins*, 788 F.

---

[123] **Statistical**: Br. at 60; *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) (not an EPA case; statistics used not specified); *Beck-Wilson v. Principi*, 441 F.3d 353, 355-56, 361-64 (6th Cir. 2006) (not a collective action; single position at one site; employer admitted male and female jobs "fungible," so statistics compared equal work); *Maggio v. City Univ. of N.Y.*, 2008 WL 466211, at *2 (E.D.N.Y. Feb. 17, 2008) (not a collective action; notes generically that statistics often used; does not cite or dispute *Lavin*; grants summary judgment for employer).

 **Non-Statistical**: Br. at 48-51, 59 n.168; *Diaz v. S&H Bondi's Dep't Store*, 2012 WL 137460 (S.D.N.Y. Jan. 18, 2012) (Step 1); *Earl v. Norfolk State Univ.*, 2014 WL 6608769, at *7 (E.D. Va. Nov. 18, 2014) (Step 1; cannot cite comparator in dept. with "different skills and responsibilities"); *Ayers v. SGS Control Servs.*, 2007 WL 646326, at *2, 5-6 (S.D.N.Y. Feb. 26, 2007) (FLSA; one job; alleged facially unlawful policies (e.g., "fluctuating workweek") in Employee Manual); *Brackett v. St. Louis Bd. of Police Comm'rs*, 2014 WL 1377460, at *1-3 (E.D. Mo. Apr. 8, 2014) (FLSA; one job, essentially same duties; blanket exemption defense); *Wilks v. Pep Boys*, 2006 WL 2821700, at *1, 4-6 (M.D. Tenn. Sept. 26, 2006), *aff'd*, 278 F. App'x 488 (6th Cir. 2008) (FLSA; employees deemed exempt regardless of duties; strong evidence of uniform pressure not to charge overtime; employer admitted policies applied nationally); *Wilkerson v. Martin Marietta Corp.*, 875 F. Supp. 1456, 1461-62 (D. Colo. 1995) (ADEA; layoffs of older workers as centralized practice; early decision barely discussing "similarly situated" standard or facts); *Jacob v. Duane Reade, Inc.*, 2016 WL 3221148, at *8 (S.D.N.Y. June 9, 2016) (FLSA; one position, one state; extensive evidence all managers did same work; blanket exemption); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 480-83 (E.D.N.Y. 2001) (ADEA; layoff of single union job type (engineer) at one plant; claims based on labor agreement; proof that leadership orchestrated layoffs and made age-biased remarks); *Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1062-66 (N.D. Ind. 2012) (FLSA; 3 hourly opt-ins at one store; other stores decertified; duties not focus of claims); *Alonso v. Uncle Jack's Steakhouse, Inc.*, 2011 WL 4389636, at *1-3 (S.D.N.Y. Sept. 21, 2011) (FLSA; tip-eligible workers at three local restaurants; uniform policies alleged to be illegal, e.g., deducting service charges from tips); *Perkins v. S. New Eng. Tel. Co.*, 669 F. Supp. 2d 212, 214, 218-20 (D. Conn. 2009) (FLSA; one position; duties shown to be "similar"; blanket exemption); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (FLSA; one job type (adjuster); 71 opt-ins seeking overtime for two local projects; blanket exemption).

Supp. 2d at 1345 (decertifying based in part on "distinct defenses"); *cf. Zivali*, 784 F. Supp. 2d at 468 (decertifying FLSA collective where manager knowledge of violations varied).[124]

   c.   *Fairness and Procedural Considerations Warrant Decertification*

The *Desilva* court's words ring equally true here: "If the Court were to follow Plaintiffs' [collective] approach, it would be left in the untenable position of either having to hold, in effect, 1,196 mini-trials, or depriving Defendants of their due process right to present its full defense." 27 F. Supp. 3d at 327-28. Bifurcation and subclasses are not solutions. *Supra* at 56 & n.105; *Zivali*, 784 F. Supp. 2d at 468 (no bifurcation; "testimony…cannot be fairly extrapolated to the 4,100" opt-ins); *Desilva*, 27 F. Supp. 3d at 320 (no bifurcation or subclasses; "not susceptible to generalized proof").[125] Plaintiffs' EPA claims should be decertified and the Opt-Ins dismissed.

## CONCLUSION

KPMG therefore respectfully requests that the Court entirely deny Plaintiffs' Motion.

Respectfully submitted: Attorneys for Defendant KPMG LLP   Dated: April 27, 2018

| **SIDLEY AUSTIN LLP** | **OGLETREE, DEAKINS, NASH,** | **CONSTANGY, BROOKS,** |
|---|---|---|
| By:  *s/Colleen M. Kenney* | **SMOAK & STEWART, P.C.** | **SMITH & PROPHETE, LLP** |
| Colleen M. Kenney (pro hac) | By:  *s/Peter O. Hughes* | By: *s/Steven W. Moore* |
| Jonathan D. Lotsoff (pro hac) | Diane M. Saunders | Steven W. Moore (pro hac) |
| Wendy Lazerson | Peter O. Hughes (pro hac) | Stacy D. Mueller (to be pro hac) |
| John G. Levi (pro hac) | Chris R. Pace (pro hac) | smoore@constangy.com |
| ckenney@sidley.com | diane.saunders@ogletreedeakins.com | smueller@constangy.com |
| jlotsoff@sidley.com | peter.hughes@ogletreedeakins.com | Dominion Towers |
| wlazerson@sidley.com | chris.Pace@ogletreedeakins.com | 600 17th Street, Suite 2700-S |
| jlevi@sidley.com | 1745 Broadway, 22nd Floor | Denver, CO 80202 |
| One South Dearborn St. | New York, NY 10019 | 720.343.7540 |
| Chicago, IL 60603 | 212.492.2500 | Fax: 720.343.7541 |
| 312.853.7000 | Fax: 212.492.2501 | |
| Fax: 312.853.7036 | | |

---

[124] Dkt. 429 ("The propriety of individualized challenges to timeliness or equitable tolling will be decided if and when KPMG raises them, and after both parties have had the opportunity to brief the issue.").

[125] *See Harper*, 2015 WL 9673810, at *6 (decertifying: "it would either prejudice defendants' ability to present their defenses, or require mini-trials for each of the opt-in plaintiffs."); *Morano*, 2012 WL 2952893, at *7 (same); *Gardner*, 2013 WL 1629299, at *12 (same); *Scott*, 2017 WL 1287512, at *9 ("efficiency…cannot be obtained at the expense of a defendant's due process rights.") (internal quote marks omitted).

ACTIVE 231617528